E-filing          CV 08        2933

                                      JSW

                                        (PR)

EXHIBIT A

State of California

# California Code of Regulations

# Title 15.  Crime Prevention and Corrections



Division 3

## Department of Corrections and Rehabilitation

Chapter 1

*Rules and Regulations of*

Adult Operations and Programs

Updated through July 12, 2006

27

4-2

# DIVISION 3.   DEPARTMENT OF CORRECTIONS

## CHAPTER 1.   RULES AND REGULATIONS OF THE DIRECTOR OF CORRECTIONS

HISTORY:
1. Change without regulatory effect repealing preface filed 10-29-90 pursuant to section 100, title 1, California Code of Regulations (Register 91, No. 6).

### Article 1.   Behavior

**3000.  Definitions.**

The following are definitions of terms as used in these regulations:

Adverse Witness means a person who has given or will give information against a prisoner or parolee.

Appeal means a formal request for, or the act of requesting, an official change of a decision, action, or policy.

Appeal Form means Inmate/Parolee Appeal Form, CDC Form 602 (Rev. 12/87).

Architectural and Engineering Services means those services procured outside of the State's Civil Service procedures and which are rendered by an architect or engineer, but may include ancillary services logically or justifiably performed in connection therewith.

Asylum State means the state other than California in which a parolee-at-large is in custody.

Attempted Escape means an unsuccessful effort to breach a secured perimeter or the use of force against a person to attempt access into an unauthorized area. Some progress toward implementing an escape must be made to implement a plan. This includes, but is not limited to the following overt acts: acquiring unauthorized clothing or identification, preparing a hiding place in an unauthorized area, lying in wait for a potential hostage, attempting access to a perimeter that was unsupervised, unlawfully obtaining tools to aid in an escape, manufacturing a likeness of a person in order to substitute for the inmate's presence, or receiving assistance from other conspirators who acted upon an escape plan, e.g. a plan to escape uncovered from verbal, telephone or mail communication.

Board of Prison Terms (Board) means the state agency which is responsible for the administration of parole for those persons committed to the department under Penal Code section 1168 and those committed under Penal Code section 1170 who also meet the criteria found in Penal Code section 2962.

California Agency Parolee means a person released from department facility to parole supervision in a California community who subsequently is within the custody of any California agency, or subdivision thereof, except the department.

California Agency Prisoner means a prisoner who has been transferred from the custody of the department to the custody of any other California agency or subdivision thereof.

California Concurrent Parolee means a person on parole for a California sentence and a sentence of another jurisdiction who is being supervised in a California community pursuant to the Uniform Act for Out-of-State Parole Supervision (Penal Code sections 11175–11179).

Case Conference means a documented conference between a parole agent and his/her supervisor to discuss a parolee's behavior.

Case records file means the file which contains the information concerning an inmate which is compiled by the department pursuant to Penal Code Section 2081.5 and includes such components as the central file, education file, visiting file and parole field file.

Central File (C-File) means a master file maintained by the department containing records regarding each person committed to its jurisdiction.

Central Office Calendar means the calendar which is composed of administrative hearing officers as designated by the deputy director, parole hearings division. They are authorized to make decisions regarding matters reported to the parole hearings division, including the decision to order a hearing scheduled.

Central Office Hearing Coordinator means the parole hearings division employee at headquarters who is responsible for hearing schedules, attorney appointments, and other hearing-related services.

Certification means that a business concern has obtained verification that it meets the definition of disabled veteran business enterprise pursuant to Military and Veterans Code section 999(g) from an agency that has been authorized by law to issue such certification.

Chaplain means an individual duly designated by a religious denomination to discharge specified religious duties, including a native American Indian spiritual leader.

Chronological History means a CDC Form 112 (Rev. 9/83), Chronological History, prepared for each inmate, upon which significant dates and commitment information affecting the inmate are logged.

Classification and Parole Representative (C&PR) means the department employee designated at each institution to be that institution's liaison with releasing boards and parole staff.

Concurrent Parolee means a person on parole for a California sentence and a sentence of another jurisdiction who is being supervised in a state other than California pursuant to the Uniform Act for Out-of-State Parole Supervision (Penal Code sections 11175–11179).

Conditions of Parole mean the specific conditions under which a prisoner is released to parole supervision.

Confinement to Quarters (CTQ) means an authorized disciplinary hearing action whereby an inmate is restricted to their assigned quarters for a period not to exceed five days for administrative rule violations and ten days for serious rule violations.

Contraband means anything which is not permitted, in excess of the maximum quantity permitted, or received or obtained from an unauthorized source.

Controlled Medication means any drug which is prescribed by a physician and is given to an inmate in controlled dosages.

Controlled Substance means any substance, drug, narcotic, opiate, hallucinogen, depressant, or stimulant as defined by California Health and Safety Code section 11007.

Cooperative Parolee means a person on parole for a California sentence who is under parole supervision in a state other than California pursuant to the Uniform Act for Out-of-State Parole Supervision (Penal Code sections 11175–11179).

Course of conduct means two or more acts over a period of time, however short, evidencing a continuity of purpose.

Criminal Identification and Investigation (CI&I) Report means the report defined by Penal Code section 11105, commonly referred to as "Rap Sheet".

Cumulative Case Summary means the cumulative summary of specific portions of the record maintained by the department regarding each prisoner from reception to discharge.

Department means the department of corrections.

Designated Level II Housing means a housing facility encompassed by a facility security perimeter and constructed to provide celled housing for inmates with Level II classification scores.

Detainer means a written document received from an official representing a district attorney office, court, or correctional or law enforcement agent which indicates that an inmate is wanted by that office and the basis for the detainer.

Determinate Sentencing Law (DSL) Prisoner means a person sentenced to prison under Penal Code section 1170 for a crime committed on or after July 1, 1977.

Direct and Constant Supervision means an inmate shall be monitored and observed by CDC staff, either custody staff or work supervisor as indicated in these regulations, sufficiently to account for the specific whereabouts of the inmate at all times.

Director means the director of the department of corrections.

Disabled Veteran Business Enterprise means a business concern as defined in Military and Veterans Code section 999(g).

Disabled Veteran Business Enterprise focus paper means a publication that meets all of the following criteria: (1) has an orientation relating to the disabled veteran business enterprise; (2) is known and utilized by members of the disabled veteran business enterprise community; (3) primarily offers articles, editorials (if any), and advertisements of business opportunities aimed at disabled veteran business enterprises; and (4) is readily available within the geographical area for which the advertisement is placed and for which the services are to be performed.

Disabled Veteran Business Enterprise focus paper and trade paper means a publication that meets all of the criteria of a disabled veteran business enterprise focus paper and all of the criteria of a trade paper.

Disciplinary Detention means a temporary housing status which confines inmates so assigned to designated rooms or cells for prescribed periods of time as punishment for serious rule violations.

Disciplinary Free means without any finding of guilt of a disciplinary infraction filed on a CDC Form 115, Rule Violation Report, classified as either administrative or serious.

Disruptive Group—means any gang, other than a prison gang.

Distribution means the sale or unlawful dispersing, by an inmate or parolee, of any controlled substance; or the solicitation of or conspiring with others in arranging for, the introduction of controlled substances into any institution, camp, contract health facility, or community correctional facility for the purpose of sales or distribution.

Drugs means substances intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease, and as defined in Health and Safety Code section 11014. In may also include drug paraphernalia, as defined in Health and Safety Code section 11014.5.

Escape History refers to any reliable information or inmate self-admission in the central file on an escape, attempted escape, walkaway, or plan to escape. The available information describing the circumstances of the escape or attempted escape shall be evaluated in determining the level of risk to correctional safety and security posed by the inmate.

Examinee means a person who voluntarily takes a polygraph examination.

Ex-Offender means a person previously convicted of a felony in California or any other state, or convicted of an offense in another state which would have been a felony if committed in California.

Execution Type Murder describes the circumstances or manner of a fatal offense in which the victim is bound, cuffed, gagged, blindfolded, or forced to assume a position from which the victim is unable to resist or flee; the victim is shot at close range; or the manner of death demonstrates that the victim had no opportunity to defend himself or herself nor to flee.

Facility Security Perimeter is any combination of living unit, work area and recreation area perimeters that is set aside to routinely restrict inmate movement based on custody level. This perimeter will contract and expand depending upon the weather, lighting conditions and hours of operation.

Federal Consecutive Prisoner means a California prisoner who is also under sentence of the United States and is confined in a federal correctional facility, and whose California term shall commence upon completion of the United States' sentence.

Field File means a working file maintained by a parole unit office containing information about a parolee and his/her current parole.

Firm means any individual, firm, partnership, corporation, association, joint venture or other legal entity permitted by law to practice the professions of architecture, landscape architecture, engineering, environmental services, land surveying or construction project management.

Force, as applied to escape or Attempted Escape, refers to physical contact or threat of physical harm against a person to enable or attempt the escape.

Frequent and Direct Supervision means that staff supervision of an inmate shall be sufficient to ensure that the inmate is present within the area permitted.

Friendly Witness means any witness who is not an adverse witness.

Gang means any ongoing formal or informal organization, association or group of three or more persons which has a common name or identifying sign or symbol whose members and/or associates, individually or collectively, engage or have engaged, on behalf of that organization, association or group, in two or more acts which include, planning, organizing threatening, financing, soliciting, or committing unlawful acts or acts of misconduct classified as serious pursuant to section 3315.

General Chrono means a CDC Form 128-B (Rev. 4–74) which is used to document information about inmates and inmate behavior. Such information may include, but is not limited to, documentation of enemies, records of disciplinary or classification matters, pay reductions or inability to satisfactorily perform a job, refusal to comply with grooming standards, removal from a program, records of parole or social service matters.

Goal means a numerically expressed disabled veteran business enterprise objective as set out in Public Contract Code section 10115(c), that awarding departments and contractors are required to make efforts to achieve.

Good Cause means a finding based upon a preponderance of the evidence that there is a factual basis and good reason for the decision made.

Good Faith Effort means a concerted effort on the part of a potential contractor to seek out and consider disabled veteran-owned and operated business enterprises as potential contractors, and/or subcontractors in order to meet the program participation goals.

Grievance means a complaint about a decision, action, or policy which an inmate, parolee or staff wish to have changed.

Harassment means a willful course of conduct directed at a specific person, group, or entity which seriously alarms, annoys, or terrorizes that person, group, or entity and which serves no legitimate purpose.

Hearing Agent means the parole and community services division employee responsible for application of specific procedures pertaining to the parole revocation hearing process; the primary liaison between the parole and community services division and the releasing authorities in matters and procedures pertaining to the parole revocation hearing process.

Hearing Coordinator means an employee assigned to coordinate the revocation process within an institution or a parole and community services division region.

High Notoriety describes an inmate who must be treated as a significant escape risk due to the unusual level of public panic that his or her escape would likely cause. The risk of public panic is based upon the nature or circumstance of the inmate's crime, the inmate's criminal history, the inmate's behavior in custody, and extensive or prolonged media coverage of the crime beyond the closest large city and its surrounding communities. A High

A-4

30. Definitions added for "Chaplain," "Religious Artifact," and "Sweat Lodge" and amendment of Note filed 11-1-93; operative 12-13-93 (Register 93, No. 45).

31. Amendment adding "Ex-Offender" filed 11-30-93; operative 12-30-93 (Register 93, No. 49).

32. Certificate of Compliance as to 7-29-93 order transmitted to OAL 11-18-93 and filed 12-31-93 (Register 94, No. 1).

33. Certificate of Compliance as to 10-18-93 order transmitted to OAL 2-15-94 and filed 3-16-94 (Register 94, No. 11).

34. Amendment of "Inmate," new definition "Serious injury", and amendment of Note filed 5-5-95; operative 6-5-95 (Register 95, No. 18).

35. Amendment of "Institution Head" filed 9-13-96 as an emergency; operative 9-13-96. A Certificate of Compliance must be transmitted to OAL by 2-24-97 or emergency language will be repealed by operation of law on the following day.

36. Amendment adding definition of "Certification" filed 11-22-96 as an emergency; operative 11-22-96 (Register 96, No. 47). A Certificate of Compliance must be transmitted to OAL by 5-1-97 pursuant to Penal Code section 5058(e) or emergency language will be repealed by operation of law on the following day.

37. Certificate of Compliance as to 9-13-96 order transmitted to OAL 11-22-96 and filed 1-6-97 (Register 97, No. 2).

38. Certificate of Compliance as to 11-22-96 order, including amendment of definition of "Certification," transmitted to OAL 3-20-97 and filed 5-1-97 (Register 97, No. 18).

39. Amendment adding definitions of "Lockdown" and "Restricted or controlled inmate movement" filed 10-16-97; operative 11-15-97 (Register 97, No. 42).

40. Amendment adding definition of "Program failure" filed 10-16-97 as an emergency; operative 10-16-97 (Register 97, No. 42). Pursuant to Penal Code section 5058(e), a Certificate of Compliance must be transmitted to OAL by 3-25-98 or emergency language will be repealed by operation of law on the following day.

41. Amendment adding definition of "Vexatious Litigant" and amending Note filed 11-12-97 as an emergency; operative 11-12-97 (Register 97, No. 46). A Certificate of Compliance must be transmitted to OAL by 3-13-98 or emergency language will be repealed by operation of law on the following day.

42. Editorial correction of definition of "Vexatious Litigant" and Histories 40 and 41 (Register 98, No. 18).

43. Amendment adding definition of "Vexatious Litigant" and amending Note refiled 4-29-98 as an emergency; operative 4-29-98 (Register 98, No. 18). A Certificate of Compliance must be transmitted to OAL by 10-6-98 or emergency language will be repealed by operation of law on the following day.

44. Certificate of Compliance as to 10-16-97 order, including removal of definition of "Program failure" to section 3062(n), transmitted to OAL 3-23-98 and filed 5-4-98 (Register 98, No. 19).

45. Certificate of Compliance as to 4-29-98 order, including further amendment of definition of "Vexatious Litigant" and Note, transmitted to OAL 6-12-98 and filed 7-21-98 (Register 98, No. 30).

46. Amendment adding new definitions of "Controlled Medication," "Controlled Substance," "Distribution" and "Laboratory" and amendment of Note filed 8-27-98 as an emergency; operative 8-27-98 (Register 98, No. 35). A Certificate of Compliance must be transmitted to OAL by 2-3-99 or emergency language will be repealed by operation of law on the following day.

47. Amendment filed 11-13-98 as an emergency; operative 11-13-98 (Register 98, No. 46). A Certificate of Compliance must be transmitted to OAL by 3-15-99 or emergency language will be repealed by operation of law on the following day.

48. Amendment adding new definitions of "Controlled Medication," "Controlled Substance," "Distribution" and "Laboratory" and amendment of Note refiled 2-3-99 as an emergency; operative 2-3-99 (Register 99, No. 6). Pursuant to Penal Code section 5058(e), a Certificate of Compliance must be transmitted to OAL by 7-13-99 or emergency language will be repealed by operation of law on the following day.

49. Certificate of Compliance as to 11-13-98 order transmitted to OAL 2-10-99 and filed 3-8-99 (Register 99, No. 11).

50. Certificate of Compliance as to 2-3-99 order transmitted to OAL 5-12-99 and filed 6-24-99 (Register 99, No. 26).

51. Amendment filed 3-27-2000 as an emergency; operative 3-27-2000 (Register 2000, No. 13). Pursuant to Penal Code section 5058(e), a Certificate of Compliance must be transmitted to OAL by 9-5-2000 or emergency language will be repealed by operation of law on the following day.

52. Amendment of definition of "Chronological History" filed 8-28-2000; operative 9-27-2000 (Register 2000, No. 35).

53. Certificate of Compliance as to 3-27-2000 order transmitted to OAL 9-5-2000; disapproval and order of repeal and deletion reinstating section as it existed prior to emergency amendment by operation of Government Code 11346.1(f) filed 10-18-2000 (Register 2000, No. 42).

54. Amendment filed 10-19-2000 deemed an emergency pursuant to Penal Code section 5058(e); operative 10-19-2000 (Register 2000, No. 42). Pursuant to Penal Code section 5058(e), a Certificate of Compliance must be transmitted to OAL by 3-27-2001 or emergency language will be repealed by operation of law on the following day.

55. Amendment adding definition of "General Chrono" filed 11-16-2000; operative 12-16-2000 (Register 2000, No. 46).

56. Certificate of Compliance as to 10-19-2000 order, including further amendment of definitions of "Execution Type Murder," "High Notoriety" and "Public Interest Case," transmitted to OAL 3-27-2001 and filed 5-3-2001 (Register 2001, No. 18).

57. Amendment of definitions of "Firm" and "Small Business Firm" and amendment of Note filed 7-12-2002; operative 8-11-2002 (Register 2002, No. 28).

58. Amendment adding definition of "Street gang" and amendment of Note filed 8-27-2002 as an emergency; operative 8-27-2002 (Register 2002, No. 35). Pursuant to Penal Code section 5058.3 a Certificate of Compliance must be transmitted to OAL by 2-4-2003 or emergency language will be repealed by operation of law on the following day.

59. Certificate of Compliance as to 8-27-2002 order transmitted to OAL 1-21-2003 and filed 3-6-2003 (Register 2003, No. 10).

60. Amendment adding definitions of "Program failure" and "Significant work related disciplinary history" filed 1-9-2004 as an emergency; operative 1-9-2004 (Register 2004, No. 2). Pursuant to Penal Code section 5058.3, a Certificate of Compliance must be transmitted to OAL by 6-17-2004 or emergency language will be repealed by operation of law on the following day.

61. Amendment adding definitions of "Program failure" and "Significant work related disciplinary history" refiled 6-17-2004 as an emergency; operative 6-17-2004 (Register 2004, No. 25). Pursuant to Penal Code section 5058.3, a Certificate of Compliance must be transmitted to OAL by 11-24-2004 or emergency language will be repealed by operation of law on the following day.

62. Certificate of Compliance as to 6-17-2004 order transmitted to OAL 11-16-2004 and filed 12-29-2004 (Register 2004, No. 53).

63. New definition of "Religious Review Committee (RRC)" filed 1-17-2006 as an emergency; operative 1-17-2006 (Register 2006, No. 3). Pursuant to Penal Code section 5058.3, a Certificate of Compliance must be transmitted to OAL by 6-26-2006 or emergency language will be repealed by operation of law on the following day.

64. Amendment of definition of "Program failure" filed 6-9-2006; operative 7-9-2006 (Register 2006, No. 23).

65. Certificate of Compliance as to 1-17-2006 order transmitted to OAL 6-22-2006 and filed 7-27-2006 (Register 2006, No. 30).

**3000.5.  Rules of Construction.**

The following rules of construction apply to these regulations, except where otherwise noted:

(a) The enumeration of some criteria for the making of discretionary decisions does not prohibit the application of other criteria reasonably related to the decision being made.

A-5

(b) The order in which criteria are listed does not indicate their relative weight or importance.

(c) "Shall" is mandatory, "should" is advisory, and "may" is permissive.

(d) The past, present, or future tense includes the others.

(e) The masculine gender includes the feminine gender; the singular includes the plural.

(f) The time limits specified in these regulations do not create a right to have the specified action taken within the time limits. The time limits are directory, and the failure to meet them does not preclude taking the specified action beyond the time limits.

NOTE: Authority cited: section 5058 and Stats. 1992, ch. 695, sec. 45. Reference: Sections 3000 and 5054, Penal Code.

HISTORY:

1. New section filed 9-3-93; operative 9-3-93 pursuant to Government Code section 11346.2(d) (Register 93, No. 36).

### 3001.  Subject to Regulations.

Regardless of commitment circumstances, every person confined or residing in facilities of the department is subject to the rules and regulations of the director, and to the procedures established by the warden, superintendent, or parole region administrator responsible for the operation of that facility. Persons on parole or civil addict outpatient status are subject to such director's rules, regulations and parole region procedures as may be applicable to such persons.

### 3001.5.  Assignment to Caseworker.

Upon reception at a facility, each inmate shall be assigned a caseworker.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Sections 5054 and 5068, Penal Code.

HISTORY:

1. New section filed 10-15-92; operative 11-16-92 (Register 92, No. 42).

### 3002.  Notice of Program, Behavioral, and Participation Expectations.

(a) Within 14 days of reception by the Department of Corrections or upon return to confinement in a departmental institution or facility, every inmate or parolee shall be issued a copy of the Rules and Regulations of the Director of Corrections and copies of all rule changes that have occurred since the last complete reprinting and reissue of the rules and regulations. Each inmate and parolee shall sign a receipt for the rules. The receipt shall be filed as a permanent record in the inmate's central file. In addition:

(1) Spanish language copies of the rules and regulations of the director shall be maintained at each reception center, institution and facility where inmates are confined. Notice shall be given in Spanish that a Spanish version of the rules is available for inspection. These rules shall be made available for review by Spanish speaking inmates who cannot read English.

(2) Within 14 days of transfer to another departmental institution or facility, the new arrival shall be given a written summary of local procedures governing the conduct and activities of inmates confined at that location and a summary of the range of work and training programs offered by and available at that institution or facility. The summary or summaries shall also include: procedures governing mail and visiting, the inmate's right to appeal and appeal procedures, the facility's basic daily schedule, and where and how additional procedural information of interest may be obtained. New arrivals shall also be given verbal staff instructions regarding the procedures.

Staff instructions shall also be given to newly received inmates regarding the possibility of receiving a one-minus reduction of their sentence or minimum eligible parole date for refraining from acts or activities of misbehavior and by participating in assigned work and program activities.

(b) During regularly scheduled institution and reception center inmate orientation sessions each inmate or parolee shall be advised of the following:

(1) The ability to earn credits by participating in assigned work and program activities; and,

(2) The availability of work and program activities; and,

(3) The possible loss of credits resulting from acts or activities of misbehavior; and,

(4) The availability of and procedures for access to health care including daily sick call procedures.

(5) Reception centers shall incorporate the inmate's acknowledgement of the receipt of the summary of reception center work and program activities in the same form used as a receipt for issue of the rules and regulations to the inmate.

(6) When inmates are placed in specialized housing with specialized or limited program options and opportunities to participate, the initial classification committee shall explain the options and opportunities available to the inmate within that specialized unit. A copy of the committee's chrono reflecting the discussion shall be given to the inmate and a copy placed in the inmate's central file.

(7) The facility location where Board of Prison Terms' Rules may be reviewed by the inmate.

(8) Available institution social services.

(c) The issuance of rules and regulations and program information, summaries, and the inmate's receipt for same is required in order to comply with Sections 2080 and 2930 of the Penal Code. An inmate's refusal to sign a receipt for the issue of rules and regulations, work and program summaries, or work and program agreements or understandings, shall be noted by staff, and the receipt shall be filed in the inmate's central file. Refusal or failure to acknowledge the receipt of information shall not relieve the inmate from any responsibility to behave and participate as expected nor from the consequence for misbehavior or refusal or failure to participate.

(d) Each institution and reception center shall provide a means of advising inmates who cannot read English of the expectations contained in this section. The provisions shall include communication of the expectations to those inmates who also have impaired hearing.

NOTE: Authority cited: section 5058, Penal Code. Reference: Sections 2080, 2930, 2931 and 5054, Penal Code.

HISTORY:

1. Amendment filed 2-24-77; effective thirtieth day thereafter (Register 77, No. 9).

2. Amendment filed 5-13-77; effective thirtieth day thereafter (Register 77, No. 20).

3. Amendment filed 5-4-83; designated effective 6-1-83 pursuant to Government Code section 11346.2(d) (Register 83, No. 19).

4. Amendment of subsections (a), (b) and new subsection (d) filed 2-8-88; operative 3-9-88 (Register 88, No. 7).

5. Editorial correction of printing errors in subsections (a)(1) and (b)(3) (Register 92, No. 5).

6. New subsections (b)(7)–(8) filed 10-15-92; operative 11-16-92 (Register 92, No. 42).

### 3003.  Threats Against Public Officials.

Any inmate away from a secure perimeter facility or parolee who makes a written or verbal threat against the life of any official specified in Penal Code section 76 with the intent and apparent ability to carry out the threat shall immediately be placed in custody at a jail or secure perimeter facility pending disposition of the charges.

NOTE: Authority cited: section 5058, Penal Code. Reference: Sections 76, 3056, 5054, and 6253, Penal Code.

HISTORY:

1. New section filed 10-18-93; operative 11-17-93 (Register 93, No. 43). For prior history, see Register 89, No. 41.

*A-6*

10. Amendment of section heading, first paragraph and Note filed 8-27-2002 as an emergency, operative 8-27-2002 (Register 2002, No. 35). Pursuant to Penal Code section 5058.3 a Certificate of Compliance must be transmitted to OAL by 2-4-2003 or emergency language will be repealed by operation of law on the following day.

11. Certificate of Compliance as to 8-27-2002 order transmitted to 1-21-2003 and filed 3-6-2003 (Register 2003, No. 10).

**3377.1. Inmate Custody Designations.**

(a) Designation of a degree of an inmate's custody shall be reasonably related to legitimate penological interests. The CDC uses the following inmate custody to establish where an inmate shall be housed and assigned, and the level of staff supervision to ensure institutional security and public safety:

Maximum Custody,

Close A Custody,

Close B Custody,

Medium A Custody,

Medium B Custody,

Minimum A Custody,

Minimum B Custody,

(1) Maximum Custody.

(A) Housing shall be in cells in an approved segregated program housing unit as described in CCR Section 3335 and CCR subsections 3341.5(b) and 3341.5(c).

(B) Assignments and activities shall be within the confines of the approved segregated program housing unit.

(C) An inmate designated as Maximum Custody shall be under the direct supervision and control of custody staff.

(2) Close A Custody Male Inmates.

(A) Housing shall be in cells within Level III and Level IV facilities in housing units located within an established facility security perimeter.

(B) Close A Custody inmates shall be permitted to participate in program assignments and activities scheduled within the hours of 0600 hours to 1800 hours unless hours are extended by the Warden to no later than 2000 hours when it is determined that visibility is not compromised in areas located within the facility security perimeter. Bases for the extended hours include operational necessity, daylight savings time, or availability of high mast lighting. Close A Custody inmates are not permitted beyond the work change area.

(C) Custody staff supervision shall be direct and constant. In addition to regular institutional counts, Close A Custody male inmates shall be counted at noon each day.

(3) Close A Custody Female Inmates.

(A) Housing shall be in cells or in a designated Close Custody dormitory.

(B) Close A Custody female inmates shall be permitted to participate in program assignments and activities scheduled within the hours of 0600 hours to 1800 hours unless hours are extended by the Warden to no later than 2000 hours when it is determined that visibility is not compromised in areas located within the facility security perimeter and the work change area. Bases for the extended hours include operational necessity, daylight savings time, or availability of high mast lighting.

(C) Custody staff supervision shall be direct and constant. In addition to regular institutional counts, Close A Custody female inmates shall be counted at noon each day.

(4) Close B Custody Male Inmates.

(A) Housing shall be in cells within designated institutions in housing units located within an established facility security perimeter.

(B) Close B Custody inmates shall be permitted to participate in program assignments and activities during the hours of 0600 hours to 2000 hours in areas located within the facility security perimeter including beyond the work change area in a designated Level II,

Level III or Level IV institution. Close B Custody inmates may participate in designated work program assignments until 2200 hours when the work program is in an assigned housing unit located within the facility security perimeter. Close B Custody inmates may participate in limited evening activities after 2000 hours until the general evening lockup and count when the limited activity is in a designated housing unit located within the facility security perimeter.

(C) The work supervisor shall provide direct and constant supervision of Close B Custody inmates during the inmates' assigned work hours.

(D) Custody staff shall provide direct and constant supervision of Close B Custody inmates at all times.

(5) Close B Custody Female Inmates.

(A) Housing shall be in cells or in a designated Close Custody dormitory located within an established facility security perimeter.

(B) Close B Custody female inmates shall be permitted to participate in program assignments and activities during the hours of 0600 hours to 2000 hours in areas located within the facility security perimeter, including beyond the work change area, in designated Level II, Level III and Level IV institutions.

Close B Custody female inmates may participate in work program assignments until 2200 hours when the work program is in an assigned housing unit located within the facility security perimeter. Close B Custody female inmates may participate in limited evening activities after 2000 hours until the general evening lockup and count when the limited activity is in an assigned housing unit located within the facility security perimeter.

(C) The work supervisor shall provide direct and constant supervision of Close B Custody inmates during the inmates' assigned work hours.

(D) Custody staff shall provide direct and constant supervision of Close B Custody inmates at all times.

(6) Medium A Custody.

(A) Housing shall be in cells or dormitories within the facility security perimeter.

(B) Assignment and activities shall be within the facility security perimeter.

(C) Supervision shall be frequent and direct.

(7) Medium B Custody.

(A) Housing shall be in cells or dormitories within the facility security perimeter.

(B) Assignments and activities shall be within the facility security perimeter. Inmates may be given daytime assignments outside the facility security perimeter but must remain on facility grounds.

(C) Custody staff shall provide frequent and direct supervision inside the facility security perimeter. Custody staff shall provide direct and constant supervision outside the facility security perimeter.

(8) Minimum A Custody.

(A) Housing shall be in cells or dormitories within the facility security perimeter.

(B) Assignments and activities may be inside or outside the facility security perimeter.

(C) Staff supervision shall consist of at least hourly observation if assigned outside the facility security perimeter. Sufficient staff supervision of the inmate shall be provided to ensure the inmate is present if assigned inside the facility security perimeter.

(9) Minimum B Custody.

(A) Housing may be in cells or dormitories on facility grounds, in a camp, in a Minimum Support Facility (MSF) or in a community based facility such as a Community Correctional Facility.

(B) Assignments and activities include eligibility for work or program assignments located either on or off institutional grounds.

**EXHIBIT B**

B-1

|  | **CORRECTIONAL TRAINING FACILITY OPERATIONS PROCEDURE #34** | **Subject: ICC & UCC REVIEWS/CLOSE CUSTODY/SPECIAL ASSIGNMENTS** |
|---|---|---|
| | | **Reference:** DOM 62010, 62040 & 11010 |
| | | **Revision Due Date: JULY 2007** |
| | | **Responsibility: CDW-CENTRAL & CDW-NORTH/SOUTH** |

## INITIAL SCREENING OF NEW ARRIVALS:

Upon arrival at the Correctional Training Facility (CTF), an inmate shall be screened for an appropriate housing assignment. A staff member at the level of Correctional Lieutenant or above is designated as the Screening Authority. In rare cases where a Correctional Lieutenant is unavailable, a Correctional Sergeant trained in Tri-Plex screening may be designated as the alternate Screening Authority. During initial screening of new arrivals, the Screening Authority shall check the CDC 840 for endorsement, CDC 812 and 812C for documented enemies at CTF prior to approving release to the general population. The Screening Authority shall also thoroughly review the central file or available documentation, interview the inmate, and complete a CTF Form 128-B Triplex Housing Review [Attachment #A], making the necessary distribution of the form.

During initial screening, reviewing staff are responsible for evaluating each inmate on a case-by-case basis for either dormitory or celled housing. A CDC 1882 Form [Attachment # B] (Initial Housing Review) shall be completed for each inmate. In the event that double celling in Administrative Segregation (Ad/Seg) is required, staff shall complete a CDC 1882-B Form [Attachment # C] (Ad/Seg Unit/Security Housing Unit Double Cell Review). Based on the available information and the interview with the inmate, the Screening Authority shall determine if the inmate is suitable for cell housing with or without special restrictions. Restrictions are any case factors which may limit the inmate's placement options at the institution. Such as gang affiliation, health or psychiatric concerns, disciplinary behavior, nature of commitment offense, age, social factors, etc.

Upon completion of the review, the Screening Authority will complete the CTF Housing chrono 128-B, identifying the inmate to be eligible for Single or Double-Cell assignment.

## DOUBLE-CELLING:
It is the expectation of the Department that inmates will double-cell and accept housing assignments as directed by staff.

Precluding factors to double-celling an inmate would be, but are not limited to, the following factors:

- History of predatory and/or repeated in-cell attempts to physically or sexually abuse another inmate.
- A significant background of fights/violence toward previous cell partners, a single act of mutual combat does not warrant single cell status.
- The inmate may be extremely vulnerable due to his limited physical stature or degree of mental illness.
- A history of sexual assaultive behavior toward other inmates.
- Inmate has an "S" suffix.
- If the inmate's affiliation with any prison gang/disruptive group would conflict with his potential cell partner.
- If the inmate's religious beliefs conflict with his potential cell partner's beliefs.
- If the inmate has current or prior victimization concerns (Developmentally Disabled Program, etc.).
- If the inmate has expressed fear in being double-celled during interview or committee reviews.

1

34                                                                                      A-2



| | CORRECTIONAL TRAINING FACILITY **OPERATIONS PROCEDURE #34** | **Subject: ICC & UCC REVIEWS/CLOSE CUSTODY/SPECIAL ASSIGNMENTS** |
|---|---|---|
| | | **Reference:** DOM 62010, 62040 & 11010 |
| | | **Revision Due Date:  JULY 2007** |
| | | **Responsibility:  CDW-CENTRAL & CDW-NORTH/SOUTH** |

**SINGLE CELLING:**

Inmates who have been identified as requiring single-celling will not be double-celled without the removal of the "S" suffix by a classification committee. However, the absence of an "S" suffix does not automatically qualify an inmate for double-cell placement.

The level of staff member authorized to temporarily approve single cell assignment shall be at the level of Correctional Lieutenant, Correctional Counselor II, or above.

If the Screening Authority determines a need for single cell housing, in addition to circling Single Cell on the CTF Housing Review Form, a CDC 1882 Form shall be initiated to reflect the same.  The CCII or Lieutenant conducting the Housing Review will sign this form as the Screening Authority and the Watch Commander will sign as the Approving Authority.  The inmate shall then be housed in CTF-Central X-Wing or other appropriate housing on Single Cell status pending Initial Unit Classification Committee (UCC) review.

- During the initial screening process by the CTF Housing Review committee, staff shall insure inmates who are identified to have a history of in-cell sexual abuse, assaultive behavior towards a cell partner or dormitory partner will be placed temporarily on single cell status.  During the inmate's initial review by UCC per CCR # 3377.1(c), UCC shall decide, if appropriate, to affix an "S" suffix to the inmate's custody designation.

- Verification that an inmate is or has been predatory towards a cell partner, has a history of in-cell sexual abuse, is or has been assaultive towards a cell partner, or demonstrates any significant in-cell violence against a cell partner shall require referral to a classification committee for review and determination of Single Cell Status.  **Upon determination that an inmate warrants Single Cell Status, the "S" Suffix shall be affixed to the inmate's custody determination and appropriately documented.**

**HOUSING INMATES UNDER 18:**

It is not CDCR policy to house inmate's seventeen (17) years of age or younger at an adult facility. However, if it is determined that newly received inmate is under seventeen years of age, the inmate shall be housed with another inmate under seventeen (17) years old, or placed on single cell status.  The C&PR's office shall be notified immediately and arrangement made to transfer the inmate an appropriate youth facility.

**CLASSIFICATION REVIEW:**

All staff involved in the review and approval of an inmate's housing placement must be cognizant of all factors that should be considered prior to making the determination to double-cell.

It remains the responsibility of the classification committee to use correctional experience and correctional awareness to make every effort to ensure the safety of inmates and staff prior to approving an inmate for double-cell housing.  Any discussion during committee regarding celling status should be



| CORRECTIONAL TRAINING FACILITY OPERATIONS PROCEDURE #34 | Subject: ICC & UCC REVIEWS/CLOSE CUSTODY/SPECIAL ASSIGNMENTS |
|---|---|
| | Reference: DOM 62010, 62040 & 11010 |
| | Revision Due Date:  JULY 2007 |
| | Responsibility:  CDW-CENTRAL & CDW-NORTH/SOUTH |

included in the CDC Form 128G. Prior to referral for transfer, placement consideration or DRB, the UCC or ICC shall determine the inmate's need for continued Single Cell Status. A classification committee's decision regarding housing status reevaluations shall be documented on a CDC Form 128-G, *Classification Committee Chrono*.    Each classification chrono written (for the purpose of Initial Classification, Annual Review or for CSR action) shall state committee reviewed the inmate's central file for Double Cell Housing eligibility. He (either does or does not) require Single Cell Housing.

This decision is based upon the inmate (either having or not having) a history of predatory assaultive behavior towards a cell partner. This inmate also (either has or does not have) a history of having been assaulted by previous cell partners. The inmate is satisfied with his current cell partner: (either Yes/No or N/A). Committee elects to (either approve or continue), (either Double Cell or Single Cell) status.

## INITIAL CLASSIFICATION:
The Unit Correctional Counselor II (CCII) has overall responsibility for the inmate classification process. Each Correctional Counselor is tasked with reviewing the Daily Movement Sheet (DMS) and scheduling their assigned inmates for initial classification within 14 days of reception. Newly arrived inmates will be placed on Orientation Status (ORI) pending initial classification review.

## ARMSTRONG vs. WILSON:
The court ordered Remedial Plan of **Armstrong vs. Wilson** requires Initial Classification Committees to adjust the Work Group of DPP inmates spending in excess of sixty (60) days at the Reception Center (RC), for no disciplinary reasons (no fault of inmate). The 61st day will be utilized as the effective date of placement on a waiting list. If the inmate's stay at the RC exceeds the waiting period on the waiting list, the inmate will be placed in work group A1 effective the date of Initial Classification and granted "S" time until assigned. The type of disability and the tracking code (DPW, DPM, DPH, SPS, or DPV) will be noted in the CDC-128-G.

## CLOSE B CUSTODY:
Close B Custody will be established by classification committee for inmates that meet the criteria of Section CCR # 3377.2 (Criteria for Assignment of Close Custody):

Central Facility **Level II** inmates designated as Close B Custody shall be housed in E-Wing and/or D-Wing. C-Wing has been designated for the overflow.

North Facility **Level III** inmates designated as Close B Custody shall be housed in Rainer Hall on the "A" Side then the "B" Side. Shasta Hall "A" Side has been designated for the overflow.

## CLOSE CUSTODY PROGRAM/WORK ASSIGNMENTS:

### Central Facility:
Close B Custody, **Level II,** inmates shall be permitted to participate in program assignments and activities, i.e., Alcoholic Anonymous and Narcotics Anonymous, during the hours of 0600 hours to 2000 hours in areas located within the Central Facility security perimeter (West Gate to East Gate). Close B



| | CORRECTIONAL TRAINING FACILITY **OPERATIONS PROCEDURE #34** | **Subject: ICC & UCC REVIEWS/CLOSE CUSTODY/SPECIAL ASSIGNMENTS** |
|---|---|---|
| | | **Reference:** DOM 62010, 62040 & 11010 |
| | | **Revision Due Date:   JULY 2007** |
| | | **Responsibility:   CDW-CENTRAL & CDW-NORTH/SOUTH** |

Custody inmates may participate in designated work program assignments until 2200 hours when the work program is in an assigned housing unit located within the facility security perimeter. Close B Custody inmates may participate in limited evening activities after 2000 hours until the general evening lockup and count when the limited activity is in a designated housing unit located within the facility security perimeter.

No Close Custody Inmates will be assigned to the Culinary with access to the Loading Dock, Laundry/Clothing Room, Lower East Corridor, or areas outside the East Gate.

**North Facility:**
Close B Custody, **Level III**, inmates shall be permitted to participate in program assignments, and activities, i.e., Alcoholic Anonymous and Narcotics Anonymous, during the hours of 0600 hours to 2000 hours in areas located within North Facility security perimeter to include North Chapel and Education. The North Patio, Visiting Room and areas behind the halls are not authorized for Close B Custody, **Level III** inmate assignments (with the exception of Inmate Visiting). Close B Custody inmates may participate in designated work program assignments until 2200 hours when the work program is in an assigned housing unit located within the facility security perimeter. Close B Custody inmates may participate in limited evening activities after 2000 hours until the general evening lockup and count when the limited activity is in a designated housing unit located within the facility security perimeter.

No Close Custody Inmates will be assigned to the North Vocations area, Culinary Back Dock area, North Visiting, North Administration Crew areas, North Patio, or any assignment that does not allow direct and constant supervision.

**MINIMUM CUSTODY:**
Unit Classification Committees may assign Minimum A and/or Minimum B custody to inmates that satisfy the Minimum Support Facility Criteria as outlined in the Violent Felonies and Minimum Custody Eligibility memorandum dated January 6, 2006.

MIN A and MIN B custody is not to be considered as automatic criteria for work assignments outside of the fenced security areas. All assignments that require an outside gate clearance must be referred to ICC for review and approval.

**MEDIUM CUSTODY:**
Medium B and Medium A custody may be assigned at the discretion of Unit Classification Committees. All assignments that require an outside gate clearance must be referred to ICC for gate clearance review and approval.

**MENTAL HEALTH SERVICES DELIVERY SYSTEM (MHSDS) LEVEL-OF-CARE (LOC)**
The Correctional Counselor I (CCI) shall continue to prepare and submit to the Classification Staff Representative (CSR) the initial request to place an inmate into any Mental Health Services Delivery System (MHSDS) Level-of Care (LOC). Subsequent to the initial CSR endorsement, the Classification

B-5



| | CORRECTIONAL TRAINING FACILITY OPERATIONS PROCEDURE #34 | Subject: ICC & UCC REVIEWS/CLOSE CUSTODY/SPECIAL ASSIGNMENTS |
|---|---|---|
| | | Reference: DOM 62010, 62040 & 11010 |
| | | Revision Due Date:  JULY 2007 |
| | | Responsibility:  CDW-CENTRAL & CDW-NORTH/SOUTH |

and Parole Representative (C&PR) will do MHSDS LOC endorsement changes within an institution if the institution is authorized to provide the required LOC.

## SOUTH FACILITY WORK ASSIGNMENTS:

1) Once an inmate is cleared for an outside assignment he should be reviewed for the lowest custody possible MIN B and ORWD.

   a) If an inmate is cleared for assignment to the firehouse, the case will be recommended and referred to the Warden for Firehouse live-in status.

   b) Inmates who are assigned to the Firehouse are subject to being directed by Firehouse staff via the 9-1-1 dispatcher to respond to local communities or freeway emergencies (per local Mutual Aid Agreement).

2) The next consideration would be for MIN B, ORWD custody. This custody qualifies an inmate for assignment to the Community Service Crew.

   a) These inmates are under constant supervision by custody staff however they are directly in the public eye. They work in all local communities doing painting, tree trimming, weeding, etc. They work in parks, streets, alleyways, schoolyards. (Normally while schools are not in session). They also are assigned to help at local community activities such as air shows, fairs, music concerts, and raceways. (Pre and post setups)

3) Next consideration should be job skill level, which would normally be maintenance type work such as, Auto Mechanic, Carpenter, Plumber, Electrician, Painter, Groundskeeper, Equipment Operator, Heavy Equipment Operator, Welder, Sheet Metal Worker, and Sewage Plant. Any of these areas would also qualify for IDL (Inmate Day Labor) assignment. Snack Bar workers should be considered in this action such as short order cook. These areas may have less supervision by non-custody staff.

4) Next consideration should be all office areas: In-Service Training (IST), Warehouse, Personnel Assignment Lieutenant, Procurement Office, Entrance Buildings, North Administration Building, Family Visiting, Plant Operation and Garage. They all need clerical skilled inmates as well as inmate porters. These areas may have less supervision by custody and non-custody staff.

5) Next consideration would be Recycling Center or a Central Yard Canteen Worker. These inmates are not under direct supervision; however they are in controlled area with a security fence around them. Recycling Center supervised by two custody staff and one non-custody staff.

6) Next consideration would be Utility Work Crews. Custody staff directly supervises these inmates. The inmate may have MIN B custody; however, committee may require an observation/monitoring period from 30 days up to 6 months before giving consideration. This action could be for a number of reasons (e.g.: not enough information in his C-file history, too much time to serve, attitude, or simply, that the committee is not comfortable in a less supervised assignment).

B-6



| | |
|---|---|
| **CORRECTIONAL TRAINING FACILITY OPERATIONS PROCEDURE #34** | **Subject:** ICC & UCC REVIEWS/CLOSE CUSTODY/SPECIAL ASSIGNMENTS |
| | **Reference:** DOM 62010, 62040 & 11010 |
| | **Revision Due Date:** JULY 2007 |
| | **Responsibility:** CDW-CENTRAL & CDW-NORTH/SOUTH |

7) Next consideration would be MED B Crews. These inmates may have a MIN B or MED B custody. These crews are also directly supervised by custody staff. Inmates would be assigned for 6 months to one year before they are returned to ICC for proper placement of assignment if they have a good work report.

The following assignments are prioritized suggestions; however, the Manpower Needs Report should be reviewed.

## AREA                                                          SUPERVISION

**Firehouse:**
 12 inmates assigned to Firehouse (Live-In status)        Fire Chief/Fire Captain
**Community Service Crew:**        (2 Crews)               Custody
**Maintenance:**
   Sewage Plant                                           Non-Custody
   Carpenters                                             Non-Custody
   Corporation Yard                                       Non-Custody
   Electrician                                            Non-Custody
   Painter                                                Non-Custody
   Plumber                                                Non-Custody
   Garage                                                 Non-Custody
   Groundskeeper          (3 Crews)                       Non-Custody
   Plant Operation                                        Non-Custody
**IDL (Inmate Day Labor):**                               Custody and Non-Custody
**Snack Bar:**                                            Non-Custody
**Warehouse:**                                            Non-Custody
**Canteen Warehouse:**                                    Non-Custody
**Central Yard Canteen:**                                 Non-Custody
**Personnel Assignment Lieutenant:**                      Custody and Non-Custody
**Procurement Office (Clerk):**                           Non-Custody
**Family Visiting Porters:**                              Custody
**IST (Porters/Clerks):**                                 Custody and Non-Custody
**Central Entrance Building (Porters):**                  Custody
**South Entrance Building (Porters):**                    Custody
**North Administration Building (Porters/Shoeshine):**    Non-Custody
**Recycling Center:**             (2 Crews)               Custody/Non-Custody
**Utility Work Crew:**            (5 Crews)               Custody

**WORK CREW SERGEANT:**
To facilitate a job change off a work crew, the Work Crew Sergeant will present a Work Change Application (CDC 132 Form) and Work Supervisor Report (CDC 101 Form) with recommendations to the Unit VII, CC II. If no further committee (ICC) action is required, the CC II will initiate and forward the



| | CORRECTIONAL | Subject: ICC & UCC REVIEWS/CLOSE CUSTODY/SPECIAL ASSIGNMENTS |
|---|---|---|
| | TRAINING FACILITY | |
| | OPERATIONS | Reference: |
| | PROCEDURE | DOM 62010, 62040 & 11010 |
| | #34 | Revision Due Date:   JULY 2007 |
| | | Responsibility:   CDW-CENTRAL & CDW-NORTH/SOUTH |

request to the Inmate Assignment Lieutenant.  In cases where additional ICC review and approval is required, the Unit VII CC II will schedule the inmate for committee as soon as practical.

## INTERNAL CLASSIFICATION AUDIT TEAM
The Audit team will consist of:
- C&PR (Chairperson)
- Assistant C&PR (Member)
- Inmate Appeals Coordinator (Member)

The primary function of this team is to review the classification process at CTF to ensure compliance with the mandates and guidelines of the D.O.M. and Director's rules.  The audit team will submit an annual report to the Chief Deputy Warden regarding their respective facilities.

**AREAS TO AUDIT:** (Will include but are not limited to)
Inmate Classification Scoring System
Initial and Annual Classification Committees
CCI Unit Caseload Tracking Procedure Methods
Caseload Management
Recordkeeping
Reports
Education / Work Programs
Confidential Information
Parole Procedures to include the CCRC Process

**A. P. KANE**
Warden (A)
Correctional Training Facility

April 3, 2006

A-8

**NAME & NUMBER**   Test, Page   **A00000**                                                    **CDC-128B**

Subject's case was reviewed on this date for **CLOSE CUSTODY**. The review indicated subject ☐ **May**   ☐ **May Not** require **CLOSE CUSTODY**. Factors requiring **CLOSE CUSTODY** include the following:

  Life without Possibility of Parole (LWOP)-5 years CLOSE A + 10 years CLOSE B.
☐ DSL or total term of 50 years or more – 5 years CLOSE A + 10 years CLOSE B.
☐ Multiple Life terms – 5 years CLOSE A then CLOSE B until within 7 years of MEPD.
☐ Life Term 1 year CLOSE A + CLOSE B until 7 years of MEPD.
☐ Determinate Sentence or Total Term of 15 years or more – 1 year CLOSE A + 4 years CLOSE B.
☐ Public Interest Case (PIC) or High Notoriety Case – 5 years CLOSE A + 5 years CLOSE B.
☐ Prior Escape or attempt with force from any correctional facility/law enforcement agency/armed escort within five years of return to custody – 8 years CLOSE + 2 years CLOSE B.
☐ Prior Escape or attempt without force from a secure perimeter facility or armed escort within five years [exclude minimum walk away] 5 years CLOSE A + 5 years CLOSE B.
☐ Involvement in documented plot/plan to escape from a secure perimeter facility within two years – 2 years CLOSE A + 2 years close B.
☐ Active Felony Holds which may result in serving a considerable amount of additional time after serving current term – 1 to 5 years CLOSE A depending on possible sentence and remainder of time at CLOSE B or until hold Dropped/Resolved.
☐ Murder of Non-Inmate while in custody-total term at CLOSE A after SHU term, not eligible for CLOSE B.
☐ Murder of inmate in custody within the last 6 years – CLOSE A first 6 years after SHU + 4 years CLOSE B.
☐ Guilty of RVR (A1/A2) or needs further Classification Committee review due to a demonstrated pattern of violence/escape/narcotic trafficking – minimum of 2 years CLOSE B before being eligible for custody reduction.
☐ Former gang member (Drop Out) 1 year CLOSE B before being eligible for custody reduction.
☐ Other documented security concerns: _____
☐ **Subject does not require CLOSE CUSTODY Housing.**
☐ **Single Cell Status.**                              **CENTRAL ☐**     **NORTH ☐**   **SOUTH ☐**

**CS** _____ **DSL** _____     **APPROVED FOR: GYM ☐**

Following review of your Central File this date, you are approved for placement as indicated above. Subject was advised he would be moved to his assigned housing as soon as possible, and if placed at CTF-North he would remain on RTQ-Orientation pending Unit Classification.

☐ **1845 Present (Copy forwarded to C&PR).**
   **asonable accommodation required and noted per 1845.   ☐ Yes   ☐ No**

_____

                                                  Chairperson

Original:   C-File
            Inmate
                                                                    CTF-1444 (Rev. 5-04)
**DATE:**                        **CTF TRIPLEX HOUSING REVIEW**              **GENERAL CHRONO**

# ATTACHMENT A

## INITIAL HOUSING REVIEW

| Name of Inmate | | CDC Number | Institution |
|---|---|---|---|
| | | | |

The above inmate has been screened prior to assigned housing. An inmate interview and available documents indicate the following:

| Ethnicity | Date of Birth | Place of Birth | County of Commitment |
|---|---|---|---|
| CSR Endorsement | Sending Jail/Institution | Previous Housing Status (xxxxxx) | Release Date/Type |
| Enemies | | Gang/Disruptive Group Affiliation | |
| Health Concerns | | Other Special Concerns | |
| History of In-Cell Assaults | | History of Aggression Towards Other Inmates | |
| Other Information/Comments | | | |
| Inmate's Remarks | | | |

Based on a review of the above, a determination has been made that:

☐ The inmate is suitable for dorm/cell housing with no special restrictions.
☐ The inmate is suitable for dorm/cell housing with the following restrictions:

_____

☐ There are placement concerns which may require single cell assignment. These concerns are based upon the following documentation:

_____

| **SCREENING AUTHORITY** | Signature: _____<br>Printed Name: _____<br>Title: _____ |
|---|---|

| **APPROVING AUTHORITY** ☐ Not Applicable<br>Single cell status is: ☐ approved ☐ disapproved | Signature: _____<br>Printed Name: _____<br>Title: _____ |
|---|---|

**DATE:** _____

DISTRIBUTION:
C-File (original)
Housing Assignment Authority
Facility Captain
Inmate

# ATTACHMENT B

112

B-1A

## ADMINISTRATIVE SEGREGATION UNIT
### DOUBLE CELL REVIEW

| Name of Inmate | CDC Number | Housing |
|---|---|---|
| Name of Inmate | CDC Number | Housing |

The above-listed inmates are being processed for occupancy of the same cell.

1.  The request is being initiated per:

    ☐ Administrative assignment by staff
    ☐ Request from one of the inmates to be assigned to the same cell
    ☐ Request from both inmates to be assigned to the same cell

2.  During the interview with:

| Staff Witnesses' Printed Name | Title | Signature |
|---|---|---|
|  |  |  |

☐ Both inmates stated agreement to the cell assignment and signed below to indicate compatibility.

Signature of Inmate: _____    Date: _____

Signature of Inmate: _____    Date: _____

☐ Both inmates stated agreement, but one or both refused to sign the acknowledgement of compatibility.
☐ One or both inmates refused the cell assignment.

3.  After a review of the inmate's statements and the case factors in each inmate's Central File it has been determined that:

    ☐ There is NO information available to indicate that the inmates are incompatible.
    ☐ There IS information that leads to the belief that the assignment of these two inmates to the same cell is contrary to the legitimate penological interests, or may threaten institution security of the safety of others.

4.  Based on this evaluation, the double cell occupancy request is:

    ☐ APPROVED
    ☐ DISAPRROVED

### APPROVING AUTHORITY

| Printed Name | Title | Date | Signature |
|---|---|---|---|
|  |  |  |  |

DISTRIBUTION:
C-File
Facility Captain
Correctional Counselor I
Inmate

# ATTACHMENT C

A- 11

CS_____ DSL___ CENTRAL☐ NORTH☐ SOUTH☐
Approved for:    Gym ☐

wing review of your Central File this date, you are approved for placement as indicated above.
ject was advised he would be moved to his assigned housing as soon as possible, and if
)d at CTF-Central/North he would remain on Orientation pending Unit Classification.

Reviewing Panel                         Approved: DOUBLE / SINGLE CELL

_____    _____
                                                Chairperson

DATE            CTF TRIPLEX HOUSING REVIEW            GENERAL CHRONO

_____

                                        ATTACHMENT A
NAME and NUMBER _____    CDC-128-B (Rev. 3/83)
                                        CTF-774 (Rev. 3/83)

CS_____ DSL___ CENTRAL☐ NORTH☐ SOUTH☐
Approved for:    Gym ☐

Following review of your Central File this date, you are approved for placement as indicated above.
Subject was advised he would be moved to his assigned housing as soon as possible, and if
placed at CTF-Central/North he would remain on Orientation pending Unit Classification.

wing Panel                         Approved: DOUBLE / SINGLE CELL

_____    _____
                                                Chairperson

DATE            CTF TRIPLEX HOUSING REVIEW            GENERAL CHRONO

_____

                                        ATTACHMENT A
NAME and NUMBER _____    CDC-128-B (Rev. 3/83)
                                        CTF-774 (Rev. 3/83)

CS_____ DSL___ CENTRAL☐ NORTH☐ SOUTH☐
Approved for:    Gym ☐

Following review of your Central File this date, you are approved for placement as indicated above.
Subject was advised he would be moved to his assigned housing as soon as possible, and if
placed at CTF-Central/North he would remain on Orientation pending Unit Classification.

Reviewing Panel                         Approved: DOUBLE / SINGLE CELL

_____    _____
                                                Chairperson

            CTF TRIPLEX HOUSING REVIEW            GENERAL CHRONO

# Attachment D

ADMINISTRATIVE SEGREGATION UNIT PLACEMENT NOTICE
CDC 114-D (Rev 10/98)

DISTRIBUTION:
WHITE - CENTRAL FILE        CANARY - WARDEN
BLUE - INMATE (2ND COPY)    PINK - HEALTH CARE MGR
GREEN - ASU                 GOLDENROD - INMATE (1ST COPY)

| INMATE'S NAME | | CDC NUMBER | |
|---|---|---|---|

### REASON(S) FOR PLACEMENT (PART A)

☐ PRESENTS AN IMMEDIATE THREAT TO THE SAFETY OF SELF OR OTHERS

☐ JEOPARDIZES INTEGRITY OF AN INVESTIGATION OF ALLEGED SERIOUS MISCONDUCT OR CRIMINAL ACTIVITY

☐ ENDANGERS INSTITUTION SECURITY    ☐ UPON RELEASE FROM SEGREGATION, NO BED AVAILABLE IN GENERAL POPULATION

DESCRIPTION OF CIRCUMSTANCES WHICH SUPPORT THE REASON(S) FOR PLACEMENT:

☐ CONTINUED ON ATTACHED PAGE (CHECK IF ADDITIONAL)    ☐ IF CONFIDENTIAL INFORMATION USED, DATE OF DISCLOSURE:    /    /

| DATE OF ASU PLACEMENT | SEGREGATION AUTHORITY'S PRINTED NAME | | SIGNATURE | | TITLE |
|---|---|---|---|---|---|
| DATE NOTICE SERVED | TIME SERVED | PRINTED NAME OF STAFF SERVING ASU PLACEMENT NOTICE | SIGNATURE | | STAFF'S TITLE |

☐ INMATE REFUSED TO SIGN    | INMATE SIGNATURE | | CDC NUMBER |

### ADMINISTRATIVE REVIEW (PART B)
*The following to be completed during the initial administrative review by Captain or higher by the first working day following placement*

| STAFF ASSISTANT (SA) | | INVESTIGATIVE EMPLOYEE (IE) | |
|---|---|---|---|
| STAFF ASSISTANT'S NAME | TITLE | INVESTIGATIVE EMPLOYEE'S NAME | TITLE |

**IS THIS INMATE:**

| | | |
|---|---|---|
| LITERATE? | ☐ YES ☐ NO | EVIDENCE COLLECTION BY IE UNNECESSARY | ☐ YES ☐ NO |
| FLUENT IN ENGLISH? | ☐ YES ☐ NO | DECLINED ANY INVESTIGATIVE EMPLOYEE | ☐ YES ☐ NO |
| ABLE TO COMPREHEND ISSUES? | ☐ YES ☐ NO | ASU PLACEMENT IS FOR DISCIPLINARY REASONS | ☐ YES ☐ NO |
| FREE OF MENTAL HEALTH SERVICES DELIVERY SYSTEM NEEDS? | ☐ YES ☐ NO | DECLINED 1ST INVESTIGATIVE EMPLOYEE ASSIGNED | ☐ YES |
| DECLINING FIRST STAFF ASSISTANT ASSIGNED? | ☐ YES | | |

Any "NO" requires SA assignment

☐ NOT ASSIGNED

Any "NO" may require IE assignment

☐ NOT ASSIGNED

### INMATE WAIVERS

☐ INMATE WAIVES OR DECLINES INTERVIEW WITH ADMINISTRATIVE REVIEWER    ☐ INMATE WAIVES RIGHT TO 72 HOURS PREPARATION TIME

☐ NO WITNESSES REQUESTED BY INMATE    | INMATE SIGNATURE | | DATE |

### WITNESSES REQUESTED FOR HEARING

| WITNESS' NAME | TITLE/CDC NUMBER | WITNESS' NAME | TITLE/CDC NUMBER |
|---|---|---|---|
| WITNESS' NAME | TITLE/CDC NUMBER | WITNESS' NAME | TITLE/CDC NUMBER |

**DECISION:** ☐ RELEASE TO UNIT/FACILITY_____    ☐ RETAIN PENDING ICC REVIEW   ☐ DOUBLE CELL   ☐ SINGLE CELL PENDING ICC

REASON FOR DECISION:

| ADMINISTRATIVE REVIEWER'S PRINTED NAME | TITLE | DATE OF REVIEW | TIME | ADMINISTRATIVE REVIEWER'S SIGNATURE |
|---|---|---|---|---|
| CORRECTIONAL ADMINISTRATOR'S PRINTED NAME (if necessary) | | CORRECTIONAL ADMINISTRATOR'S CO-SIGNATURE (if necessary) | | DATE OF REVIEW |

See Chronological Classification Review document (CDC 128-G) for specific hearing information

STATE OF CALIFORNIA
**INMATE SEGREGATION PROFILE**
CDC 114-A1 (10/98)

DEPARTMENT OF CORRECTIONS

Update information legibly and prepare a new CDC Form 114-A1 <u>at least</u> every <u>90 days</u> or as required to maintain current information.

| DATE INITIATED | CDC NUMBER | INMATE'S NAME | | ETHNICITY | CELL |
|---|---|---|---|---|---|
| DATE OF BIRTH | COUNTY OF LAST LEGAL RESIDENCE | | CONTROLLING COMMITMENT OFFENSE | PRIOR HOUSING | |
| REASON FOR SEGREGATION | | DATE OF ASU PLACEMENT | CS | PRISON RELEASE DATE | MERD |

## SPECIAL INFORMATION

*COMMENT WHEN ADDITIONAL INFORMATION WOULD HELP CLARIFY AN ISSUE*

MED / PSYCH ISSUE: ☐ EOP ☐ CCCMS ☐ DPP: ☐ HEARING ☐ SIGHT ☐ MOBILITY

| YES | NO | | YES | NO | |
|---|---|---|---|---|---|
| | | STAFF THREATS / BATTERY | | | SAFETY CONCERNS (WHEN/WHERE?): |
| | | INMATE THREATS / BATTERY | | | PRIOR SUICIDE ATTEMPTS |
| | | SEX RELATED OFFENSES/ DISCIPLINARIES: | | | CELLING LIMITATION/RESTRICTIONS: |
| | | IN PRISON WEAPON OFFENSES | | | PRIOR CELL FIGHTS: |
| | | GANG STATUS: | | | DOUBLE CELL / AUTHORIZED BY: |
| | | NICKNAME OR MONIKER: | | | PRIOR SINGLE CELL STATUS (WHEN/WHERE/REASON?): |
| | | ESCAPE RISK: | | | |

COMMENTS / OBSERVATIONS:

## ENEMIES / RIVAL GROUPS (LIST ALL ENEMIES HOUSED IN *THIS* INSTITUTION)

| DATE ADDED | NAME AND CDC NUMBER | HOUSING/LOCATION | GANG STATUS/COMMENTS |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

☐ ADDITIONAL ENEMIES NOTED ON ATTACHED INMATE SEGREGATION PROFILE

| YARD ASSIGNMENT: ICC DATE: | ☐ WALK ALONE | ☐ CONTROLLED/COMPATIBLE | ☐ REINTERGRATED/MIXED | |
|---|---|---|---|---|
| YARD ASSIGNMENT: ICC DATE: | ☐ WALK ALONE | ☐ CONTROLLED/COMPATIBLE | ☐ REINTERGRATED/MIXED | Reason for Change |
| YARD ASSIGNMENT: ICC DATE: | ☐ WALK ALONE | ☐ CONTROLLED/COMPATIBLE | ☐ REINTERGRATED/MIXED | Reason for Change |

YARD ASSIGNMENT RESTRICTIONS/COMMENTS:

| PRINTED NAME, TITLE AND SIGNATURE OF PERSON INITIATING FORM | DATE |
|---|---|
| | |

HIGHLIGHT "CONFIDENTIAL" ENEMIES AND REDACT PRIOR TO SENDING TO RECORDS OFFICE FOR SLOUGH FILING

**ATTACHMENT F**

**INMATE SEGREGATION RECORD**
CDC 114-A (Rev 9/98)

| CDC NUMBER | | | | | | | | | | INMATE'S NAME | | CELL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|

## RECORD OF DAILY ACTIVITY
### INSTRUCTIONS:

In order to document Segregated Housing Conditions, Unit Staff must record all services and activities offered to segregated inmates and all significant activity (e.g., classification reviews). Maintain a record of the following:

1. CELL INSPECTION – A weekly inspection must be completed and recorded to ensure the cells are being properly maintained by the inmates.
2. EXERCISE – A record must be maintained on exercise offered and received to ensure each inmate is given the opportunity to exercise a minimum of ten (10) hours per week. Exercise may be suspended for disciplinary offenses. Record refusals.
3. SHOWERS – Inmates must be allowed to shower three (3) times each week. Record all showers or refusals.
4. SUPPLIES – Cleaning and personal hygiene supplies shall be offered on a weekly basis to all inmates and provided on an as-needed basis. Record what was provided.
5. CLOTHING, LINEN – Clothing will be issued upon assignment and exchanged and laundered not less than every other week. Towels, sheets, and pillow cases will be laundered not less than once every two (2) weeks. Blankets shall be cleaned at least once every six (6) months. Record all exchanges.
6,7,8. MEALS – Record all meals served. Record any refusals of a meal served.
9. TRASH DISPOSAL – Daily trash disposal shall be offered. Record all disposals.

| DATE | CELL INSPECTION | EXERCISE | SHOWERS | SUPPLIES | CLOTHING / LINEN | BREAKFAST | LUNCH | DINNER | TRASH DISPOSAL | STAFF COMMENTS | STAFF NAME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

SYMBOLS
X - ITEM COMPLETED
Q - CONFINED TO QUARTERS / PENDING DISCIPLINARY
L - LINEN EXCHANGED
B - BLANKETS EXCHANGED

R - REFUSED
N - NO YARD PENDING ICC/ REVIEW
C - CLOTHING EXCHANGED
S - LOCKDOWN

ATTACHMENT G

B-15

**RELEASE PROGRAM STUDY**
CDC 611 (10/86)

ORIGINAL TO C-FILE VIA C&PR AFTER SECTION B IS COMPLETED
ONE COPY TO C&PR
RETAIN ONE COPY AT REGION
ONE COPY TO INMATE (ATTACH ASSIGNED AGENT'S BUSINESS CARD)
ONE COPY TO RE-ENTRY SPECIALIST OR ASSIGNED AGENT

**SECTION A**

| INMATE'S NAME | | CDC NUMBER | | COUNTY OF COMMITMENT | |
|---|---|---|---|---|---|

| SCHEDULED RELEASE DATE | RRD | EPRD | CLASSIFICATION SCORE | HOUSING STATUS | INSTITUTION |
|---|---|---|---|---|---|

| RESIDENCE PLANS IN COUNTY OF COMMITMENT | WITH WHOM | | RELATIONSHIP | | PHONE NUMBER |
|---|---|---|---|---|---|
| | STREET ADDRESS | | CITY | | COUNTY |

| RESIDENCE PLANS OUT OF STATE/COUNTY OF COMMITMENT (SEE REVERSE FOR COMMENTS) | WITH WHOM | | RELATIONSHIP | | PHONE NUMBER |
|---|---|---|---|---|---|
| | STREET ADDRESS | | CITY | | COUNTY (STATE, IF INTERSTATE) |

| EMPLOYMENT PLANS | NAME OF FIRM | | PERSON TO CONTACT | | TYPE OF POSITION OFFERED |
|---|---|---|---|---|---|
| | STREET ADDRESS | | CITY | | PHONE NUMBER |

| RE-ENTRY PLANS | IS INMATE INTERESTED IN WORK FURLOUGH? ☐ YES ☐ NO | INMATE'S SIGNATURE | DATE |
|---|---|---|---|

**REGISTRATION/NOTIFICATION REQUIRED:** ☐ NONE ☐ 11590 H&S ☐ 290 PC ☐ 457.1 PC ☐ 3058.6 PC

**HOLDS PLACED:** ☐ NO ☐ YES BY: _____

USI&NS A NO. _____

**ENEMY-GANG FACTORS:** ☐ NONE ☐ SEE ATTACHED CDC 812

**INSTITUTIONAL PROGRAM BEHAVIOR:** ☐ ABOVE AVERAGE ☐ ACCEPTABLE ☐ MARGINAL

**SERIOUS DISCIPLINARIES:** ☐ NONE ☐ SEE REVERSE

**MEDICAL/PSYCHIATRIC PROBLEMS:** ☐ NONE ☐ SEE REVERSE

**CASEWORKER'S EVALUATION:** ☐ NONE ☐ SEE REVERSE

| COUNSELOR'S NAME (PRINT): | PHONE NUMBER AND EXTENSION | DATE |
|---|---|---|
| C&PR'S SIGNATURE | | DATE |

**SECTION B** TO BE COMPLETED BY ASSIGNED AGENT

| REGIONAL RE-ENTRY SCREENING | RE-ENTRY PLACEMENT: ☐ APPROVED ☐ DENIED | IF APPROVED, INDICATE PROGRAM |
|---|---|---|
| | IF DENIED, FULLY EXPLAIN REASON | |

WAS THIS INMATE COMMITTED FOR AN ACT OF VIOLENCE (INJURY OR DEATH) AGAINST A PEACE OFFICER EITHER AS PART OF, OR INCIDENTAL TO, THE OFFENSE/ARREST FOR WHICH THE INMATE WAS SENT TO PRISON? ☐ YES ☐ NO

| SIGNATURE OF REGIONAL RE-ENTRY SCREENING AGENT | PHONE NUMBER | DATE |
|---|---|---|

| PAROLE UNIT ASSIGNMENT AND REPORTING INSTRUCTIONS | ASSIGNED UNIT | ASSIGNED AGENT | PHONE NUMBER |
|---|---|---|---|

ASSIGNED AGENT'S COMMENTS AND REPORTING INSTRUCTIONS TO INMATE

RESIDENCE TO BE ARRANGED IN (COUNTY) _____ (STATE) _____

☐ RELEASE WITH FULL FUNDS    ☐ REPORT FIRST WORKING DAY FOLLOWING RELEASE.

☐ RELEASE WITH $ _____ IN FUNDS WITH BALANCE TO PAROLE OFFICE    ☐ REPORT AS FOLLOWS:

☐ REPORT TO PAROLE UNIT - STREET _____

CITY & STATE _____

PHONE _____

| ASSIGNED AGENT'S SIGNATURE | UNIT SUPERVISOR'S SIGNATURE | DATE |
|---|---|---|

**ATTACHMENT H**

| | |
|---|---|
|  **CORRECTIONAL TRAINING FACILITY OPERATIONS PROCEDURE #35** | **Subject: RECEPTION OF DISABILITY PLACEMENT PROGRAM** |
| | **Reference:** DOM 62050 |
| | **Revision Due Date: OCTOBER 2003** |
| | **Responsibility: CHIEF MEDICAL OFFICER** |

The Correctional Training Facility (CTF) is not designated as a Disability Placement Program (DPP) facility. However, in the event that a DPP inmate(s) is transferred to CTF and/or identified living within existing population, staff shall comply with the following procedure.

### Disability Placement Purpose:

The purpose and objective of the Disability Placement Program (DPP) Procedure at CTF is to define and outline administrative procedures to provide for the reception, identification, tracking, housing, program, classification and security needs of DPP inmates. The DPP is a Departmental Program designed to provide appropriate housing and programming for inmates with the following disabilities:

Inmate Requires Special Placement at A Designated DPP Facility

Inmate Does Not Require Special Placement and May be Placed at Any Facility According To Case Factors

DPW – Wheelchair User
DPM – Mobility Impaired
DPH – Hearing Impaired
DPV – Vision Impaired
DPS – Speech Impaired
DPO – Other

DNM – Mobility Impaired
DNH – Hearing Impaired
DNV – Vision Impaired
DNS – Speech Impaired

### Responsibility:

Warden has the ultimate responsibility for the implementation and operation of this procedure.

Health Care Manager (HCM) will exercise administrative responsibility for the medical issues.

Associate Warden-Classification & Programs, will exercise administrative responsibility for the custody/counseling issues.

Facility Captains will maintain functional responsibility.

### Classification & Parole Representative:

C&PR is responsible for ensuring completion of Section "E" of the CDC 1845.

Maintaining an accurate count and tracking of all DPP inmates.

Referring cases to respective unit counseling staff of all inmates verified to have a disability in Section "C" of the CDC Form 1845 (requiring special placement in a designated DPP facility) for referral to a Classification Staff Representative (CSR) for review and endorsement.

To ensure that the classification process and subsequent transfer is expedited.



| | |
|---|---|
| **CORRECTIONAL TRAINING FACILITY** **OPERATIONS PROCEDURE** **#34** | **Subject: ICC & UCC REVIEWS/CLOSE CUSTODY/SPECIAL ASSIGNMENTS** |
| | **Reference:** **DOM 62010, 62040 & 11010** |
| | **Revision Due Date:  JULY 2007** **Responsibility:  CDW-CENTRAL & CDW-NORTH/SOUTH** |

# ADDENDUM

## ICC & UCC REVIEWS/CLOSE CUSTODY /SPECIAL ASSIGNMENTS

### SOUTH FACILITY WORK ASSIGNMENTS (PAGES 5,6,7)
1)      Once an inmate is cleared for an outside assignment, he should be reviewed for the lowest custody possible MIN B and ORWD.

### READS:
   a) If an inmate is cleared for assignment to the firehouse, the case will be recommended and referred to the Warden for Firehouse live-in status.

### SHOULD READ:
   **a) If an inmate is cleared for assignment to the firehouse, the case will be recommended and referred to the Chief Deputy Warden, North/South Facilities.**

### READS:
7)    Next consideration would be MED B crews.  These inmates may have a MIN B or MED B custody. These crews are also directly supervised by custody staff.  Inmates would be assigned for 6 months to one year before they are returned to ICC for proper placement of assignment if they have a good work report.

### SHOULD READ:      (DELETE SECTION)

### READS:
          WORK CREW SERGEANT:
          To facilitate a job change off a work crew, the Work Crew Sergeant will present a Work Change Application (CDC-132 Form) and Work Supervisor Report (CDC-101Form) with recommendations to the Unit VII, CCII.  If no further committee (ICC) action is required, the CCII will initiate and forward the request to the Inmate Assignment Lieutenant.  In cases where additional ICC review and approval is required, the Unit VII CCII will schedule the inmate for committee as soon as practical.

### SHOULD READ:
          WORK CREW SERGEANT:
          **To facilitate a job change off a work crew, the Work Crew Sergeant will present a Work Change Application (CDC-132 Form) and Work Supervisor Report (CDC-101 Form) with recommendations to the Unit VII, CCII. If no further committee (ICC) action is required, the**

A-18

|  | CORRECTIONAL TRAINING FACILITY OPERATIONS PROCEDURE #34 | Subject: ICC & IC REVIEWS/CLOSE CUSTODY/SPECIAL ASSIGNMENTS |
|---|---|---|
| | | Reference: DOM 62010, 62040 & 11010 |
| | | Revision Due Date:  JULY 2007 |
| | | Responsibility:  CDW-CENTRAL & CDW-NORTH/SOUTH |

(Continued)

CCII will initiate and forward the request to the Inmate Assignment Lieutenant.  In cases where additional ICC review and approval is required, the Unit VII CCII will schedule the inmate for committee as soon as practical.  All ORWD referrals will be forwarded to the Chief Deputy Warden North/South Facility for review/approval.

B. Curry

Ben Curry
Warden (A)
Correctional Training Facility

June 21, 2006

ᴄⁱ

B-19

**EXHIBIT C**

C-1

| | | Subject: CENTRAL UNLOCKS & YARD CARDS |
|---|---|---|
|  | CORRECTIONAL TRAINING FACILITY | |
| | OPERATIONS PROCEDURE #40 | Reference: DOM Section 52020.8.11 |
| | | Revision Due Date: SEPTEMBER 2007 |
| | | Responsibility:    Correctional Captain and Program Lieutenants |

The Correctional Captain is responsible for ensuring compliance with this procedure. The Program Lieutenants are responsible for ensuring that all personnel comply with the schedules set forth in this procedure in their specific area of responsibility.

## METHODS:

1. **First Watch General Unlock / Lockup Procedures for General Population Housing Wings B, C, D, E, F, G, Y and Z Wings:**
   - When the First Watch Wing Officers assume their post, all inmates residing in the wing must be secured in their respective cells. The securing of a wing is accomplished by the Third Watch Wing Officers prior to the 2130 count and is done in the following manner:
   - All inmates will be secured in their assigned cells. All cell doors will be secured by keying the cell door Folger-Adams locking device in the locked position.
   - The bar-locking device will be placed in the deadlock position.
   - Upon reporting to their assigned wing, the officers will make a visual inspection of the wing. This inspection is to make sure that all cells are secured and locked by the Folger-Adams locking device. Further inspection will assure the locking device is in the deadlock position. A visual check will be made of the wing to ensure that all common areas are secured. Additionally, the security check is to ascertain that no inmates are injured, (i.e., suicide, cell-fights, etc...).

## A. Emergency Unlocks:

   - An emergency unlock is considered to be an unscheduled inmate movement from a cell between the hours of 2200 & 0600 hours, with the exception of the porters & clerks who are regularly assigned night workers. Early worker releases are not considered an emergency unlock.
   - Emergency unlocks require the notifying / approval of the Watch Commander. At least two (2) officers and one (1) supervisor should be present on tier if time permits, (i.e. fire, etc.).
   - Emergency unlocks shall be accomplished by placing the locking bar in the "KEY" position and then unlocking the cell door of the inmate involved. The S&E Officer with the bar key controls the bar-locking device on the tier and maintains control of the bar locking device key during all unlocks on First Watch. A visual inspection from the cell's door window will precede the opening of the cell door. Examples of Emergency Unlocks are as follows:
     a. In case of suicide or attempted suicide.
     b. If an inmate is ill and medical personnel require and/or request that he be moved to the Infirmary.
     c. If an inmate has placed an obstruction over his cell door window bars and refuses to remove the obstruction.
     d. If the inmate cannot be counted in his cell, i.e., he cannot be awakened and is not showing skin.
     e. If the inmate assaults another inmate in the cell.

1

1·2



| | |
|---|---|
| **CORRECTIONAL TRAINING FACILITY** | **Subject:** CELL UNLOCKS & YARD CARDS |
| **OPERATIONS PROCEDURE #40** | **Reference:** DOM Section 52020.8.11 |
| | **Revision Due Date:** SEPTEMBER 2007 |
| | **Responsibility:** Correctional Captain and Program Lieutenants |

- All emergency unlocks will be accomplished in accordance with the following procedures:
  a. When notified of a need for an emergency unlock, and approval has been granted, the Watch Sergeant will proceed to the wing with the additional staff as outlined in this order and with an S&E Officer who will be in control of the bar key.
  b. Staff with Wing Corridor Entrance Door Key Set must surrender this set to the Staff remaining in the corridor.
  c. On the tier the bar-locking device will be placed in the "KEY" position.
  d. The Wing Officers, supervisor and additional officers will proceed to the cell door. After making a visual inspection of the cell through the cell door window, the cell door will be keyed open, the inmate removed, if necessary, and the cell door locked.
  e. The locking device is to be secured back in the deadlock position, and the bar-locking device key will be returned to Central Control.

## B. Culinary Early Workers Unlocks:

- The Second Watch Culinary Sergeant will submit to Control and the Watch Office every day, a list of inmate(s) who are to be awakened early on the following morning. This will be accomplished prior to 1330 hours daily in the following manner:
  a. This list will contain the names, numbers, housing and time each inmate is to report to his assignment.
  b. The Third Watch Culinary Sergeant will ensure that copies of the early wake-up list are correct and routed to the concerned areas.
  c. The Wing Officer will awaken all inmates housed in the wing whose name appear on the list one half (1/2) hour maximum prior to the scheduled releasing of the inmates or at the discretion of the Wing Officer.
  d. The overhead tier lights are to be turned on after awakening inmates and prior to releasing inmates in order to maintain visual contact of the inmates and to enhance the safety of the release.

- Culinary unlocks will be conducted in the following manner:
  a. Two (2) S&E Officers will proceed to the wing. The bar-locking device will be placed on the "KEY" position by the S&E Officer. During releases, the S&E Officer will retain the bar key. The Wing Officer, will proceed to the tiers and conduct the unlock while the Second S&E remains in the wing sallyport providing additional visual coverage of the Wing Officer and inmates being released. The sallyport gate will be locked during releases. As each inmate is released from his cell, he will proceed to the first tier. At the completion of releases for the individual wing, the S&E will unlock the gate, and the inmates will proceed to their work assignments.
  b. Upon completion of the unlock, the S&E Officer will ensure that the bar locking devises are returned to the deadlock position. The S&E Officer will return the bar keys to Control at the completion of the releases. At no time will the sallyport gate key be taken past the sallyport gate.
  c. At NO TIME will the bar-locking device be placed in the "OPEN" position to facilitate a Culinary Unlock.

Ɛ⁄/1

A ⁻3



| | Subject: CELL UNLOCKS & YARD CARDS |
|---|---|
| CORRECTIONAL TRAINING FACILITY | |
| OPERATIONS PROCEDURE #40 | Reference: DOM Section 52020.8.11 |
| | Revision Due Date: SEPTEMBER 2007 |
| | Responsibility: Correctional Captain and Program Lieutenants |

d. All unlocks will be handled as quietly as possible so as to minimize disturbing other inmates. Kicking on cell doors, banging on the locking devices and other loud noises will not be tolerated.

2. **Second Watch General Unlock / Lockup Procedures for General Population Housing Wings B, C, D, E, F, G, Y and Z Wings:**

- The initial unlock of general population inmates prior to breakfast meal release will be conducted in the following manner:

a. A minimum of two (2) Officers will be present on the tier at all times in a wing when all unlocks or lockups are conducted on a routine basis and during major releases, i.e., meals, work/school.

b. Immediately upon assuming their post, the 0600 hours Officers assigned to the general population housing wings will conduct a security inspection. This inspection will be conducted with the bar-locking device in the deadlock position. During this inspection the Wing Officers will unlock the Folger-Adams locking devices on the cell doors of all identified a.m. diabetics and early workers at this time period. The remaining cell doors in that wing will have their Folger-Adams locking devices in the locked position. When the a.m. diabetics and early workers are called for they will be released by moving the bar from the deadlock position to the "KEY" position and then back to the deadlock position once the inmates have exited the cell. The bar will be moved to the "KEY" position releasing the a.m. diabetics and early workers. The wing security officer will ensure that only diabetics and early workers (not their cellmates) are released to the morning meal early by utilizing the early workers and diabetics list.

c. Prior to the breakfast release, the Wing Officers will unlock the remaining Folger-Adams locking devices, with the exception of CTQ/RTQ inmates. Those inmates housed with a CTQ/RTQ inmate will be released individually after their tier has been released. The Wing Tier Officer will then place the bar-locking devices in the "KEY" position to begin that tier's release, starting with the Third Tier down to the First Tier. The Officer assigned to the front door will place the 1st tier bar-locking devices into the "KEY" position for the first tier release.

d. Upon completion of each half (B,C,D,E,Y,Z) or tier (F,G) being released, both Tier Officers will be on the tiers to release inmates housed with RTQ/CTQ inmates. Both Officers will conduct security checks to ensure that all inmates have been released safely. The inmates will proceed directly to the dining hall or other approved activity. Under no circumstances will inmates be allowed to loiter on the tiers. The bar will then be moved back to the deadlock position before the release of the tier.

e. All inmates will return to their housing units after the morning meal and will remain on the 1st Tier. After all inmates have returned the Tier Officers will announce 3rd tier Lock-Up. Only 3rd Tier Inmates will go up and stand by their door with their backs against the wall. The Officers will key each door and allow only the assigned inmates in the cell. After completing the 3rd Tier, the Officers will follow the same procedure for the 2nd Tier and then the 1st Tier. The Officers will proceed with the lockup from the Third Tier down to First Tier (1 East Side & 1 West Side) locking those inmates in their respective cells. Upon



| | | Subject: CENTRAL UNLOCKS & YARD CARDS |
|---|---|---|
| | CORRECTIONAL TRAINING FACILITY | |
| | | Reference: DOM Section 52020.8.11 |
| | OPERATIONS PROCEDURE #40 | Revision Due Date: SEPTEMBER 2007 |
| | | Responsibility:    Correctional Captain and Program Lieutenants |

completion of the 0800 hour work and school release, the tier officers will conduct a 0815 hour yard release. The Tier Officers will lock all Folders-Adams locking devices and complete all hourly unlocks without using the bars. The bars will be utilized for the 1230 work and school call. Upon completion of the 1230 hour work and school release the Tier Officers will lock all Folders-Adams locking devices and complete all hourly unlocks without using the bar.

f.   Bar-Locking devices will not be utilized when conducting hourly unlocks. The bar-locking devices will only be utilized for mass unlocks / releases (0600 a.m. diabetics and early workers release, morning meal release and lock-up, 0800 work, school and yard release and the 1230 work, school and yard release) and emergency releases.

g.   During Yard Release, it will be the duty of the Officer assigned to the I.D. Card Box to collect I.D. Cards of ALL inmates going to the yard. The I.D. Cards will be placed in the box according to the last two (2) digits of the inmate's commitment number.

h.   Those inmates assigned Close Custody Status will have their I.D. Cards placed in the Close Custody Section of the I.D. Card Box. Again, these cards will be organized according to the last two (2) digits of the inmate's commitment number. The purpose of this is to accommodate the scheduled count activity and higher security requirements. I.D. picture boxes will remain locked at all times when not in use.

i.   Periodic clothed body searches of inmates are required of Correctional Personnel during mass movement of inmates in the corridor to control contraband.

j.   The completed yard count will be called into the Center Corridor Officer, (Ext. 4314). When releasing from the yard, the Yard Officer will allow ten (10) inmates at a time through the yard gate. Upon entering the West Gate, the inmates will identify themselves by their last name and the last two (2) digits of their commitment number in order to receive their I.D. Cards from the West Gate Officer. The inmates will then remove all items from their pockets, place them on the table prior to proceeding through the metal detector.

k.   The Yard Fence Gate and the West Corridor Grill Gate shall remain locked between unlocks. The outer security door located at the West Gate will be left unlocked whenever inmates or Officers are on the yard in the event that an emergency arises on the yard. The West Corridor Officer will be responsible for the operation of the West Corridor Gate.

l.   Special unlocks or releases from the yard will be made to accommodate visits or other needs at the discretion of the Recreation Yard Officer following approved notification of legitimate activity.

m.   Upon determination that an inmate is on the Recreation Yard, the Wing Officer will notify the West Gate Officer (via telephone Extension. #4439) to accommodate visits, interviews or other legitimate activity. The West Gate Officer will check the I.D. Cards under their supervision to determine if the inmate is or is not involved in Recreation Yard Activity. Under these circumstances, if an inmate is on the yard, the Wing Officer will have the inmate's name announced over the Public Address System. Additionally, Tower #4 (telephone Extension #4004) may be contacted, who in turn will notify the Yard Officers to provide assistance in locating inmates for visits or specified legitimate activity.

n.   Yard releases are subject to change at the discretion of the Watch Commander to accommodate other movement or during inclement weather.



| | |
|---|---|
| **CORRECTIONAL TRAINING FACILITY**<br><br>**OPERATIONS PROCEDURE #40** | **Subject:** CENTRAL UNLOCKS & YARD CARDS |
| | **Reference:** DOM Section 52020.8.11 |
| | **Revision Due Date: SEPTEMBER 2007** |
| | **Responsibility:**   Correctional Captain and Program Lieutenants |

## A. Unlocks to the Education Department:

- All inmates entering the Education Department will surrender their I.D. cards to the Officer at the door. Inmates without I.D. Cards will not be permitted entry. Inmates who have lost, or have not been issued their I.D. Cards, will not be permitted entry until they have received an I.D. Card.
- The Education Officer will sort the I.D. Cards by individual classes and will retain them until school is released. The Education Officer will return I.D. Cards to student inmates at that time.
- The Education Officer will retain education clerks I.D. Cards until the inmates are released from their assignments.
- Non-student or unassigned inmates with legitimate business in the area may enter the Education Department with a pass/ducat after surrendering their I.D. Cards with the Education Officer at the Entrance Door.

## 3. Third Watch General Unlock / Lockup Procedures for General Population Housing Wings B, C, D, E, F, G, Y and Z Wings:

- Upon reporting to the wings, the 1400-hour Officers will make a security inspection of their unit, ensuring that all RTQ/CTQ inmates are in their assigned cells, not injured, and that all doors are locked. This includes cells, mop rooms, and plumbing chases. The Unit Sergeant will be notified immediately of any discrepancies.
- Yard recall begins promptly at 1500 hours or at the discretion of the Watch Commander. The Officers and Unit Sergeant designated for corridor coverage will report to the Corridor promptly when the yard announcement is made.
- The Wing will be secured prior to yard recall.
- Yard recall is conducted by wing. At the completion of the wing yard recall, the two (2) Tier Officers will announce lockup. Those inmates requesting to go into their cells will stand by their assigned cell door. The two (2) Tier Officers will proceed with the lockup from the Third Tier down to the First Tier (1 East Side – 1 West Side) locking those inmates in their respective cells.
- At 1630 hours, all inmates are secured in their cells for Count unless placed on authorized Out-Count Slips.
- At approximately 1730 hours, or upon the clearing of the Institution Count and completion of emergency alarm checks, the evening meal will commence. When Central Control announces for corridor coverage, those Officers and Unit Sergeants assigned for corridor coverage will promptly report to the corridor.
- To facilitate the pick-up of TB and Psychotropic Medication for inmates requiring such medication, the evening meal release will precede beginning with the First Tier up to the Third Tier. Wings are released to the dining halls one and a half (1½) tiers at a time for B, C, D, E, Y and Z Wings. One (1) tier at a time for F and G Wings, (due to a larger tier size).
- Prior to the evening meal release, the Wing Officers will deadlock the bar and unlock the Folgers-Adams locking devices, with the exception of CTQ/RTQ inmates. Those inmates housed with a RTQ/CTQ inmate will be released individually after their tier has been released. The Wing Tier Officer will then place the bar-locking devices in the "KEY" position to begin



| | | **Subject:** CENTRAL UNLOCKS & YARD CARDS |
|---|---|---|
| **CORRECTIONAL TRAINING FACILITY** | **OPERATIONS PROCEDURE #40** | **Reference:** DOM Section 52020.8.11 |
| | | **Revision Due Date:** SEPTEMBER 2007 |
| | | **Responsibility:** Correctional Captain and Program Lieutenants |

that tier's release, starting with First Tier up to the Third Tier. The Officer assigned to the front door will place the 1st tier bar-locking devices into the "KEY" position for the first tier release. Upon completion of each half (B,C,D,E,Y,Z) or tier (F,G) being released, both Tier Officers will be on the tiers to release inmates housed with RTQ/CTQ inmates and will conduct security checks to ensure that all inmates have been released safely. Inmates will proceed directly to the dining hall, yard, or other approved activity. Under no circumstances will inmates be allowed to loiter on the tiers. The wing will be secured by locking the cell doors with the Folgers-Adams Key making sure that all inmates staying behind are uninjured and appear mentally normal before the release of the next tier.

- When the wing is released from the dining hall, inmates in possession of a valid Red Privilege Card, and a Green I.D. Card may go directly to the yard at this time. All inmates returning to the wing will remain on the 1st Tier. After all inmates have returned the Tier Officers will announce 3rd tier Lock-Up. Only 3rd Tier Inmates will go up and stand by their door with their backs against the wall. The Officers will key each door and allow only the assigned inmates in the cell. After completing the 3rd Tier the Officers will follow the same procedure for the 2nd Tier and then the 1st Tier. The Officers will proceed with the lockup from the Third Tier down to First Tier (1 East Side & 1 West Side) locking those inmates in their respective cells. Within 10 minutes of the last inmates being locked up (in order to allow the wing porters to clean the wing), the Officers will commence with Red Privilege Card program.

- At no time shall an Officer be on the tier alone. Both Tier Officers shall be on the tier at the same time. The Officer with the Door Set shall provide visual coverage during major releases from the sallyport area.

## A. Evening Release for Yard and Shower Program:

- Upon being released from the dining hall, those inmates not on yard restriction, in possession of a valid Red Privilege Card and a Green I.D. Card will be allowed the opportunity to go directly to the yard. The I.D. Cards of all inmates entering the Recreation Yard will be retained at the West Gate. Those inmates returning to the wings will remain on the First Tier until lockup is announced following completion of the evening meal for their respective wing.

- After securing the wing, the Wing Officers will begin the evening wing program in accordance with Third Watch Post Orders. The cell door Folger-Adams locking devices will not be unkeyed / unlocked at any time on Third Watch except to release authorized inmates to the evening meal / Red Card Programs, etc. Upon releasing the approved inmate, the cell door is to be re-locked.

## 4. Central Facility Unlocks: ALL TIMES ARE APPROXIMATE

| | |
|---|---|
| 0300 Hours | Unlock for Culinary Cooks (B, C, F, G, Y and Z Wings). |
| 0500 Hours | Unlock for Culinary Cooks (all mainline wings). |
| 0615 Hours | Breakfast releases from B, C, D, E, Y & Z Wings will be by 1½ tiers.  F & G Wings will release one (1) tier only. Work release from Culinary and wings already fed eastbound to Maintenance and Laundry, and west bound to yard. |
| 0800 Hours | Work, and School release from wings, or upon completion of the breakfast meal. |
| 0815 Hours | Yard Release from wings upon completion of Work and School Release. |
| 0830 Hours | Commence with RTQ/CTQ Status shower program. |

6

1-7

| | | |
|---|---|---|
|  | **CORRECTIONAL TRAINING FACILITY**<br><br>**OPERATIONS PROCEDURE #40** | **Subject:** CENTRAL UNLOCKS & YARD CARDS |
| | | **Reference:** DOM Section 52020.8.11 |
| | | **Revision Due Date:** SEPTEMBER 2007 |
| | | **Responsibility:** Correctional Captain and Program Lieutenants |

| | |
|---|---|
| 0900 Hours | Begin tier activity / hourly unlock schedule. |
| 1100 Hours | Close Custody Yard Recall / Courtesy Yard Recall. |
| 1115 Hours | Education release to all mainline wings. |
| 1130 Hours | Secure all wings. |
| 1215 Hours | Wing secured, bars secured for afternoon release to work, school and yard. |
| 1215 Hours | Close Custody Count. |
| 1230 Hours | Commence program for "C" Status inmates, and end at 1515 Hours. **(NOTE: Program for "C" status inmates will be conducted weekdays only).** |
| 1230 Hours | Work, School, and Yard release from all mainline wings. |
| 1330 Hours | Hourly Unlock |
| **1415 Hours** | **Weekends and Holidays all inmates will Lockup.** |
| **1430 Hours** | **Hourly Unlock for A2B and Red Card inmates. (Red Card Only on Weekends and Holidays).** |
| 1430 Hours | Commence yard recall for P.M. Culinary workers. |
| 1500 Hours | Yard Recall. *(NOTE: Yard recall may begin earlier due to the number of inmates on the yard).* |
| 1500 Hours | Education release back to all mainline wings in conjunction with E & F Wing Yard Recall. |
| 1515 Hours | Secure "C" Status inmates from the yard and wing. |
| 1530 Hours | Hourly Unlock. **(Weekends and Holidays-Red Card Only).** |
| 1630 Hours | Secure Wings and commence alarm checks. |
| 1700 Hours | Count (Mandatory Standing Count). |
| 1730 Hours | Release wings to the evening meal on a rotating basis. E, D and C Wings will be fed in the first phase as long as Close Custody inmates reside in these wings. For those wings not in the first phase for the evening meal, unlock for Red Card Yard, Early Workers, Diabetics and Ducats (Library on Sundays and Mondays). The wings in the second and third phase for the meal release will begin their evening Red Card Program (**showers only**) and will be limited to East or West side on a daily rotation. Lockup the wing prior to the evening meal release from the wing. Upon completion of the evening meal the wing will be secured. Red Card Unlock begins ten (10) minutes after the wing is secured. When the wing is released from the Dining Hall, all inmates returning to the wing will be secured prior to commencing with Red Privilege Card Program. |

**NOTE:** Red Card Yard Release: Wings scheduled in the second and third phases will conduct a release to the yard only after the completion of the release to the dining halls for the First Phase Wings. This release will be for Red Card Holders who do not want to go to the evening meal (**no Close Custody**). Those inmates who want to go to the yard and forgo attending the evening meal will remain on the first tier of their wings, behind the grill gate until the West Corridor Officer announces yard



| | |
|---|---|
| CORRECTIONAL TRAINING FACILITY | Subject: CENTRAL UNLOCKS & YARD CARDS |
| OPERATIONS PROCEDURE #40 | Reference: DOM Section 52020.8.11 |
| | Revision Due Date: SEPTEMBER 2007 |
| | Responsibility:    Correctional Captain and Program Lieutenants |

release for that wing. Upon completion of the yard release the Red Card Program (**showers only**) will be conducted.

**NOTE:**    **A2B and "C" Status inmates will lockup upon returning from the Dining Hall.**
A continued hourly unlock for Red Card holders will commence no more than ten (10) minutes after the lockup is completed.

2000 Hours    Close Custody Count
2030 Hours    Commence yard recall.
2100 Hours    Red Card shower program ends.
2130 Hours    Count.

**Special Security Measures:**

- Bar-locking devices will never be utilized to accomplish hourly unlocks. The bar-locking devices will only be utilized for mass unlocks / releases, meal lockups and emergency releases.
- Cell visiting and wing visiting is not permitted at any time. Only authorized maintenance workers will be permitted to enter a wing. These workers must be under direct supervision of a staff member at all times.
- Tier loitering is forbidden at all times.
- With the exception of extreme emergencies, the bar-locking device will never be placed in the open position.
- Activities in the wing during Second Watch and Third Watch will be limited to the designated or approved tier activities. Program is restricted to Red Privilege Cards on weekdays after the 1700 hours count. On weekends and holidays the program is restricted to Red Privilege Cards at 1430 hours.
- Library on weekends and holidays is restricted to Red Card Only for Non-Priority Use.
- With the exception of authorized unlocks, inmates will not exit the wings unless they have a verified pass or ducat in their possession. Passes will not be issued to any area unless the supervisor in charge of the area has been contacted and the presence of the inmate is requested and/or verified. Passes will only be made out and issued by Custody Staff.
- Officers/Staff in charge of the Culinary will release Culinary Workers from their assigned areas. Corridor Officers will not release workers from the Culinary. Upon ascertaining whether or not an inmate lives in a wing, the Corridor Officer may allow him access to the wing.
- During meal and major releases, the Unit Sergeant assigned as Corridor Sergeant will supervise the wing releases. Dining Hall supervision during meals will be provided by a Unit Sergeant in each Dining Hall. It will be the responsibility of the Watch Commander to ensure supervisory coverage of the Corridor and Dining Halls.
- Inmate corridor traffic during major releases will be one-way traffic (to the right of the corridor) unless otherwise determined by the Watch Commander. Inmates will not walk within the white boundary lines and may only cross these lines while exiting or entering an area, i.e. culinary, wings, etc.



| | |
|---|---|
| **CORRECTIONAL TRAINING FACILITY**<br><br>**OPERATIONS PROCEDURE #40** | Subject: **GENERAL UNLOCK & YARD CARDS**<br>Reference:<br>     DOM Section 52020.8.11<br>**Revision Due Date:** SEPTEMBER 2007<br>**Responsibility:** Correctional Captain<br>     and Program Lieutenants |

- Inmates returning from meals have the choice of yard (if eligible), or their cells (unless released for a shower or Red Card Programs). If an inmate is going to the yard, he does not enter the wing. No cell visiting or tier loitering is permitted at any time.
- The area from the Wing Entrance Door to the inner gate is to be clear of inmates at all times.
- When conducting major lockups, the two (2) Tier Officers will stand on the 2nd Tier and make sure all inmates returning to the wing remain on the 1st Tier. After all inmates have returned the Tier Officers will announce 3rd tier Lock-Up. Only 3rd Tier Inmates will go up and stand by their door with their backs against the wall. The Officers will key each door and allow only the assigned inmates in the cell. After completing the 3rd Tier the Officers will follow the same procedure for the 2nd Tier and then the 1st Tier. The Officers will proceed with the lockup from the Third Tier down to First Tier (1 East Side & 1 West Side) locking those inmates in their respective cells.
- All inmates in the East Corridor beyond X-Wing will be in state issued clothes. No personal clothes will be allowed beyond X-Wing unless it is for a medical emergency.

## 5. Lockdowns or Modified Program:

- When the entire facility or any part of the inmate population is on lockdown status, the cell-feeding process will begin immediately after the respective watch has assumed duty and the meal has been delivered. Inmates returning to the wing will be immediately secured in their cells.
- There will be no yard releases until completion of cell feeding and wing clean up.

## 6. Shower Programs:

- Close "B" Custody inmates who are a full-time assigned worker will be showered between the hours of 1500 and 1930 hours.
- All CTQ/RTQ inmates regardless of custody level will be showered on Second Watch.
- All unassigned inmates and "C" status will be allowed to shower during their program time which starts at the 1230 hours release and prior to the 1515 hours lockup.
- Third Watch is responsible for showering those inmates assigned to a full-time work/school position. Showers will be conducted between 1500 and 2050 hours.
- Controlled showers will consist of a maximum of one-half (½) tier of inmates out at any given time. A reasonable amount of time (30 minutes per group of inmates) will be afforded for inmates to shower and return to their cells.

## YARD CARDS:

### Identification/Privilege Cards:

Receiving and Release will prepare a CDC 131 Green Identification Card, a CDC 130 Red Privilege Card, and a Yard Card for all new arrivals to CTF. All inmates will receive a Green Identification Card prior to departing R&R, or as soon as practical. R&R will deliver the non-issued Red Privilege Cards and Yard Cards to the Records Department for storage and later issuance as appropriate.

C-10



| | |
|---|---|
| **CORRECTIONAL TRAINING FACILITY**<br><br>**OPERATIONS PROCEDURE #40** | **Subject:** CENTRAL UNLOCKS & YARD CARDS |
| | **Reference:**     DOM Section 52020.8.11 |
| | **Revision Due Date:** SEPTEMBER 2007 |
| | **Responsibility:**    Correctional Captain and Program Lieutenants |

**Initial Classification:**

The correctional counselor is responsible for reviewing the DMS for new arrivals to their caseload, determining the inmates Work Group / Privilege Group and obtaining the appropriate Yard Card and/or Red Card as necessary.   The Yard Card and Red Privilege Card can be obtained in the Records Department.  The correctional counselor will issue the appropriate card (s) to the inmate upon completion of the initial classification process, or forward the appropriate card (s) to the respective Wing Officer for issuance.

Should Unit Classification Committee change an inmate(s) work group status from A1-A to either A2-B or C-Status, the assigned correctional counselor will be responsible for obtaining the appropriate card.

Lost or altered ID cards shall be replaced.  The cost associated with replacing the Green ID, Red Privilege or Yard Card shall be the sole responsibility of the inmate(s).  Should any card(s) as described above be altered, the inmate(s) shall not be allowed entrance into the Central Yard.


*B. Curry*

Ben Curry
Warden (A)
Correctional Training Facility                    September 13, 2006


RECEIVED

SEP 20 2006

AW-CEN CTF

10

*l-11*

**EXHIBIT D**

State of California

# Memorandum

Date    :    December 23, 2002

To    :    **ALL STAFF & INMATES**
**CTF - CENTRAL**

Subject  :    **OPERATION PROCEDURE (OP) #40**

The following is a clarification to O.P. #40.
These clarifications will be strictly adhered to **effective January 8, 2003.**

1.  East/West Rotation
    **2nd phase** – Only East side or West side will be released to the yard or for showers. The whole side (Red Card holders desiring either yard or showers) will be released at the same release.

    NOTE:  Staff will continue to explore and consider systems which would identify a set number of inmates from the non-designated side of the wing for courtesy yard release.

    **3rd phase** – Courtesy yard release will be completed for Red Card holders on both sides of the wings desiring yard access. When the courtesy yard release inmates have exited the wing, staff will conduct a shower program for the designated East or West side Red Card holders.

2.  Close Custody programming after 2000 hours is **no** longer permitted.

J. Hamlet
Warden
Correctional Training Facility

(D)

**EXHIBIT E**

E-1

STATE OF CALIFORNIA                                                    SL 2 5 2006 DEPARTMENT OF CORRECTIONS

**INMATE/PAROLEE**  
**APPEAL FORM**  
CDC 602 (12/87)

Location: Institution/Parole Region      Log No.                    Category

1. _____ CTF-C  06 - 02329                   2 3

2. _____                  2. _____  DEC 8 2006

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME A. BOSTON  Andre | NUMBER D-03868 | ASSIGNMENT MAC-001/MAC CHAIRMAN | UNIT/ROOM NUMBER EW-236U |
|---|---|---|---|

A. Describe Problem: This inmate appeal is being filed pursuant to the California Code of Regulations (CCR), Title 15 § 3084.1, 3084.2, and 3160 (a) in their entirety. In order to seek timely resolution of this matter we are requesting that the appeal be bypassed to the Second Level in accordance with CCR Title 15 § 3084.5 (b) as it addresses a violation of California Code of Regulations (CCR) **Title 15 § 3377.1** by a policy implemented by the Institution Head at CTF. The factors of this appeal are as follows: CTF-Central Facility is a part of a California State Prison that can house approximately 3230 inmates. Central Facility's inmates

If you need more space, attach one additional sheet.

B. Action Requested: It is requested that #1 The institution become in complete compliance with the Departmental Regulations regarding Close R Custody program assignments and activities. It is also requested that the Close "B" Custody inmates at CTF be given the "full" opportunity to program assignments and activities between 0600

Inmate/Parolee Signature: _Andre Boston_          Date Submitted: 7/21/06

C. INFORMAL LEVEL (Date Received: _____ )

Staff Response: _____

_BYPASS_

Staff Signature: _____          Date Returned to Inmate: _____

D. FORMAL LEVEL  
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

_BYPASS_

Signature: _____   RECEIVED   RECEIVED   Date Submitted: _____

Note: Property/Funds appeals must be accompanied by a completed                 CDC Appeal Number:
Board of Control form BC-1E, Inmate Claim

JUL 2 1 2006          OCT 17 2006          SEP 2 5 2006          06 - 02329

CTF APPEALS      CTF APPEALS          CTF APPEALS                E-2

INMATE APPEALS BRANCH DEC 28 2006 RECEIVED

First Level    ☐ Granted    ☐ P. Granted    ☑ Denied    ☐ Other _____

E. REVIEWER'S ACTION (Complete within 15 working days): Date assigned: **JUL 21 2006** ___ Due Date: **SEP 01 2006**

Interviewed by: ___ LT R. LYNCH _____

Staff Signature: _____ Title: ___ LT ___ Date Completed: 6.27.06

Division Head Approved:

Signature: _____ Title: ___ RC. ___ Returned / Date to Inmate: SEP 25 2006

F. If dissatisfied, explain reasons for requesting a Second-Level Review, and submit to Institution or Parole Region Appeals Coordinator within 15 days of receipt of response.

The MAC is dissatisfied with the First Level Response and hereby respectfully request a Second Level Review of this matter based on the following reasons: The MAC asserts that the First Level Review authored by Lieutenant R. Lynch and signed by acting Associate Warden R. Pope was inappropriate and should be SEE ATTACHED PAGES

Signature: _____  Date Submitted: 10/13/06

Second Level    ☐ Granted    ☐ P. Granted    ☑ Denied    ☐ Other **OCT 17 2006**    **NOV 15 2006**

G. REVIEWER'S ACTION (Complete within 10 working days): Date assigned: **OCT 17 2006** ___ Due Date: _____

☑ See Attached Letter

Signature: _____    Date Completed: _____

Warden/Superintendent Signature: _____    Date Returned to Inmate: **DEC 8 2006**

H. If dissatisfied, add data or reasons for requesting a Director's Level Review, and submit by mail to the third level within 15 days of receipt of response.

The MAC is dissatisfied with the institutional response at the Second Level and hereby requests a Director's Level Review based on the following reasons: The institution appears to represent that if they say something "is so," it must be so period. The conditions grieved in the MAC's appeal on behalf of the population are longstanding and still remain unresolved. The institutional response also demonstrates measures, which have been routinely adopted by the Inmate Appeals Coordinators (See attached page)

Signature: _____ A. Boston, D-03868 _____    Date Submitted: 12-22-06

For the Director's Review, submit all documents to: Director of Corrections
P.O. Box 942883
Sacramento, CA 94283-0001
Attn: Chief, Inmate Appeals

DIRECTOR'S ACTION:    ☐ Granted    ☐ P. Granted    **RECEIVED**    ☑ Denied    ☐ Other    DEC 2 2006

☑ See Attached Letter

CDC 602 (12/87)    DEC 18 2006    CTF-C    Date: **MAR 16 2007**

CTF APPEALS

E-3

Describe Problem Continued:

general population is represented by an elected inmate advisory council (MAC). The MAC's function, as described in Title 15 of the CCR and the CDCR Department Operations Manual (DOM), is to advise and communicate with the Warden and other staff, those matters of common interest and concern to the inmate general population. CTF Central Facility currently houses approximately 576 Close B Custody inmates who are affected by the program for Close B inmates at CTF.

At present as a direct result of language restrictions in Operation Procedure # 34, CTF-Central Facility allows Close B Custody inmates the opportunity to access program activities including access to the recreational yard area between the approximate hours of 0700 and 1530 hours. Following the completion of the afternoon yard recall, Close B Custody inmates are not allowed any other recreational yard access until the following day. Close B Custody inmates are only allowed access to evening program within the housing unit until 1945 hours. The MAC asserts that the program access currently afforded is far less than that authorized by the applicable CCR Sections. (see attachment "C")

Pursuant to the mandatory language of **CCR Title 15 § 3377.1 (a)(4)(B)** which states in pertinent part: "[(B) Close B Custody inmates shall (EMPHASIS ADDED AND MANDATORY LANGUAGE PER **CCR TITLE § 3000.5**] be permitted to participate in program assignments and activities during the hours of 0600 to 2000 hours in areas located within the facility security perimeter including beyond the work change area in a designated Level II, III or IV institution...]". Pursuant to this language the CTF Close B Custody population are Departmentally entitled to program assignments and activities during the hours of 0600 to 2000 hours. However, CTF O.P. #34 presently contains a local restriction that violates the CCR Title 15 and prohibits Close B Custody inmates from full access to program activities [i.e.- Yard activities during non-work hours as is Departmentally authorized per **CCR Title 15 § 3044**] between the hours of 0600 and 2000 hours.

Recreational yard access is a part of the activities which Close B Custody inmates are entitled and authorized access to between the hours of 0600 and 2000 hours according to the CCR. Yet at CTF when the 1700 hours institutional count clears these same privilege group eligible inmates are being denied any further access to yard as is Departmentally mandated and authorized. The applicable section of **CCR Title 15 § 3377.1 (a)(4)(B)** contains mandatory language of **SHALL** when describing the activities and assignments that Close B Custody inmates are permitted to participate in between the 0600 and 2000 hours. The mandatory terminology of **CCR Title 15 § 3377.1 (a)(4)(B)** precludes the discretionary application of not allowing Close B Custody inmates to participate in program assignments, and activities up until 2000 hours.

By not allowing Close B Custody inmates the opportunity to participate in recreational yard activities until 2000 hours, CTF is essentially removing privileges from the specialized segment of the general population at CTF-Central Facility who would otherwise be entitled to and eligible for such.

**CCR Title 15 § 3044 (c)(2)** provides in pertinent part: (2)- All or a portion of privileges available to a work/training incentive group may be denied, modified or temporarily suspended at a disciplinary hearing upon a finding of an inmate's guilt for a disciplinary offense described in sections 3314 and 3315 of these regulations or by a classification committee action changing the inmate's custody classification, work/training privilege group or institution placement. By not allowing Close B Custody inmates yard activities up to 2000 hours, CTF is effectively denying Close B Custody inmates who have not been found guilty of any disciplinary violation, nor had their custody classification changed, the access to program activities that they are entitled to per the applicable California regulation.

**CCR Title 15 § 3044 (c)(5)** provides in pertinent part: (5)- No inmate or group of inmates shall be granted privileges not equally available to other inmates of the same custody classification who would otherwise be eligible for the same privilege." In this case inmates throughout the Department who are of the Close B Custody classification and similarly assigned enjoy the regular program assignments and activities that the CTF-Central Facility Close B Custody are being denied unjustly. This disparity of treatment in selectively excluding and subjecting these otherwise eligible Close B Custody inmates to a condition which is not only adverse, and unfair, but also in violation of recognized Departmental policies, is in effect an act of discrimination against a particular class of inmates at this facility who are being denied privileges that they are otherwise entitled to.

CONTINUED OF REVERSE SIDE

/o8                                              E-4

Continued:

While CTF has for years been hesitant to resolve some of the discrepancies and conflicts which exist regarding the Close B Custody Program, the MAC would draw the administration's attention to the Department's position on Close B Custody program assignments and work activities. The Inmate Appeals Branch in Sacramento routinely issues a Departmental Bulletin entitled the "Insighter". This bulletin contains information on appeal issues and recent court rulings. In "The Insighter" issue #17 dated January 2003, there was a column entitled "A Court Weighs In On Application of Regs" which advised institutions about a recent court decision on the application of regulations within the Department. The column discussed a challenge by an inmate to the application (or non-compliance) of regulations on Close B Custody program and activity hours. Headquarters clearly indicated that despite local attempts to justify their non-compliance with the regulations as applied to Close B Custody program, the court had found that "an institution could not have a reasonable interest that contravenes the regulations under which it operates." Additionally, the court found that neither local policy nor the Departmental Operations Manual (DOM) supercede the California Code of Regulations (CCR) and that the language of the applicable CCR section was mandatory not discretionary. (See attachment A)

The MAC would point out that Administrative concerns regarding the availability of high mast lighting, daylight savings time and operational necessity are applicable per CCR § 3377.1 (a)(2)(B) to Close "A" Custody inmates only and not Close B Custody inmates. Additionally the issue of Close Custody inmates not going beyond the work change area is per CCR § 3377.1 (a)(2)(B) applicable to Close A Custody inmates only and not Close B Custody inmates despite existing local policy.

Furthermore the provisions of DOM § 51020.1 provides that "Supplements shall: Not create new policy/regulation... A definition of a regulation is that it: implements, interprets, or makes more specific the provisions of statute, case law or regulation of controlling agencies...imposes requirements which shall be met to qualify for any general entitlement or privilege available to inmates, parolees, or the public." All Operational Supplements shall comply and expound on the implementation of Regulations not contradict them, and in this case the Operational Supplement (OP #34) clearly is not in compliance with the CCR.

Lastly, the MAC would note that previous attempts to informally address the administration seeking revision of Operations Procedure #34 have been to no avail. Therefore, in this instance the submission of this appeal is appropriate. (See attachment B)
//


Action Requested Continued:


and 2000 hours, as is prescribed by the California Regulatory Authority provided in CCR **Title** 15 § 3377.1 aforementioned. #2)- O.P. #34 (and any other relevant O.P. sections) be revised to reflect program activities and assignments as is reflected within the applicable CCR section aforementioned.

Date: ___7/21/66___

/s/ _____
A. Boston, D-03868
MAC Chairman

**ATTACHMENT A**

E-6

# The Insighter

Issue Number 12          CDC INMATE APPEALS BRANCH TRAINING BULLETIN          January 2001



*Inmate*
*Appeals*
*Branch*
*916-358-2417*

E. Alameida, Jr., Director
CDC

K. Kinser, Chf. Dep. Director
Support Services

E.A. Mitchell, Dep. Director
Policy and Eval Div.

Nola Grannis, Chief
Inmate Appeals Branch

**Office Staff**
Sandy Brady, SWPT
Sharon Candalot, AGPA
DeeAnne Cooper, WPT
Morenda Hamarlund, OT
Lizie Hoagland, WPT
Mary Morairty, AGPA
Renee Welsh, OT

**Appeals Examiners**
Ken Allen, SSM-I
Jocelynn Arceo, FC
Judy Burleson, SSM-I
Pio Enriquez, FC
Randy Floto, FC
Maya Hodges-Wilkins, FC
Chuck Hollis, FC
Tony Loftin, FC
Jane Pearson, FC
Derek Porter, FC
Jerry Stocker, FC
Betsy Sullivan, SSM-I
Tom Surges, SSM-I



## A MESSAGE FROM THE CHIEF...

*Greetings!* Before becoming chief, I had the pleasure of working with most of the appeals coordinators and their staff; therefore, I have a feeling of continued confidence in the abilities of those around me. This year should bring with it some interesting challenges including significant changes in law, regulation, and policy. Many of you are currently feeling the crush of appeals regarding frontal nudity, the ban on smoking products, and soon—restitution and Plata complaints. I would like to ask your cooperation in maintaining the integrity of the exhaustion requirement pursuant to the Prison Litigation Reform Act of 1995. This act gave us the ability to thwart premature filings in the courts, resulting in their immediate dismissal for failure to exhaust by administrative appeal. The way to best support the reform act is through strict adherence to appeal time limits. Too many First or Second Level responses address the appellant's failure, without cause, to meet time constraints, yet proceed to respond as if they had. Instead of preventing future litigation, the response commits CDC to follow this appeal to its end. More often than not, this means court, and court represents much time, effort, and money. If an appellant has no legitimate excuse for delayed submittal/resubmittal, then the appeal should be screened out for untimeliness, thereby preventing access to court.

## THIRD PARTY INTERVENTION ON BEHALF OF AN INMATE/PAROLEE APPELLANT

Inmates and parolees have a right to appeal CDC decisions, actions, conditions, or policies that adversely affect them. No other inmate or parolee shall submit a CDC 602 on behalf of another inmate or parolee. Nonetheless, an appellant may obtain the assistance of another person, including an inmate or parolee, in preparing the appeal. Institution staff shall provide the assistance necessary to inmates who have difficulty communicating in written English to afford access to the appeal process. These are CDC regulations.

*To what extent may an appellant be represented by a third party, such as a parent, an inmate, or an attorney?* Third parties may assist and even ghostwrite appeals for an appellant. This is especially relevant to a disabled inmate who cannot write a CDC 602. The CDC 602 must be submitted over the appellant's signature and through the appellant, not a third party. If the appellant cannot sign his or her own name, a staff member should interview the appellant and obtain a verbal or other acknowledgement that the CDC 602 was knowingly submitted by the appellant and the content represents the appellant's position. The employee should write on the CDC 602 that the interview was conducted and the circumstances of the appellant's concurrence. Responses to the appeal should be directed to the appellant, not the third party. Staff assistance to communicate the response for a disabled appellant should be provided as necessary and documented. *(CCR 3084.1, 3084.2, 3084.3)*

## A Court Weighs In On Application of Regs

A recent California court decision to grant an inmate's writ of habeas corpus serves as a reminder to CDC that we must follow our established regulations. The inmate petitioner asserted that the institution failed to follow CCR 3377.1 which establishes Close "B" Custody program and activity hours. The response at each level of appeal cited a variety of justifications to establish different program hours. **First level:** the rule changes were permissive and the institution had the authority to amend them; *the court ruled that the language was mandatory.* **Second level:** DOM permitted the institution to retain prior policy; *the court ruled that DOM does not supercede the CCR.* **Third level:** a reasonable penological interest existed to change the hours; *the court ruled that an institution could not have a reasonable interest that contravenes the regulations under which it operates.* While some regulations may seem to be outdated or inconvenient, CDC is held to compliance.

Recommendations to revise regulations should be submitted through the chain of command to headquarters staff.

★ ★ ★ ★

171                                                  E-7

**ATTACHMENT B**

E-8

# Men's Advisory Council
# Executive Body
# CTF-Central Facility

## Memorandum

Date:      July 18, 2005

To:        **A. P. KANE**              Via:    **W. J. HILL**
           **Warden (A)**                      **Associate Warden**
           **Correctional Training Facility**   **CTF-Central Facility**

Subject:   **REQUEST FOR REVIEW AND REVISION OF THE PROVISIONS FOR CLOSE
           CUSTODY PROGRAMMING AS DESCRIBED IN OPERATIONS PROCEDURE #34**

While previous Administrations for the Correctional Training Facility (CTF) have been hesitant to address programming concerns of Close Custody inmates, the Men's Advisory Council (MAC) is advocating that the present Administration reconsider and resolve some of the discrepancies and conflicts that this element of our population considerD to be fundamental as stakeholders in their rehabilitation. Given the newly reorganized, mission-based orientation of the Department of Corrections and Rehabilitation (CDCR), the goal of equitable program access for all inmates at common Custody and Security Levels should be a priority. Program access should be based on the Department's regulations contained in the California Code of Regulations (CCR), Title 15 and facilitated by the Department's policy guidelines contained in the Department Operations Manual (DOM). Finally, the institution's Operations Procedures (OP) should carry out the mandates of the regulations and policy guidelines, rather than perpetuate long-standing local "interpretations."

In your consideration of our request and advocacy on the behalf of Close Custody inmates as stakeholders in their rehabilitation process, the MAC would draw the Administration's attention to clearly defineF and unambiguous Departmental positions on Close B Custody program assignments and work activities. The Inmate Appeals Branch in Sacramento has routinely published a Departmental Bulletin entitled *"The Insighter,"* which contains information on appeal issues and recent court rulings. We would call your attention to a column contained in the January 2003, Issue #17 of *"The Insighter"* that is entitled "A Court Weighs in On Application of Regs" (Attachment A). The column discussed a challenge by an unnamed inmate to the application (or non-compliance) of regulations on Close B Custody program and activity hours. According to the article, the court had found that "an institution could not have a reasonable interest that contravenes the regulations under which it operates." In addition, the court ruled that local policy and the DOM "does not supercede the CCR."

CTF's OP #34 addresses several different CCR and DOM topics within a single operations procedure. Those topics include classification, housing, work assignments and program activities. The MAC represents and advocates that the provisions of this procedure should be consistent with the applicable regulatory provisions of the CCR and policy guidelines of the Department.

REQUEST FOR REVIEW AND REVISION OF THE PROVISIONS FOR CLOSE
CUSTODY PROGRAMMING AS DESCRIBED IN OPERATIONS PROCEDURE #34
Page 2

The MAC has developed a description of what we have identified as the apparent
discrepancies or conflicts in the OP. In addition, we have attempted to suggest possible
solutions or provisions that could address these issues, which we are submitting for your
consideration. For informational purposes, all references in this correspondence refer to the
provisions of CCR Title 15, Division 3, Section 3377.1, which deals with Inmate Custody
Designations and DOM Section 62010.7.3, which addresses Custody Designations. The MAC
would also assert that any future revision of CTF's Operations Procedures should be consistent
with the format described in the provisions of DOM Sections 51020.1-51020.5, which outline
policy regarding the supplemental process to the Department's rules, regulations, and
guidelines.   Incorporating the DOM format would facilitate easy comparison where
institutional policy describes local procedures or expands upon the provisions of the DOM.

The specific provisions of OP #34 for Close B Custody program activities/work assignments
violate the regulatory language of the CCR. The MAC also notes that the language contained
in DOM §62010.7.3 is outdated and similarly violates the applicable provisions of the CCR
regarding program activities and work assignments for inmates with Close B Custody
designations.

The MAC would respectfully request your review of the indicated provisions of OP #34 and
consider adopting or developing revisions, which would bring CTF's OP into compliance with
both the CCR and the DOM for Close B Custody program, assignments and activities. We
would also suggest that, in view of the adoption of new mission based organizational policy,
the institution could share the need to revise and incorporate changes to the DOM with the
appropriate division or section of CDCR to bring Departmental policy into compliance with
the regulatory language of the CCR and rulings of the courts that impact program access.

Because this matter is a significant concern to the Close B Custody inmates of CTF as
stakeholders who are directly affected by the Department's newly reorganized commitment to
rehabilitation, the MAC is respectfully requesting that an informative response to this input be
provided for us to share with our constituency after you have had the opportunity to review
and consider the attached material.

A. BOSTON
MAC Chairman
CTF-Central Facility

Attachments:
A. Material from *"The Insighter"*
B. Proposed Recommendations for Review and Revision
C. CCR §3377.1(a)(4)
D. CCR §3000
E. CCR §3377.1(a)(2)(C)
F. DOM § 52020.4.12



E-18

**ATTACHMENT A**

# The Insighter

 

ISSN Number ... CDC INMATE APPEALS BRANCH TRAINING BULLETIN ... January 2001



*Inmate*
*Appeals*
*Branch*
*916-358-2417*

*E. Alameida, Jr., Director*
*CDC*
*K. Kinser, Chf. Dep. Director*
*Support Services*
*E.A. Mitchell, Dep. Director*
*Policy and Eval. Div.*
*Nola Grannis, Chief*
*Inmate Appeals Branch*

*Office Staff*
*Sandy Brady, SWPT*
*Sharon Candalot, AGPA*
*DeeAnne Cooper, WPT*
*Orenda Hamarlund, OT*
*Irie Hoogland, WPT*
*Mary Morairty, AGPA*
*Renee Welsh, OT*

*Appeals Examiners*
*Ken Allen, SSM-I*
*Jocelynni Arceo, FC*
*Judy Burleson, FC*
*Pio Enriquez, FC*
*Randy Floto, FC*
*Maya Hodges-Wilkins, FC*
*Chuck Hollis, FC*
*Tony Loftin, FC*
*Jane Pearson, FC*
*Derek Porter, FC*
*Jerry Stocker, FC*
*Betsy Sullivan, SSM-I*
*Tom Surges, SSM-I*



## A MESSAGE FROM THE CHIEF...

*Greetings!* Before becoming chief, I had the pleasure of working with most of the appeals coordinators and their staff; therefore, I have a feeling of continued confidence in the abilities of those around me. This year should bring with it some interesting challenges including significant changes in law, regulation, and policy. Many of you are currently feeling the crush of appeals regarding frontal nudity, the ban on smoking products, and soon—restitution and Plata complaints. I would like to ask your cooperation in maintaining the integrity of the exhaustion requirement pursuant to the Prison Litigation Reform Act of 1995. This act gave us the ability to thwart premature filings in the courts, resulting in their immediate dismissal for failure to exhaust by administrative appeal. The way to best support the reform act is through strict adherence to appeal time limits. Too many First or Second Level responses address the appellant's failure, without cause, to meet time constraints, yet proceed to respond as if they had. Instead of preventing future litigation, the response commits CDC to follow this appeal to its end. More often than not, this means court, and court represents much time, effort, and money. If an appellant has no legitimate excuse for delayed submittal/resubmittal, then the appeal should be screened out for untimeliness, thereby preventing access to court.

## THIRD PARTY INTERVENTION ON BEHALF OF AN INMATE/PAROLEE APPELLANT

Inmates and parolees have a right to appeal CDC decisions, actions, conditions, or policies that adversely affect them. No other inmate or parolee shall submit a CDC 602 on behalf of another inmate or parolee. Nonetheless, an appellant may obtain the assistance of another person, including an inmate or parolee, in preparing the appeal. Institution staff shall provide the assistance necessary to inmates who have difficulty communicating in written English to afford access to the appeal process. These are CDC regulations.

*To what extent may an appellant be represented by a third party, such as a parent, an inmate, or an attorney?* Third parties may assist and even ghostwrite appeals for an appellant. This is especially relevant to a disabled inmate who cannot write a CDC 602. The CDC 602 must be submitted over the appellant's signature and through the appellant, not a third party. If the appellant cannot sign his or her own name, a staff member should interview the appellant and obtain a verbal or other acknowledgement that the CDC 602 was knowingly submitted by the appellant and the content represents the appellant's position. The employee should write on the CDC 602 that the interview was conducted and the circumstances of the appellant's concurrence. Responses to the appeal should be directed to the appellant, not the third party. Staff assistance to communicate the response for a disabled appellant should be provided as necessary and documented. *(CCR 3084.1, 3084.2, 3084.3)*

## A Court Weighs In On Application of Regs

A recent California court decision to grant an inmate's writ of habeas corpus serves as a reminder to CDC that we must follow our established regulations. The inmate petitioner asserted that the institution failed to follow CCR 3377.1 which establishes Close "B" Custody program and activity hours. The response at each level of appeal cited a variety of justifications to establish different program hours. First level: the rule changes were permissive and the institution had the authority to amend them; *the court ruled that the language was mandatory.* Second level: DOM permitted the institution to retain prior policy; *the court ruled that DOM does not supercede the CCR.* Third level: a reasonable penological interest existed to change the hours; *the court ruled that an institution could not have a reasonable interest that contravenes the regulations under which it operates.* While some regulations may seem to be outdated or inconvenient, CDC is held to compliance.

Recommendations to revise regulations should be submitted through the chain of command to headquarters staff.

✱ ✱ ✱ ✱



76

E-12

**ATTACHMENT B**

E -13

**ATTACHMENT B**

CTF-CENTRAL FACILITY MEN'S ADVISORY COUNCIL
PROPOSAL FOR REVIEW AND REVISION OF OPERATIONS PROCEDURE #34
July 14, 2005

BACKGROUND

The MAC is advocating that the Correctional Training Facility (CTF) embrace a new commitment to expanded program activities and work assignments for Close B Custody inmates, as stakeholders in their rehabilitation, consistent with the newly defined and reorganized mission based direction of the Department of Corrections and Rehabilitation (CDCR). The MAC is asserting that these program and work activities should be compliant and consistent with the provision of Departmental regulatory language contained in the California Code of Regulations (CCR) Title 15 and policy contained in the Department Operations Manual (DOM). The provisions of Operations Procedures (OP) #34 initially define program access for Close B Custody inmates at CTF.

The MAC's premise for requesting this review and revision of institutional policy is based on the explicit language of CCR §3377.1. The MAC would assert that previous concerns expressed by the Administration of CTF regarding the availability of "high mast lighting," daylight savings time and operational necessity are appropriate for Close A Custody inmates per CCR §3377.1(a)(2)(B), but do not apply to program access and activities for Close B Custody inmates, the affected class and stakeholders in this program issue. Similarly, the MAC would assert that limitations imposed on work assignments for CTF's Close B Custody inmates are applicable to Close A Custody inmates and should not be applied to CTF's Close B Custody population.

Because only Page 1 of OP #34 deals specifically with Close B Custody Program access, the MAC's proposals for review and revision to this OP are confined to the provisions of this applicable page. That does not preclude our recommendation that the balance of this OP be realigned in accordance with the provisions of DOM §§ 51020.1- 51020.5.

The language utilized in this proposal is adapted from CCR §3377.1(a)(4) and appropriately modifies the current outdated language contained in DOM §62010.7.3, which is not included to avoid confusion.

The appropriate Subject/Section Heading and reference for this OP should be as noted below. Proposed language for the sections of OP #34 that impact Close B inmates are enclosed in text blocks and should be the first entries in this OP to be compliant with DOM supplement formatting. The notes concerning Attachments would not be included in an OP.

---

**DOM §62010.7.3 Custody Designations**

   **Close B**

Housing.    The housing of Close B Custody inmates at CTF shall be in cells, in accordance with their security levels, within the established facility security perimeters of the Central and North Facilities.

Inmates who have been classified as Level II, Close B Custody inmates shall be housed in cells in CTF-Central Facility in E-Wing and D-Wing. C-Wing will be utilized as overflow housing for Level II, Close B Custody inmates, based upon institutional needs and bed space availability.

---

F-161

PROPOSAL FOR REVIEW AND REVISION OF OPERATIONS PROCEDURE #34
Page 2

Inmates who have been classified as Level III, Close B Custody inmates shall be housed in cells in CTF-North Facility in Rainer Hall-A (Yard Side). Shasta Hall-A (Yard Side) will be utilized as overflow housing for Level III, Close B Custody inmates, based upon institutional needs and bed space availability.

Assignments/Activities. Close B Custody inmates shall be permitted to participate in program assignments and activities during the hours of 0600 to 2000 Hours in areas located within the facility security perimeter, including beyond the work change area. Work supervisors shall provide direct and constant supervision of Close B Custody inmates during the inmate's assigned work hours. *(See Attachments C and D as noted below)*

Close B Custody inmates may participate in designed work program assignments until 2200 Hours when the work program is in an assigned housing unit located within the facility security perimeter. *(See Attachment C and D as noted below)*

Close B Custody inmates may participate in limited evening activities (showers and tier activities) after 2000 Hours until the general evening lockup and count at 2100 Hours, when the limited activity is in a designated housing unit, located within the facility security perimeter. *(See Attachment C and D as noted below)*

Notes for Attachment C:
  ➢ See highlighted portion of Attachment C – CCR §3377.1(a)(4)
  ➢ See CCR §3377.1(a)(4)(B) concerning work program assignments until 2200 Hours
  ➢ See §3377.1(a)(4)(C) concerning provisions for direct and constant supervision
Note for Attachment D:
  ➢ See highlighted portion of Attachment D – CCR §3000, which defines the "Facility Security Perimeter" as "any combination of living unit, work area, and recreation area perimeters that is set aside to *routinely restrict inmate movement based on custody level*."

To be compliant with the provisions of the CCR, the restriction of Level II Close B Custody inmates to activities within the "Central Facility security perimeter (West to East Gate) should be modified to incorporate the proposed language above (eliminating West to East Gate restrictions). Level II inmates are routinely allowed to move beyond those gates beginning with morning yard activities through the 1500 Hours Yard Recall. The artificial "collapsing" of the security perimeter at Central Facility violates the provisions of the CCR.

Level II and Level III Close B Custody inmates should be afforded the same yard access as other Level II and Level III inmates between the hours of 0600 to 2000 Hours to be compliant with the provisions of CCR §3377.1(a)(4). In addition, those inmates should be afforded work assignments and access to participation in inmate activity groups and leisure time activities (AA, NA, Veterans' Group, Meditation Group, etc.) between the hours of 0600 to 2000 Hours.

PROPOSAL FOR REVIEW AND REVISION OF OPERATIONS PROCEDURE #34
Page 3

The previous provisions which excluded the "Culinary Back Dock areas, Laundry/Clothing Room, Lower East Corridor" in Central Facility and "the Vocations Area, Culinary Back Dock areas, North Visiting or North Patio" in North Facility as potential work assignment and program activity areas need to be revised by facilitating "direct and constant supervision" for Close B Custody inmates of both Custody Levels.

The inclusion of an extra Close Custody Count, which is not required for Close B Custody inmates, as justification for restriction from program and work assignment access, whether claiming "job impact," conflict with program "scheduling" or unregulated security concerns violate the regulatory provisions of CCR §3377.1(a)(2)(C) (Attachment E) and Departmental policy outlined in DOM § 52020.4.12 (Attachment F), which apply to Close A Custody inmates *only*.

The requirement for direct and constant supervision to facilitate mission related activities that support rehabilitation of the CTF's Close B Custody population needs to be embraced instead of avoided. Disproportionate restrictions and the inability of Close B Custody inmates to avail themselves of work and program activities because of the design of an Operations Procedure clearly violates regulatory language, Departmental policy and court rulings. The regulatory language and the stated mission of the newly reorganized CDCR were written and adopted to facilitate the rehabilitation of Close B Custody inmates, without prejudice, as stakeholders with a liberty interest in meeting the State's parole policies.

**A. BOSTON**
**MAC Chairman**
**CTF-Central Facility**

cc:     Council Membership
        MAC File

E-16

**ATTACHMENT C**

uses the following inmate custody to establish where an inmate shall be housed and assigned, and the level of staff supervision to ensure institutional security and public safety:

Maximum Custody
Close A Custody
Close B Custody
Medium A Custody
Medium B Custody
Minimum A Custody
Minimum B Custody

(1) Maximum Custody.

(A) Housing shall be in cells in an approved segregated program housing unit as described in CCR Section 3335 and CCR subsections 3341.5(b) and 3341.5(c).

(B) Assignments and activities shall be within the confines of the approved segregated program housing unit.

(C) An inmate designated as Maximum Custody shall be under the direct supervision and control of custody staff.

(2) Close A Custody Male Inmates.

Housing shall be in cells within Level III and Level IV facilities in housing units located within an established facility security perimeter.

(B) Close A Custody inmates shall be permitted to participate in program assignments and activities scheduled within the hours of 0600 hours to 1800 hours unless hours are extended by the Warden to no later than 2000 hours when it is determined that visibility is not compromised in areas located within the facility security perimeter. Bases for the extended hours include operational necessity, daylight savings time, or availability of high mast lighting. Close A Custody inmates are not permitted beyond the work change area.

(C) Custody staff supervision shall be direct and constant. In addition to regular institutional counts, Close A Custody male inmates shall be counted at noon each day.

(3) Close A Custody Female Inmates.

(A) Housing shall be in cells or in a designated Close Custody dormitory.

(B) Close A Custody female inmates shall be permitted to participate in program assignments and activities scheduled within the hours of 0600 hours to 1800 hours unless hours are extended by the Warden to no later than 2000 hours when it is determined that visibility is not compromised in areas located within the facility security perimeter and the work change area. Bases for the extended hours include operational necessity, daylight savings time, or availability of high mast lighting.

(C) Custody staff supervision shall be direct and constant. In addition to regular institutional counts, Close A Custody female inmates shall be counted at noon each day.

(4) Close B Custody Male Inmates.

(A) Housing shall be in cells within designated institutions in housing units located within an established facility security perimeter.

(B) Close B Custody inmates shall be permitted to participate in program assignments and activities during the hours of 0600 hours to 2000 hours in areas located within the facility security perimeter including beyond the work change area in a designated Level II, Level III or Level IV institution. Close B Custody inmates may participate in designated work program assignments until 2200 hours when the work program is in an assigned housing unit located within the facility security perimeter. Close B Custody inmates may participate in limited evening activities after 2000 hours until the general evening lockup and count when the limited activity is in a designated housing unit located within the facility security perimeter.

(C) The work supervisor shall provide direct and constant supervision of Close B Custody inmates during the inmates' assigned work hours.

(D) Custody staff shall provide direct and constant supervision of Close B Custody inmates at all times.

(5) Close B Custody Female Inmates.

(A) Housing shall be in cells or in a designated Close Custody dormitory located within an established facility security perimeter.

(B) Close B Custody female inmates shall be permitted to participate in program assignments and activities during the hours of 0600 hours to 2000 hours in areas located within the facility security perimeter, including beyond the work change area, in designated Level II, Level III and Level IV institutions. Close B Custody female inmates may participate in work program assignments until 2200 hours when the work program is in an assigned housing unit located within the facility security perimeter. Close B Custody female inmates may participate in limited evening activities after 2000 hours until the general evening lockup and count when the limited activity is in an assigned housing unit located within the facility security perimeter.

(C) The work supervisor shall provide direct and constant supervision of Close B Custody inmates during the inmates' assigned work hours.

(D) Custody staff shall provide direct and constant supervision of Close B Custody inmates at all times.

(6) Medium A Custody.

(A) Housing shall be in cells or dormitories within the facility security perimeter.

(B) Assignment and activities shall be within the facility security perimeter.

(C) Custody staff shall provide frequent and direct supervision.

(7) Medium B Custody.

(A) Housing shall be in cells or dormitories within the facility security perimeter.

(B) Assignment and activities shall be within the facility security perimeter. Inmates may be given daytime assignments outside the facility security perimeter but must remain on facility grounds.

(C) Custody staff shall provide frequent and direct supervision inside the facility security perimeter. Custody staff shall provide direct and constant supervision outside the facility security perimeter.

(8) Minimum A Custody.

(A) Housing shall be in cells or dormitories within the facility security perimeter.

(B) Assignment and activities may be inside or outside the facility security perimeter.

(C) Staff supervision shall consist of at least hourly observation if assigned outside the facility security perimeter. Sufficient staff supervision of the inmate shall be provided to ensure the inmate is present if assigned inside the facility security perimeter.

(9) Minimum B Custody.

(A) Housing may be in cells or dormitories on facility grounds, in a camp, in a Minimum Support Facility (MSF) or in a community based facility such as a Community Correctional Facility.

(B) Assignments and activities include eligibility work or program assignments located either on or off institutional grounds.

(C) Sufficient staff supervision shall be provided to ensure the inmate is present.

(b) An "R" suffix shall be affixed by a classification committee to the inmate's custody designation to alert staff of inmates who have a history of specific sex offenses.

(1) The "R" suffix shall be designated for any inmate who was convicted of, or whose commitment offense includes an act equivalent to any of the following offenses:

(A) Assault with intent to commit rape, sodomy, oral copulation, rape in concert with another, lascivious acts upon a child, or penetration of genitals or anus with a foreign object. [Penal Code Section 220]

11. Certificate of Compliance as to 3-20-96 order transmitted to OAL 7-25-96 and filed 9-5-96 (Register 96, No. 36).

12. Amendment of section and Note filed 5-1-97; operative 5-31-97 (Register 97, No. 18).

13. Amendment of subsection (d)(2)(A) filed 7-28-97 as an emergency; operative 7-28-97 (Register 97, No. 31). Pursuant to Penal Code section 5058(e), a Certificate of Compliance must be transmitted to OAL by 1-5-98 or emergency language will be repealed by operation of law on the following day.

14. Certificate of Compliance as to 7-28-97 order transmitted to OAL 10-27-97 and filed 12-8-97 (Register 97, No. 50).

15. Amendment of subsection (d)(2)(A), new subsection (d)(2)(B), subsection relettering and amendment of subsection (d)(3)(E) filed 1-9-2004 as an emergency; operative 1-9-2004 (Register 2004, No. 2). Pursuant to Penal Code section 5058.3, a Certificate of Compliance must be transmitted to OAL by 6-17-2004 or emergency language will be repealed by operation of law on the following day.

### 3376.1.   Departmental Review Board.

The Departmental Review Board (DRB) provides the director's final review of classification issues, which are referred by an institution head for a resolution or decision at the headquarters level. The DRB decision serves as the director's level decision, which is not appealable and concludes the inmate/parolee's departmental administrative remedy of such issues.

(a) Composition of the DRB:

(1) The deputy director or an assistant deputy director of the institutions division (chairperson).

(2) The deputy director or assistant deputy director of the parole and community services division.

(3) The chief of classification services (shall abstain on DRB issues resulting from a difference of opinion between an institution head and the chief of classification services).

(4) The chief of health services.

(b) Two members shall constitute a quorum.

(c) The DRB shall meet at the call of the chairperson.

(d) Referrals shall be made to the DRB when:

(1) An institution head is unable to resolve a difference of opinion with the chief of classification services.

(2) An institution head believes a clarification of departmental policy of statewide importance is required.

(3) An institution head believes a DRB level decision for placement of an inmate is required because of an unusual threat to the safety of persons or public interest in the case, e.g., commuted or modified death sentence or classification of an inactive gang member or associate. Subsequent DRB reviews of the continued placement of inactive gang members or associates in a security-housing unit (SHU) shall occur no earlier than two years after the previous DRB decision. Upon denial of an alternative placement for an inactive gang member or associate, the DRB is authorized to schedule an earlier review, of the placement if the DRB determines that it is reasonable to expect that release from SHU will be granted in less than two years.

(4) A difference between a Board of Prison Terms' program placement order and the department's policies cannot be resolved.

(5) An out-of-state or federal prison placement is recommended by the institution classification committee.

(6) Meritorious credit is recommended by an institution classification committee to reduce an inmate's period of confinement pursuant to Penal Code Section 2935.

(7) The inmate's current placement was ordered by the DRB and there is no documentation in the inmate's central file to indicate that the DRB has relinquished responsibility for the inmate's placement.

(e) Decisions of the DRB shall be in writing and implemented within 30 calendar days after the decision is made.

NOTE: Authority cited: section 5058, Penal Code. Reference: Sections 5054 and 5068, Penal Code; and Sandin v. Connor (1995) 515 U.S. 472; Madrid v. Gomez (N.D.Cal. 1995) 889 F.Supp. 1146.

HISTORY:
1. New section filed 1-16-92; operative 2-17-92 (Register 92, No. 13).
2. Amendment of subsection (d)(3) and Note filed 8-30-99 as an emergency; operative 8-30-99 (Register 99, No. 36). Pursuant to Penal Code section 5058(e), a Certificate of Compliance must be transmitted to OAL by 2-8-2000 or emergency language will be repealed by operation of law on the following day.
3. Certificate of Compliance as to 8-30-99 order transmitted to OAL 2-7-2000 and filed 3-21-2000 (Register 2000, No. 12).

### 3377.   Facility Security Levels.

Each camp, facility, or area of a facility complex shall be designated at a security level based on its physical security and housing capability. Reception centers are not facilities of assignment and are exempt from the security level designations except for the assignment of permanent work crew inmates. The security levels are:

(a) Level I facilities and camps consist primarily of open dormitories with a low security perimeter.

(b) Level II facilities consist primarily of open dormitories with a secure perimeter, which may include armed coverage.

(c) Level III facilities primarily have a secure perimeter with armed coverage and housing units with cells adjacent to exterior walls.

(d) Level IV facilities have a secure perimeter with internal and external armed coverage and housing units described in section 3377(c), or cell block housing with cells non-adjacent to exterior walls.

NOTE: Authority cited: section 5058, 5058.3, Penal Code. Reference: Sections 5054 and 5068, Penal Code.

HISTORY:
1. New section filed 8-7-87 as an emergency; operative 8-7-87 (Register 87, No. 34). A Certificate of Compliance must be transmitted to OAL within 120 days or emergency language will be repealed on 12-7-87.
2. Certificate of Compliance as to 8-7-87 order transmitted to OAL 12-4-87; disapproved by OAL (Register 88, No. 16).
3. New section filed 1-4-88 as an emergency; operative 1-4-88 (Register 88, No. 16). A Certificate of Compliance must be transmitted to OAL within 120 days or emergency language will be repealed on 5-3-88.
4. Certificate of Compliance as to 1-4-88 order transmitted to OAL 5-3-88; disapproved by OAL (Register 88, No. 24).
5. New section filed 6-2-88 as an emergency; operative 6-2-88 (Register 88, No. 24). A Certificate of Compliance must be transmitted to OAL within 120 days or emergency language will be repealed on 9-30-88.
6. Certificate of Compliance including amendment transmitted to OAL 9-26-88 and filed 10-26-88 (Register 88, No. 50).
7. Change without regulatory effect amending section filed 10-22-90 pursuant to section 100, Title 1, California Code of Regulations (Register 91, No. 4).
8. Editorial correction of printing errors (Register 91, No. 11).
9. Editorial correction of printing error in subsection (b) (Register 92, No. 5).
10. Amendment of section heading, first paragraph and Note filed 8-27-2002 as an emergency, operative 8-27-2002 (Register 2002, No. 35). Pursuant to Penal Code section 5058.3 a Certificate of Compliance must be transmitted to OAL by 2-4-2003 or emergency language will be repealed by operation of law on the following day.
11. Certificate of Compliance as to 8-27-2002 order transmitted to OAL 1-21-2003 and filed 3-6-2003 (Register 2003, No. 10).

### 3377.1.   Inmate Custody Designations.

(a) Designation of a degree of an inmate's custody shall be reasonably related to legitimate penological interests. The CDC

E-19

Case 2:90-cv-00520-KJM-DB   Document 2   Filed 06/12/2008   Page 59 of 79

(B) Rape.

(C) Rape of spouse.

(D) Rape or penetration of genitals or anal openings by foreign object; acting in concert by force or violence.

(E) Abduction to live in an illicit relationship.

(F) Incest.

(G) Sodomy.

(H) Sexually assaulting an animal.

(I) Lewd or lascivious acts with a child under 14.

(J) Oral copulation.

(K) Penetration of genital or anal openings by foreign object.

(2) Within six months upon reception of an inmate with a record of arrest or detention for any offenses listed in Section 3377.1(b)(1), a classification committee shall determine the need for an "R" suffix to the inmate's custody designation. The committee shall consider the arrest reports and district attorney's comments related to each arrest.

(3) If a unit classification committee (UCC) finds that an inmate may no longer require an "R" suffix, the committee shall refer the matter to the Institution Classification Committee (ICC) for action.

(4) An inmate whose "R" suffix has been removed shall be eligible for any housing or assignment for which they otherwise would qualify had the "R" suffix never been designated.

(5) When an "R" suffix has been considered and not applied, or has been removed at one facility, another facility shall not affix an "R" suffix. If the facility disagrees with the "R" removal or decision against "R" designation, it shall submit the case for a Departmental Review Board decision.

(e) An "S" suffix may be affixed by a classification committee to the inmate's custody designation to alert staff of an inmate's need for single cell housing. The classification committee's decision to affix the "S" suffix shall be based on documented evidence that the inmate may not be safely housed in a double cell or dormitory situation based on a recommendation by custody staff or a health care clinician.

NOTE: Authority cited: section 5058, Penal Code. Reference: Sections 5054 and 5068, Penal Code; Americans with Disability Act (ADA), 42 U.S.C., section 12131, et seq.; and *Pennsylvania Department of Corrections v. Ydskey* (1998) 524 U.S. 206.

HISTORY:

1. New section filed 8-7-87 as an emergency; operative 8-7-87 (Register 87, No. 34). A Certificate of Compliance must be transmitted to OAL within 120 days or emergency language will be repealed on 12-7-87.

2. Certificate of Compliance as to 8-7-87 order transmitted to OAL 12-4-87; disapproved by OAL (Register 88, No. 16).

3. New section filed 1-4-88 as an emergency; operative 1-4-88 (Register 88, No. 16). A Certificate of Compliance must be transmitted to OAL within 120 days or emergency language will be repealed on 5-3-88.

4. A Certificate of Compliance as to 1-4-88 order transmitted to OAL 5-3-88; disapproved by OAL (Register 88, No. 24).

5. New section filed 6-2-88 as an emergency; operative 6-2-88 (Register 88, No. 24). A Certificate of Compliance must be transmitted to OAL within 120 days or emergency language will be repealed on 9-30-88.

6. Certificate of Compliance transmitted to OAL 9-26-88 and filed 10-26-88 (Register 88, No. 50).

7. Change without regulatory effect amends section filed 10-22-90 pursuant to section 100, Title 1, California Code of Regulations (Register 91, No. 4).

8. Editorial correction of printing error inadvertently omitting text (Register 91, No. 11).

9. Editorial correction of printing error in subsection (a)(9)(B) (Register 91, No. 5).

10. Amendment filed 3-27-2000 as an emergency; operative 3-27-2000 (Register 2000, No. 13). Pursuant to Penal Code section

5058(e), a Certificate of Compliance must be transmitted to OAL by 9-5-2000 or emergency language will be repealed by operation of law on the following day.

11. Certificate of Compliance as to 3-27-2000 order transmitted to OAL 9-5-2000; disapproval and order of repeal and deletion reinstating section as it existed prior to emergency amendment by operation of Government Code 11346.1(f) filed 10-18-2000 (Register 2000, No. 42).

12. Amendment filed 10-19-2000 deemed an emergency pursuant to Penal Code section 5058(e); operative 10-19-2000 (Register 2000, No. 42). Pursuant to Penal Code section 5058(e), a Certificate of Compliance must be transmitted to OAL by 3-27-2001 or emergency language will be repealed by operation of law on the following day.

13. Certificate of Compliance as to 10-19-2000 order, including further amendment of subsections (a), (a)(2)(B) and (a)(3)(B) and amendment of Note, transmitted to OAL 3-27-2001 and filed 5-3-2001 (Register 2001, No. 18).

## 3377.2. Criteria for Assignment of Close Custody.

(a) Close Custody: Upon review of an inmate's case factors and need for supervision, the classification committee shall establish a Close Custody designation in accordance with the following case considerations when it determines that the inmate meets case factor criteria for either Close A Custody as listed in section 3377.2(b) or for Close B Custody as listed in section 3377.2(c).

(1) The case factors to be considered in assigning Close Custody include, but are not limited to, the following:

(A) the inmate's total term, sentence, or remaining time-to-serve;

(B) the inmate's escape history;

(C) identification of a management concern;

(D) receipt of an active law enforcement felony hold;

(E) a finding of guilt for a serious Rules Violation Report (RVR) (see section 3315);

(F) an inmate who is considered to be High Notoriety or is designated as a Public Interest Case.

(2) Departmental Review Board (DRB) approval is required to assign a Close Custody designation to an inmate who does not meet the case factor criteria established in this section. Authorization from the DRB shall be required before extending a Close Custody designation beyond the time constraints established for the most similar group of sentences.

(3) Custody determination shall be based on information available at the time of review. An ICC may temporarily assign a Close Custody designation to an inmate, for a maximum of ninety (90) days, pending receipt of documents or verification of information needed to make a final determination.

(4) Any inmate being evaluated for reduction of Close Custody shall demonstrate a record of: disciplinary-free behavior and compliance with behavioral expectations, such as positive programming and participation for the last 12 months prior to the review.

(5) The Annual Classification Committee review shall include consideration of custody reduction.

(6) When calculating the time to be served in Close Custody in accordance with the case factor criteria, a classification committee shall count an inmate's behavior conforming to minimum expectations in the California Youth Authority (CYA) prior to the inmate's placement in CDC during the inmate's current term.

(7) When calculating the time served in Close Custody in accordance with case factor criteria, a classification committee shall not include periods of time that an inmate was serving a determinate or indeterminate term in Security Housing Unit (SHU) or in Administrative Segregation Unit (ASU) or any segregated program housing unit.

(8) In cases involving an escape, the date of the escapee's return to CDC custody shall be the starting date to be used in calculating the start of the Close Custody time frame.

(9) An inmate who meets the Close Custody case factor criteria and who also has a documented health care or disability special housing need, which cannot be reasonably accommodated in the existing facility shall be referred by classification committee to the Classification Staff Representative (CSR) for transfer consideration.

(10) An inmate who is identified to be a management concern shall be ineligible for custody reduction consideration below Close B Custody. Upon review and determination that an inmate no longer presents a management concern, a Unit Classification Committee shall refer the case to Institutional Classification Committee (ICC) for review. The ICC may remove the identification of the inmate as a management concern based on consideration of the inmate's long-term positive programming, evaluation of the inmate's behavior in custody, and determination that the inmate no longer presents a continuing threat to public safety warranting Close B Custody.

(11) The classification committee is to consider the inmate's length of term or remaining time to serve in light of the inmate's escape history. An inmate with an escape history shall serve the longest required amount of time before becoming eligible for custody reduction below Close A Custody and shall also serve the longest required amount of time before being eligible for custody reduction below Close B Custody.

(12) An inmate who meets more than one Close A Custody case factor shall be designated Close A Custody for the longest required amount of time before becoming eligible for Close B Custody consideration.

(13) An inmate who meets more than one case factor for Close B Custody shall serve the longest required amount of time before he or she is to be eligible for consideration of further custody reduction.

(14) An inmate who is ineligible for further custody reduction based on any exclusionary case factor shall be precluded from further custody reduction.

(15) Upon classification committee review and determination that an inmate meets the Close Custody criteria, the inmate shall be designated Close Custody and shall be required to complete established time frames for Close A Custody and Close B Custody in compliance with Sections 3377.2(b) and 3377.2(c). Neither the inmate's projected date of release nor the inmate's earliest possible release date shall override established time frames.

(16) A classification committee may on a case-by-case basis consider for Medium A Custody an inmate who otherwise meets the Close Custody criteria [e.g., the minimum time periods for Close A and Close B Custody provided in subsections (b) and (c)] and who has been in CDC custody before March 2000 serving his or her instant offense. The inmate may retain Medium A Custody if the classification committee determines that the inmate's current housing, program, and in-custody behavior do not substantiate a need for supervision and restrictive housing at the level of Close Custody and one of the following conditions are met:

(A) The inmate has already demonstrated positive programming for an equal or greater period of time at a less restrictive degree of custody during his or her present commitment and a classification committee has determined that the inmate has no history of escape, is not a management concern, is not an LWOP, and has no active law enforcement hold.

(B) The inmate was not designated Close Custody upon initial period of incarceration and has since served more than half of the required amount of time for Close Custody at a less restrictive degree of custody, and a classification committee has determined that the inmate has no history of escape, has no active law enforcement hold, is not an LWOP, and is not a management concern.

(C) The inmate is sentenced to a single Life term and has less than two years to be within seven years of MEPD and a

classification committee has determined that the inmate does not demonstrate a significant risk of escape, has no history of escape, is not a management concern, and has no active law enforcement hold.

(b) Close A Custody Case Factor Criteria: An inmate who meets any of the Close A Custody case factor criteria described in this subsection shall be assigned to Close A Custody.

(1) Lengthy Sentence. An inmate serving a sentence of Life Without the Possibility of Parole (LWOP) shall serve his or her first five (5) years of incarceration in CDC at Close A Custody before he or she shall be eligible for custody reduction consideration.

(2) Lengthy Sentence plus Management Concern and/or Escape History. An inmate who demonstrates a management concern and/or an escape history in addition to serving a lengthy sentence as defined below shall require Close A Custody:

(A) An inmate with a management concern and/or an escape history sentenced to a Total Term of 50 years or more shall serve at least his or her first five (5) years of incarceration in CDC at Close A Custody before he or she shall be eligible for consideration of custody reduction.

(B) An inmate with a management concern and/or an escape history who is sentenced to more than one Life sentence shall serve his or her first five (5) years of incarceration in CDC at Close A Custody before he or she shall be eligible for consideration of custody reduction.

(C) An inmate with a management concern and/or an escape history who is sentenced to a Life sentence shall serve at least his or her first year of incarceration in CDC at Close A Custody before he or she shall be eligible for consideration of custody reduction.

(D) An inmate with a management concern and/or an escape history who is sentenced to a total term of fifteen (15) years' or more but less than 50 years shall serve at least his or her first year of incarceration in CDC at Close A Custody before he or she shall be eligible for consideration of custody reduction.

(3) An inmate whose precommitment and prior in-custody behavior demonstrates no management concern and reflects no escape history, but whose term of incarceration meets any of the following criteria shall require Close A Custody:

(A) An inmate who is sentenced to a Total Term of 50 years or more shall serve at least his or her first five (5) years of incarceration in CDC at Close A Custody before he or she shall be eligible for consideration of custody reduction.

(B) An inmate who is sentenced to more than one Life sentence shall serve at least his or her first five (5) years of incarceration in CDC at Close A Custody before he or she shall be eligible for consideration of custody reduction.

(C) An inmate who is sentenced to a Life sentence shall serve his or her first year of incarceration in CDC at Close A Custody before he or she shall be eligible for consideration of custody reduction.

(D) An inmate who is sentenced to a total term of 15 years or more, but less than 50 years, shall serve his or her first year of incarceration in CDC at Close A Custody before he or she shall be eligible for consideration of custody reduction.

(4) Escape History. An inmate with a documented escape history (as reflected in State, Federal, local or juvenile criminal history) as described in this section shall be assigned to Close A Custody:

(A) An inmate convicted of or whose commitment offense includes Escape With Force or Attempted Escape With Force from any correctional setting or armed escort occurring within the last five (5) years of return to CDC custody shall serve his or her first eight (8) years upon receipt in CDC at Close A Custody before he or she shall be eligible for consideration of custody reduction.

(B) An inmate convicted of or whose commitment offense includes Escape Without Force or Attempted Escape Without

**ATTACHMENT D**

**§ 3000**

Determinate Sentence Law (DSL) Prisoner means a person sentenced to prison under Penal Code section 1170 for a crime committed on or after July 1, 1977.

Determinate Sentencing Law (DSL) means the felon sentencing laws of the Penal Code, as they became operative July 1, 1977.

Direct and Constant Supervision means that an inmate shall be monitored and observed by CDC staff, either custody staff or work supervisor as indicated in these regulations, sufficiently to account for the specific whereabouts of the inmate at all times.

Director means the director of the department of corrections.

Disabled Veteran Business Enterprise means a business concern as defined in Military and Veterans Code section 999(g).

Disabled Veteran Business Enterprise focus paper means a publication that meets all of the following criteria: (1) has an orientation relating to the disabled veteran business enterprise; (2) is known and utilized by members of the disabled veteran business enterprise community; (3) primarily offers articles, editorials (if any), and advertisements of business opportunities aimed at disabled veteran business enterprises; and (4) is readily available within the geographical area for which the advertisement is placed and for which the services are to be performed.

Disabled Veteran Business Enterprise focus paper and trade paper means a publication that meets all of the criteria of a disabled veteran business enterprise focus paper and all of the criteria of a trade paper.

Disciplinary Detention means a temporary housing status which confines inmates so assigned to designated rooms or cells for prescribed periods of time as punishment for serious rule violations.

Disciplinary Free means without any finding of guilt of a disciplinary infraction filed on a CDC Form 115, Rule Violation Report, classified as either administrative or serious.

Disruptive Group—means any gang, other than a prison gang.

Distribution means the sale or unlawful dispersing, by an inmate or parolee, of any controlled substance; or the solicitation of or conspiring with others in arranging for, the introduction of controlled substances into any institution, camp, contract health facility, or community correctional facility for the purpose of sales or distribution.

Drugs means substances intended for use in the diagnosis, cure, mitigation, treatment or prevention of disease, and as defined in Health and Safety Code section 11014. It may also include drug paraphernalia, as defined in Health and Safety Code, section 11014.5.

Escape History refers to any reliable information or inmate self-admission in the central file on an escape, attempted escape, walkaway, or plan to escape. The available information describing the circumstances of the escape or attempted escape shall be evaluated in determining the level of risk to correctional safety and security posed by the inmate.

Examinee means a person who voluntarily takes a polygraph examination.

Ex-Offender means a person previously convicted of a felony in California or any other state, or convicted of an offense in another state, which would have been a felony if committed in California.

Execution Type Murder describes the circumstances or manner of a fatal offense in which the victim is bound, cuffed, gagged, blindfolded, or forced to assume a position from which the victim is unable to resist or flee; the victim is shot at close range; or the manner of death demonstrates that the victim had no opportunity to defend himself or herself nor to flee.

Facility Security Perimeter is any combination of living unit, work area and recreation area perimeters that is set aside to routinely restrict inmate movement based on custody level. This perimeter will contract and expand depending upon the weather, lighting conditions and hours of operation.

Federal Consecutive Prisoner means a California prisoner who is also under sentence of the United States and is confined in a federal correctional facility, and whose California term shall commence upon completion of the United States' sentence.

Field File means a working file maintained by a parole unit office containing information about a parolee and his/her current parole.

Firm means any individual, firm, partnership, corporation, association, joint venture or other legal entity permitted by law to practice the professions of architecture, landscape architecture, engineering, environmental services, land surveying or construction project management.

Force, as applied to escape or Attempted Escape, refers to physical contact or threat of physical harm against a person to enable or attempt the escape.

Frequent and Direct Supervision means that staff supervision of an inmate shall be sufficient to ensure that the inmate is present within the area permitted.

Friendly Witness means any witness who is not an adverse witness.

Gang means any ongoing formal or informal organization, association or group of three or more persons which has a common name or identifying sign or symbol whose members and/or associates, individually or collectively, engage or have engaged, on behalf of that organization, association or group, in two or more acts which include, planning, organizing threatening, financing, soliciting, or committing unlawful acts or acts of misconduct classified as serious pursuant to section 3315.

General Chrono means a CDC Form 128-B (Rev. 4-74) which is used to document information about inmates and inmate behavior. Such information may include, but is not limited to, documentation of enemies, records of disciplinary or classification matters, pay reductions or inability to satisfactorily perform a job, refusal to comply with grooming standards, removal from a program, records of parole or social service matters.

Goal means a numerically expressed disabled veteran business enterprise objective as set out in Public Contract Code section 10115(c), that awarding departments and contractors are required to make efforts to achieve.

Good Cause means a finding based upon a preponderance of the evidence that there is a factual basis and good reason for the decision made.

Good Faith Effort means a concerted effort on the part of a potential contractor to seek out and consider disabled veteran-owned and operated business enterprises as potential contractors, and/or subcontractors in order to meet the program participation goals.

Grievance means a complaint about a decision, action, or policy, which an inmate, parolee or staff wishes to have changed.

Harassment means a willful course of conduct directed at a specific person, group, or entity, which seriously alarms, annoys, or terrorizes that person, group, or entity and which serves no legitimate purpose.

Hearing Agent means the parole and community services division employee responsible for application of specific procedures pertaining to the parole revocation hearing process; the primary liaison between the parole and community services division and the releasing authorities in matters and procedures pertaining to the parole revocation hearing process.

Hearing Coordinator means an employee assigned to coordinate the revocation process within an institution or a parole and community services division region.

High Notoriety describes an inmate who must be treated as a significant escape risk due to the unusual level of public panic that his or her escape would likely cause. The risk of public panic is based upon the nature or circumstance of the inmate's crime, the inmate's criminal history, the inmate's behavior in custody, and

10

**ATTACHMENT E**

§ 3377.1

DEPARTMENT OF CORRECTIONS

TITLE 15

uses the following inmate custody to establish where an inmate shall be housed and assigned, and the level of staff supervision to ensure institutional security and public safety:

Maximum Custody
Close A Custody
Close B Custody
Medium A Custody
Medium B Custody
Minimum A Custody
Minimum B Custody

(1) Maximum Custody.

(A). Housing shall be in cells in an approved segregated program housing unit as described in CCR Section 3335 and CCR subsections 3341.5(b) and 3341.5(c).

(B). Assignments and activities shall be within the confines of the approved segregated program housing unit.

(C) An inmate designated as Maximum Custody shall be under the direct supervision and control of custody staff.

(2) Close A Custody Male Inmates.

Housing shall be in cells within Level III and Level IV facilities in housing units located within an established facility security perimeter.

(B) Close A Custody inmates shall be permitted to participate in program assignments and activities scheduled within the hours of 0600 hours to 1800 hours unless hours are extended by the Warden to no later than 2000 hours when it is determined that visibility is not compromised in areas located within the facility security perimeter. Bases for the extended hours include operational necessity, daylight savings time, or availability of high mast lighting. Close A Custody inmates are not permitted beyond the work change area.

(C) Custody staff supervision shall be direct and constant. In addition to regular institutional counts, Close A Custody male inmates shall be counted at noon each day.

(3) Close A Custody Female Inmates.

(A) Housing shall be in cells or in a designated Close Custody dormitory.

(B) Close A Custody female inmates shall be permitted to participate in program assignments and activities scheduled within the hours of 0600 hours to 1800 hours unless hours are extended by the Warden to no later than 2000 hours when it is determined that visibility is not compromised in areas located within the facility security perimeter and the work change area. Bases for the extended hours include operational necessity, daylight savings time, or availability of high mast lighting.

(C) Custody staff supervision shall be direct and constant. In addition to regular institutional counts, Close A Custody female inmates shall be counted at noon each day.

(4) Close B Custody Male Inmates.

(A) Housing shall be in cells within designated institutions in housing units located within an established facility security perimeter.

(B) Close B Custody inmates shall be permitted to participate in program assignments and activities during the hours of 0600 hours to 2000 hours in areas located within the facility security perimeter including beyond the work change area in a designated Level II, Level III or Level IV institution. Close B Custody inmates may participate in designated work program assignments until 2200 hours when the work program is in an assigned housing unit located within the facility security perimeter. Close B Custody inmates may participate in limited evening activities after 2000 hours until the general evening lockup and count when the limited activity is in a designated housing unit located within the facility security perimeter.

(C) The work supervisor shall provide direct and constant supervision of Close B Custody inmates during the inmates' assigned work hours.

(D) Custody staff shall provide direct and constant supervision of Close B Custody inmates at all times.

(5) Close B Custody Female Inmates.

(A) Housing shall be in cells or in a designated Close Custody dormitory located within an established facility security perimeter.

(B) Close B Custody female inmates shall be permitted to participate in program assignments and activities during the hours of 0600 hours to 2000 hours in areas located within the facility security perimeter, including beyond the work change area, in designated Level II, Level III and Level IV institutions. Close B Custody female inmates may participate in work program assignments until 2200 hours when the work program is in an assigned housing unit located within the facility security perimeter. Close B Custody female inmates may participate in limited evening activities after 2000 hours until the general evening lockup and count when the limited activity is in an assigned housing unit located within the facility security perimeter.

(C) The work supervisor shall provide direct and constant supervision of Close B Custody inmates during the inmates' assigned work hours.

(D) Custody staff shall provide direct and constant supervision of Close B Custody inmates at all times.

(6) Medium A Custody.

(A) Housing shall be in cells or dormitories within the facility security perimeter.

(B) Assignment and activities shall be within the facility security perimeter.

(C) Custody staff shall provide frequent and direct supervision.

(7) Medium B Custody.

(A) Housing shall be in cells or dormitories within the facility security perimeter.

(B) Assignment and activities shall be within the facility security perimeter. Inmates may be given daytime assignments outside the facility security perimeter but must remain on facility grounds.

(C) Custody staff shall provide frequent and direct supervision inside the facility security perimeter. Custody staff shall provide direct and constant supervision outside the facility security perimeter.

(8) Minimum A Custody.

(A) Housing shall be in cells or dormitories within the facility security perimeter.

(B) Assignment and activities may be inside or outside the facility security perimeter.

(C) Staff supervision shall consist of at least hourly observation if assigned outside the facility security perimeter. Sufficient staff supervision of the inmate shall be provided to ensure the inmate is present if assigned inside the facility security perimeter.

(9) Minimum B Custody.

(A) Housing may be in cells or dormitories on facility grounds, in a camp, in a Minimum Support Facility (MSF) or in a community based facility, such as a Community Correctional Facility.

(B) Assignments and activities include eligibility work or program assignments located either on or off institutional grounds.

(C) Sufficient staff supervision shall be provided to ensure the inmate is present.

(b) An "R" suffix shall be affixed by a classification committee to the inmate's custody designation to alert staff of inmates who have a history of specific sex offenses.

(1) The "R" suffix shall be designated for any inmate who was convicted of, or whose commitment offense includes an act equivalent to any of the following offenses:

(A) Assault with intent to commit rape, sodomy, oral copulation, rape in concert with another, lascivious acts upon a child, or penetration of genitals or anus with a foreign object. [Penal Code Section 220]

F-25

**ATTACHMENT F**

#### 52020.4.1    Frequency of Counts

The frequency of counts shall be determined by the Warden based on the security needs of the individual facilities and custody designations of assigned inmates. Inmate activity programs shall not be scheduled to conflict with institutional counts.

#### 52020.4.2    Out Counts

To maintain continuity of operations, some inmates will not always be counted in their assigned housing units. These inmates shall be "out counted" on the job/program assignment by their supervisors. Tentative out count slips shall be submitted to control to include bed numbers, inmates name and number, and the area where the inmates are to be out counted. The tentative out counts shall be submitted no earlier than forty-five minutes prior to count and no later than thirty minutes prior to count.

#### Positive Counts

All staff who need to conduct an out count shall make a positive count, at each designated count time, and telephone the positive count into Control. Out-counted inmates shall remain under direct supervision until the count is clear. (A positive/physical count means to see and count living flesh.)

- Minimum B inmates assigned outside the perimeter fence may be out-counted and returned to their assigned duties. (The exception shall be for emergency counts.)

#### 52020.4.3    Standing Counts

Inmates housed in cells shall stand at the cell door for a predetermined count at least once each day. Inmates shall remain standing until counted by the officer conducting the count. Inmates housed in dormitory housing shall sit on their assigned bed/bunk during the count.

#### 52020.4.4    Positive Counts

The actual number of inmates that each respective staff member has counted shall be reported to Control by the person who conducted the actual count. A positive count slip shall be prepared and submitted to Control showing the date, time, count total and signature of staff member conducting the positive count.

#### 52020.4.5    Negative Counts

If the Control Sergeant does not accept the positive count, a recount and a negative count shall be requested from the counting employee. A negative count is the recording of the bed numbers, upper (U) or lower (L) designation if double bed unit, of all unoccupied beds in a housing unit at count time. These bed numbers shall be recorded on a negative count slip.

The negative count slip shall be submitted to Control showing the date, time, negative bed numbers, negative bed total and signature of the staff member conducting the negative count.

#### Negative Counts Method

Upon receiving instructions from control to make a negative count, the officer shall start with the lowest number cell/room in numerical order, writing down the numbers of each unoccupied bed. Upon completion, the officer shall report/phone to Control the unoccupied beds in numerical order.

#### 52020.4.6    Emergency Counts

Emergency counts shall be conducted to establish whether an escape has occurred or in the event of an obvious escape (inmate seen climbing security fence, dummy in bed, etc.) to determine the exact identity of the inmate(s) involved. Emergency counts may be initiated by the Watch Commander or Administrative-Officer-of-the-Day (AOD) when visibility is severely restricted as delineated in DOM 52020.9.7. All inmates assigned to a state prison shall be returned to their respective housing, except for medical emergencies, and counted during the emergency count.

- An institution may establish an approved list of critical workers to be out-counted during an emergency count when such absence of critical workers could disrupt the institution operation (i.e., inmate culinary tasks).

#### 52020.4.7    Picture Count

When a positive or negative count does not clear and the identity of the out-of-place or missing inmate(s) cannot be determined, an individual picture identification check shall be made. Up-to-date pictures of all inmates shall be maintained in Control.

- Only the identification pictures of the affected housing section shall be removed from Control and taken to the housing area for a positive visual identification.

#### 52020.4.8    Emergency Count Approval

During business hours, emergency counts shall be approved at a level not less than the Captain or the Watch Commander. During non-business hours, emergency counts shall be approved by the AOD or Watch Commander.

#### 52020.4.9    Count Clear Notifications

When the count is cleared, the Control Sergeant shall notify all concerned by the public address system or other available means. (The institution count is clear.)

#### 52020.4.10    Count Slips

The Master Count Sheet, positive count slips, out-count slips, negative count slips, if applicable, and adding machine tape shall be secured together as one document and retained for one year. (Longer than one year if they reflect evidence of an escape.) The above documents shall be designed by facility correctional staff to meet the needs of their individual facility. (Count slips shall be prepared in blue or black ink, with time of count, actual count, location of count and the signature of counting employee. Slips shall not be altered.)

#### 52020.4.11    Informal Counts

Informal counts shall be conducted by all employees supervising inmates outside the security areas. These counts shall be made on not less than an hourly basis. Any discrepancies shall be reported to Control immediately.

#### 52020.4.12    Close Custody Counts

Close custody counts shall be conducted utilizing a positive picture identification card to count all inmates classified as Close A custody. These inmates shall be counted while they are on work assignments, on recreation time, in housing unit, or involved in any other activity. Schedule of counts shall be predetermined by individual institutions.

#### 52020.5    Control Policy

On all watches, the Control Sergeant shall log times that official counts are received on a Master Count Sheet. They shall maintain a current, accurate record of all inmates to reflect all inmate movement.

#### 52020.5.1    Running Count

The Control Sergeant shall maintain a running count. The running count shall be updated during the shift as dictated by the amount of movement. (Any movement which affects the institution count.) The running count shall be verified by cross-checking with the cardex total. This shall reduce the human error factor.

#### 52020.5.2    Cardex

The cardex shall indicate on the front of the file the total tentative capacity and also the occupied count of the tier/housing area. Each card shall have a current picture for identification and pertinent information about the assigned inmate. The Control Sergeant shall maintain constant and absolute accuracy of the cardex file.

#### 52020.5.3    Daily Record of Housing and Assignment Changes

All movement and assignment changes, as they occur, shall be made by the Control Sergeant for the affected unit on a CDC Form 117. All classification and assignment changes originating from the inmate assignment officer shall be given to the Control Sergeant to update status changes on each individual inmate (supplemental CDC Form 117).

- The original CDC Form 117 (white copy) shall be retained for one year in Control.

E-27

**EXHIBIT F**

**DEPARTMENT OF CORRECTIONS**
**Correctional Training Facility**
**Soledad, California**

**SUPPLEMENTAL PAGE**

RE:    CTF APPEAL LOG No. **CTF-C-06-02329**
First Level Reviewer's Response

*BOSTON*                *D-03868*                *EW-236U*

**APPEAL DECISION:**

   *DENIED*

**APPEAL ISSUE:** CUSTODY/CLASS

1) In your appeal, you assert that CTF-Central Facility is not in complete compliance with the Departmental Regulations regarding Close B Custody program assignments and activities, that the Close B Custody inmates in CTF-Central Facility are being denied the programming prescribed by the California Regulatory Authority.

2) You claim that the mandatory language of **CCR Title 15 § 3377.1 (a)(4)(B)** in part states Close B Custody inmates shall be permitted to participate in program assignments and activities during the hours of 0600 to 2000 hours in areas located within the facility security perimeter including beyond the work change area in a designated Level II, III or IV institution.

3) You further state in your appeal that the Close B Custody population are Departmentally entitled to program assignments and activities during the hours of 0600 to 2000 hours (i.e., yard activities during non-work hours between the hours of 0600 and 2000 hours), yet when the CTF Institutional Count clears at 1700 hours, the Close B Custody inmates are denied any further access to the yard privileges that the rest of the non-Close Custody inmate population is able to utilize. You allege that this is essentially "removing privileges from the specialized segment of the general population" and that CTF O.P. #34 presently contains a local restriction that violates the CCR Title 15, prohibiting Close B Custody inmates from full access to program activities.

4) In your appeal you also claim that according to **CCR Title 15 § 3044 (c)(2) and (5)** that by denying Close B Custody inmates yard activities up to 2000 hours, CTF is effectively denying inmates who have not been found guilty of any disciplinary violation, nor had their custody classification changed; and that the disparity in treatment of non-Close Custody and Close B Custody inmates is not only adverse, and unfair, but also in violation of recognized Departmental policies, is in effect an act of discrimination against a particular class of inmates.

CTF-C-06-02~
First Level Reviewer's Response
Page 2 of 3

5) Additionally you state in your appeal that the issue of Close B Custody inmates not being allowed to go beyond the work change area is local policy only, per **CCR Title 15 § 3377.1 (a)(2)(B)**, and should be applicable to Close A Custody inmates rather than Close B Custody inmates.

6) You request that #1) CTF-Central Facility provide the "full" opportunity to program assignments and activities between 0600 hours and 2000 hours and that #2) O.P. #34 (and any other relevant O.P. sections) be revised to reflect your citings in **CCR Title 15 § 3377.1**.

7) You want your appeal to be bypassed to the Second Level in accordance with **CCR Title 15 § 3084.5 (b)** because it violates **CCR Title 15 § 3377.1** by a policy implemented by CTF's Institution Head.

**APPEAL RESPONSE:**

Inmate BOSTON, on August 27, 2006, at approximately 1600 hours, I (Lt. R. Lynch) reviewed this inmate appeal (CTF-C-06-02329).

Due to **CCR Title 15 § 3377.1 (A)(4)(B)**, which you cite in your appeal, it is clear that Close B Custody inmates may participate in limited evening activities after 2000 hours until the general evening lockup and count when the limited activity is in a designated housing unit located within the facility security perimeter. You are seeking evening yard program, yet the CCR is clear that the Close B Custody inmates *may* participate in limited evening activities...when the limited activity is in a designated housing unit... This would therefore eliminate your claim to evening yard access.

In **CCR Title 15 § 3044 (c)**, another citation in your appeal, it is clearly stated that ...Inmate privileges shall be governed by an inmate's behavior, custody classification and assignment. Also, ...Institutions may provide additional incentives for each privilege group, subject to availability of resources and constraints imposed by security needs.... Thus, this institution's lack of available resources and constraints imposed by security needs justifies the current Close B Custody criteria at CTF-Central Facility.

Your use of **CCR Title 15 § 3044 (c)(2)**, being another example of the unfair treatment of Close B Custody inmates is not applicable, since the majority of the Close B Custody inmates are not Close B Custody for disciplinary reasons, but classification reasons. **CCR Title 15 § 3044 (c)(5)** is also determined by a classification designation.

Central Facility is in complete compliance with Departmental Regulations regarding Close B Custody inmates, it is not feasible to give the inmates classified as Close B Custody the "full" opportunity to program assignments and activities between 0600 hours and 2000 hours, due to CTF-Central Facility's available resources and constraints imposed by security needs, your appeal will be Denied.

CTF-C-06-023
**First Level Reviewer's Response**
**Page 3 of 3**

Once again, inmate appeal (CTF-C-06-02329) is **DENIED** at this level of review.


R. Lynch
Correctional Lieutenant
CTF-Central Facility


**J. Soares**
Correctional Captain
CTF-Central Facility

cc:   Appeals Office File
       Inmate's Central File

**EXHIBIT G**

**Request for Second Level Review**
**CTF Appeal Log # CTF-C-06-02329**
**(continued)**

invalidated because that review violates the requirements of Administrative Law and Departmental policy. The MAC initially requested a bypass to the Second Level for review in accordance with the provisions of the California Code of Regulations (CCR) Title 15, Section 3084.5(e)(1). Because the person who signed and authorized the implementation of Operations Procedure (OP) #34 was the institution head (Warden), his actions cannot be reviewed by a subordinate at the rank of a Correctional Lieutenant or modified by a subordinate at the rank of Associate Warden. In this matter, the issues being appealed by the MAC on the behalf of Close B Custody members of the general population involve the provisions and restrictions imposed on Close B Custody inmates by OP #34, signed by acting Warden B. Curry on June 21, 2006, the only person authorized by the Department to review the OP would be Warden Curry. The MAC is appealing those provisions of OP #34, which they believe conflict with the specific program provisions for Close B Custody inmates defined by the language contained in CCR, Title 15 §3377.1. As previously stated, DOM §51020.1 prohibits the creation of new policies or regulations by supplements (OPs) that change or reinterpret regulations. Because the pertinent part of CCR, Title 15 §3084.5(e) states: "Formal appeals shall not be reviewed by a staff person who...is of lower administrative rank than any participating staff..." a subordinate administrative staff member or Correctional Lieutenant cannot respond in a matter that is the responsibility of the Warden who has implemented this OP as the institution head.

The First Level Responder failed to address the main tenets raised in this appeal, which provide for Close B Custody programming, which are separate and distinct from the program provisions for Close A Custody programming. In a further attempt to clarify our position, the MAC respectfully directs the Administration's attention to the following information. CCR Title 15 and the DOM establish clear and separate criteria and provisions for Close B Custody program access and assignments. The MAC cites the following specific provisions and constructive language included in the CCR and DOM (***bold/italicized print*** has been utilized for added emphasis of relative points).

CCR Title 15 §3000 contains four definitions relative to **Designated Level II Housing, Facility Security Perimeter, and Security Parameters:**
    1.    **"Designated Level II Housing** means a housing facility encompassed by a **facility security perimeter** and constructed to provide celled housing for inmates with **Level II classification scores."**
- *The MAC asserts that CTF Central Facility Level II Housing within the Central Facility security perimeter contains celled housing for inmates with Level II classification scores, exactly as defined by §3000.*

    2.    **"Facility Security Perimeter** is any combination of living unit, work area and recreation area **perimeters** that is set aside to routinely restrict inmate movement based on custody level. This **perimeter** will contract and expand depending upon the weather, lighting conditions and hours of operation.
- *The MAC does not see any restrictive parameters contained in this definition, which would deny the requested expansion of Close B Custody program opportunities.*

    3.    **"Secure Perimeter** means the **largest Security Perimeter** that physically retains inmates in custody on facility property."
- *The MAC does not see any restrictive parameters contained in this definition, which would deny the requested expansion of Close B Custody program opportunities.*

    4.    **"Secure Perimeter** means any unbroken physical barrier or combination of physical barriers that restricts inmate movement to a contained area without being process through a door, gate or sally port."
- *The MAC does not see any restrictive parameters contained in this definition, which would deny the requested expansion of Close B Custody program opportunities.*

CCR Title 15 §3000.5 establishes the **Rules of Construction**, which apply to salient points in the MAC's grievance.

CCR Title 15 §3377.1(a)(4)(A-C) establish the following points relative to this grievance:

1.    Subsection (A) states that Close B inmates' "…housing shall be in cells within **designated institutions** in housing units located within an established **facility secure perimeter**."
- *The MAC asserts that the programming opportunities, which they have advocated for, are not prohibited by the parameters of this definition.*

2.    Subsection (B) states "Close B inmates shall be permitted to participate in program assignments and activities during the hours of 0600 hours to 2000 hours in areas **located within the facility security perimeter including beyond work change area** in a **designated Level II**, Level III or Level IV institution. Close B inmates may participate in limited evening activities after 2000 hours until the general evening lockup and count when the limited activity is in a designated housing unit within the **facility security perimeter**.
- *The MAC asserts that the programming opportunities, which they have advocated for, are specifically authorized by the parameters of this definition.*

3.    Subsection (C) provided for the direct and constant supervision of work supervisors during the inmates' assigned work hours
- *The MAC asserts that staffing for the programming opportunities, which they have advocated for, are adequate to meet the parameters of this definition.*

4.    Subsection (D) provides for the direct and constant supervision of Close B Custody inmates at all times.
- *The MAC asserts that staffing for the programming opportunities, which they have advocated for, are adequate to meet the parameters of this definition.*

The crux of this appeal is that CTF has refused for years to comply with the Legislative and Departmental mandates outlined in CCR Title 15 §3377.1(a)(4)(B), which delineate the opportunities for Close B inmates to participate in program assignments and activities within the facility security perimeter, including beyond the work change area, between 0600 and 2000 Hours. CTF Central Facility is clearly and unambiguously a **designated Level II institution** within a **facility security perimeter**, which should provide inmates who are designated as Close B Custody with entitlement to participate in program assignments and activities up until 2000 Hours. At this time, CTF does not permit Close B Custody inmates to participate in this *mandated* access to program activities on the recreation yard beyond 1500 Hours. The First Level Responder never addressed this tenet in his response.

The First Level Responder confined his response to the second element of the section cited above, focusing on limited program activities after 2000 hours until the general evening lockup and count when the activity is in a designated housing unit located within the facility security perimeter. The Responder emphasized the usage of the permissive word "…may…" in the context of that issue.   The MAC's main tenet however, focuses on the program opportunities afforded in the first portion of the cited CCR section, which contains the mandatory wording "…shall…" when referring to Close B Custody inmates opportunity to access program activities between 0600 and 2000 Hours. The MAC asserts that this wording imposes an obligation on and duty on CTF to provide Close B Custody inmates with program activities during the designated hours. To this extent, CTF is not in compliance with Legislative and Departmental mandates.

**CTF Appeal Log # CTF-C-06-02329 – Request for Second Level Response**
**Page 3**

The First Level Responder also attempts to excuse CTF's failure to provide mandated programming under the guise of available resources and constraints imposed by security needs. The courts have not allowed institutions to excuse themselves with program responsibilities and the Responder was provided with the Department's own direction, published in Issue #17 of *The Insighter* (Attachment A). The circumstances discussed in this article were similar to those existing at CTF in that a CDC institution was denying Close B Custody inmates with program activities during the program hours specified by the CCR. The court ruled that an "…institution **could not** have a reasonable interest that contravenes the regulations under which it operates." In the present matter, CTF seeks to advance different theories and reasons to contravene the Legislative and Departmental guidelines.

Based upon the foregoing information and material previous submitted by the MAC, the MAC requests that the Second Level Response address the following specific issues and requests for action expressed in our appeal:

1. Invalidate the findings of the First Level Response.
2. Address the main tenet of that appeal, which pertains to Close B Custody program activities between 0600 and 2000 Hours.
3. Resolve the discrepancy(ies) that exist because of CTF's non-compliance with CCR Title 15 §3377.1(a)(4)(B) pertaining to Close B Custody program activities between 0600 and 2000 Hours.

**A. BOSTON**
**MAC Chairman**
**CTF-Central Facility**                              **October 13, 2006**

G-4

**EXHIBIT H**

DEPARTMENT OF CORRECTION
Correctional Training Facility
Soledad, California

## Second Level Reviewer's Response

**DATE:**    November 28, 2006

**TO:**  *BOSTON*      *D-03868*      *EW-236U*

**CTF APPEAL LOG No. CTF-C-06-02329**

**APPEAL DECISION:**    **DENIED**

**APPEAL ISSUE:**  (Custody/Class)

**APPEAL RESPONSE:**

In your appeal you request the following items be answered at the Second Level of appeal:

(1) That the First Level response be invalidated.

(2) That CTF address the main tenet of the First Level appeal, which pertains to Close B Custody program activities between 0600 and 2000 hours.

(3) That CTF resolve the discrepancy(ies) that exist because of CTF's non-compliance with CCR Title 15 §3377.1(a)(4)(B) pertaining to Close B Custody program activities between 0600 and 2000 hours.

On August 27, 2006, you were interviewed by Lieutenant R. Lynch to provide you the opportunity to explain your appeal and present supporting information or documents.

A thorough review of your appeals' package and all of your attachments has been completed and reveals the following:

(1) The Appeals Coordinator at CTF reviewed this appeal and it was processed for a First Level response. It is now at the Second Level, which you request.

(2) Operations Procedure #34 states in part: *Close B Custody, **Level II** inmates shall be permitted to participate in program assignments and activities, ie., Alcoholic Anonymous and Narcotics Anonymous, during the hours of 0600 hours to 2000 hours in areas located within the Central Facility security perimeter (West Gate to East Gate. Close B Custody inmates may participate in designated assignments until 2200 hours when the work program is in an assigned housing unit located within the facility security perimeter.*

(3) Operation Procedure #34 clearly states that Close B Custody inmates are permitted to participate in programs within Central Facility between 0600 and 2000 hours with exceptions being made until 2200 hours.

(4) Close Custody inmates at CTF are not permitted to go beyond the West Gate for night yard privileges.

H-2

Second Level Reviewer's Response
CTF Appeal Log # **CTF-C-05-.045**
Page 2 of 2

You have not provided any new or additional information.    Therefore, based on the aforementioned, your appeal is being denied at the Second Level of Review.

Reviewed By: _____    Date    12/5/06
                        C. Noll, Associate Warden, Central Facility

_____    Date    12-7-06
Ben Curry, Warden (A)

cc:    Appeals Office File
       Inmate's Central File

102.

H-3

**EXHIBIT I**

# REQUEST FOR DIRECTOR'S LEVEL REVIEW OF INMATE APPEAL
## CTF# 06-02329

(Continued)
and the Administration in the assignment of staff for appellate responses, particularly when the issues involve
institutional policy(ies). The MAC respectfully requests that the Director's Level Review *acknowledge* and
*address* the points raised in the MAC's request for a Second Level Review and the points, which follow, that
address the institutional response.

1.      The Second Level response neatly sidesteps acknowledgement or granting the MAC's request for
invalidating the First Level response to an institutional policy issue by a Correctional Lieutenant, signed off by
a Correctional Captain. The MAC continues to assert that Operations Procedures, signed by the Warden,
constitute institutional policy decisions and directives that are not subject to the review or commentary by his
subordinates in the implementation of that policy. This remains a substantial problem at CTF. Correctional
Officers, Correctional Supervisors, and bargaining unit officials *routinely* obstruct, contradict, or redirect the
application and implementation of institutional policy. Their actions extend to personal interpretation of
statutory/regulatory rulings and circumvention of state and federal law. The Administration is unable to
effectively counter or discipline the actions of bargaining unit officials who erect a de facto "Green Wall"
against the adoption of changes that would normalize programming access and opportunities at this institution.

2.      The institution's response quotes the local Operations Procedure (OP) #34, which partially governs
program access and participation by Close B Custody inmates. *Again,* the institution neatly sidesteps the *key
issue.* CTF's OP's *are not in compliance with California Regulatory Law and the DOM.* They do not address,
acknowledge, comment, or provide an "institutional interpretation" of the *ten, specific citation of the CCR*
presented by the MAC in this appeal. Those actions and the "creation" of OP's that *contravene the regulations
under which they operate* violate departmental policy as defined in DOM §51020.1. That section states:
"Supplements shall:...Not create new policy/regulation. Clarify and not duplicate or conflict with the DOM
provisions." The language of OP #34 clearly violates the *mandatory* language contained in the CCR. That
language negates the discretion of CTF to apply its own interpretation of Close B Custody program access,
activities and assignments.

3.      The institution's reliance on the language contained in their OP to demonstrate that Close B Custody
program inmates "...are permitted to participate in programs within Central Facility between 0600 and 2000
hours with exceptions being made until 2200 hours..." are contradicted by other language contained in the OP
and the actual practices engaged in by CTF staff. The OP's partial adoption of language from the CCR and the
DOM, while excluding the *complete provisions of regulatory law and Departmental policy,* side steps the issue
of evening yard access and program activities in the housing units between 2000-2100 Hours. The difference
between what an OP "clearly states" and the *reality* of program practices is "day and night."

4.      The institution does not justify why Close B Custody inmates are not permitted beyond the West Gate
for night yard. Again, the institution chooses to ignore the provisions of the CCR and the DOM.

The MAC charges that CTF is deliberately indifferent and in violation of law by their failure to provide the
mandated programming under a variety of guises and ignoring cautionary advice published in *The Insighter,* a
Departmental publication; thereby contravening rulings in the state courts, Legislative intent and Departmental
guidelines.

Recent changes to the daily program schedule of activities, articulated in OP#40, further restrict and violate
Close B Custody inmates' access to assignments and program activities in the course of a normal program day.

(See Reverse)

The MAC asserts that CTF does not have a reasonable interest or legitimate penological interest in contravening the regulations under which it operates.

The MAC's position is simply that the institution should be in *complete, not "selective"* compliance with California Regulatory Law. The institutional position is in direct conflict with the CCR, in that California Regulatory Law establishes the parameters that institutions *shall* (mandatory language) operate under and the expectation that they will carry out their duties *within those defined parameters*

The MAC is requesting the Director's Level Response direct:

1.      Instruct CTF that all local procedures must be in full compliance with any applicable provisions of California Regulatory Law and Departmental policy, especially where those procedures apply to access to program assignments and activities by Close B Custody inmates housed within the institution.

2.      Instruct CTF to immediately amend any of the several local OP's with provisions that directly contradict or do not reflect complete compliance with California Regulatory Law and applicable provisions of the DOM.

Respectfully submitted,

**A. BOSTON**
**MAC Chairman**
**CTF-Central Facility**          December 22, 2006

I-3

**EXHIBIT J**

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS AND REHABILITATION
INMATE APPEALS BRANCH
P. O. BOX 942883
SACRAMENTO, CA 94283-0001

## DIRECTOR'S LEVEL APPEAL DECISION

Date:  **MAR 1 6 2007**

In re:    Boston, D-03868
Correctional Training Facility
P.O. Box 686
Soledad, CA 93960

IAB Case No.: 0607538          Local Log No.: CTF 06-02329

This matter was reviewed on behalf of the Director of the California Department of Corrections and Rehabilitation (CDCR) by Appeals Examiner J. G. Arceo, Facility Captain. All submitted documentation and supporting arguments of the parties have been considered.

**I    APPELLANT'S ARGUMENT:**   It is the appellant's position that he disputes the California Code of Regulations, Title 15, Section (CCR) and CDC Operations Manual Section's polices and procedures at it relates to inmates designated with Close "B" custody. The appellant reports that Correctional Training Facility (CTF) us essentially removing privileges from the specialized segment of the general inmate population at CTF-Central (C) who would otherwise be entitled to and eligible for same. He requests that CTF's policies and procedures be brought into compliance with regulatory law and departmental policy. Further, he asks that CTF's Close "B" inmates be granted full and equitable opportunities for Inmate Work/Training Incentive Program assignments and activities between 0600 and 2000 hours, pursuant to the CCR 3377.1.

**II    SECOND LEVEL'S DECISION:** The reviewer found that the institution is in compliance with Operational Procedure #34 regarding programs within CTF-C, Close "B" inmates are permitted to participate in. The Operational Procedure also addresses the programs and activities Close "B" Level II inmates shall be permitted to attend during the hours of 0600 and 2000. The First and Second Levels of appeal have provided responses within departmental policy for this issue.

**III  DIRECTOR'S LEVEL DECISION:** Appeal is denied.

**A.  FINDINGS:**  The appellant has failed to present evidence that he is aware of all security concerns within the CTF. The Warden is charged by law with the responsibility to ensure the safety of staff, inmates, and public safety. The Warden has indicated that he will consider Men's Advisory Council recommendations. Pursuant to the California Penal Code Section 2933, inmates are not guaranteed a specific assignment but are afforded the opportunity for a credit qualifying assignment as provided by institutional and departmental resources. Unfortunately, Close custody inmates are limited by numerous criteria to ensure their safe custody and accountability. Given the inmate population at CTF and available resources not all inmates will be assigned to the job of his choice or in a specific area of a facility. The appellant has failed to establish that the Warden has violated the intent of the law. The Warden must ensure that recommendations submitted by any inmate or group of inmates on behalf of the entire inmate population ensure institutional safety and security, are within the intent of established law and reasonable penological interest. The appellant's appeal issues have received the required reviews. The appellant has not supported his requested action. No intervention at the Director's Level of Review is warranted.

**B.  BASIS FOR THE DECISION:**
CCR: 3001, 3270, 3272, 3274, 3375, 3377, 3377.1, 3377.2, 3380

**C.  ORDER:**  No changes or modifications are required by the institution.

J-2

BOSTON, D-03868
CASE NO. 0607538
PAGE 2


This decision exhausts the administrative remedy available to the appellant within CDCR.


N. GRANNIS, Chief
Inmate Appeals Branch

cc:     Warden, CTF
        Appeals Coordinator, CTF

**EXHIBIT K**

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS

**INMATE/PAROLEE APPEAL FORM**

CDC 602 (12/87)

Location: Institution/Parole Region    CTF-C

Log No. 06 - 02873    Category 2 - 15

1. _____

2. _____

OCT 24 2006

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME A. BOSTON, Andre | NUMBER D-03868 | ASSIGNMENT MAC CHAIRMAN/MAC.001 | UNIT/ROOM NUMBER EW-236U |
|---|---|---|---|

A. Describe Problem: **This inmate appeal is being filed by the CTF-Central Facility Men's Advisory Council (MAC) on behalf of the general population, pursuant to California Code of Regulation (CCR), Title 15, §§ 3084.1 and 3084.5 and the Department's Operations Manual (DOM) § 53120.12 in their entirety. In order to seek timely resolution of this matter, we are requesting that the appeal be bypassed to the Second Level. The factors involved in this appeal are as follows: CTF-Central Facility is a part of the Correctional Training Facility (CTF), a state prison. The facility can house approximately 2,828 general population inmates. Specifically, the facility houses a total of approximately 556 inmates, who are**

If you need more space, attach one additional sheet.    CONTINUED ON ADDITIONAL SHEET

B. Action Requested: **The MAC is requesting that CTF's policies and Operations Procedures be brought into complete compliance with regulatory law and CDCR policy. Specifically, CTF's Close B Custody inmates should be granted full and equitable opportunities for IWTIP program assignments in accordance with the provisions of CCR § 3377.1 and that any language**

Inmate/Parolee Signature: A. Boston, MAC Chairman    CONTINUED ON ADDITIONAL SHEET    Date Submitted: 8/31/06

C. INFORMAL LEVEL (Date Received: _____ )

Staff Response: _____

BYPASS

Staff Signature: _____    Date Returned to Inmate: _____

D. FORMAL LEVEL

If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

_____

BYPASS

Signature RECEIVED    RECEIVED    Date Submitted: _____

Note: Property/Funds appeals must be accompanied by a completed Board of Control form BC-1E, Inmate Claim

CDC Appeal Number:

SEP 1 2006    OCT 24 2006

06 - 02873

APPEALS    CTF APPEALS

SEP 1 2006

First Level    ☐ Granted    ☐ P. Granted    ☐ Denied    ☐ Other _____

E. REVIEWER'S ACTION (Complete within 15 working days): Date assigned: ____SEP 1 2006____ Due Date OCT 1 7 2006

Interviewed by: _____

BYPASS

Staff Signature: _____  Title: _____  Date Completed: _____

Division Head Approved:                                                    Returned

Signature: _____  Title: _____  Date to Inmate: _____

F. If dissatisfied, explain reasons for requesting a Second-Level Review, and submit to Institution or Parole Region Appeals Coordinator within 15 days of receipt of response.

BYPASS

Signature: _____  Date Submitted: _____

Second Level    ☐ Granted    ☐ P. Granted    ☒ Denied    ☐ Other ____Sep 1-2006____ Date: OCT 17 2006

G. REVIEWER'S ACTION (Complete within 10 working days): Date assigned: Sep 1-2006 Due Date: OCT 17 2006

☒ See Attached Letter

Signature: X ___A C Aish  A W C A)___  Date Completed: 10-19-06

Warden/Superintendent Signature: X _____  Date Returned to Inmate: OCT 2 4 2006

H. If dissatisfied, add data or reasons for requesting a Director's Level Review, and submit by mail to the third level within 15 days of receipt of response.

The circumstances which give rise to this appeal, have been created by a
series of actions undertaken by the Administration of the Correctional
Training Facility (CTF), reflected in the adoption of Operations Procedures
(OP) #34, 40 and 88 that have had a direct impact on the Close B Custody
inmates. This appeal was filed on the behalf of those Close B Custody inmates
who are housed in CTF-Central Facility. (See attached for continuation)

Signature: ___A. BOSTON, D-03868, MAC Chairman___  Date Submitted: 11/7/06

For the Director's Review, submit all documents to: Director of Corrections
P.O. Box 942883
Sacramento, CA 94283-0001
Attn: Chief, Inmate Appeals

DIRECTOR'S ACTION: ☐ Granted    ☐ P. Granted    ☒ Denied    ☐ Other _____

☒ See Attached Letter

CDC 602 (12/87)                                                    Date: JAN 2 3 2007

**Problem (Continued):**

Classified by CDCR as Level II, Close-B Custody, representing 25% of the total general population,. CCR Title 15 defines and incorporates the provisions for their program expectations according to their inmate custody designations. Those program expectations are supported by corresponding program policy articulated in the DOM. Central Facility's general population is represented by an elected inmate advisory council (MAC). The MAC's function, as described in CCR Title 15 and the DOM is to advise and communicate with the Warden and other staff, those matters of common interest and concern to the inmate general population. In pursuit of that mandate, the MAC has met on multiple occasions with the CTF Administration concerning equal access to Level II program assignment opportunities for all Close Custody inmates, which would be consistent with regulatory law and Departmental policy. Despite those efforts, the MAC has been confronted with reports that supervisory and rank & file staff are attributing the continuing program changes that adversely affect all general population inmates to "an agreement or decision reached between the Administration and the MAC." The program circumstances, which the MAC is grieving are defined by Operations Procedures (OP) #34 and #40.

The MAC asserts that the restrictive language and circumstances imposed by OP #34 and OP #40 have an explicit, negative impact on Close B Custody inmates, which contradict the regulatory language of CCR Title 15 and the policy provisions of the DOM. The result of those restrictions is to effectively deny those inmates program assignments to which they are entitled.

- The latest revision of OP #34, signed by Ms. P. Barker for Warden A. P. Kane on April 3, 2006, contains the following pertinent language on pages 3 and 4: "Close B, Level II inmates shall be permitted to participate in program assignments and activities, i.e., Alcoholic Anonymous and Narcotics Anonymous, during the hours of 0600 hours to 2000 hours in areas located within the Central Facility *security perimeter (West Gate to East Gate)*. Close B Custody inmates may participate in designated work program assignments until 2200 hours when the work program is in an assigned housing unit located within the facility security perimeter. Close B Custody inmates may participate in limited evening activities after 2000 hours until the general evening lockup and count when the limited activity is in a designated housing unit located within the facility security perimeter. No Close Custody inmates will be assigned to the Culinary with access to the Loading Dock, Laundry/Clothing Room, Lower East Corridor, or areas outside the East Gate."

- Former Warden J. Hamlet signed the last revision of OP #40 on October 24, 2002. Although this critical OP has not been officially revised in four years, numerous, substantial changes in program routine have been instituted, which are contrary to the provisions of the signed OP available to the general population. The OP cites the West Corridor Grill Gate and Yard Fence Gate as the portals for Central Facility Recreation Yard access and egress. The OP also establishes specific procedures for Yard Recall and Counts that directly impact the Close B inmate population at CTF-Central. Although the provisions for Close Custody Counts are also discussed in OP #11, which governs Inmate Count and Movement, there is no actual description or delineation of Close Custody inmate movement contained in that OP. In accordance with OP #40, Close B inmates are recalled from yard activities at 1100 hours, but not counted until 1215 Hours. They are counted with all other inmates at 1700 Hours; separately at 2000 Hours as Close Custody inmates; and again at 2130 Hours with all other inmates. This is done in spite of the fact that neither the CCR nor the DOM requires additional counts for Close B Custody inmates. The OP explicitly limits evening program to showers only prior to meals and excludes any release to the yard for Red Card Holders who are Close Custody inmates after the completion of the evening meal. There are no specific provisions for Close B inmates' participation in Inmate Activity Groups between the hours of the 1700 Hour Institutional Count and the 2000 Hour Close Custody Count. The combined result of the provisions created by OP #40 for the counting, release and movement of Close B Custody inmates is the imposition of demonstrable restrictions on their IWTIP program assignments and participation.

- It is perhaps instructive to note that OP #80, CTF's Mission Statement, states that Central Facility is a "training and work-oriented facility that provides comprehensive academic, vocational and industrial programs for Level II inmates." The statement asserts that there are a "variety of self-improvement programs, academic classes, vocational classes, literacy program, and work assignments available for *minimum and medium custody inmates*." There is no specific mention of program and work assignment provisions for close custody inmates. Significantly, OP #80 also states CTF "has a *secured-armed perimeter*. There are armed towers spaced around the *perimeter*, each of which is staffed and armed with lethal as well as less lethal weapons. The *perimeter* of each of the facilities contains separate vehicle and pedestrian sallyports, whose overlooking towers are staffed 24 hours per day."

CCR Title 15 and the DOM establish clear criteria and provisions for Close B Custody program access and assignments (*bold/italicized print* has been added for emphasis of relative points).

- CCR §3000 contains four definitions relative to *Designated Level II Housing, Facility Security Perimeter, and Security Perimeters:*
    1. "*Designated Level II Housing* means a housing facility encompassed by a *facility security perimeter* and constructed to provide celled housing for inmates with *Level II classification scores*."
    2. "*Facility Security Perimeter* is any combination of living unit, work area and recreation area *perimeters* that is set aside to routinely restrict inmate movement based on custody level. This *perimeter* will contract and expand depending upon the weather, lighting conditions and hours of operation."
    3. "*Secure Perimeter* means the *largest Security Perimeter* that physically retains inmates in custody on facility property."
    4. "*Secure Perimeter* means any unbroken physical barrier or combination of physical barriers that restricts inmate movement to a contained area without being processed through a door, gate or sallyport."

- CCR §3000.5 establishes the "Rules of Construction," which apply to salient points in the MAC's grievance.

[OVER]

- CCR §3377.1(a)(4)(A-C) establishes the following points relative to this grievance:
  - o  Subsection (A) states that Close B inmates "housing shall be in cells within *designated institutions* in housing units located within an established *facility secure perimeter*."
  - o  Subsection (B) states "Close B inmates shall be permitted to participate in program assignments and activities during the hours of 0600 hours to 2000 hours in areas located within the *facility security perimeter including beyond work change area* in a *designated Level II*, Level III or Level IV institution.  Close B Custody inmates may participate in limited evening activities after 2000 hours until the general evening lockup and count when the limited activity is in a designated housing unit within the *facility security perimeter.* "
  - o  Subsection (C) provides for the direct and constant supervision of work supervisors during the inmates' assigned work hours.  Subsection (D) provides for the direct and constant supervision of Close B Custody inmates at all times.

CCR 3377.1(a)(4)(B) mandates the opportunity for Close B inmates to participate in program assignments within the facility secure perimeter including beyond the work change.  The MAC asserts that CTF is not allowed to restrict inmates from program assignments to areas strictly defined by the "East and West Gates" (as imposed by OP #34). The MAC further asserts that the institution has developed *local definitions* of the *facility security perimeter* that are contrary to the regulatory language contained in CCR Title 15.  The Culinary areas (including the back dock), the Clothing and Laundry Rooms, Receiving and Release, the Central Facility Vocational classrooms and the Prison Industry Authority are all clearly located within CTF-Central Facility's *actual* security perimeter as determined by regulatory law and CDCR policy.   There is no legitimate penological interest demonstrated by the institution's restriction of the assignment and participation of Close B inmates in these areas, especially during daylight hours.  The determination of the "East and West Gates" as an arbitrary definition constitutes an underground regulation imposed by CTF (with possible undue influence by Custody bargaining units).  The "policy," which establishes the East and West Gates as the "security perimeter," is immediately contradicted by the ability of Close B inmates to participate in Recreation Yard activities between the approximate hours of 0900 to 1500 Hours. The Central Facility Recreation Yard is clearly *outside* the West Gate. Close B inmate assignments in Medical and Education are all located *beyond* the Lower East Corridor, another arbitrary boundary established in the language of OP #34.  In addition, the restrictions imposed by CTF against Close B inmate work or program assignments (Vocations & PIA) deny those inmates access to the benefits implied in CTF's "Mission Statement" (even though they are specifically excluded from CTF's mission at this time). Close B inmates have no ("zero") access to vocational programs, absolutely essential to the parole requirements imposed by the Board of Parole Hearings on life term inmates. Close B inmates have no ("zero") opportunity to participate in PIA assignments. As a result, those inmates are denied access to PIA's primary function, which is inmate work programming. Close B inmates are denied the opportunity to participate in PIA's Inmate Employability Program, which would document and certify their skills, work experiences and work habits while assigned to PIA Enterprises. This eliminates Close B inmates' possible participation in another desirable parole requirement sought by the Board of Parole Hearings. The result of this denial of IWTIP program access is a direct and indirect impact on the liberty interests of Close B inmates regarding their parole opportunities.

For the last six years, CTF has failed to demonstrate any interest in improving the program opportunities for Close B inmates and has engaged in an ongoing degradation of Close B assignment opportunities. The previous attempt by former Warden A. P. Kane to create Close B access to vocational programming was withdrawn by the present Administration. CTF has been apprised of CDCR's internal view of denying Close B Custody Program Access, published in the Inmate Appeals Branch Insighter (see Attachment A - Issue #17, dated 2003 – "A Court Weighs in on Application of Regs"), but has failed to respond. CTF's Close B inmates are disproportionately unemployed and underassigned. Only a third of Close B inmates are actually assigned to jobs/education. Over half the A1A Close B inmates are unassigned and cannot find a job or vocational assignment (See Attachment B). Close B inmates previously worked for decades throughout the institution, without any evidence of a legitimate penological concern or security incidents at CTF that would support denying them access to which they are entitled under regulatory law and CDCR policy. DOM §51020.1 specifically directs that "Supplements shall not create new policy/regulation." A regulation "implements, interprets or makes more specific the provisions of statute, case law or regulation of controlling agencies... imposes requirements which shall be met to qualify for general entitlement or privileges available to inmates..." CDCR policy clearly directs that supplements (OP's) shall comply and expound on the implementation of regulations and *not contract* them. OP #34 is clearly not in compliance with regulatory law or CDCR policy.  As a result, CTF's Close B Custody inmate population is being adversely affected without avenue(s) for relief. The MAC's attempts to address these discrepancies through constructive dialogue, input and recommendations have been dismissed by the CTF Administration and the Close B inmate general population continues to suffer as a consequence. The CCR and the DOM explicitly establish that CTF-Central Facility's Close B inmates, housed in a designated Level II housing, are entitled to participate in program assignments and activities during the hours of 0600 hours to 2000 hours in areas located within the facility security perimeter including beyond work change area.  Close B Custody inmates' IWTIP program entitlements are being denied or obstructed by policies and procedures adopted and imposed by the CTF Administration.

**Action Requested (Continued):**
contained in OP's #34 and #40, as well as any other relevant OP's, be revised to comply with the provisions of the CCR and the DOM.

**A. BOSTON**
**MAC Chairman**
**CTF-Central Facility**                    August 31, 2006

# The Insighte.



Issue Number 17 · · · CDC INMATE APPEALS BRANCH TRAINING BULLETIN · · · January 2003



*Inmate*
*Appeals*
*Branch*
916-358-2417

E. Almeida, Jr., Director
CDC

K. Kinzer, Chf. Dep. Director
Support Services

E.A. Mitchell, Dep. Director
Policy and Eval. Div.

Nola Grannis, Chief
Inmate Appeals Branch

*Office Staff*
Sandy Brady, SWPT
Sharon Candelot, AGPA
DeeAnne Cooper, WPT
Morenda Hamarlund, OT
Lizie Hoogland, WPT
Mary Moriarty, AGPA
Renee Welsh, OT

*Appeals Examiners*
Keri Allen, SSM-I
Jocelynn Arceo, FC
Judy Burleson, SSM-I
Pio Enriquez, FC
Randy Flota, FC
Maya Hodges-Wilkins, FC
Chuck Hollis, FC
Tony Loftin, FC
Laine Pearson, FC
Derek Porter, FC
Terry Stocker, FC
Betsy Sullivan, SSM-I
Tom Zuiget, SSM-I



## A MESSAGE FROM THE CHIEF...

*Greetings!* Before becoming chief, I had the pleasure of working with most of the appeals coordinators and their staff; therefore, I have a feeling of continued confidence in the abilities of those around me. This year should bring with it some interesting challenges including significant changes in law, regulation, and policy. Many of you are currently feeling the crush of appeals regarding frontal nudity, the ban on smoking products, and soon—restitution and Plata complaints. I would like to ask your cooperation in maintaining the integrity of the exhaustion requirement pursuant to the Prison Litigation Reform Act of 1995. This act gave us the ability to thwart premature filings in the courts, resulting in their immediate dismissal for failure to exhaust by administrative appeal. The way to best support the reform act is through strict adherence to appeal time limits. Too many First or Second Level responses address the appellant's failure, without cause, to meet time constraints, yet proceed to respond as if they had. Instead of preventing future litigation, the response commits CDC to follow this appeal to its end. More often than not, this means court, and court represents much time, effort, and money. If an appellant has no legitimate excuse for delayed submittal/resubmittal, then the appeal should be screened out for untimeliness, thereby preventing access to court.

## THIRD PARTY INTERVENTION ON BEHALF OF AN INMATE/PAROLEE APPELLANT

Inmates and parolees have a right to appeal CDC decisions, actions, conditions, or policies that adversely affect them. No other inmate or parolee shall submit a CDC 602 on behalf of another inmate or parolee. Nonetheless, an appellant may obtain the assistance of another person, including an inmate or parolee, in preparing the appeal. Institution staff shall provide the assistance necessary to inmates who have difficulty communicating in written English to afford access to the appeal process. These are CDC regulations.

*To what extent may an appellant be represented by a third party, such as a parent, an inmate, or an attorney?* Third parties may assist and even ghostwrite appeals for an appellant. This is especially relevant to a disabled inmate who cannot write a CDC 602. The CDC 602 must be submitted over the appellant's signature and through the appellant, not a third party. If the appellant cannot sign his or her own name, a staff member should interview the appellant and obtain a verbal or other acknowledgement that the CDC 602 was knowingly submitted by the appellant and the content represents the appellant's position. The employee should write on the CDC 602 that the interview was conducted and the circumstances of the appellant's concurrence. Responses to the appeal should be directed to the appellant, not the third party. Staff assistance to communicate the response for a disabled appellant should be provided as necessary and documented. *(CCR 3084.1, 3084.2, 3084.3)*

## A Court Weighs In On Application of Regs

A recent California court decision to grant an inmate's writ of habeas corpus serves as a reminder to CDC that we must follow our established regulations. The inmate petitioner asserted that the institution failed to follow CCR 3377.1 which establishes Close "B" Custody program and activity hours. The response at each level of appeal cited a variety of justifications to establish different program hours. First level: the rule changes were permissive and the institution had the authority to amend them; *the court ruled that the language was mandatory.* Second level: DOM permitted the institution to retain prior policy; *the court ruled that DOM does not supercede the CCR.* Third level: a reasonable penological interest existed to change the hours; *the court ruled that an institution could not have a reasonable interest that contravenes the regulations under which it operates.* While some regulations may seem to be outdated or inconvenient, CDC is held to compliance.

Recommendations to revise regulations should be submitted through the chain of command to headquarters staff.



****

114

ATTACHMENT A    k-10

# CENTRAL FACILITY
# CLOSE CUSTODY ASSIGNMENT PROFILE
## as of:  August 22, 2006

| CLOSE CUSTODY INMATE HOUSING | C-WING | D-WING | E-WING | CENTRAL FACILITY* |
|---|---|---|---|---|
| TOTAL NUMBER OF CLOSE CUSTODY INMATES | 57 | 252 | 254 | 562 |
| TOTAL NUMBER OF A-1-A ASSIGNED CLOSE CUSTODY INMATES | 11 | 76 | 105 | 192 34.1% |
| TOTAL NUMBER OF A-1-A UNASSIGNED CLOSE CUSTODY INMATES | 35 | 150 | 121 | 306 54.4% |
| TOTAL NUMBER OF A-2-B CLOSE CUSTODY INMATES | 6 | 27 | 25 | 58 10.3% |
| TOTAL NUMBER OF C STATUS CLOSE CUSTODY INMATES | 5 | 0 | 1 | 6 <1% |

| TOTAL NUMBER OF CLOSE CUSTODY INMATES BY AREA OF ASSIGNMENT | C-WING | D-WING | E-WING | CENTRAL FACILITY* |
|---|---|---|---|---|
| EDUCATION | 10 (-) | 40 | 52 (-) | 102 (-) |
| HOUSING UNIT WORKERS | 1 | 30 (-) | 28 (-) | 59 (-) |
| RECREATION YARD CREW | 0 | 2 | 9 | 11 |
| CORRIDOR WORKERS | 0 | 2 | 8 | 10 |
| INFIRMARY WORKERS | 0 | 0 | 6 | 6 |
| OTHER MISCELLANEOUS POSITIONS | 0 | 2 | 2 (-) | 4 (-) |

| COMPARISON WITH GENERAL POPULATION | C-WING | D-WING | E-WING | CENTRAL FACILITY* |
|---|---|---|---|---|
| CENTRAL FACILITY MEDIUM/MINIMUM CUSTODY | 197 | 0 | 0 | 2828 |
| CENTRAL FACILITY CLOSE CUSTODY INMATES | 57 2.0% OF POPULATION | 252 8.9% OF POPULATION | 253 8.9% OF POPULATION | 562 19.8% OF POPULATION |
| TOTAL NUMBER OF A-1-A ASSIGNED CLOSE CUSTODY INMATES | 11 <1% | 76 2.7% | 105 3.7% | 192 6.8% |
| TOTAL NUMBER OF A-1-A UNASSIGNED CLOSE CUSTODY INMATES | 35 1.2% | 150 5.3% | 121 4.3% | 306 10.8% |
| TOTAL NUMBER OF A-2-B CLOSE CUSTODY INMATES | 6 <1% | 27 <1% | 25 <1% | 58 2% |
| TOTAL NUMBER OF C STATUS CLOSE CUSTODY INMATES | 5 <1% | 0 | 1 <1% | 6 <1% |

*EXCLUDES X & O-WING POPULATION

# CENTRAL FACILITY
# CLOSE CUSTODY ASSIGNMENT PROFILE
## as of:  March 3, 2006

| CLOSE CUSTODY INMATE HOUSING | C-WING | D-WING | E-WING | CENTRAL FACILITY* |
|---|---|---|---|---|
| TOTAL NUMBER OF CLOSE CUSTODY INMATES | 66 | 253 | 254 | 573 |
| TOTAL NUMBER OF A-1-A ASSIGNED CLOSE CUSTODY INMATES | 12 | 74 | 114 | 200 34.9% |
| TOTAL NUMBER OF A-1-A UNASSIGNED CLOSE CUSTODY INMATES | 39 | 153 | 116 | 308 53.7% |
| TOTAL NUMBER OF A-2-B CLOSE CUSTODY INMATES | 13 | 26 | 23 | 62 10.8% |
| TOTAL NUMBER OF C STATUS CLOSE CUSTODY INMATES | 2 | 0 | 1 | 3 <1% |

| TOTAL NUMBER OF CLOSE CUSTODY INMATES BY AREA OF ASSIGNMENT | C-WING | D-WING | E-WING | CENTRAL FACILITY* |
|---|---|---|---|---|
| EDUCATION | 12 | 37 | 58 | 107 |
| HOUSING UNIT WORKERS | 0 | 32 | 29 | 61 |
| RECREATION YARD CREW | 0 | 2 | 9 | 11 |
| CORRIDOR WORKERS | 0 | 2 | 8 | 10 |
| INFIRMARY WORKERS | 0 | 0 | 6 | 6 |
| OTHER MISCELLANEOUS POSITIONS | 0 | 1 | 4 | 5 |

| COMPARISON WITH GENERAL POPULATION | C-WING | D-WING | E-WING | CENTRAL FACILITY* |
|---|---|---|---|---|
| CENTRAL FACILITY MEDIUM/MINIMUM CUSTODY | 188 | 0 | 0 | 2828 |
| CENTRAL FACILITY CLOSE CUSTODY INMATES | 66 2.3% OF POPULATION | 253 8.9% OF POPULATION | 254 9% OF POPULATION | 573 20.3% OF POPULATION |
| TOTAL NUMBER OF A-1-A ASSIGNED CLOSE CUSTODY INMATES | 12 <1% | 74 2.6% | 114 4% | 200 7% |
| TOTAL NUMBER OF A-1-A UNASSIGNED CLOSE CUSTODY INMATES | 39 1.3% | 153 5.4% | 116 4.1% | 308 10.8% |
| TOTAL NUMBER OF A-2-B CLOSE CUSTODY INMATES | 13 <1% | 26 <1% | 23 <1% | 62 2% |
| TOTAL NUMBER OF C STATUS CLOSE CUSTODY INMATES | 2 <1% | 0 | 1 <1% | 3 <1% |

*EXCLUDES X & O-WING POPULATION

**EXHIBIT L**

DEPARTMENT OF CORRECTIONS AND REHABILITATION
Correctional Training Facility
Soledad, California

RE:    CTF APPEAL LOG No. *CTF-C-06-02873*
Second Level Reviewer's Response

**BOSTON**                **D-03868**                **EW-236U**

APPEAL DECISION:    **DENIED**

APPEAL ISSUE: CUSTODY/CLASSIFICATION (Category 2)

You are filing an appeal as the CTF Central Men's Advisory Council (MAC) Chairperson on behalf of the general population. You cite CCR, Title 15, Section 3084.1, 3084.5 and Departmental Operations Manual (DOM) Section 53120.12.

- You claim Operational Procedures #34 and #40 have an explicit negative impact on Close B custody inmates.
- You claim CTF's definition of security perimeter (Westgate and East gate) is out of compliance with departmental regulations.
- You claim there are too many counts for Close B custody inmates. You assert CTF is not allowed to restrict inmates from program assignments to areas strictly defined by the "East and West gates."
- You claim Close B inmates have no opportunity to participate in vocational and Prison Industry Authority (PIA) programs.

ACTION REQUESTED:

The MAC is requesting CTF's policies and operational procedures be brought into complete compliance with regulatory law and CDCR policy. Specifically, CTF's Close B Custody inmates should be granted full and equitable opportunities for IWTIP program assignments in accordance with the provisions of CCR, Section 3377.1. You also request that language contained in OP #34 and #40, as well as any other relevant OP's be revised to comply with the provisions of the CCR and the DOM.

APPEAL RESPONSE:

On October 16, 2006, you were interviewed by acting Associate Warden J. C. Sisk concerning this appeal. You provided background information concerning the MAC's position on this issue and stated in essence that all the information was in the appeal.

A thorough review of the appeals package and all your attachments, Operational Procedures, CCR sections and DOM sections has been completed and reveals the following:

- CCR Section 3084.1. Right to appeal. This section describes an individual inmate's ability to file an appeal.

- CCR Section 3084.5. Levels of appeal review and disposition. This section describes why you requested this appeal be bypassed to the Second Level of Review because you are contesting a policy or procedure implemented by the institution head.

L-2

Second Level Reviewer's Response
CTF Appeal Log # *CTF-C-06-02873*
. Page 2 of 3

- DOM Section 53120.12, Inmate Advisory Committee Appeals. This section gives the authority to the MAC to file an appeal on any decision or action when the matter is not resolved through normal MAC communication channels with the Warden. This section continues on to state, "Warden's staff and the (IACs) are urged to consider every reasonable means to resolve issues at the lowest possible level before utilizing the appeals process."

- CCR Section 3270, Security-General Policy states, "The primary objectives of the correctional institutions are to protect the public by safely keeping persons committed to the custody of the Director of Corrections, and to afford such persons with every **reasonable** opportunity and encouragement to participate in rehabilitative activities. Consistent effort will be made to insure the **security** of the institution and the effectiveness of the treatment programs within the **framework of security and safety.** Each employee must be trained to understand how **physical facilities degree of custody classification** personnel and **operative procedures** affect the maintenance of inmate custody and security. The requirements of custodial security and of staff, inmate and public safety **must take precedence** over all other considerations in the operation of all the programs and activities of the institution of the department."

- CCR, Section 3380, Chief Executive Officer, Subsection (a), states, "The warden or superintendent of an institution of the department is the chief executive officer of that institution, and is responsible for the custody, treatment, training and discipline of all inmates under his or her charge. Subsection (c) states, "Subject to the approval of the Director of Corrections, wardens, superintendents and parole region administrators will establish such **operational plans and procedures as** are required by the director for implementation of regulations and as may otherwise be required for their respective operations. Such procedures will apply only to the inmates, parolees and personnel under the administrator.

Previous CTF Wardens have utilized Operational Procedures to establish Facility security perimeters, housing units, additional counts and areas of movement for Close custody inmates. The current warden continues to use and approve OP's.

These OP's take into consideration the public safety as outlined in CCR Section 3270. The Warden is within his right to do so per CCR Section 3380. Other possible considerations would be the age of the facility, numerous vehicle and pedestrian sally ports beyond the East Gate, poor lighting and the lack of an electrified fence.

Therefore, CTF's Operational Procedures are authorized and in compliance with regulatory law and CDCR policy.

Close custody inmates have all the opportunities per IWTIP as allowed by their custody.

Close custody life term inmates will have vocation and or PIA opportunities between 7 to 9 years prior to their Minimum Eligible Parole Date (MEPD). This would allow sufficient time to acquire a trade or two prior to their appearance before the Board of Parole Hearings (BPH).

Second Level Reviewer's Response
CTF Appeal Log # *CTF-C-06-02873*
.Page 3 of 3

In the MAC's meeting with Warden Curry he stated he would consider proposals for Close Custody inmates to work in the culinary. The restriction to the back dock where delivery vehicles have access remains unavailable for Close Custody inmate assignments.

The Warden was also interested in any recommendation for new jobs for Close Custody inmates within the facility security perimeter between 0600 and 2000 or 2200 hours.

The MAC feel that CTF is too restrictive per OP's and should adopt the larger security perimeter beyond work change (East gate). The institutional position is that the OP's are utilized to cover legitimate security concerns while remaining within the understanding of the CCR.

In reference to the Inmate Appeals Branch newsletter "The Insighter" has no bearing on this issue. It is not a regulatory publication. It is informational in nature. Court decisions filter to the institutions via CDCR headquarters.

Based on the action requested, Section B of the appeal CTF is within CDCR policy and no change is needed. Program assignments by IWTIP for Close Custody is appropriate although new assignments or expanded areas will be considered once submitted by the MAC.

Based on the aforementioned information, CTF will not change any Operational Procedures as they relate to this appeal. Therefore, your appeal is DENIED at the Second Level of Review.


Reviewed By: _____

J. C. Sisk, Associate Warden (A), Central Housing

*10-19-06*
Date


_____

B. Curry, Warden (A), CTF

*10-23-06*
Date


Cc: Appeals office
    Inmate C-file

**EXHIBIT M**

## REQUEST FOR DIRECTOR'S LEVEL REVIEW OF INMATE APPEAL
## CTF# 06-02873

### Reasons (Continued)

a designated Level II facility encompassed by a facility security perimeter and constructed to provide celled housing for inmates with Level II classification scores. Over a period of slightly more than five years, CTF has adopted a series of increasingly restrictive physical parameters, which obstruct program access and participation for Close B Custody inmates. These increased restrictions have been adopted in spite of nearly a decade of Level II Close B Custody programming without serious incidents. There is no direct evidence of a legitimate penological reason for reducing overall program access and opportunities by more than 75%. In addition, access to vocational and Prison Industry assignments has been completely eliminated. These actions seem to directly contradict the stated mission of the institution and the Department of Corrections and Rehabilitation (CDCR). Acting Warden B. Curry has invited recommendations from the MAC for proposals to create new jobs for Close B Custody inmates within the restrictive physical parameters adopted by CTF. While this is a positive response to engage the MAC on the behalf of the Close B Custody population, the Administration's interpretation of language contained in the California Code of Regulations (CCR) Title 15 and the Department Operations Manual (DOM), which govern Close B Custody program is still called into question. The institution's response **does not address** the sections of the CCR and DOM cited by the MAC as the basis for this appeal. CCR Title 15 Sections 3000, 3000.5 and 3377.1(a)(A-C) deal with the specific **mandatory language,** which governs Close B Custody program access. The five CCR Sections cited by the CTF Administration do not negate the rules of construction, which mandate compliance with the sections cited by the MAC in this appeal. The DOM **explicitly directs** that supplements (OP's) **shall not create new policy/regulation.** DOM §51020.1 further states that "Supplements shall:...**not** duplicate or **contradict** DOM provisions."

- The institution's assertion that "Previous CTF Wardens have utilized Operational Procedures to establish Facility security perimeters, housing units, additional counts and areas of movement for Close B Custody inmates does not excuse the current Warden from compliance with regulatory law and Departmental policy.

- The institution's assertions about the "...age of the facility, numerous vehicle and pedestrian sally ports beyond the East Gate, poor lighting and the lack of an electrified fence..." are contradicted by the provisions for programming by Close B Custody inmates in other institutions of higher or similar security levels that are older than CTF and also do not have electrified fences. If the Department wanted to make specific accommodations beyond those already stated in the CCR, *multiple changes* to the Director's Rules over the past two years, which specifically address Close Custody programming, provided more than ample opportunity. The sections, which the MAC cited as the basis for this appeal, remain unchanged.

- Simply stating "...CTF's Operational Procedures are authorized and in compliance with regulatory law and CDCR policy..." does not make it so if the institutional policy violates regulatory law or contradicts Departmental Policy.

- Close B Custody inmates **do not** have all the opportunities per the IWTIP program as asserted by the institution. Simply saying they do, does not make it so if Close B Custody inmates do not have access to Vocational and Prison Industry assignments.

- Seemingly "promising" Close B custody life term inmates with "... vocation and or PIA opportunities between 7 to 9 years prior to their Minimum Parole Date (MEPD)..." **does not** provide those inmates with the opportunity to engage in meaningful employment and training or to establish a record of efforts to rehabilitate themselves prior to their appearance before the Board of Parole Hearings (BPH). Denial of Close B Custody inmates' real access to program opportunities and job assignments creates a legitimate liberty interest when inmates appear before the BPH without evidence of participation in programs which meet the desirable parole requirements. (Over)

1

A-2

- CTF's current waiting list for vocational participation by *any CTF-Central Facility inmate, regardless of the custody level*, is over 100 years in real time access.
- CTF currently has **no vocation or PIA job opportunities** for Close B Custody inmates. Prior to the introduction of the more restrictive definition of so-called security perimeters, which contradict the CCR and DOM, CTF's Close B Custody inmates had been gainfully employed and allowed to train in areas from which they are now restricted. This has happened despite a lack of incidents or demonstrated penological concerns that support the changes adopted by previous Wardens.
- The institution's assertion that "…Court decisions filter to the institutions via CDCR headquarters…" does not negate the informational commentary of CDCR's (headquarters) Inmate Appeals Branch newsletter, "The Insighter."
- The institution's assertion that their OP's are utilized to cover legitimate security concerns "…while remaining within the **understanding of the CCR**…" may succinctly define the application of opinion or perception over regulatory law and Departmental policy. If the Department feels that the regulatory law or policy provisions, which govern inmate programming access and opportunities, are too liberal and need to be more restrictive, the Legislature has provided them with appropriate remedies. Close B Custody inmates who have demonstrated a commitment to programming and rehabilitation, working their way down from the acknowledged security concerns of Level III and Level IV Close A Custody housing, desire the opportunities and access proscribed by the CCR and the DOM.

The MAC asserts that CTF, a CDCR institution, does not have a reasonable interest or legitimate penological interest that contravenes the regulations under which it operates. The MAC is requesting that the Director's Level Review carefully consider the CCR provisions, which the MAC has cited in this appeal and the issues that they have raised on the behalf of the Close B Custody inmate population. The MAC is respectfully requesting that the Review *specifically address the cited CCR provisions*, unlike the institutional response, and provide Close B Custody inmates with a clear expectation of program access and opportunities that should be available to them at CTF in accordance with regulatory law, Departmental policy and IWTIP program guidelines. The MAC is respectfully requesting a direct answer to the question of the institution's requirement to comply with the plain language of the CCR and the DOM, versus subjecting the provisions to interpretation, opinion or disregard for Legislative intent. If the Director's Level Review finds that the issues raised by the MAC are valid, the MAC would respectfully requests that CTF be instructed to amend any/all OP's regarding Close Custody programming to comply with California Regulatory Law and Departmental Policy.

Respectfully submitted,

**A. BOSTON**
**MAC Chairman**
**CTF-Central Facility**          November 7, 2006

m-3

**EXHIBIT N**

N-1

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS AND REHABILITATION
INMATE APPEALS BRANCH
P. O. BOX 942883
SACRAMENTO, CA 94283-0001

# DIRECTOR'S LEVEL APPEAL DECISION

Date: **JAN 2 3 2007**

In re: Boston, D-03868
Correctional Training Facility
P.O. Box 686
Soledad, CA 93960

IAB Case No.: 0605652          Local Log No.: CTF 06-02873

This matter was reviewed on behalf of the Director of the California Department of Corrections and Rehabilitation (CDCR) by Appeals Examiner J. G. Arceo, Facility Captain. All submitted documentation and supporting arguments of the parties have been considered.

**I    APPELLANT'S ARGUMENT:** It is the appellant's position that he disputes the California Code of Regulations, Title 15, Section (CCR) and CDC Operations Manual Section's polices and procedures at it relates to inmates designated with Close "B" custody. He requests that Correctional Training Facility's (CTF) policies and procedures be brought into compliance with regulatory law and departmental policy. Further, he asks that CTF's Close "B" inmates be granted full and equitable opportunities for Inmate Work/Training Incentive Program (IWTIP) assignments pursuant to the CCR 3377.1.

**II   SECOND LEVEL'S DECISION:** Warden Curry advised the Men's Advisory Committee (MAC) that he would consider proposals for Close custody inmates to work in the culinary. The back dock restrictions remain in place and those assignments are unavailable to Close custody inmates. The Operational Procedures are utilized to cover legitimate security concerns while remaining within the intent of the CCRs. Program assignments or by the IWTIP for Close custody inmates are appropriate although new assignments or expanded areas will be considered once submitted by the MAC.

**III  DIRECTOR'S LEVEL DECISION:** Appeal is denied.

    **A.  FINDINGS:** The appellant has failed to present evidence that he is aware of all security concerns within the CTF that impact inmate movement. The Warden is charged by law with the responsibility to ensure the safety of staff, inmates, and public safety according to the physical and fiscal resources of his institution. The Warden has indicated that he will consider MAC recommendations. Pursuant to the California Penal Code Section 2933, inmates are not guaranteed a specific assignment but are afforded the opportunity for a credit qualifying assignment as provided by institutional and departmental resources. The appellant has failed to establish that the Warden has violated this law.

    Unfortunately, Close custody inmates are limited by numerous security criteria to ensure their safe custody and accountability to prevent escapes. Given the numbers of inmates at CTF versus the available resources not all inmates will be assigned to the job of his choice or to a specific area of a facility he feels he is entitled to travel. The Warden must ensure that recommendations submitted by any inmate or group of inmates on behalf of the entire inmate population ensure institutional safety and security and are within the intent of established law and reasonable penological interest. The appellant's appeal issues have received the required reviews. The appellant has not supported his requested action. It is clear that Warden Curry is aware of assignment concerns of Close custody inmates. No intervention at the Director's Level of Review is warranted.

    **B.  BASIS FOR THE DECISION:**
CCR: 3001, 3270, 3272, 3274, 3375, 3377, 3377.1, 3377.2, 3380

    **C.  ORDER:** No changes or modifications are required by the institution.

N-2

BOSTON, D-03868
CASE NO. 0605652
PAGE 2


This decision exhausts the administrative remedy available to the appellant within CDCR.


N. GRANNIS, Chief
Inmate Appeals Branch

cc:     Warden, CTF
        Appeals Coordinator, CTF

N-3

**EXHIBIT O**

# Correctional Training Facility
# Tri-Facility Men's Advisory Councils
# Soledad, California

# Constitution & Bylaws
### ADOPTED January 26, 2004

D-2

# CONSTITUTION

## ARTICLE I.

### NAMES

The names of the three autonomous facility inmate advisory councils shall be: the CTF-Central Facility Men's Advisory Council, the CTF-North Facility Men's Advisory Council, and the CTF-South Facility Men's Advisory Council. They may also be referred to as the CTF-Central, North and South Facility MAC's or the Tri-Facility MAC's. (Art. I.1)

## ARTICLE II.

### OBJECTIVES

The CTF Tri-Facility MAC Councils shall serve to advise and communicate with the Warden of the Correctional Training Facility and staff or the administration and staff of the Central, North, and South Facilities about the issues and concerns expressed by the inmate general population of the entire institution or their individual facilities. No administrative responsibilities are implied or to be assumed by the Councils. (Art. II.1)

The CTF Tri-Facility MAC Councils shall provide their inmate general populations with representation and a voice in administrative deliberations and decisions affecting the welfare and best interests of the inmates of the entire institution or their individual facilities. (Art. II.2)

The CTF Tri-Facility MAC Councils shall provide the Warden and administrative staff of CTF and the Tri-Facilities with a vehicle to communicate their administrative concerns, administrative actions and the reasons for administrative actions which affect the inmate general population of the entire institution or their individual facilities. (Art. II.3)

## ARTICLE III.

### MEMBERSHIP

Any general population inmate is eligible for nomination, election, and retention for membership as a MAC Representative for his individual housing unit or facility, limited only by his ability to effectively serve and function in that capacity. (Art. III.1)

Representatives shall be nominated and elected by the inmates living in the general population housing units of CTF under the provisions of the MAC Constitution and Bylaws. (Art. III.2)

A-3

CONSTITUTION & ...LAWS
Page 2

The duly elected Representatives of each facility's MAC shall form an autonomous MAC General Council, a body that represents the specific interests and concerns of the inmate general population of the CTF-Central, North or South Facility. The body may also be referred to as the General Council. (Art. III.3)

Each inmate general population housing unit of the Correctional Training Facility shall elect one (1) Representative for each of three major ethnic groups for membership on their facility's General Council. They shall be referred to as the Black, Mexican, and White General Council Representative(s). They may also be referred to as the Black, Mexican, or White MAC Representatives [abbreviated as Rep(s)]. (Art. III.4)

Each facility General Council may form specialized subcommittees authorized by the Warden of the Correctional Training Facility that are composed of Representatives that are elected by an approved specialized segment of their facility's inmate general population. (Art. III.5)

Each duly elected Representative shall have an equal vote in the deliberations of his facility's General Council. (Art. III.6)

The term of office for a General Council Representative shall be two (2) years and shall expire two (2) years from the date he assumes office and is entered on the official roll. (Art. III.7)

Every duly elected Representative may stand for re-election at the end of his term of office and shall be limited only to the number of terms his constituency chooses to re-elect him to office for his facility's General Council. (Art. III.8)

A Representative shall be subject to recall by his constituency and impeachment by his facility's General Council. (Art. III.9)

# ARTICLE IV.

## OFFICERS

The Officers of each facility's MAC Council shall consist of the: Chairman, Vice-Chairman, Parliamentarian, Secretary, Vice-Secretary, Committee Coordinator, and Sergeant-at-Arms. (Art. IV.1)

The Officers of each facility's MAC Council shall be nominated and elected by a majority vote of the Representatives of their facility's General Council from the membership of that Council. Anyone who is nominated as an Officer must have been a duly elected member in good standing of his facility's General Council prior to his nomination as an Officer. (Art. IV.2)

CONSTITUTION & /LAWS

Page 3

The Officers elected by each facility's General Council shall collectively form that MAC Council's Executive Body and their former positions as Representatives shall be declared vacant. Their positions shall be filled by the nomination and election of new Representatives for the specific housing unit's designated ethnic groups or approved specialized segments of their facility's inmate general population. (Art. IV.3)

The Officers of each facility's Executive Body, with the exception of the Chairman, shall be allowed to vote in the determination of any action before their General Council. (Art. IV.4)

The term of office for an Officer of a facility's MAC Council shall be two (2) years and shall expire two (2) years from the date he assumes office and is entered on the official role. (Art. IV.5)

All duly elected Officers of a facility's MAC Council shall stand for re-election at the end of their term of office subject to the provisions of the MAC's Bylaws. (Art. IV.6)

Each facility MAC shall have an Executive Committee comprised of the Officers and designated Representatives of the General Council. The members of each facility's Executive Committee shall have an equal vote in the determination of any action before that committee. (Art. IV.7)

# ARTICLE V.

## AMENDMENTS

The Tri-Facility MAC Councils shall be empowered to amend this Constitution from the date of its original approval and signing. Any Amendments shall be sequentially numbered and incorporated as additional text from this point in the Constitution's published form, preceding any bylaws or pages containing the signatures of ratification and approval. (Art. V.1)

CONSTITUTION & LAWS
Page 4

# *MAC BYLAWS*

## SECTION I.

### MEMBERSHIP

I.    ORGANIZATION (§1.I)

    A.    <u>CTF Tri-Facility MAC Councils</u> (§1.I.A)

        1.    The CTF Tri-Facility MAC Councils, as equal and autonomous bodies, may adopt such bylaws as they deem necessary, to be attached to the MAC Constitution to organize and provide direction for their Councils. (§1.I.A.1)

        2.    The CTF Tri-Facility MAC Councils shall faithfully discharge their duties   to represent the interests and concerns of their constituencies and they shall be governed by and afforded any rights vested in the provisions of the MAC Constitution and Bylaws. (§1.I.A.2)

    B.    <u>CTF Tri-Facility MAC General Councils</u> (§1.I.B)

        1.    The membership of each facility's General Council shall consist of duly elected MAC Representatives for each general population housing unit and for each approved specialized segment or designated sub-facility of a facility's inmate general population. (§1.I.B.1)

            a.    Housing Units
               The membership from each facility's general population housing unit shall consist of that number of Representatives afforded by the provisions of the MAC Constitution and Bylaws. (§1.I.B.1.a)

            b.    Specialized Segments of the Facility Inmate General Population (§1.I.B.1.b)

               1)    The CTF Tri-Facility MAC Councils recognize the need for representation of certain specialized segments of their inmate general population, which represent different elements of a facility's inmate community, which vary from facility to facility, according to the changing mission statements of the Correctional Training Facility. (§1.I.B.1.b.1)

CONSTITUTION & .LAWS
Page 5

2) The CTF Tri-Facility MAC Councils shall promote the formation of a subcommittee of each facility's General Council to represent the specialized segments of their housing units or designated sub-facilities, subject to the final approval by the Warden of the Correctional Training Facility. (§1.I.B.1.b.2)

3) All approved specialized segments of the inmate general population of a facility may nominate and elect one (1) Representative per yard or unit, according to their facility's design and population concerns, for membership in the facility's General Council. All duly elected Representatives shall have rights and responsibilities equal to those of housing unit Representatives on their facility's General Council. (§1.I.B.1.b.3)

4) The CTF Tri-Facility MAC's shall recognize the following approved · specialized segments of the inmate general population of the Correctional Training Facility within each of their individual facilities for representation, which shall include: American Indians, Distinct Segments of the Mexican Community, Asian-Pacific Islanders, Latin Americans and Others. (§1.I.B.1.b.4)

5) Any specialized segments of the inmate general population of a facility housing unit who are designated by CDC as specific ethnicities, but who feel they should be distinctly recognized for their diversity within a facility's inmate community and who have not been approved for specific representation under this Section of the Bylaws, may petition the MAC Coordinator of their facility or the Warden of the Correctional Training Facility ·for representation on their MAC Council. (§1.I.B.1.b.5)

6) Each facility's Representatives shall be referred to as MAC Representatives or MAC Reps for the segments they respectively represent. (§1.I.B.1.b.6)

CONSTITUTION & LAWS
Page 6

    c.      Temporary Representatives

           Each facility's General Council shall have the authority to elect Temporary Representatives in accordance with provisions of Section 4 of the MAC Bylaws. (§1.I.B.1.c)

    d.      Designated Sub-Facilities (§1.I.B.1.d)

          1)    Central Facility East Dorm  (§1.I.B.1.d.1)

              a)    The Central Facility East Dorm is entitled to representation equal to that of any other Central Facility general population housing unit on the facility's General Council. (§1.I.B.1.d.1)a)

              b)    The Central Facility East Dorm is entitled to special representation on the Central Facility Executive Committee and consideration in all committee matters before the Central Facility's General Council that arise due to the dorm's unique operational concerns and physical plan, subject to the General Council's consent and approval. (§1.I.B.1.d.1)b)

          2)    Central Facility Gym Dorm  (§1.I.B.1.d.2)

              a)    When activated, the Central Facility Gym Dorm is recognized as a sub-facility of the Central Facility for representative purposes. (§1.I.B.1.d.2)a)

              b)    The Central Facility Gym Dorm is entitled to elect one (1) Representative for each of the three (3) major ethnic groups (Black, Mexican, and White) for membership on the Central Facility's General Council. (§1.B.1.d.2)b)

C.    <u>CTF Tri-Facility Executive Bodies</u>

    The membership of each facility's Executive Body shall consist of duly elected Officers from each facility's General Council. (§1.I.C)

CONSTITUTION &  .LAWS
Page 7

D.    .CTF Tri-Facility Executive Committees

The membership of each facility Executive Committee shall consist of the elected Officers and designated Representatives from each facility's General Council. (§1.I.D)

# SECTION 2.

## NOMINATIONS

I.    OPPORTUNITY FOR OPPOSING NOMINATIONS (§2.I)

A.    General Council Representatives (§2.I.A)

1.    All Representatives shall stand for election at the end of their term of office unless they are prevented by any provision of the MAC Constitution and Bylaws. (§2.I.A.1)

2.    Nomination notices shall be posted and the affected segment(s) of the inmate general population of a facility shall have the opportunity to nominate opposing candidates. (§2.I.A.2)

B.    Executive Body Officers  (§2.I.B)

1.    All Officers shall stand for election at the end of their term of office unless they are prevented by any provision of the MAC Constitution and Bylaws. (§2.I.B.1)

2.    The facility's General Council shall be notified and shall have the opportunity to nominate opposing candidates. (§2.I.B.2)

II.    NOMINATION PROCESS (§2.II)

A.    General Council Representatives (§2.II.A)

1.    When a vacancy occurs or the term of office for a Representative will expire on a facility's General Council, the Council shall cause notices to be posted in the affected housing unit(s) or throughout the facility for a period of fourteen (14) days. The notices shall describe the vacant position or the date a current Representative's term will expire. (§2.II.A.1)

CONSTITUTION & LAWS
Page 8

2.      Nomination Forms  (§2.I.A.2)

    a.      Nomination forms may be posted in the housing units or they may be kept in the housing unit office or at the Officer's podium as determined by the facility's General Council. (§2.II.A.2.a)

    b.      Nomination forms shall clearly identify the Representative position and provide spaces to write in nominees' names, CDC numbers, and cell numbers. (§2.II.A.2.b)

    c.      Inmates may nominate themselves, another inmate from their designated ethnic group in their housing unit or an inmate from their approved specialized segment of their facility's inmate general population. (§2.II.A.2.c)

    d.      A nominee's intent or agreement to run for and serve in a representative capacity shall be verified by the Chairman of the facility's Elections Committee or by a MAC Representative designated by the MAC Chairman. (§2.II.A.2.d)

    e.      The incumbent Representative shall automatically be included, unless he declines to run for re-election or is prevented by any provision of the MAC Constitution and Bylaws. (§2.II.A.2.e)

    f.      All nomination forms shall be authenticated by a housing unit Officer and shall be retained on file in the MAC Office. (§2.II.A.2.f)

B.      Executive Body Officers  (§2.II.B)

1.      When a vacancy occurs or an Officer's term on the Executive Body will expire, a notice shall be forwarded to all Representatives of the facility's General Council. If the vacancy on the Executive Body is not automatically filled by the act of succession or is created by an act of succession, the circumstances shall be described in the notice to General Council members. (§2.II.B.1)

2.      The notices shall, whenever possible, be delivered no less than seven (7) days prior to the next regularly scheduled meeting of the facility's General Council, unless a special session is called for to address the vacancy of the Chairman or the Parliamentarian. The notices shall describe the vacant position or the date the current office holder's term will expire. (§2.II.B.2)

CONSTITUTION & LAWS
Page 9

3.   At the designated meeting of the facility's General Council, the Chairman shall describe the duties and responsibilities of the vacant position as defined by the Constitution and Bylaws. (§2.II.B.3)

4.   MAC Council members may nominate themselves or another member of their Council. Nominations must be seconded by another member of their Council. Nominees may agree or decline to become candidates. Nominees shall be allowed to state their qualifications for seeking the position for which they are nominated. (§2.II.B.4)

5.   An incumbent Officer shall automatically be included as a nominee unless he declines to run for re-election or is prevented by any provisions of the MAC Constitution and Bylaws. (§2.II.B.5)

# SECTION 3.

## ELECTIONS

I.   ELECTION PROCESS (§3.I)

A.   <u>General Council Representatives</u> (§3.I.A)

1.   Any eligible general population inmate, duly nominated by a designated segment of a facility's population, shall have the opportunity to stand for election against an incumbent candidate under the provisions of this Section of the MAC Bylaws. (§3.I.A.1)

2.   Elections shall, whenever possible, take place at least twenty-one (21) days prior to the expiration of any current Representative's term of office or within thirty days (30) days after a position is declared vacant. (§3.I.A.2)

3.   In the event that elections cannot be held within the time constraints provided within the MAC Bylaws due to extraordinary circumstances, such as a lockdown of the institution, facility or housing unit; the affected Representative(s) shall continue to hold office until such time as nominations and elections can be conducted in accordance with the provisions of this Section. (§3.I.A.3)

4.    The date and time of scheduled elections shall be posted in the affected housing unit and may be announced on the institution's TV scroller. Sample ballots may also be posted in the affected housing units. (§3.I.A.4)

5.    Elections shall be conducted by confidential ballot. Official ballots shall be produced and distributed to inmates of the designated ethnic group or an approved specialized segment of the affected housing unit to vote at the scheduled date and time. Ballot distribution and collection shall be done under staff supervision. (§3.I.A.5)

6.    After the voting is completed and the ballots are collected, they shall be verified and counted under staff supervision. After counting, the ballots and tally sheets shall be delivered by staff to the MAC Coordinator who shall authenticate the results of the elections. All written ballots shall be retained for thirty (30) days after the close of the elections by the MAC Coordinator. (§3.I.A.6)

7.    The results of any election shall be reported by the Chairman of the facility's Elections Committee and posted in the affected housing units. Election results may be announced on the institution's TV scroller. (§3.I.A.7)

8.    Unopposed Candidates (§3.I.A.8)

    a.    In accordance with the provisions of Section 38 of <u>Robert's Rules of Order</u>, if a candidate is unopposed at the close of nominations, the Chairman of the facility's Elections Committee or MAC Representative designated by the facility's MAC Chairman may be authorized by a unanimous vote of the Council to cast the vote on the behalf of the Council for the candidate. If there are any objections, an election by ballot shall be conducted in accordance with the provisions of this Section of the MAC Bylaws. (§3.I.A.8.a)

B.    <u>EXECUTIVE BODY OFFICERS</u> (§3.I.B)

1.    Elections of Executive Body Officers shall take place as announced during a designated meeting of the facility's General Council. The Council Chairman or Representative may call for a vote by confidential ballot or by a show of hands with the candidates excused from the immediate area during the voting process. (§3.I.B.1)



2.    The facility's Council Chairman shall preside over any election of Officers unless the Chairman faces re-election; in which case, the Vice-Chairman shall preside over the election for Chairman. (§3.I.B.2)

3.    In the event that elections cannot be held within the time constraints provided within the MAC Bylaws due to extraordinary circumstances, such as a lockdown of the institution, facility, or housing unit, the affected Officer(s) shall continue to hold office until such time as nominations and elections can be conducted in accordance with the provisions of this Section. (§3.I.B.3)

4.    Vote of Confidence (§3.I.B.4)

  a)    In the event that extraordinary circumstances arise, such as those described above, which continue to prevent the assembly of a majority of the General Council, the facility may conduct the election of an unopposed candidate by a Vote of Confidence. (§3.I.B.4.a)

  b)    In order to be valid, a Vote of Confidence shall consist of a majority vote of not less than 50% of the current number of members recorded on the official roll, plus one additional member. (§3.I.B.4.b)

5.    The Chairman of the facility's Elections Committee or MAC Representative designated by the MAC Chairman shall prepare a report of the election results for authentication by the facility's MAC Coordinator. The results shall be published in the minutes of the General Council meeting and may be announced on the institution's TV scroller. (§3.I.B.5)

# SECTION 4.

## METHOD OF FILLING VACANCIES

I.    A duly elected Representative or Officer shall assume all duties and responsibilities of his office upon authentication and publication of election results if the position is vacant or on the first day after the current officer holder's term of office expires. (§4.I)



CONSTITUTION & BYLAWS
Page 12

II.    On the date a duly elected Representative or Officer assumes office and his term begins, the facility Council's Secretary shall enter his name on the facility's official roll. (§4.II)

III.    In the event that a duly elected Representative or Officer is temporarily unable to fulfill the responsibilities of his office on the Council for reasons such as: illness, injury, or temporary out-to-court or out-to-medical status; his standing shall be protected until his return or the circumstances which prevented him from fulfilling his responsibilities are resolved. (§4.III)

IV.    In the event that the Council determines that a duly elected Representative or Officer is no longer able to fulfill his term of office on the facility's Council, in accordance with the provisions of Section 11, the Council shall declare that the position is vacant. (§4.IV)

A.    General Council Representatives (§4.IV.A)

1.    The facility's General Council shall schedule and conduct nominations and elections to fill any vacancies occurring on the General Council, in accordance with the provisions of Sections 2 and 3 of the MAC Bylaws. (§4.IV.A.1)

2.    Temporary Representatives (§4.IV.A.2)

a.    In the event that a housing unit fails to advance a candidate for Representative of a designated ethnic group or an approved specialized segment of the inmate general population or a if a member is temporarily unable to fulfill his Representative responsibilities, the facility's Council may identify and elect a Temporary Representative for the position. (§4.IV.A.2.a)

b.    Temporary Representatives shall be elected by a majority vote of the facility's General Council. They may be elected for a period of no more than thirty (30) days. (§4.IV.A.2.b)

c.    Temporary Representatives may present and discuss issues in the meetings of the facility's General Council and on behalf of their designated constituency, but they may not vote on any issue before the Council. (§4.IV.A.2.c)

CONSTITUTION & LAWS
Page 13

B.    Executive Body Officers  (§4.IV.B)

    1.    If a vacancy on the Executive Body is not filled by the act of succession, the Officer's position shall be filled by nominations and an election conducted in accordance with the provisions of Sections 2 and 3 of the MAC Bylaws. (§4.IV.B.1)

    2.    Temporary Officers  (§4.IV.B.2)

        a.    There shall be no provisions made for the appointment or election of temporary Officers on a facility's Executive Body, except as provided under the provisions of Section 8 of the Bylaws. (§4.IV.B.2.a)

        b.    The only provisions for an Officer on a facility's Executive Body to act in another Officer's capacity are described in Section 5 of the MAC Bylaws. (§4.IV.B.2.b)

    3.    Act of Succession  (§4.IV.B.3)

        a.    If a vacancy occurs on a facility's Executive Body before the end of an Officer's term of office, the position may be filled without elections in accordance with the provisions for succession to an office described in Section 5 of the Bylaws. (§4.IV.B.3.a)

        b.    Only the positions of Chairman and Secretary may be filled by the act of succession. (§4.IV.B.3.b)

# Section 5.

## DUTIES OF OFFICERS

I.    CHAIRMAN  (§5.I)

A.    The Chairman shall call the meetings of a facility's General Council and Executive Body to order at the appointed time.  He shall preside at all meetings of the General Council and Executive Body.  He shall announce the agenda and business before the General Council and Executive Body in the proper order. He shall state and put all questions properly brought before the General Council and Executive Body. (§5.I.A)

CONSTITUTION & BYLAWS 
Page 14

B.    The Chairman shall preserve order and decorum and decide all questions of order, with the advice and assistance of the Parliamentarian, subject to appeal by the General Council. (§5.I.B)

C.    The Chairman shall communicate the will or concerns of a facility's General Council and Executive Body in a form and manner determined and approved by the General Council.   This shall include any communication with the inmate general population or the Warden and staff of the Correctional Training Facility. (§5.I.C)

D.    The Chairman shall coordinate all formal activities of a facility's MAC. He shall guide the actions of the Executive Body on a day to day basis. He shall endeavor to remain aware of the activities of his General Council members in their daily conduct of MAC business.  He shall endeavor to insure that their activities conform to the objectives and guidelines of this Constitution and Bylaws, properly representing the will and concerns of the general population of his facility.  He shall report any concerns to the General Council. (§5.I.D)

E.    The Chairman shall communicate with the Warden's designated MAC Coordinator for his facility on a regular basis and as needed on an urgent basis to represent the will and concerns of a facility's General Council and Executive Body.  He shall inform the General Council and Executive Body of any concerns expressed by the MAC Coordinator.  He shall insure that any communication received from the Warden and the Administrative Staff and the staff of his individual facility is disseminated to the MAC membership and general population of the Chairman's facility. (§5.I.E)

F.    The Chairman shall sign any document to be published and/or distributed on the behalf of his facility's MAC.  He shall provide his facility's MAC Coordinator with a copy of those documents.  The MAC Coordinator shall review and may sign, note, and/or shall approve any document to be published to the inmate general population of the facility on the behalf of the MAC prior to the document being distributed. (§5.I.F)

G.    The Chairman may, in the performance of his duties or at the request of his facility's General Council, request to meet with the MAC Coordinator, designated staff, or the Warden. (§5.I.G)

H.    The Chairman may utilize the MAC Minute Response or other approved methods of communication to report on any matter of immediate concern brought to the attention of a facility's Executive Body to inform the inmate general population of his facility by posting in the housing units. (§5.I.H)

CONSTITUTION & BYLAWS
Page 15



I.    The Chairman shall file and report any record of financial activities affecting the MAC to the facility's General Council. (§5.I.I)

J.    The Chairman shall order and maintain a record of all office and housekeeping supplies authorized for the facility's MAC Office and support of the members of the facility's General Council and Executive Body in the performance of their duties. (§5.I.J)

K.    The Chairman shall be responsible to the MAC Coordinator for all records of his facility's MAC activities and shall hand over all records pertaining to his facility's MAC activities to his successor prior to vacating that office. (§5.I.K)

L.    The facility's Vice-Chairman shall act as Chairman pro tem if the Chairman is temporarily unable to fulfill his duties. (§5.I.L)

M.    In the event that the office of the Chairman of a facility becomes vacant, the Vice-Chairman may succeed to the Chairman's office for the duration of the Vice-Chairman's elected term. If the Chairman's position is not filled by the act of succession, the facility's General Council shall be informed no less than seven (7) days prior to scheduling a special session of the Council, at which time they shall nominate and elect his successor by a majority vote of the members. (§5.I.M)

II.    VICE-CHAIRMAN (§5.II)

A.    The Vice-Chairman shall assist the Chairman in the duties of his office. (§5.II.A)

B.    The Vice-Chairman shall perform other duties as requested by the Chairman to represent the will and concerns of the facility's General Council and Executive Body. (§5.II.B)

C.    In the event that the office of the Vice-Chairman of a facility becomes vacant, the facility's General Council shall be informed no less than seven (7) days prior to the next scheduled session of the Council, at which time they shall nominate and elect the Vice-Chairman's successor by a majority vote of the members. (§5.II.C)

CONSTITUTION & BYLAWS 
Page 16

III.   PARLIAMENTARIAN (§5.III)

A.    The Parliamentarian shall provide recommendations to the facility's General Council and Executive Body to insure that all activities of the facility's MAC are conducted in accordance with the provisions of Title 15 of the California Code of Regulations (CCR), the Department Operations Manual (DOM), the published policies and procedures of the Correctional Training Facility, any specific published policies and procedures of his facility, the MAC Constitution and Bylaws, and parliamentary procedures as described in Robert's Rules of Order.  (§5.III.A)

B.    The Parliamentarian shall ask the Chairman to interrupt any formal meeting of the facility's General council or Executive Body, if in his opinion, an action is not proper in standing.  He shall state the nature of the exception and inform the General Council or Executive Body what the proper procedure would be to resolve the matter. (§5.III.B)

C.    The Parliamentarian may be asked to review any documents being advanced by the facility's MAC to insure their compliance prior to submitting them to the General Council for their approval or distribution. (§5.III.C)

D.    The authority for review  of all facility MAC activities shall lie with the Chairman, acknowledging the advice of the Parliamentarian, subject to the approval or appeal by the facility's General Council.  All actions are subject to review by the facility's MAC Coordinator and final approval, if required, by the Warden. (§5.III.D)

E.    The Parliamentarian shall perform other duties as requested by the Chairman to represent the will and concerns of the General Council. (§5.III.E)

F.    The facility's Parliamentarian shall assume the additional duties of the Sergeant-at-Arms in the event that the Sergeant-at-Arms is temporarily unable to fulfill his duties. (§5.III.F)

G.    In the event that the office of the Parliamentarian of a facility becomes vacant, the facility's General Council shall be informed no less than seven (7) days prior to scheduling a special session of the Council, at which time they shall nominate and elect the Parliamentarian's successor by a majority vote of the members.  (§5.III.G)

CONSTITUTION & BYLAWS
Page 17



IV.    SECRETARY (§5.IV)

A.    The Secretary shall keep a record of all regular proceedings of the facility's MAC and any special proceedings in the form and manner approved by the General Council, Executive Body or the Chairman. The Secretary shall prepare a report of those proceedings in the form of minutes or other documents for the approval of the General Council, Executive Body or the Chairman for publication and distribution. The Secretary shall be responsible for the preparation and orderly filing of all other official MAC documents for publication and distribution in the form and manner approved by the General Council, Executive Body or the Chairman. (§5.IV.A)

B.    The Secretary shall maintain the facility's official MAC roll and publish an accurate roster of all members of the facility's General Council, Executive Body, and any approved standing or special committees. He shall call the roll and record the attendance at any formal meeting of the General Council. (§5.IV.B)

C.    The Secretary shall file and maintain a copy of all documents generated as a result of the activities of the facility's General Council, Executive Body, and any approved standing or special committees. (§5.IV.C)

D.    The Secretary shall file, copy distribute and report on any official correspondence and documents received by the facility's MAC. (§5.IV.D)

E.    The Secretary shall perform other duties as requested by the Chairman to represent the will and concerns of the facility's General Council. (§5.IV.E)

F.    The facility's Vice-Secretary shall act as the Secretary in the event that the Secretary is temporarily unable to fulfill his duties. (§5.IV.F)

G.    In the event that the office of Secretary of a facility becomes vacant, the Vice-Secretary shall succeed to the Secretary's office for the duration of the Vice-Secretary's elected term, unless he declines succession. If the Secretary's position is not filled by the act of succession, the facility's General Council shall be informed no less than seven (7) days prior to the next scheduled session of the Council, at which time they shall nominate and elect the Secretary's successor by a majority vote of the members. (§5.IV.G)

V.    VICE-SECRETARY (§5.V)

A.    The Vice- Secretary shall assist the Secretary in the duties of his office. (§5.V.A)



CONSTITUTION & BYLAWS
Page 18

B.  The Vice-Secretary shall insure that all newly elected Representatives receive a copy of the Constitution and Bylaws and a MAC Orientation Package for their facility. (§5.V.B)

C.  The Vice-Secretary shall act as a Housing Unit Coordinator for his facility to insure that information is disseminated and shared between all housing units. (§5.V.C)

D.  The Vice-Secretary shall insure that the facility's elected Housing Unit Representatives conduct regular monthly meetings with Housing Unit Staff to address issues raised by their constituents. He shall also assist the Housing Unit Representatives in preparing an agenda and scheduling quarterly meetings with their respective Facility Unit's Supervisory Staff. (§5.V.D)

E.  The Vice-Secretary shall perform other duties as requested by the Chairman to represent the will and concerns of the facility's General Council. (§5.V.E)

F.  In the event that the office of the Vice-Secretary becomes vacant, the facility's General Council shall be informed no less than seven (7) days prior to the next scheduled session of the Council, at which time they shall nominate and elect the Vice-Secretary's successor by a majority vote of the members. (§5.V.F)

VI.  COMMITTEE COORDINATOR (§5.VI)

A.  The Committee Coordinator shall guide and assist the standing committee chairmen and the committee members of a facility in representing the will and concerns of his facility's General Council. He shall monitor the activities of any standing or special committees formed by the General Council as authorized by the Warden. (§5.VI.A)

B.  The Committee Coordinator shall insure that the committee chairmen maintain a record of all scheduled committee meetings and assist in the coordination of meeting sites. He shall insure that all parties receive notification to attend. (§5.VI.B)

C.  The Committee Coordinator shall insure that the committee chairmen maintain a record of their committees' activities and that he receives a copy of such reports in a timely manner for copying and distribution if required in the performance of his duties. He shall insure that the originals of all reports generated by any standing or special committees are filed with the Secretary. (§5.VI.B)

CONSTITUTION & BY LAWS 
Page 19

D.     The Committee Coordinator shall apprise the facility's MAC Chairman of the status of all ongoing committee activities. (§5.VI.D)

E.     The Committee Coordinator shall perform other duties as requested by the Chairman to represent the will and concern of the facility's General Council. (§5.VI.E)

F.     In the event that the office of the Committee Coordinator becomes vacant, the facility's General Council shall be informed no less than seven (7) days prior to the next scheduled session of the Council, at which time they shall nominate and elect the Committee Coordinator's successor by a majority vote of the members. (§5.VI.F)

VII.    SERGEANT-AT-ARMS (§5.VII)

A.     The Sergeant-at-Arms shall assist the Chairman in the assembly of the facility's Representatives on the General Council or Officers of the Executive Body and shall assist in maintaining order during their meetings. (§5.VII.A)

B.     The Sergeant-at-Arms shall call a member or anyone in attendance at meetings of the facility's General Council or Executive Body to order if their conduct becomes disruptive. This shall be done with reasoned communication and without force or threat of force. (§5.VII.B)

C.     The Sergeant-at-Arms shall assist the Chairman in the recognition of anyone wishing to speak during meetings of the facility's General Council or Executive Body. (§5.VII.C)

D.     The facility's Sergeant-at-Arms shall assume the additional duties of the Committee Coordinator in the event that he is temporarily unable to fulfill his duties. (§5.VII.D)

E.     The Sergeant-at-Arms shall perform other duties as requested by the Chairman to represent the will and concerns of the facility's General Council. (§5.VII.E)

F.     In the event that the office of Sergeant-at-Arms becomes vacant, the facility's General Council shall be informed no less than seven (7) days prior to the next scheduled session of the Council, at which time they shall nominate and elect the Sergeant-at-Arms' successor by a majority vote of the members. (§5.VII.F)

CONSTITUTION & BYLAWS
Page 20

# Section 6.

## MEETINGS

I.    FORMAL MEETINGS  (§6.I)

    A.    All formal meetings with staff shall be requested in writing and an agenda covering information regarding the issue(s) or problem(s) to be discussed shall be provided for review and research prior to the scheduled meeting. (§6.I.A)

    B.    All members of the facility's General Council or Executive Body shall be informed of the date, time, location and purpose of any formal meeting called for those members. (§6.I.B)

C.    <u>General Council</u>  (§6.I.C)

    1.    The facility's General Council should meet at least twice monthly, at a time and location to be determined by the Council at its previous meeting.  This provision is waived in the event of unanticipated events or security concerns, such as a lockdown. (§6.I.C.1)

    2.    The facility's General Council may petition the MAC Coordinator to call for a formal meeting at any time to address concerns of the Council. (§6.I.C.2)

    3.    Housing Unit Representatives and Facility Unit Representatives for Specialized Segments of the Inmate General Population (§6.I.C.3)

        a.    Housing Unit Representatives shall meet with their Housing Unit Staff on at least a monthly basis to address and discuss issues raised within their housing unit. (§6.I.C.3.a)

        b.    Housing Unit Representatives and Facility Unit Representatives for specialized segments of the inmate general population shall meet with their respective Facility Unit's Supervisory Staff on at least a quarterly basis to address and discuss issues raised by their constituencies. (§6.I.C.3.b)

CONSTITUTION & BY-LAWS
Page 21

    D.    <u>Executive Body</u> (Individual Facilities) (§6.I.D)

        1.    The facility's Executive Body shall meet formally at the Chairman's request. (§6.I.D.1)

        2.    The Chairman may call for an emergency meeting of the facility's General Council by a majority vote of the Executive Body. (§6.I.D.2)

        3.    Any two (2) members of the facility's Executive Body may call for an emergency meeting of the facility's Executive Body. (§6.I.D.3)

    E.    <u>Tri-Facility Executive Bodies</u> (§6.I.E)

        1.    The Tri-Facility Executive Bodies shall meet formally at least once a month. (§6.I.E.1)

        2.    The Chairman of any one of the facility's Executive Bodies may call for an emergency meeting of the Tri-Facility Executive Bodies. The meeting shall be scheduled with the consent of his facility's Executive Body and concurrence of the other Tri-Facility Executive Bodies. (§6.I.E.2)

II.    INFORMAL MEETINGS (§6.II)

    A.    Any duly elected Representative or Officer of the facility's MAC may initiate contact with staff and meet informally with staff in the conduct of the MAC members' duties and responsibilities, subject to the provisions of the Constitution and Bylaws. (§6.II.A)

III.    LOCKDOWNS (§6.III)

    A.    The facility's Executive Body shall be informed by Administrative Staff as soon as safety and security concerns permit, what the reasons for a lockdown are and what administrative concerns may exist. (§6.III.A)

    B.    The facility's Executive Body shall be released to communicate with the General Council Representatives as soon as safety and security concerns permit, to facilitate communication related to the lockdown circumstances. (§6.III.B)

    C.    The facility's MAC shall endeavor to assist in communicating the reason(s) for a lockdown and any administrative concerns associated with lockdown activities. (§6.III.C)

CONSTITUTION & BYLAWS
Page 22

    D.    The facility's Executive Body and General Council Representatives shall be released to circulate in between and within housing units, as approved by a Plan of Operations or by staff direction, to facilitate communication between their constituency and staff as soon as safety and security concerns permit. (§6.III.D)

IV.    MAC OFFICE (§6.IV)

    A.    Each facility's MAC shall maintain such office space as provided by the institution and this shall be the primary work site for assigned workers. (§6.IV. A)

    B.    Access to the MAC office shall be limited to the members of the facility's Executive Body or General Council, as identified by their MAC Special Activity Cards. (§6.IV. B)

    C.    No one who is not a member of the facility's Executive Body or General Council shall be admitted to the facility's MAC office without the specific permission of the MAC Coordinator, except as provided by individual facility operational procedures and guidelines. (§6.IV. C)

    D.    All persons approved to enter the MAC office may utilize the assigned telephone to conduct official MAC business. (§6.IV. D)

## Section 7.

## COMMITTEES

I.    STANDING COMMITTEES (§7.I)

    A.    Each facility MAC shall be authorized to maintain the following Standing Committees, which may include sub-committees to address the facilities' individual concerns: (§7.I.A)

        1.    Health and Welfare Committee (§7.I.A.1)

        2.    Canteen and Property Committee (§7.I.A.2)

        3.    Visiting Committee (§7.I.A.3)

        4.    Recreation Committee (§7.I.A.4)

        5.    Elections Committee (§7.I.A.5)

B.    The purpose of the Standing Committees shall be to develop and support communication and respect between staff of the designated areas and inmates of the facility's inmate general population.    The Standing Committees shall communicate the concerns raised by the facility's General Council or Executive Body. (§7.I.B)

C.    The Standing Committees shall be formed from the General Council. Membership on a facility's Standing Committee shall be limited to duly elected Representatives in good standing from that facility's General Council and shall be an additional duty assumed by the Representatives. (§7.I.C)

D.    Officers of the Executive Body may attend and participate in Standing Committee activities when solicited by the Committee Chairmen or when approved by the General Council due to inadequate committee participation, which limits the ability to address the will and concerns of the General Council. (§7.I.D)

E.    The specific duties and responsibilities of the Standing Committees shall be as follows: (§7.I.E)

1.    Health and Welfare Committee

The Health and Welfare Committee shall receive reports that concern the health and welfare of the facility's inmate general population.  They shall gather information and make suggestions, recommendations and proposals to address those issues. (§7.I.E.1)

a.    The Committee's interests shall include, but are not limited to the specific areas of Health Care Services, Food Services, and Clothing & Laundry Services. (§7.I.E.1.a)

c.    The Committee may also address any other area of the institution or institutional services where a health and welfare issue is raised due to its effect on the facility's inmate general population. (§7.I.E.1.b)

2.    Canteen and Property Committee

The Canteen and Property Committee shall receive reports that concern canteen, special purchases, and quarterly packages from the facility's inmate general population.    They shall gather information and make suggestions, recommendations and proposals to address those issues. (§7.I.E.2)

CONSTITUTION & BYLAWS
Page 24

a.  The Committee's interests shall include, but are not limited to canteen items available for purchase in facility canteens and the proposed introduction of new items to the canteens. (§7.I.E.2.a)

b.  The Committee's interests shall also include, but are not limited to the review of inmate property concerns, which includes the review of items approved for special canteen purchases or for inclusion on quarterly package lists and the proposed introduction of new items available for special canteen purchases or for inclusion on quarterly package lists. (§7.I.E.2.b)

3.  Visiting Committee

The Visiting Committee shall receive reports that concern the facility and institution's visiting program. They shall gather information and make suggestions, recommendations and proposals to address those issues. (§7.I.E.3)

a.  The Committee's interests shall include, but are not limited to the improvement of the conditions and quality of regular visits and family visits for the facility's inmate general population. (§7.I.E.3.a)

4.  Recreation Committee

The Recreation Committee shall receive reports that concern the facility's recreational activities, areas, and the equipment available to the inmate general population. They shall gather information and make suggestions, recommendations and proposals to address those issues. (§7.I.E.4)

a.  The Committee's interests shall include, but are not limited to improving the availability of and access to recreational opportunities. (§7.I.E.4.a)

b.  The Committee's interests shall include, but are not limited to television services, movies, the recreational library, outside entertainment programs, tournaments and sports activities, availability of equipment for yard and housing unit recreational activities, and Arts in Corrections programs. (§7.I.E.4.b)

c.  The Committee's interests shall also include, but are not limited to the review of items approved for handicraft purchases, procedures and opportunities for participation in handicrafts and proposed expansions to the handicraft program. (§7.I.E.4.c)

5.  Elections Committee

The Elections Committee shall facilitate the nomination and election process of Representatives to the facility's General Council. Their activities shall conform to the provisions of the Constitution and Bylaws. (§7.I.E.5)

F.  Standing Committee Chairmen shall be appointed by the facility's Executive Body.  Chairmanship of a Standing Committee shall be an additional duty assumed by a Representative. (§7.I.F)

1.  A Standing Committee Chairman shall guide the activities of his facility's committee with consideration of input from the committee's membership, the General Council and inmate general population.  He shall chair their meetings and is responsible for guiding and monitoring the actions of committee members and any appointed Vice-Chairmen in the conduct of their duties and responsibilities. (§7.I.F.1)

2.  Standing Committee Chairmen are responsible to the facility's Executive Body and General council for their actions and conduct. They shall be evaluated by the Executive Body on a periodic basis for their effectiveness in committee leadership and for their committee's effectiveness in addressing the will and concerns of the General Council. (§7.I.F.2)

G.  Removal and Replacement of Standing Committee Chairmen and Committee Members  (§7.I.G)

1.  Standing Committee Chairmen may be removed and replaced by the Executive Body. (§7.I.G.1)

II.  SPECIAL OR AD HOC COMMITTEES  (§7.II)

A.  The Chairman of the Executive Body may appoint and form special or ad hoc committees to address a limited issue or problem raised by the facility's General Council, Executive Body or MAC Coordinator.  This action shall be approved by the General Council. (§7.II.A)

B.    The Chairman of the Executive Body may appoint a chairman for any special or ad hoc committee from the General Council or Executive Body. (§7.II.B)

C.    The Chairman of the facility's Executive Body shall insure that the General Council is kept informed about all actions and activities of any special or ad hoc committee for their review and approval, prior to any requests for formal action by the General Council.    Any action or publication generated by a special or ad hoc committee is subject to the review and approval of the facility's General Council. (§7.II.C)

III.  ·  APPEARANCE AND PARTICIPATION OF NON-ELECTED MEMBERS OF THE INMATE GENERAL POPULATION  (§7.III) ·  ·

A.    A facility's Council may invite non-elected members of the facility's inmate general population to appear and speak in the course of the Council's activities for the purposes of benefiting from an inmate's knowledge or experience with an issue or concern. (§7.III.A)

# Section 8.

## PARLIAMENTARY AUTHORITY

I.     Robert's Rules of Order shall be the authority for deciding issues of parliamentary procedure not otherwise specified in the Constitution and Bylaws. (§8.I)

II.    A quorum of the members of a facility's General Council or Executive Body shall be the necessary authority to conduct official business, including voting on all matters before the General Council or Executive Body.  A quorum of the General Council or Executive Body shall be 50% of the current number of members recorded on the roll, plus one (1) additional member. (§8.II)

III.   The results of all voting conducted by a facility's General Council or Executive Body shall be determined by a majority vote of a quorum, unless otherwise specified in the Constitution and Bylaws.

# Section 9.

## EXECUTIVE COMMITTEE

I.     A facility's Executive Committee shall consist of the elected Officers of the Executive Body and other members designated by the facility's General Council. (§9.I)



CONSTITUTION & BYLAWS
Page 27

II.     Any formal action recommended by a facility's Executive Committee shall be
        subject to the approval of the General Council or may be undertaken with the
        expressed consent of that Council to carry out their will and concerns. (§9.II)


# Section 10.

## ACTIVITY CARDS

I.      On election to their office, all Representatives, members of the Executive
        Committee, or Executive Officers of a facility's Council shall be issued MAC
        Special Activity Cards for identification and access to conduct the business of
        their facility. (§10.I)

II.     Each facility's members shall be issued distinct MAC Special Activity Cards by
        their facility's MAC Coordinator and shall surrender those cards on his or her
        demand. (§10.II)

III.    Members shall carry their MAC Special Activity Card at all times when
        conducting official MAC business and shall identify themselves with staff prior
        to entering any authorized area other than their own housing unit. (§10.III)

IV.     Each facility's Administrative Staff shall develop and distribute a memorandum
        clearly identifying and describing the circumstances and authorization for access
        to various areas of the facility, based on the MAC Council members duties and
        responsibilities. (§10.IV)


# Section 11.

## REMOVAL OF MEMBERS

I.      VOLUNTARY REMOVAL (§11.I)

        A.      Any Representative or Officer of a facility's MAC Council may voluntarily
                remove himself from office by submission of his MAC Special Activity
                Card and/or with a letter of resignation. (§11.I.A)

        B.      The MAC Coordinator may choose to interview any Council member to
                insure that his reasons for resignation are voluntary and not the result of
                coercion. (§11.I.B)

CONSTITUTION & I⤸AWS
Page 28

II.    INVOLUNTARY REMOVAL  (§11.II)

A.    General Council Members  (§11.II.A)

1.    If a Representative is moved from his housing unit or facility, he may voluntarily resign or he shall be involuntarily removed by the General Council because he can no longer represent the constituency that elected him. The former Representative may seek election in his new housing unit or facility, if or when a vacancy exists. (§11.II.A.1)

2.    If a Representative is involuntarily removed for reasons other than recall or impeachment and he is unable to seek election in his new housing unit or facility, he shall vacate any position on the facility's Council, Executive Committee, or any committee membership(s) and shall not be eligible for participation in any official MAC capacity at that time. (§11.II.A.2)

3.    If a Representative is involuntarily moved from his housing unit, the Council shall insure that his removal from his constituency was not a retaliatory action simply because the inmate is a member of the MAC or that the move wasn't made as a reprisal against the inmate because of his authorized and approved actions and activities as a Council member. (§11.II.A.3)

4.    A majority of the constituency of any elected Representative may call for his removal. That request should be in the form of a petition communicated to the Executive Body or MAC Coordinator. The MAC Coordinator shall be notified of any petition for recall received by the Executive Body. (§11.II.A.4)

5.    In the event that a facility's Executive Body receives a petition for recall of a member, they shall call for a meeting of the facility's General Council to discuss the issue and for the Council to review the circumstances of the recall petition. (§11.II.A.5)

6.    A spokesman, chosen from and by the petitioners for recall, shall be invited to address the facility's General Council to present the case for recall. (§11.II.A.6)

7.    The Representative who is subject to the recall petition shall be allowed to address the General Council in his defense. (§11.II.A.7)

8.     If the General Council determines that there is reasonable cause, they shall ask for a no confidence vote from the designated segment of the facility's inmate general population for the Representative subject to the recall. (§11.II.A.8)

9.     In the event that a Representative is recalled by his constituency or removed by the facility's General Council, he shall immediately forfeit any other committee chairmanship(s), office(s), or committee membership(s) on the MAC and shall be ineligible to participate in any official MAC capacity, subject to an appeal and review by the Warden. (§11.II.A.9)

10.    A copy of all records and minutes regarding the impeachment or removal of a Representative from office shall be forwarded to the Warden via the MAC Coordinator of the Representative's facility. (§11.II.A.10)

11.    Any action of a designated segment of a facility's inmate general population or the General Council to remove or impeach a Representative is subject to review and final approval by the Warden. (§11.II.A.11)

B.    Executive Body  (§11.II.B)

1.     Any Officer of a facility's Executive Body is subject to impeachment for cause by the facility's General Council. (§11.II.B.1)

2.     Any petition by a majority of the General Council for impeachment shall be filed by the Council with their facility's MAC Coordinator and a special session of the General Council shall be called to discuss and debate the issue within seven (7) days after filing the petition, unless prevented by unusual facility circumstances or security concerns, such a lockdown. (§11.II.B.2)

3.     If there is a petition to impeach the facility's Chairman, the Vice-Chairman shall act as Chairman pro tem until the matter is heard by the General Council. The Vice-Chairman shall preside at the special session until the matter is resolved. (§11.II.B.3)

4.     Representatives of the facility's General Council shall present the cause for impeachment. (§11.II.B.3)

5.     The Officer subject to the petition for impeachment shall be allowed to address the facility's General Council in his defense. (§11.II.B.5)

6.    If the facility's General Council determines there is cause, they may move and vote for removal of the Officer by a majority vote of the Council. (§11.II.B.6)

7.    A copy of all records and minutes regarding the impeachment or removal of an Officer from a facility's Executive Body shall be forwarded to the Warden via the facility's MAC Coordinator. (§11.II.B.7)

8.    Any action of a facility's General Council to impeach an Officer of their Executive Body is subject to review and final approval by the Warden. (§11.II.B.8)

## Section 12.

## AMENDMENTS

I.    Any future amendments to the Constitution, addition of a new bylaw or an amendment to an existing bylaw shall require ratification by a majority vote of the combined membership of each facility's General Council and Executive Body. (§12.I)

II.   The ratified Constitution, Bylaws and any subsequent amendments are subject to the review and approval of the Warden of the Correctional Training Facility. (§12.II)

III.  AMENDMENTS TO THE BYLAWS (§12.III)

(Amendments to the Bylaws will be chronologically listed from this point forward, prior to the signature pages for ratification.)

1-32

CONSTITUTION & BYLAWS

The provisions and terms of the attached Constitution & Bylaws for the Correctional Training Facility Tri-Facility Men's Advisory Councils are submitted for the review and approval of the Warden on this date, January 27, 2004.

A. BOSTON
MAC Chairman
CTF-Central Facility

R. STOBAUGH
MAC Chairman
CTF-North Facility

D. BULLOCK
MAC Chairman
CTF-South Facility

The attached Constitution & Bylaws for the Correctional Training Facility Tri-Facility Men's Advisory Councils are approved as submitted on this date. Any future amendments to this document must be approved and ratified by the Councils and are subject to final approval by the Warden of the Correctional Training Facility.

J. SOLIS
Warden
Correctional Training Facility

_____
Date

159

0-37

# EXHIBIT "P"

**FILED**

JUN 0 8 2007

LISA M. GALDOS
CLERK OF THE SUPERIOR COURT
_____DEPUTY
S. GARSIDE

1    SUPERIOR COURT OF CALIFORNIA

2    COUNTY OF MONTEREY

3

4    In re                                ) Case No.: HC 5668
                                          )
5         Boston, et al.                  ) ORDER
                                          )
6                On Habeas Corpus.        )
     _____)

7

8        Andre Boston, David Rucker, Robert Nydegger, Craig Gerstner, Michael Comeaux,

9    David Moreno and Adam Vasquez filed a petition for writ of habeas corpus.

10       Petitioners are incarcerated at Correctional Training Facility (CTF) in Soledad.

11       Petitioners are Men's Advisory Council Executive Body members at CTF-Central

12   Facility.

13       Petitioners claim that CTF prison officials are denying Close B Custody inmates full

14   access to program assignments and activities during the hours of 0600 hours to 2000 hours in

15   violation of California Code of Regulations, title 15, section 3377.1(a)(4)(B).

16       Section 3377.1(a)(4)(B) provides:

17       Close B Custody inmates shall be permitted to participate in program assignments and

18       activities during the hours of 0600 hours to 2000 hours in areas located within the facility

19       security perimeter including beyond the work change area in a designated Level II, Level

20       III or Level IV institution. Close B Custody inmates may participate in designated work

21       program assignments until 2200 hours when the work program is in an assigned housing

22       unit located within the facility security perimeter. Close B Custody inmates may

23       participate in limited evening activities after 2000 hours until the general evening lockup

24       and count when the limited activity is in a designated housing unit located within the

25       facility security perimeter.

1

1  Petitioners argue that Close B Custody inmates are allowed on the recreation yard only
2  between the hours of 0900 to 1100 hours and 1300 hours to 1500 hours. Petitioners argue that
3  they do not have access to the recreation yard area beyond 1500 hours.

4  Petitioners argue that Close B Custody inmates are not allowed to participate in program
5  assignments and activities in areas beyond the work change area during the hours of 0600 hours
6  to 2000 hours in violation of 3377.1(a)(4)(B).

7  Petitioners appear to argue that some assignments located within the "Facility Security
8  Perimeter," such as the Clothing Room, Laundry and Culinary are improperly excluded for Close
9  B Custody assignments. Petitioners contend that CTF Operations Procedure No. 34's definition
10  of "Facility Security Perimeter" conflicts with the definition of "Facility Security Perimeter" set
11  forth in California Code of Regulations, title 15, section 3000. Under section 3000, "Facility
12  Security Perimeter" is any combination of living unit, work area and recreation area perimeters
13  that is set aside to routinely restrict inmate movement based on custody level. Section 3000
14  further provides that this perimeter will contract and expand depending upon the weather,
15  lighting conditions and hours of operation. CTF Operations Procedure No. 34 provides in
16  pertinent part, "Close B Custody, Level II, inmates shall be permitted to participate in program
17  assignments and activities, i.e., Alcoholic Anonymous and Narcotics Anonymous, during the
18  hours of 0600 hours to 2000 hours in areas located *within the Central Facility Security Perimeter*
19  *(West Gate to East Gate)*." (See Operations Procedure No. 34, p.3.) Petitioners claim that under
20  CTF Operations Procedure No. 34's definition of "Facility Security Perimeter," the recreation
21  yard and all areas beyond the East and West Gates are excluded.

22  Petitioners claim that CTF prison officials do not permit Close B Custody inmates to
23  participate in limited evening activities after 2000 hours in violation of section 3377.1(a)(4)(B).
24  On December 23, 2002, the CTF Warden J. Hamlet issued a memorandum which states, "Close

25

2

1  Custody programming after 2000 hours is no longer permitted." (See Petitioners' Exhibit D,
2  Memorandum dated December 23, 2002.)

3      Petitioners submitted two separate appeals (CTF C-06-02329 and CTF C-06-02873.).
4  The Director denied both appeals.

5      Petitioners contend that under California Code of Regulations, title 15, section 3084.5(e),
6  Correctional Lieutenant R. Lynch did not have authority to complete the first level review of
7  their appeal (Log No. CTF-C-06-02329).

8      Pursuant to California Rules of Court, Rule 4.551(b), the court requests an informal
9  response from the Attorney General's Office (Respondent). The informal response should
10 address the following issues: 1) whether Correctional Lieutenant Lynch had authority to review
11 the appeal (Log No. CTF-C-06-02329) at the first level under California Code of Regulations,
12 title 15, section 3084.5(e); 2) why Close B Custody inmates have access to the recreation yard
13 only between the hours of 0900 to 1100 hours and 1300 hours to 1500 hours; 3) whether the
14 definition of "Facility Security Perimeter" in CTF's Operations Procedure Number 34 (See
15 Operations Procedure No. 34, p.3) conflicts with the definition "Facility Security Perimeter" set
16 forth in the California Code of Regulations, title 15, section 3000; 4) whether Close B Custody
17 inmates are allowed to participate in program assignments and activities in areas beyond the
18 work change area during the hours of 0600 hours to 2000 hours; 5) whether CTF officials are not
19 permitting Close B Custody inmates to work in the Clothing Room, Laundry or Culinary; and 6)
20 why Close B Custody inmates are not permitted to participate in limited evening activities after
21 2000 hours.

22     The informal response shall be filed within 15 days from the date of service of the order.
23 Petitioner may file reply within 15 days from the date of service of the informal response upon
24 Petitioner.

25

3

1    IT IS SO ORDERED.

2    Dated: 6 - 8 - 07

3

4    _____
     Hon. Jonathan R. Price
5    Judge of the Superior Court

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

0-5

# EXHIBIT "Q"

**EDMUND G. BROWN JR.**
*Attorney General*

*State of California*
*DEPARTMENT OF JUSTICE*



455 GOLDEN GATE AVENUE, SUITE 11000
SAN FRANCISCO, CA 94102-7004

Public: (415) 703-5500
Telephone: (415) 703-5741
Facsimile: (415) 703-5843
E-Mail: Amanda.Murray@doj.ca.gov

July 13, 2007

The Honorable Jonathan R. Price
Monterey County Superior Court
240 Church Street, Department 3
Salinas, CA 93902-1819

RE:   INFORMAL RESPONSE
      In re Boston, et al., Case No. HC 5668

Dear Judge Price:

Petitioners Andre Boston, David Rucker, Robert Nydegger, Craig Gerstner, Michael Comeaux, David Moreno, and Adam Vasquez allege that the Correctional Training Facility (CTF) is denying Close B Custody inmates access to the prison's programs and activities in violation of California Code of Regulations, title 15, section 3377.1(a)(4)(B). However, CTF may properly restrict Close B Custody inmates from fully participating in the prison's programs and activities based on the institution's limited resources and safety and security concerns. Moreover, – consistent with the California Department of Corrections and Rehabilitation's (CDCR) regulations – CTF properly defined the prison's "facility security perimeter," restricting Close B Custody inmates' movement within the prison. Thus, the petition should be denied.

## 1.   CTF May Restrict Close B Custody Inmates From Fully Participating in Institutional Programs and Activities Based on Available Resources and Safety and Security Concerns.

The warden is entrusted with the supervision, management, and control of the prison and is responsible for the care and custody of all its inmates. (Cal. Code of Regs., tit. 15, § 3380, subd. (a); Pen. Code, § 5054.) The primary objective of a prison – protecting public safety – must take precedence over all other prison operations. (Cal. Code Regs., tit. 15, § 3270.) Although inmates are afforded a reasonable opportunity to participate in rehabilitative activities, institutional programs are limited by the prison's available resources and safety and security concerns. (*Id.*; Pen. Code, § 2933 [every prisoner shall have a reasonable opportunity to participate in institutional programming consistent with institutional security and available resources].) Accordingly, each prison must establish operational procedures to adequately implement CDCR's regulations while ensuring public safety and institutional security. (Cal. Code Regs., tit. 15, § 3270, subd. (c).)

Thus, a Close B Custody inmate's "right" to fully participate in CTF's programs and

The Honorable Jonathan R. Price
July 13, 2007
Page 2

activities is limited by the prison's available resources and safety and security concerns. (Ex. A,
CTF Appeal Log, No. CTF-C-06-02873, pp. 8-10; Ex. B, CTF Appeal Log, No. CTF-C-06-
02329, pp. 9, 12, 16; Cal. Code Regs., tit. 15, §§ 3270, 3043; Pen. Code, § 2933.)  Because Close
B Custody inmates represent an increased risk to institutional security and public safety,[1]
CDCR's regulations require that Close B Custody inmates receive direct and constant
supervision and limited access to institutional programs, activities, and facilities.  (Cal. Code
Regs., tit. 15, § 3277.1; Cal. Code Regs., tit. 15, § 3277.2.)[2]  Contrary to petitioners' claim, CTF
may additionally limit Close B Custody inmates' access to the prison's facilities and institutional
programming based on the prison's available resources and safety and security concerns.  (Ex. A
at pp. 8-10; Ex. B, at pp. 9, 12, 16; Cal. Code Regs., tit. 15, §§ 3270, 3043; Pen. Code, § 2933.)
Thus, CTF's operation procedures reflect a balance between offering Close B Custody inmates
the opportunity to participate in rehabilitative activities, using the prison's limited resources, and
maintaining safety and security.  (Ex. A at pp. 8-10; Ex. B, at pp. 12, 16; Ex. C, Operations
Procedure #34; Ex. D, Operations Procedure #40; Ex. E, Memorandum re Operations Procedure
#40, dated December 23, 2002.)  Accordingly, Close B Custody inmates have limited access to
CTF's recreation yard; may only participate in program assignments and activities within the
Central Facility security perimeter; are not allowed to participate in evening activities after 2000
hours; and are not allowed to work in the Clothing Room, Laundry, or Culinary Department.
(Ex. A at pp. 9-10, 13; Ex. B at pp. 7, 12, 16; Ex. C at p. 3-4; Ex. E.)

2.     **The Correctional Training Facility Properly Defined "Facility Security
Perimeter" for Close B Custody Inmates.**

       The California Code of Regulations, title 15, section 3000, defines Facility Security
Perimeter as "*any combination* of living unit, work area and recreation area perimeters that is set
aside to routinely restrict inmate movement based on custody level.  This perimeter will contract
and expand depending on weather, lighting conditions, and hours of operation." (Cal. Code
Regs., tit. 15, § 3000, *emphasis added*.)  This expansive definition permits the prison to establish

---

      1. Classifying an inmate as Close B Custody requires consideration of the following
factors: (a) the inmate's total term, sentence, or remaining time-to-serve; (b) the inmate's escape
history; (c) identification of a management concern; (d) receipt of an active law enforcement
felony hold; (e) a finding of guilt for a serious rules violation report; and (f) an inmate who is
considered to have high notoriety or is designated a public interest case.  (Cal. Code Regs., tit.
15, § 3277.2.)

      2. Under section 3371.1, Close B Custody inmates are limited to: (a) program
assignments and activities in areas located within the facility security perimeter during the hours
of 0600 hours to 2000 hours; (b) work program assignments in an assigned housing unit located
within the facility security perimeter until 2200 hours; and (c) limited evening activities after
2000 hours until the general evening lockup and count when the limited activity is in a
designated housing unit located within the facility security perimeter.  (Cal. Code Regs., tit. 15, §
3371.1.)

The Honorable Jonathan R. Price
July 13, 2007
Page 3

"facility security perimeter" boundaries – in any combination – for each custody classification consistent with the prison's specific safety and security concerns. (Cal. Code Regs., tit. 15, § 3270.) Contrary to petitioners' claim, CTF's definition is neither superficially defined nor in conflict with CDCR's regulations. (Petn. at p. 4.) Rather, because Close B Custody inmates represent an increased risk to institutional security and public safety, CTF's definition –  defining "Facility Security Perimeter" as "West Gate to East Gate" – is based on legitimate security concerns and is encompassed within CDCR's regulation. (Cal. Code Regs., tit. 15, § 3270; Ex. A, CTF Appeal Log, No. CTF-C-06-02873, pp. 8-10; Ex. B, CTF Appeal Log, No. CTF-C-06-02329, pp. 12, 16; Ex. C, Operations Procedure #34 at, pp. 3-4.) Thus, CTF properly defined "facility security perimeter," restricting Close B Custody inmates' movement within the prison.

**3.    Petitioners' Claim that Correctional Lieutenant Lynch Did Not Have Authority to Review Petitioners' Appeal is Moot.**

Petitioners' claim that Lieutenant Lynch did not have authority to review Petitioners' appeal (Appeal Log No. CTF-C-06-02329) is moot. Petitioners' complaint was appealed – and denied – at the highest level of review (the Director's Level of Review). (Cal. Code Regs. tit. 15, § 3084.5.) Thus, because petitioners' appeal was ultimately reviewed by the Director – who has a higher administrative rank than the Warden – there is nothing more for the court to decide. (*In re Hutchinson* (1972) 23 Cal. App. 3d 337, 338-339.) Moreover, even assuming petitioners' appeal is not moot (and Lieutenant Lynch did not have authority to review it), petitioners would not be entitled to habeas relief. As addressed above, the petition should be denied because CTF properly limits Close B Custody inmates from fully participating in the prison's programs and activities based on the institution's limited resources and safety and security concerns. Thus – at most – Petitioners would be entitled to have their appeal re-heard through the prison's administrative process. Accordingly, because Petitioners claim is moot and resolution would not entitled them to habeas corpus relief, the petition must be denied.

**4.    Conclusion.**

CTF may properly restrict Close B Custody inmates from fully participating in the prison's programs and activities based on the institution's limited resources and safety and security concerns. Moreover, – in accordance with CDCR's regulations – CTF properly defined the prison's "facility security perimeter," restricting Close B Custody inmates' movement within the prison. Finally, petitioners' claim that Lieutenant Lynch did not have authority to review their appeal is moot and does not entitle them to habeas corpus relief. Thus, the petition should be denied.

Sincerely,

AMANDA MURRAY
Deputy Attorney General
State Bar No. 223829

For    EDMUND G. BROWN JR.
       Attorney General

A-4

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    **In re Boston, et al.**

No.:    **HC 5668**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On **July 16, 2007,** I served the attached

## INFORMAL RESPONSE

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

**Andre' Boston
D-03868
Correctional Training Facility
P.O. Box 689
Soledad, CA 93960-0689**
in pro per

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on **July 16, 2007,** at San Francisco, California.

| M.M. Argarin | _M.M. Argarin_ |
| --- | --- |
| Declarant | Signature |

20096216.wpd

162                                                                                                    6-5

# EXHIBIT A



STATE OF CALIFORNIA                                    DEPARTMENT OF CORRECTIONS

**INMATE/PAROLEE**          Location:  Institution/Parole Region          Log No.                    Category
**APPEAL FORM**                        CTF-C               0 6 - 0 2 8 7 3                    2    15
CDC 602 (12/87)                 1. _____        OCT 24 2006
                                2. _____

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME | NUMBER | ASSIGNMENT | UNIT/ROOM NUMBER |
|---|---|---|---|
| A. BOSTON, Andre | D-03868 | MAC CHAIRMAN/MAC.001 | EW-236U |

A. Describe Problem: This inmate appeal is being filed by the CTF-Central Facility Men's Advisory,
Council (MAC) on behalf of the general population, pursuant to California Code of Reg-
ulation (CCR), Title 15, §§ 3084.1 and 3084.5 and the Department's Operations Manual (DOM)
§ 53120.12 in their entirety.  In order to seek timely resolution of this matter, we are
requesting that the appeal be bypassed to the Second Level.  The factors involved in this
appeal are as follows: CTF-Central Facility is a part of the Correctional Training Facility
(CTF), a state prison.  The facility can house approximately 2,828 general population
inmates.  Specifically, the facility houses a total of approximately 556 inmates, who are

If you need more space, attach one additional sheet.                    CONTINUED ON ADDITIONAL SHEET

B. Action Requested: The MAC is requesting that CTF's policies and Operations Procedures be brought
into complete compliance with regulatory law and CDCR policy.  Specifically, CTF's Close
B Custody inmates should be granted full and equitable opportunities for IWTIP program
assignments in accordance with the provisions of CCR § 3377.1 and that any language
                                              CONTINUED ON ADDITIONAL SHEET
Inmate/Parolee Signature: A. Boston, MAC Chairman          Date Submitted: 8/31/06

C. INFORMAL LEVEL (Date Received: _____ )

Staff Response: _____

BYPASS

Staff Signature: _____          Date Returned to Inmate: _____

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

BYPASS

Sig RECEIVED     RECEIVED          Date Submitted: _____
Note: Property/Funds appeals must be accompanied by a completed          CDC Appeal Number:
Board of Control form BC-1E, Inmate Claim
SEP 1 2006     OCT 2 4 2006                         06 - 02873

171

FEB 1 2000

First Level    ☐ Granted    ☐ P. Granted    ☐ Denied    ☐ Other _____
E. REVIEWER'S ACTION (Complete within 15 working days): Date assigned: _____SEP 1 2006_____ Due Date OCT 1 7 2006

Interviewed by: _____

BY PASS

Staff Signature: _____ Title: _____ Date Completed: _____
Division Head Approved:                                           Returned
Signature: _____ Title: _____ Date to inmate: _____

F. If dissatisfied, explain reasons for requesting a Second-Level Review, and submit to Institution or Parole Region Appeals Coordinator within 15 days of receipt of response.

BY PASS

Signature: _____ Date Submitted: _____

Second Level    ☐ Granted    ☐ P. Granted    ☒ Denied    ☐ Other _____
G. REVIEWER'S ACTION (Complete within 10 working days): Date assigned: Sep 1-2006 Due Date: OCT 17 2006
☒ See Attached Letter

Signature: X _JC Aish  AWCA)_ Date Completed: 10-19-06
Warden/Superintendent Signature: X _____ Date Returned to Inmate: OCT 2 4 2006

H. If dissatisfied, add data or reasons for requesting a Director's Level Review, and submit by mail to the third level within 15 days of receipt of response.

The circumstances which give rise to this appeal, have been created by a
series of actions undertaken by the Administration of the Correctional
Training Facility (CTF), reflected in the adoption of Operations Procedures
(OP) #34, 40 and 88 that have had a direct impact on the Close B Custody
inmates.  This appeal was filed on the behalf of those Close B Custody inmates
who are housed in CTF-Central Facility,  (See attached for continuation)
Signature: _A. BOSTON, D-03868, MAC Chairman_ Date Submitted: _11/7/06

For the Director's Review, submit all documents to:  Director of Corrections
                                                    P.O. Box 942883
                                                    Sacramento, CA 94283-0001
                                                    Attn: Chief, Inmate Appeals

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

DIRECTOR'S ACTION:  ☐ Granted    ☐ P. Granted    ☒ Denied    ☐ Other _____
☒ See Attached Letter                          w.L-f
                                                    Date: JAN 2 3 2007
CDC 602 (12/87)

Problem (Continued):

Classified by CDCR as Level II, Close-B Custody, representing 25% of the total general population,. CCR Title 15 defines and incorporates the provisions for their program expectations according to their inmate custody designations. Those program expectations are supported by corresponding program policy articulated in the DOM. Central Facility's general population is represented by an elected inmate advisory council (MAC). The MAC's function, as described in CCR Title 15 and the DOM is to advise and communicate with the Warden and other staff, those matters of common interest and concern to the inmate general population. In pursuit of that mandate, the MAC has met on multiple occasions with the CTF Administration concerning equal access to Level II program assignment opportunities for all Close Custody inmates, which would be consistent with regulatory law and Departmental policy. Despite those efforts, the MAC has been confronted with reports that supervisory and rank & file staff are attributing the continuing program changes that adversely affect all general population inmates to "an agreement or decision reached between the Administration and the MAC." The program circumstances, which the MAC is grieving are defined by Operations Procedures (OP) #34 and #40.

The MAC asserts that the restrictive language and circumstances imposed by OP #34 and OP #40 have an explicit, negative impact on Close B Custody inmates, which contradict the regulatory language of CCR Title 15 and the policy provisions of the DOM. The result of those restrictions is to effectively deny those inmates program assignments to which they are entitled.

- The latest revision of OP #34, signed by Ms. P. Barker for Warden A. P. Kane on April 3, 2006, contains the following pertinent language on pages 3 and 4: "Close B, Level II inmates shall be permitted to participate in program assignments and activities, i.e., Alcoholic Anonymous and Narcotics Anonymous, during the hours of 0600 hours to 2000 hours in areas located within the Central Facility *security perimeter (West Gate to East Gate)*. Close B Custody inmates may participate in designated work program assignments until 2200 hours when the work program is in an assigned housing unit located within the facility security perimeter. Close B Custody inmates may participate in limited evening activities after 2000 hours until the general evening lockup and count when the limited activity is in a designated housing unit located within the facility security perimeter. No Close Custody inmates will be assigned to the Culinary with access to the Loading Dock, Laundry/Clothing Room, Lower East Corridor, or areas outside the East Gate."

- Former Warden J. Hamlet signed the last revision of OP #40 on October 24, 2002. Although this critical OP has not been officially revised in four years, numerous, substantial changes in program routine have been instituted, which are contrary to the provisions of the signed OP available to the general population. The OP cites the West Corridor Grill Gate and Yard Fence Gate as the portals for Central Facility Recreation Yard access and egress. The OP also establishes specific procedures for Yard Recall and Counts that directly impact the Close B inmate population at CTF-Central. Although the provisions for Close Custody Counts are also discussed in OP #11, which governs Inmate Count and Movement, there is no actual description or delineation of Close Custody inmate movement contained in that OP. In accordance with OP #40, Close B inmates are recalled from yard activities at 1100 hours, but not counted until 1215 Hours. They are counted with all other inmates at 1700 Hours; separately at 2000 Hours as Close Custody inmates; and again at 2130 Hours with all other inmates. This is done in spite of the fact that neither the CCR nor the DOM requires additional counts for Close B Custody inmates. The OP explicitly limits evening program to showers only prior to meals and excludes any release to the yard for Red Card Holders who are Close Custody inmates after the completion of the evening meal. There are no specific provisions for Close B inmates' participation in Inmate Activity Groups between the hours of the 1700 Hour Institutional Count and the 2000 Hour Close Custody Count. The combined result of the provisions created by OP #40 for the counting, release and movement of Close B Custody inmates is the imposition of demonstrable restrictions on their IWTIP program assignments and participation.

- It is perhaps instructive to note that OP #80, CTF's Mission Statement, states that Central Facility is a "training and work-oriented facility that provides comprehensive academic, vocational and industrial programs for Level II inmates." The statement asserts that there are a "variety of self-improvement programs, academic classes, vocational classes, literacy program, and work assignments available for *minimum and medium custody inmates*." There is no specific mention of program and work assignment provisions for close custody inmates. Significantly, OP #80 also states CTF "has a *secured-armed perimeter*. There are armed towers spaced around the *perimeter*, each of which is staffed and armed with lethal as well as less lethal weapons. The *perimeter* of each of the facilities contains separate vehicle and pedestrian sallyports, whose overlooking towers are staffed 24 hours per day."

CCR Title 15 and the DOM establish clear criteria and provisions for Close B Custody program access and assignments (*bold/italicized print* has been added for emphasis of relative points).

- CCR §3000 contains four definitions relative to *Designated Level II Housing, Facility Security Perimeter, and Security Perimeters:*
    1. *"Designated Level II Housing* means a housing facility encompassed by a *facility security perimeter* and constructed to provide celled housing for inmates with *Level II classification scores*."
    2. *"Facility Security Perimeter* is any combination of living unit, work area and recreation area *perimeters* that is set aside to routinely restrict inmate movement based on custody level. This *perimeter* will contract and expand depending upon the weather, lighting conditions and hours of operation."
    3. *"Secure Perimeter* means the *largest Security Perimeter* that physically retains inmates in custody on facility property."
    4. *"Secure Perimeter* means any unbroken physical barrier or combination of physical barriers that restricts inmate movement to a contained area without being processed through a door, gate or sallyport."

- CCR §3000.5 establishes the "Rules of Construction," which apply to salient points in the MAC's grievance.

[OVER]

Δ-9

- CCR §3377.1(a)(4)(A-C) establishes the following points relative to this grievance:
  - o Subsection (A) states that Close B inmates "housing shall be in cells within *designated institutions* in housing units located within an established *facility secure perimeter*."
  - o Subsection (B) states "Close B inmates shall be permitted to participate in program assignments and activities during the hours of 0600 hours to 2000 hours in areas located within the *facility security perimeter including beyond work change area* in a *designated Level II*, Level III or Level IV institution. Close B Custody inmates may participate in limited evening activities after 2000 hours until the general evening lockup and count when the limited activity is in a designated housing unit within the *facility security perimeter*."
  - o Subsection (C) provides for the direct and constant supervision of work supervisors during the inmates' assigned work hours. Subsection (D) provides for the direct and constant supervision of Close B Custody inmates at all times.

CCR 3377.1(a)(4)(B) mandates the opportunity for Close B inmates to participate in program assignments within the facility secure perimeter including beyond the work change. The MAC asserts that CTF is not allowed to restrict inmates from program assignments to areas strictly defined by the "East and West Gates" (as imposed by OP #34). The MAC further asserts that the institution has developed *local definitions* of the *facility security perimeter* that are contrary to the regulatory language contained in CCR Title 15. The Culinary areas (including the back dock), the Clothing and Laundry Rooms, Receiving and Release, the Central Facility Vocational classrooms and the Prison Industry Authority are all clearly located within CTF-Central Facility's *actual* security perimeter as determined by regulatory law and CDCR policy. There is no legitimate penological interest demonstrated by the institution's restriction of the assignment and participation of Close B inmates in these areas, especially during daylight hours. The determination of the "East and West Gates" as an arbitrary definition constitutes an underground regulation imposed by CTF (with possible undue influence by Custody bargaining units). The "policy," which establishes the East and West Gates as the "security perimeter," is immediately contradicted by the ability of Close B inmates to participate in Recreation Yard activities between the approximate hours of 0900 to 1500 Hours. The Central Facility Recreation Yard is clearly *outside* the West Gate. Close B inmate assignments in Medical and Education are all located *beyond* the Lower East Corridor, another arbitrary boundary established in the language of OP #34. In addition, the restrictions imposed by CTF against Close B inmate work or program assignments (Vocations & PIA) deny those inmates access to the benefits implied in CTF's "Mission Statement" (even though they are specifically excluded from CTF's mission at this time). Close B inmates have no ("zero") access to vocational programs, absolutely essential to the parole requirements imposed by the Board of Parole Hearings on life term inmates. Close B inmates have no ("zero") opportunity to participate in PIA assignments. As a result, those inmates are denied access to PIA's primary function, which is inmate work programming. Close B inmates are denied the opportunity to participate in PIA's Inmate Employability Program, which would document and certify their skills, work experiences and work habits while assigned to PIA Enterprises. This eliminates Close B inmates' possible participation in another desirable parole requirement sought by the Board of Parole Hearings. The result of this denial of IWTIP program access is a direct and indirect impact on the liberty interests of Close B inmates regarding their parole opportunities.

For the last six years, CTF has failed to demonstrate any interest in improving the program opportunities for Close B inmates and has engaged in an ongoing degradation of Close B assignment opportunities. The previous attempt by former Warden A. P. Kane to create Close B access to vocational programming was withdrawn by the present Administration. CTF has been apprised of CDCR's internal view of denying Close B Custody Program Access, published in the Inmate Appeals Branch Insighter (see Attachment A - Issue #17, dated 2003 – "A Court Weighs in on Application of Regs"), but has failed to respond. CTF's Close B inmates are disproportionately unemployed and underassigned. Only a third of Close B inmates are actually assigned to jobs/education. Over half the A1A Close B inmates are unassigned and cannot find a job or vocational assignment (See Attachment B). Close B inmates previously worked for decades throughout the institution, without any evidence of a legitimate penological concern or security incidents at CTF that would support denying them access to which they are entitled under regulatory law and CDCR policy. DOM §51020.1 specifically directs that "Supplements shall not create new policy/regulation." A regulation "implements, interprets or makes more specific the provisions of statute, case law or regulation of controlling agencies... imposes requirements which shall be met to qualify for general entitlement or privileges available to inmates..." CDCR policy clearly directs that supplements (OP's) shall comply and expound on the implementation of regulations and *not contract* them. OP #34 is clearly not in compliance with regulatory law or CDCR policy. As a result, CTF's Close B Custody inmate population is being adversely affected without avenue(s) for relief. The MAC's attempts to address these discrepancies through constructive dialogue, input and recommendations have been dismissed by the CTF Administration and the Close B inmate general population continues to suffer as a consequence. The CCR and the DOM explicitly establish that CTF-Central Facility's Close B inmates, housed in a designated Level II housing, are entitled to participate in program assignments and activities during the hours of 0600 hours to 2000 hours in areas located within the facility security perimeter including beyond work change area. Close B Custody inmates' IWTIP program entitlements are being denied or obstructed by policies and procedures adopted and imposed by the CTF Administration.

Action Requested (Continued):
contained in OP's #34 and #40, as well as any other relevant OP's, be revised to comply with the provisions of the CCR and the DOM.

A. BOSTON
MAC Chairman
CTF-Central Facility                    August 31, 2006

174                                                              B-10

# The Insighter



Issue Number    CDC INMATE APPEALS BRANCH TRAINING BULLETIN    January



*Inmate*
*Appeals*
*Branch*
*916-358-2417*

E. Alameida, Jr., Director
CDC
K. Kinser, Chf. Dep. Director
Support Services
E.A. Mitchell, Dep. Director
Policy and Eval Div.
Nola Grannis, Chief
Inmate Appeals Branch

Office Staff
andy Brady, SWPT
Sharon Candalot, AGPA
DeeAnne Cooper, WPT
Lorenda Hamarlund, OT
Lizie Hoogland, WPT
Mary Moraitry, AGPA
Renee Welsh, OT

Appeals Examiners
en Allen, SSM-I
ceByril Arco, FC
dy Burleson, SSM-I
o Enriquez, FC
rudy Floto, FC
ya Hodges-Wilkins, FC
uck Hollis, FC
y Loftin, FC
e Pearson, FC
ck Porter, FC
J Stocker, FC
sy Sullivan, SSM-I
z Swiges, SSM-I



## A MESSAGE FROM THE CHIEF...

*Greetings!* Before becoming chief, I had the pleasure of working with most of the appeals coordinators and their staff; therefore, I have a feeling of continued confidence in the abilities of those around me. This year should bring with it some interesting challenges including significant changes in law, regulation, and policy. Many of you are currently feeling the crush of appeals regarding frontal nudity, the ban on smoking products, and soon—restitution and Plata complaints. I would like to ask your cooperation in maintaining the integrity of the exhaustion requirement pursuant to the Prison Litigation Reform Act of 1995. This act gave us the ability to thwart premature filings in the courts, resulting in their immediate dismissal for failure to exhaust by administrative appeal. The way to best support the reform act is through strict adherence to appeal time limits. Too many First or Second Level responses address the appellant's failure, without cause, to meet time constraints, yet proceed to respond as if they had. Instead of preventing future litigation, the response commits CDC to follow this appeal to its end. More often than not, this means court and court represents much time, effort, and money. If an appellant has no legitimate excuse for delayed submittal/resubmittal, then the appeal should be screened out for untimeliness, thereby preventing access to court.

## THIRD PARTY INTERVENTION ON BEHALF OF AN INMATE/PAROLEE APPELLANT

Inmates and parolees have a right to appeal CDC decisions, actions, conditions, or policies that adversely affect them. No other inmate or parolee shall submit a CDC 602 on behalf of another inmate or parolee. Nonetheless, an appellant may obtain the assistance of another person, including an inmate or parolee, in preparing the appeal. Institution staff shall provide the assistance necessary to inmates who have difficulty communicating in written English to afford access to the appeal process. These are CDC regulations.

To what extent may an appellant be represented by a third party, such as a parent, an inmate, or an attorney? Third parties may assist and even ghostwrite appeals for an appellant. This is especially relevant to a disabled inmate who cannot write a CDC 602. The CDC 602 must be submitted over the appellant's signature and through the appellant, not a third party. If the appellant cannot sign his or her own name, a staff member should interview the appellant and obtain a verbal or other acknowledgement that the CDC 602 was knowingly submitted by the appellant and the content represents the appellant's position. The employee should write on the CDC 602 that the interview was conducted and the circumstances of the appellant's concurrence. Responses to the appeal should be directed to the appellant, not the third party. Staff assistance to communicate the response for a disabled appellant should be provided as necessary and documented. (CCR 3084.1, 3084.2, 3084.3)

## A Court Weighs In On Application of Regs

A recent California court decision to grant an inmate's writ of habeas corpus serves as a reminder to CDC that we must follow our established regulations. The inmate petitioner asserted that the institution failed to follow CCR 3377.1 which establishes Close "B" Custody program and activity hours. The response at each level of appeal cited a variety of justifications to establish different program hours. First level: the rule changes were permissive and the institution had the authority to amend them; *the court ruled that the language was mandatory.* Second level: DOM permitted the institution to retain prior policy; *the court ruled that DOM does not supercede the CCR.* Third level: a reasonable penological interest existed to change the hours; *the court ruled that an institution could not have a reasonable interest that contravenes the regulations under which it operates.* While some regulations may seem to be outdated or inconvenient, CDC is held to compliance.

Recommendations to revise regulations should be submitted through the chain of command to headquarters staff.

✱ ✱ ✱ ✱

# CENTRAL FACILITY
# CLOSE CUSTODY ASSIGNMENT PROFILE
## as of: August 22, 2006

| CLOSE CUSTODY INMATE HOUSING | C-WING | D-WING | E-WING | CENTRAL FACILITY* |
|---|---|---|---|---|
| TOTAL NUMBER OF CLOSE CUSTODY INMATES | 57 | 252 | 254 | 562 |
| TOTAL NUMBER OF A-1-A ASSIGNED CLOSE CUSTODY INMATES | 11 | 76 | 105 | 192 34.1% |
| TOTAL NUMBER OF A-1-A UNASSIGNED CLOSE CUSTODY INMATES | 35 | 150 | 121 | 306 54.4% |
| TOTAL NUMBER OF A-2-B CLOSE CUSTODY INMATES | 6 | 27 | 25 | 58 10.3% |
| TOTAL NUMBER OF C STATUS CLOSE CUSTODY INMATES | 5 | 0 | 1 | 6 <1% |

| TOTAL NUMBER OF CLOSE CUSTODY INMATES BY AREA OF ASSIGNMENT | C-WING | D-WING | E-WING | CENTRAL FACILITY* |
|---|---|---|---|---|
| EDUCATION | 10 (-) | 40 | 52 (-) | 102 (-) |
| HOUSING UNIT WORKERS | 1 | 30 (-) | 28 (-) | 59 (-) |
| RECREATION YARD CREW | 0 | 2 | 9 | 11 |
| CORRIDOR WORKERS | 0 | 2 | 8 | 10 |
| INFIRMARY WORKERS | 0 | 0 | 6 | 6 |
| OTHER MISCELLANEOUS POSITIONS | 0 | 2 | 2 (-) | 4 (-) |

| COMPARISON WITH GENERAL POPULATION | C-WING | D-WING | E-WING | CENTRAL FACILITY* |
|---|---|---|---|---|
| CENTRAL FACILITY MEDIUM/MINIMUM CUSTODY | 197 | 0 | 0 | 2828 |
| CENTRAL FACILITY CLOSE CUSTODY INMATES | 57 2.0% OF POPULATION | 252 8.9% OF POPULATION | 253 8.9% OF POPULATION | 562 19.8% OF POPULATION |
| TOTAL NUMBER OF A-1-A ASSIGNED CLOSE CUSTODY INMATES | 11 <1% | 76 2.7% | 105 3.7% | 192 6.8% |
| TOTAL NUMBER OF A-1-A UNASSIGNED CLOSE CUSTODY INMATES | 35 1.2% | 150 5.3% | 121 4.3% | 306 10.8% |
| TOTAL NUMBER OF A-2-B CLOSE CUSTODY INMATES | 6 <1% | 27 <1% | 25 <1% | 58 2% |
| TOTAL NUMBER OF C STATUS CLOSE CUSTODY INMATES | 5 <1% | 0 | 1 <1% | 6 <1% |

*EXCLUDES X & O-WING POPULATION

A-12

# CENTRAL FACILITY
# CLOSE CUSTODY ASSIGNMENT PROFILE
## as of:  March 3, 2006

| CLOSE CUSTODY INMATE HOUSING | C-WING | D-WING | E-WING | CENTRAL FACILITY* |
|---|---|---|---|---|
| TOTAL NUMBER OF CLOSE CUSTODY INMATES | 66 | 253 | 254 | 573 |
| TOTAL NUMBER OF A-1-A ASSIGNED CLOSE CUSTODY INMATES | 12 | 74 | 114 | 200 34.9% |
| TOTAL NUMBER OF A-1-A UNASSIGNED CLOSE CUSTODY INMATES | 39 | 153 | 116 | 308 53.7% |
| TOTAL NUMBER OF A-2-B CLOSE CUSTODY INMATES | 13 | 26 | 23 | 62 10.8% |
| TOTAL NUMBER OF C STATUS CLOSE CUSTODY INMATES | 2 | 0 | 1 | 3 <1% |

| TOTAL NUMBER OF CLOSE CUSTODY INMATES BY AREA OF ASSIGNMENT | C-WING | D-WING | E-WING | CENTRAL FACILITY* |
|---|---|---|---|---|
| EDUCATION | 12 | 37 | 58 | 107 |
| HOUSING UNIT WORKERS | 0 | 32 | 29 | 61 |
| RECREATION YARD CREW | 0 | 2 | 9 | 11 |
| CORRIDOR WORKERS | 0 | 2 | 8 | 10 |
| INFIRMARY WORKERS | 0 | 0 | 6 | 6 |
| OTHER MISCELLANEOUS POSITIONS | 0 | 1 | 4 | 5 |

| COMPARISON WITH GENERAL POPULATION | C-WING | D-WING | E-WING | CENTRAL FACILITY* |
|---|---|---|---|---|
| CENTRAL FACILITY MEDIUM/MINIMUM CUSTODY | 188 | 0 | 0 | 2828 |
| CENTRAL FACILITY CLOSE CUSTODY INMATES | 66 2.3% OF POPULATION | 253 8.9% OF POPULATION | 254 9% OF POPULATION | 573 20.3% OF POPULATION |
| TOTAL NUMBER OF A-1-A ASSIGNED CLOSE CUSTODY INMATES | 12 <1% | 74 2.6% | 114 4% | 200 7% |
| TOTAL NUMBER OF A-1-A UNASSIGNED CLOSE CUSTODY INMATES | 39 1.3% | 153 5.4% | 116 4.1% | 308 10.8% |
| TOTAL NUMBER OF A-2-B CLOSE CUSTODY INMATES | 13 <1% | 26 <1% | 23 <1% | 62 2% |
| TOTAL NUMBER OF C STATUS CLOSE CUSTODY INMATES | 2 <1% | 0 | 1 <1% | 3 <1% |

*EXCLUDES X & O-WING POPULATION

A-13

DEPARTMENT OF CORRECTIONS AND REHABILITATION
Correctional Training Facility
Soledad, California

RE:    CTF APPEAL LOG No. *CTF-C-06-02873*
       Second Level Reviewer's Response

**BOSTON**                    *D-03868*                    *EW-236U*

APPEAL DECISION:    ***DENIED***

APPEAL ISSUE: CUSTODY/CLASSIFICATION (Category 2)

You are filing an appeal as the CTF Central Men's Advisory Council (MAC) Chairperson on behalf of the general population. You cite CCR, Title 15, Section 3084.1, 3084.5 and Departmental Operations Manual (DOM) Section 53120.12.

- You claim Operational Procedures #34 and #40 have an explicit negative impact on Close B custody inmates.
- You claim CTF's definition of security perimeter (Westgate and East gate) is out of compliance with departmental regulations.
- You claim there are too many counts for Close B custody inmates. You assert CTF is not allowed to restrict inmates from program assignments to areas strictly defined by the "East and West gates."
- You claim Close B inmates have no opportunity to participate in vocational and Prison Industry Authority (PIA) programs.

ACTION REQUESTED:

The MAC is requesting CTF's policies and operational procedures be brought into complete compliance with regulatory law and CDCR policy. Specifically, CTF's Close B Custody inmates should be granted full and equitable opportunities for IWTIP program assignments in accordance with the provisions of CCR, Section 3377.1. You also request that language contained in OP #34 and #40, as well as any other relevant OP's be revised to comply with the provisions of the CCR and the DOM.

APPEAL RESPONSE:

On October 16, 2006, you were interviewed by acting Associate Warden J. C. Sisk concerning this appeal. You provided background information concerning the MAC's position on this issue and stated in essence that all the information was in the appeal.

A thorough review of the appeals package and all your attachments, Operational Procedures, CCR sections and DOM sections has been completed and reveals the following:

- CCR Section 3084.1. Right to appeal. This section describes an individual inmate's ability to file an appeal.

- CCR Section 3084.5. Levels of appeal review and disposition. This section describes why you requested this appeal be bypassed to the Second Level of Review because you are contesting a policy or procedure implemented by the institution head.

Q-14

Second Level Reviewer's Response
CTF Appeal Log # *CTF-C-06-02873*
Page 2 of 3

- DOM Section 53120.12, Inmate Advisory Committee Appeals. This section gives the authority to the MAC to file an appeal on any decision or action when the matter is not resolved through normal MAC communication channels with the Warden. This section continues on to state, "Warden's staff and the (IACs) are urged to consider every reasonable means to resolve issues at the lowest possible level before utilizing the appeals process."

- CCR Section 3270, Security-General Policy states, "The primary objectives of the correctional institutions are to protect the public by safely keeping persons committed to the custody of the Director of Corrections, ~~and to afford such persons with every reasonable opportunity and encouragement to participate in rehabilitative activities. Consistent effort will be made to insure the security of the institution and the effectiveness of the treatment programs within the framework of security and safety. Each employee must be trained to understand how physical facilities degree of custody classification personnel and operative procedures affect the maintenance of inmate custody and security~~. The requirements of custodial security and of staff, inmate and public safety **must take precedence** over all other considerations in the operation of all the programs and activities of the institution of the department."

- CCR, Section 3380, Chief Executive Officer, Subsection (a), states, "The warden or superintendent of an institution of the department is the chief executive officer of that institution, and ~~is responsible for the custody, treatment, training and discipline of all inmates under his or her charge. Subsection (c) states, "Subject to the approval of the Director of Corrections,~~ wardens, superintendents and parole region administrators will establish such **operational plans and procedures as** are required by the director for implementation of regulations and as may otherwise be required for their respective operations. Such procedures will apply only to the inmates, parolees and personnel under the administrator.

Previous CTF Wardens have utilized Operational Procedures to establish Facility security perimeters, housing units, additional counts and areas of movement for Close custody inmates. The current warden continues to use and approve OP's.

These OP's take into consideration the public safety as outlined in CCR Section 3270. The Warden is within his right to do so per CCR Section 3380. Other possible considerations would be the age of the facility, numerous vehicle and pedestrian sally ports beyond the East Gate, poor lighting and the lack of an electrified fence.

Therefore, CTF's Operational Procedures are authorized and in compliance with regulatory law and CDCR policy.

Close custody inmates have all the opportunities per IWTIP as allowed by their custody.

Close custody life term inmates will have vocation and or PIA opportunities between 7 to 9 years prior to their Minimum Eligible Parole Date (MEPD). This would allow sufficient time to acquire a trade or two prior to their appearance before the Board of Parole Hearings (BPH).

Q-15

Second Level Reviewer's Response
CTF Appeal Log # *CTF-C-06-02873*
Page 3 of 3

In the MAC's meeting with Warden Curry he stated he would consider proposals for Close Custody inmates to work in the culinary. The restriction to the back dock where delivery vehicles have access remains unavailable for Close Custody inmate assignments.

The Warden was also interested in any recommendations for new jobs for Close Custody inmates within the facility security perimeter between 0600 and 2000 or 2200 hours.

The MAC feel that CTF is too restrictive per OP's and should adopt the larger security perimeter beyond work change (Eastgate). The institutional position is that the OP's are utilized to cover legitimate security concerns while remaining within the understanding of the CCR.

In reference to the Inmate Appeals Branch newsletter "The Insighter" has no bearing on this issue. It is not a regulatory publication. It is informational in nature. Court decisions filter to the institutions via CDCR headquarters.

Based on the action requested, Section B of the appeal CTF is within CDCR policy and no change is needed. Program assignments by IWTIP for Close Custody is appropriate although new assignments or expanded areas will be considered once submitted by the MAC.

Based on the aforementioned information, CTF will not change any Operational Procedures as they relate to this appeal. Therefore, your appeal is DENIED at the Second Level of Review.

Reviewed By: _____          _10-19-06_
            J. C. Sisk, Associate Warden (A), Central Housing          Date

            _____          [illegible date]
            B. Curry, Warden (A), CTF          Date

Cc: Appeals office
    Inmate C-file

A-16

# REQUEST FOR DIRECTOR'S LEVEL REVIEW OF INMATE APPEAL
## CTF# 06-02873

### Reasons (Continued)

a designated Level II facility encompassed by a facility security perimeter and constructed to provide celled housing for inmates with Level II classification scores. Over a period of slightly more than five years, CTF has adopted a series of increasingly restrictive physical parameters, which obstruct program access and participation for Close B Custody inmates. These increased restrictions have been adopted in spite of nearly a decade of Level II Close B Custody programming without serious incidents. There is no direct evidence of a legitimate penological reason for reducing overall program access and opportunities by more than 75%. In addition, access to vocational and Prison Industry assignments has been completely eliminated. These actions seem to directly contradict the stated mission of the institution and the Department of Corrections and Rehabilitation (CDCR). Acting Warden B. Curry has invited recommendations from the MAC for proposals to create new jobs for Close B Custody inmates within the restrictive physical parameters adopted by CTF. While this is a positive response to engage the MAC on the behalf of the Close B Custody population, the Administration's interpretation of language contained in the California Code of Regulations (CCR) Title 15 and the Department Operations Manual (DOM), which govern Close B Custody program is still called into question. The institution's response **does not address** the sections of the CCR and DOM cited by the MAC as the basis for this appeal. CCR Title 15 Sections 3000, 3000.5 and 3377.1(a)(A-C) deal with the specific **mandatory language,** which governs Close B Custody program access. The five CCR Sections cited by the CTF Administration do not negate the rules of construction, which mandate compliance with the sections cited by the MAC in this appeal. The DOM **explicitly directs** that supplements (OP's) **shall not create new policy/regulation.** DOM §51020.1 further states that "Supplements shall:...not duplicate or **contradict** DOM provisions."

- The institution's assertion that "Previous CTF Wardens have utilized Operational Procedures to establish Facility security perimeters, housing units, additional counts and areas of movement for Close B Custody inmates does not excuse the current Warden from compliance with regulatory law and Departmental policy.
- The institution's assertions about the "...age of the facility, numerous vehicle and pedestrian sally ports beyond the East Gate, poor lighting and the lack of an electrified fence..." are contradicted by the provisions for programming by Close B Custody inmates in other institutions of higher or similar security levels that are older than CTF and also do not have electrified fences. If the Department wanted to make specific accommodations beyond those already stated in the CCR, *multiple changes* to the Director's Rules over the past two years, which specifically address Close Custody programming, provided more than ample opportunity. The sections, which the MAC cited as the basis for this appeal, remain unchanged.
- Simply stating "...CTF's Operational Procedures are authorized and in compliance with regulatory law and CDCR policy..." does not make it so if the institutional policy violates regulatory law or contradicts Departmental Policy.
- Close B Custody inmates **do not** have all the opportunities per the IWTIP program as asserted by the institution. Simply saying they do, does not make it so if Close B Custody inmates do not have access to Vocational and Prison Industry assignments.
- Seemingly "promising" Close B custody life term inmates with "... vocation and or PIA opportunities between 7 to 9 years prior to their Minimum Parole Date (MEPD)..." **does not** provide those inmates with the opportunity to engage in meaningful employment and training or to establish a record of efforts to rehabilitate themselves prior to their appearance before the Board of Parole Hearings (BPH). Denial of Close B Custody inmates' real access to program opportunities and job assignments creates a legitimate liberty interest when inmates appear before the BPH without evidence of participation in programs which meet the desirable parole requirements. (Over)

1

Q-17

- CTF's current waiting list for vocational participation by *any CTF-Central Facility inmate, regardless of the custody level*, is over 100 years in real time access.

- CTF currently has no vocation or PIA job opportunities for Close B Custody inmates. Prior to the introduction of the more restrictive definition of so-called security perimeters, which contradict the CCR and DOM, CTF's Close B Custody inmates had been gainfully employed and allowed to train in areas from which they are now restricted. This has happened despite a lack of incidents or demonstrated penological concerns that support the changes adopted by previous Wardens.

- The institution's assertion that "...Court decisions filter to the institutions via CDCR headquarters..." does not negate the informational commentary of CDCR's (headquarters) Inmate Appeals Branch newsletter, "The Insighter."

- The institution's assertion that their OP's are utilized to cover legitimate security concerns "...while remaining within the **understanding of the CCR**..." may succinctly define the application of opinion or perception over regulatory law and Departmental policy. If the Department feels that the regulatory law or policy provisions, which govern inmate programming access and opportunities, are too liberal and need to be more restrictive, the Legislature has provided them with appropriate remedies. Close B Custody inmates who have demonstrated a commitment to programming and rehabilitation, working their way down from the acknowledged security concerns of Level III and Level IV Close A Custody housing, desire the opportunities and access proscribed by the CCR and the DOM.

The MAC asserts that CTF, a CDCR institution, does not have a reasonable interest or legitimate penological interest that contravenes the regulations under which it operates. The MAC is requesting that the Director's Level Review carefully consider the CCR provisions, which the MAC has cited in this appeal and the issues that they have raised on the behalf of the Close B Custody inmate population. The MAC is respectfully requesting that the Review *specifically address the cited CCR provisions*, unlike the institutional response, and provide Close B Custody inmates with a clear expectation of program access and opportunities that should be available to them at CTF in accordance with regulatory law, Departmental policy and IWTIP program guidelines. The MAC is respectfully requesting a direct answer to the question of the institution's requirement to comply with the plain language of the CCR and the DOM, versus subjecting the provisions to interpretation, opinion or disregard for Legislative intent. If the Director's Level Review finds that the issues raised by the MAC are valid, the MAC would respectfully requests that CTF be instructed to amend any/all OP's regarding Close B Custody programming to comply with California Regulatory Law and Departmental Policy.

Respectfully submitted,

**A. BOSTON**
MAC Chairman
**CTF-Central Facility**          November 7, 2006

Q-18

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS AND REHABILITATION
INMATE APPEALS BRANCH
P. O. BOX 942883
SACRAMENTO, CA 94283-0001

## DIRECTOR'S LEVEL APPEAL DECISION

Date:

In re:    Boston, D-03868
Correctional Training Facility
P.O. Box 686
Soledad, CA 93960

IAB Case No.: 0605652          Local Log No.: CTF 06-02873

This matter was reviewed on behalf of the Director of the California Department of Corrections and Rehabilitation (CDCR) by Appeals Examiner J. G. Arceo, Facility Captain. All submitted documentation and supporting arguments of the parties have been considered.

I    APPELLANT'S ARGUMENT:    It is the appellant's position that he disputes the California Code of Regulations, Title 15, Section (CCR) and CDC Operations Manual Section's polices and procedures at it relates to inmates designated with Close "B" custody. He requests that Correctional Training Facility's (CTF) policies and procedures be brought into compliance with regulatory law and departmental policy. Further, he asks that CTF's Close "B" inmates be granted full and equitable opportunities for Inmate Work/Training Incentive Program (IWTIP) assignments pursuant to the CCR 3377.1.

II    SECOND LEVEL'S DECISION:    Warden Curry advised the Men's Advisory Committee (MAC) that he would consider proposals for Close custody inmates to work in the culinary. The back dock restrictions remain in place and those assignments are unavailable to Close custody inmates. The Operational Procedures are utilized to cover legitimate security concerns while remaining within the intent of the CCRs. Program assignments or by the IWTIP for Close custody inmates are appropriate although new assignments or expanded areas will be considered once submitted by the MAC.

III    DIRECTOR'S LEVEL DECISION:    Appeal is denied.

A.    FINDINGS:    The appellant has failed to present evidence that he is aware of all security concerns within the CTF that impact inmate movement. The Warden is charged by law with the responsibility to ensure the safety of staff, inmates, and public safety according to the physical and fiscal resources of his institution. The Warden has indicated that he will consider MAC recommendations. Pursuant to the California Penal Code Section 2933, inmates are not guaranteed a specific assignment but are afforded the opportunity for a credit qualifying assignment as provided by institutional and departmental resources. The appellant has failed to establish that the Warden has violated this law.

Unfortunately, Close custody inmates are limited by numerous security concerns to ensure their staff, custody and accountability to prevent escapes. Given the numbers of inmates at CTF versus the availability resources of all inmates will be assigned to the jobs his choice or the security of escape the custody inmates to travel. The Warden must ensure that accommodations submitted readily balance the program of inmates within the oding the needs of the inmate population commensurate to safety and security as within the balance of established law and accountability periological interest. The appellant's appeal issues have received the required reviews. The appellant has not supported his requested action. It is clear that Warden Curry is aware of assignment concerns of Close custody inmates. No intervention at the Director's Level of Review is warranted.

B.    BASIS FOR THE DECISION:
CCR: 3001, 3270, 3272, 3274, 3375, 3377, 3377.1, 3377.2, 3380

C.    ORDER:    No changes or modifications are required by the institution.

Q-19

BOSTON, D-03868
CASE NO. 0605652
PAGE 2

This decision exhausts the administrative remedy available to the appellant within CDCR.

N. GRANNIS, Chief
Inmate Appeals Branch

cc:     Warden, CTF
        Appeals Coordinator, CTF

# EXHIBIT B

STATE OF CALIFORNIA

SE. 2 5 2006 DEPARTMENT OF CORRECTIONS

**INMATE/PAROLEE**
**APPEAL FORM**
CDC 602 (12/87)

Location:    Institution/Parole Region    CTF-C  Log No. 0 6 - 0 2 3 2 9    Category 2 - 3

1.

2.                                  2.    DEC 8 2006

You may appeal any policy, action or decision which has a significant adverse affect upon you. With the exception of Serious CDC 115s, classification committee actions, and classification and staff representative decisions, you must first informally seek relief through discussion with the appropriate staff member, who will sign your form and state what action was taken. If you are not then satisfied, you may send your appeal with all the supporting documents and not more than one additional page of comments to the Appeals Coordinator within 15 days of the action taken. No reprisals will be taken for using the appeals procedure responsibly.

| NAME A. BOSTON Andre | NUMBER D-03868 | ASSIGNMENT MAC-001/MAC CHAIRMAN | UNIT/ROOM NUMBER EW-236U |

A. Describe Problem: This inmate appeal is being filed pursuant to the California Code of Regulations (CCR), Title 15 § 3084.1, 3084.2, and 3160 (a) in their entirety. In order to seek timely resolution of this matter we are requesting that the appeal be bypassed to the Second Level in accordance with CCR Title 15 § 3084.5 (b) as it addresses a violation of California Code of Regulations (CCR) **Title 15 § 3377.1** by a policy implemented by the Institution Head at CTF. The factors of this appeal are as follows: CTF-Central Facility is a part of a California State Prison that can house approximately 3230 inmates. Central Facility's inmates

If you need more space, attach one additional sheet.

B. Action Requested: It is requested that #1 The institution become in complete compliance with the Departmental Regulations regarding Close B Custody program assignments and activities. It is also requested that the Close "B" Custody inmates at CTF be given the "full" opportunity to program assignments and activities between 0600,

Inmate/Parolee Signature: _Andre Boston_    Date Submitted: _____

C. INFORMAL LEVEL (Date Received: _____ )

Staff Response: _____

BYPASS

RECEIVED
INMATE APPEALS BRANCH
DEC 2 8 2006

Staff Signature: _____    Date Returned to Inmate: _____

D. FORMAL LEVEL
If you are dissatisfied, explain below, attach supporting documents (Completed CDC 115, Investigator's Report, Classification chrono, CDC 128, etc.) and submit to the Institution/Parole Region Appeals Coordinator for processing within 15 days of receipt of response.

BYPASS

RECEIVED

Signature: _____  RECEIVED    Date Submitted: _____
Note: Property/Funds appeals must be accompanied by a completed    CDC Appeal Number:
Board of Control form BC-1E, Inmate Claim
SEP 2 5 2006                    0 6 - 0 2 3 2 9
JUL 2 1 2006
OCT 1 7 2006

CTF APPEALS

First Level    ☐ Granted    ☐ P. Granted    ☑ Denied    ☐ Other _____

E. REVIEWER'S ACTION (Complete within 15 working days): Date assigned: JUL 21 2006    Due Date: SEP 01 2006

Interviewed by: LT R. LYNCH

Staff Signature: _____    Title: LT    Date Completed: 6.27.06

Division Head Approved/

Signature: _____    Title: _____    Returned Date to Inmate: SEP 25 2006

F. If dissatisfied, explain reasons for requesting a Second-Level Review, and submit to Institution or Parole Region Appeals Coordinator within 15 days of receipt of response.

The MAC is dissatisfied with the First Level Response and hereby respectfully

request a Second Level Review of this matter based on the following reasons:

The MAC asserts that the First Level Review authored by Lieutenant R. Lynch

and signed by acting Associate Warden R. Pope was inappropriate and should be

SEE ATTACHED PAGES

Signature: _____    Date Submitted: 10/13/06

Second Level    ☐ Granted    ☐ P. Granted    ☑ Denied    ☐ Other _____    NOV 15 2006

G. REVIEWER'S ACTION (Complete within 10 working days): Date assigned: OCT 17 2006    Due Date: _____

☑ See Attached Letter

Signature: _____

Warden/Superintendent Signature: _____    Date Completed: _____

Date Returned to Inmate: DEC 8 2006

H. If dissatisfied, add data or reasons for requesting a Director's Level Review, and submit by mail to the third level within 15 days of receipt of response.

The MAC is dissatisfied with the institutional response at the Second Level and hereby

requests a Director's Level Review based on the following reasons:  The institution

appears to represent that if they say something "is so," it must be so period.  The

conditions grieved in the MAC's appeal on behalf of the population are longstanding and

still remain unresolved.  The institutional response also demonstrates measures, which

have been routinely adopted by the Inmate Appeals Coordinators (See attached page)

Signature: _____ A. Boston, D-03868 _____    Date Submitted: 12-22-06

For the Director's Review, submit all documents to: Director of Corrections
P.O. Box 942883
Sacramento, CA 94283-0001
Attn: Chief, Inmate Appeals

DIRECTOR'S ACTION: ☐ Granted    ☐ P. Granted    ☑ Denied    ☐ Other _____

☑ See Attached Letter

CDC 602 (12/87)

RECEIVED

DEC 18 2006  CIB-C

Date: MAR 16 2007

Describe Problem Continued:

general population is represented by an elected inmate advisory council (MAC). The MAC's function, as described in Title 15 of the CCR and the CDCR Department Operations Manual (DOM), is to advise and communicate with the Warden and other staff, those matters of common interest and concern to the inmate general population. CTF Central Facility currently houses approximately 576 Close B Custody inmates who are affected by the program restrictions for Close B inmates at CTF.

At present as a direct result of language restrictions in Operation Procedure # 34, CTF-Central Facility allows Close B Custody inmates the opportunity to access program activities including access to the recreational yard area between the approximate hours of 0700 and 1530 hours. Following the completion of the afternoon yard recall, Close B Custody inmates are not allowed any other recreational yard access until the following day. Close B Custody inmates are only allowed access to evening program within the housing unit until 1945 hours. The MAC asserts that the program access currently afforded is far less than that authorized by the applicable CCR Sections. (see attachment "C")

Pursuant to the mandatory language of CCR Title 15 § 3377.1 (a)(4)(B) which states in pertinent part: "[(B) Close B Custody inmates shall [EMPHASIS ADDED AND MANDATORY LANGUAGE PER CCR TITLE § 3000.5] be permitted to participate in program assignments and activities during the hours of 0600 to 2000 hours in areas located within the facility security perimeter including beyond the work change area in a designated Level II, III or IV institution...]". Pursuant to this language the CTF Close B Custody population are Departmentally entitled to program assignments and activities during the hours of 0600 to 2000 hours. However, CTF O.P. #34 presently contains a local restriction that violates the CCR Title 15 and prohibits Close B Custody inmates from full access to program activities [i.e.- Yard activities during non-work hours as is Departmentally authorized per CCR Title 15 § 3044] between the hours of 0600 and 2000 hours.

Recreational yard access is a part of the activities which Close B Custody inmates are entitled and authorized access to between the hours of 0600 and 2000 hours according to the CCR. Yet at CTF when the 1700 hours institutional count clears these same privilege group eligible inmates are being denied any further access to yard as is Departmentally mandated and authorized. The applicable section of CCR Title 15 § 3377.1 (a)(4)(B) contains mandatory language of SHALL when describing the activities and assignments that Close B Custody inmates are permitted to participate in between the 0600 and 2000 hours. The mandatory terminology of CCR Title 15 § 3377.1 (a)(4)(B) precludes the discretionary application of not allowing Close B Custody inmates to participate in program assignments, and activities up until 2000 hours.

By not allowing Close B Custody inmates the opportunity to participate in recreational yard activities until 2000 hours, CTF is essentially removing privileges from the specialized segment of the general population at CTF-Central Facility who would otherwise be entitled to and eligible for such.

CCR Title 15 § 3044 (c)(2) provides in pertinent part: (2)- All or a portion of privileges available to a work/training incentive group may be denied, modified or temporarily suspended at a disciplinary hearing upon a finding of an inmate's guilt for a disciplinary offense described in sections 3314 and 3315 of these regulations or by a classification committee action changing the inmate's custody classification, work/training privilege group or institution placement. By not allowing Close B Custody inmates yard activities up to 2000 hours, CTF is effectively denying Close B Custody inmates who have not been found guilty of any disciplinary violation, nor had their custody classification changed, the access to program activities that they are entitled to per the applicable California regulation.

CCR Title 15 § 3044 (c)(5) provides in pertinent part: (5)- No inmate or group of inmates shall be granted privileges not equally available to other inmates of the same custody classification and assignment who would otherwise be eligible for the same privilege." In this case inmates throughout the Department who are of the Close B Custody classification and similarly assigned enjoy the regular program assignments and activities that the CTF-Central Facility Close B Custody are being denied unjustly. This disparity of treatment in selectively excluding and subjecting these otherwise eligible Close B Custody inmates to a condition which is not only adverse, and unfair, but also in violation of recognized Departmental policies, is in effect an act of discrimination against a particular class of inmates at this facility who are being denied privileges that they are otherwise entitled to.

Continued:

While CTF has for years been hesitant to resolve some of the discrepancies and conflicts which exist regarding the Close B Custody Program, the MAC would draw the administration's attention to the Department's position on Close B Custody program assignments and work activities. The Inmate Appeals Branch in Sacramento routinely issues a Departmental Bulletin entitled the "Insighter". This bulletin contains information on appeal issues and recent court rulings. In "The Insighter" issue #17 dated January 2003, there was a column entitled "A Court Weighs In On Application of Regs" which advised institutions about a recent court decision on the application of regulations within the Department. The column discussed a challenge by an inmate to the application (or non-compliance) of regulations on Close B Custody program and activity hours. Headquarters clearly indicated that despite local attempts to justify their non-compliance with the regulations as applied to Close B Custody program, the court had found that "an institution could not have a reasonable interest that contravenes the regulations under which it operates." Additionally, the court found that neither local policy nor the Departmental Operations Manual (DOM) superceded the California Code of Regulations (CCR) and that the language of the applicable CCR section was mandatory not discretionary. (See attachment A)

The MAC would point out that Administrative concerns regarding the availability of high mast lighting, daylight savings time and operational necessity are applicable per CCR § 3377.1 (a)(2)(B) to Close "A" Custody inmates only and not Close B Custody inmates. Additionally the issue of Close Custody inmates not going beyond the work change area is per CCR § 3377.1 (a)(2)(B) applicable to Close A Custody inmates only and not Close B Custody inmates despite existing local policy.

Furthermore the provisions of DOM § 51020.1 provides that "Supplements shall: Not create new policy/regulation... A definition of a regulation is that it: implements, interprets, or makes more specific the provisions of statute, case law or regulation of controlling agencies...imposes requirements which shall be met to qualify for any general entitlement or privilege available to inmates, parolees, or the public." All Operational Supplements shall comply and expound on the implementation of Regulations not contradict them, and in this case the Operational Supplement (OP #34) clearly is not in compliance with the CCR.

Lastly, the MAC would note that previous attempts to informally address the administration seeking revision of Operations Procedure #34 have been to no avail. Therefore, in this instance the submission of this appeal is appropriate. (See attachment B)
//


Action Requested Continued:


and 2000 hours, as is prescribed by the California Regulatory Authority provided in CCR Title 15 § 3377.1 aforementioned. #2)- O.P. #34 (and any other relevant O.P. sections) be revised to reflect program activities and assignments as is reflected within the applicable CCR section aforementioned.

Date: 7/21/66

/s/ _____
A. Boston, D-03868
MAC Chairman



# The Insighter

Issue Number    CDC Inmate Appeals Branch Training Bulletin    January 2003



*Inmate*
*Appeals*
*Branch*
*916-358-2417*

*E. Alameida, Jr., Director*
*CDC*
*K. Kinzer, Chf. Dep. Director*
*Support Services*
*E.A. Mitchell, Dep. Director*
*Policy and Eval. Div.*
*Nola Grannis, Chief*
*Inmate Appeals Branch*

*Office Staff*
*Sandy Brady, SWPT*
*Sharon Candalot, AGPA*
*DeeAnne Cooper, WPT*
*Dorenda Hamarlund, OT*
*Lizie Hoogland, WPT*
*Mary Moralriy, AGPA*
*Renee Welsh, OT*

*Appeals Examiners*
*Ken Allen, SSM-I*
*Jocelynn Arceo, FC*
*Judy Burleson, SSM-I*
*Pio Enriquez, FC*
*Randy Floto, FC*
*Maya Hodges-Wilkins, FC*
*Chuck Hollis, FC*
*Tony Loftin, FC*
*Lane Pearson, FC*
*Derek Rorter, FC*
*Jerry Stocker, FC*
*Betsy Sullivan, SSM-I*
*Tom Surges, SSM-I*



## A MESSAGE FROM THE CHIEF...

*Greetings!* Before becoming chief, I had the pleasure of working with most of the appeals coordinators and their staff; therefore, I have a feeling of continued confidence in the abilities of those around me. This year should bring with it some interesting challenges including significant changes in law, regulation, and policy. Many of you are currently feeling the crush of appeals regarding frontal nudity, the ban on smoking products, and soon—restitution and Plata complaints. I would like to ask your cooperation in maintaining the integrity of the exhaustion requirement pursuant to the Prison Litigation Reform Act of 1995. This act gave us the ability to thwart premature filings in the courts, resulting in their immediate dismissal for failure to exhaust by administrative appeal. The way to best support the reform act is through strict adherence to appeal time limits. Too many First or Second Level responses address the appellant's failure, without cause, to meet time constraints, yet proceed to respond as if they had. Instead of preventing future litigation, the response commits CDC to follow this appeal to its end. More often than not, this means court, and court represents much time, effort, and money. If an appellant has no legitimate excuse for delayed submittal/resubmittal, then the appeal should be screened out for untimeliness, thereby preventing access to court.

## THIRD PARTY INTERVENTION ON BEHALF OF AN INMATE/PAROLEE APPELLANT

Inmates and parolees have a right to appeal CDC decisions, actions, conditions, or policies that adversely affect them. No other inmate or parolee shall submit a CDC 602 on behalf of another inmate or parolee. Nonetheless, an appellant may obtain the assistance of another person, including an inmate or parolee, in preparing the appeal. Institution staff shall provide the assistance necessary to inmates who have difficulty communicating in written English to afford access to the appeal process. These are CDC regulations.

*To what extent may an appellant be represented by a third party, such as a parent, an inmate, or an attorney?* Third parties may assist and even ghostwrite appeals for an appellant. This is especially relevant to a disabled inmate who cannot write a CDC 602. The CDC 602 must be submitted over the appellant's signature and through the appellant, not a third party. If the appellant cannot sign his or her own name, a staff member should interview the appellant and obtain a verbal or other acknowledgement that the CDC 602 was knowingly submitted by the appellant and the content represents the appellant's position. The employee should write on the CDC 602 that the interview was conducted and the circumstances of the appellant's concurrence. Responses to the appeal should be directed to the appellant, not the third party. Staff assistance to communicate the response for a disabled appellant should be provided as necessary and documented. *(CCR 3084.1, 3084.2, 3084.3)*

## A Court Weighs In On Application of Regs

A recent California court decision to grant an inmate's writ of habeas corpus serves as a reminder to CDC that we must follow our established regulations. The inmate petitioner asserted that the institution failed to follow CCR 3377.1 which establishes Close "B" Custody program and activity hours. The response at each level of appeal cited a variety of justifications to establish different program hours. First level: the rule changes were permissive and the institution had the authority to amend them; *the court ruled that the language was mandatory.* Second level: DOM permitted the institution to retain prior policy; *the court ruled that DOM does not supercede the CCR.* Third level: a reasonable penological interest existed to change the hours; *the court ruled that an institution could not have a reasonable interest that contravenes the regulations under which it operates.* While some regulations may seem to be outdated or inconvenient, CDC is held to compliance.

Recommendations to revise regulations should be submitted through the chain of command to headquarters staff.

✳ ✳ ✳ ✳

188

Q-24

DEPARTMENT OF CORRECTIONS
Correctional Training Facility
Soledad, California

SUPPLEMENTAL PAGE

RE:    CTF APPEAL LOG No. CTF-C-06-02329
First Level Reviewer's Response

*BOSTON*                    *D-03868*                    *EW-236U*

APPEAL DECISION:

*DENIED*

APPEAL ISSUE: CUSTODY/CLASS

1) In your appeal, you assert that CTF-Central Facility is not in complete compliance with the Departmental Regulations regarding Close B Custody program assignments and activities,that the Close B Custody inmates in CTF-Central Facility are being denied the programming prescribed by the California Regulatory Authority.

2) You claim that the mandatory language of **CCR Title 15 § 3377.1 (a)(4)(B)** in part states Close B Custody inmates shall be permitted to participate in program assignments and activities during the hours of 0600 to 2000 hours in areas located within the facility security perimeter including beyond the work change area in a designated Level II, III or IV institution.

3) You further state in your appeal that the Close B Custody population are Departmentally entitled to program assignments and activities during the hours of 0600 to 2000 hours (i.e., yard activities during non-work hours between the hours of 0600 and 2000 hours), yet when the CTF Institutional Count clears at 1700 hours, the Close B Custody inmates are denied any further access to the yard privileges that the rest of the non-Close Custody inmate population is able to utilize. You allege that this is essentially "removing privileges from the specialized segment of the general population" and that CTF O.P. #34 presently contains a local restriction that violates the CCR Title 15, prohibiting Close B Custody inmates from full access to program activities.

4) In your appeal you also claim that according to **CCR Title 15 § 3044 (c)(2)** and (5) that by denying Close B Custody inmates yard activities up to 2000 hours, CTF is effectively denying inmates who have not been found guilty of any disciplinary violation, nor had their custody classification changed; and that the disparity in treatment of non-Close Custody and Close B Custody inmates is not only adverse, and unfair, but also in violation of recognized Departmental policies, is in effect an act of discrimination against a particular class of inmates.

CTF-C-06-02:
First Level Reviewer's Response
Page 2 of 3

5) Additionally you state in your appeal that the issue of Close B Custody inmates not being allowed to go beyond the work change area is local policy only, per CCR Title 15 § 3377.1 (a)(2)(B), and should be applicable to Close A Custody inmates rather than Close B Custody inmates.

6) You request that #1) CTF-Central Facility provide the "full" opportunity to program assignments and activities between 0600 hours and 2000 hours and that #2) O.P. #34 (and any other relevant O.P. sections) be revised to reflect your citings in CCR Title 15 § 3377.1.

7) You want your appeal to be bypassed to the Second Level in accordance with CCR Title 15 § 3084.5 (b) because it violates CCR Title 15 § 3377.1 by a policy implemented by CTF's Institution Head.

## APPEAL RESPONSE:

Inmate BOSTON, on August 27, 2006, at approximately 1600 hours, I (Lt. R. Lynch) reviewed this inmate appeal (CTF-C-06-02329).

Due to CCR Title 15 § 3377.1 (A)(4)(B), which you cite in your appeal, it is clear that Close B Custody inmates may participate in limited evening activities after 2000 hours until the general evening lockup and count when the limited activity is in a designated housing unit located within the facility security perimeter. You are seeking evening yard program, yet either CCR is clear that the Close B Custody inmates may participate in limited evening activities when the limited activity is in a designated housing unit. This would therefore eliminate your claim to evening yard access.

In CCR Title 15 § 3044 (c), another citation in your appeal, it is clearly stated that ...Inmate privileges shall be governed by an inmate's behavior, custody classification and assignment. Also, ...Institutions may provide additional incentives for each privilege group, subject to availability of resources and constraints imposed by security needs.... Thus, this institution's lack of available resources and constraints imposed by security needs justifies the current Close B Custody criteria at CTF-Central Facility.

Your use of CCR Title 15 § 3044 (c)(2), being another example of the unfair treatment of Close B Custody inmates is not applicable, since the majority of the Close B Custody inmates are not Close B Custody for disciplinary reasons, but classification reasons. CCR Title 15 § 3044 (c)(5) is also determined by a classification designation.

Central Facility is in complete compliance with Departmental Regulations regarding Close B Custody inmates, it is not feasible to give the inmates classified as Close B Custody the "full" opportunity to program assignments and activities between 0600 hours and 2000 hours. The for CTF-Central Facility's available resources and constraints imposed by security needs, your appeal will be Denied.

Request for Second Level Review
CTF Appeal Log # CTF-C-06-02329
(continued)

invalidated because that review violates the requirements of Administrative Law and Departmental policy. The MAC initially requested a bypass to the Second Level for review in accordance with the provisions of the California Code of Regulations (CCR) Title 15, Section 3084.5(e)(1). Because the person who signed and authorized the implementation of Operations Procedure (OP) #34 was the institution head (Warden), his actions cannot be reviewed by a subordinate at the rank of a Correctional Lieutenant or modified by a subordinate at the rank of Associate Warden. In this matter, the issues being appealed by the MAC on the behalf of Close B Custody members of the general population involve the provisions and restrictions imposed on Close B Custody inmates by OP #34, signed by acting Warden B. Curry on June 21, 2006, the only person authorized by the Department to review the OP would be Warden Curry. The MAC is appealing those provisions of OP #34, which they believe conflict with the specific program provisions for Close B Custody inmates defined by the language contained in CCR, Title 15 §3377.1. As previously stated, DOM §51020.1 prohibits the creation of new policies or regulations by supplements (OPs) that change or reinterpret regulations. Because the pertinent part of CCR, Title 15 §3084.5(e) states: "Formal appeals shall not be reviewed by a staff person who...is of lower administrative rank than any participating staff..." a subordinate administrative staff member or Correctional Lieutenant cannot respond in a matter that is the responsibility of the Warden who has implemented this OP as the institution head.

The First Level Responder failed to address the main tenets raised in this appeal, which provide for Close B Custody programming, which are separate and distinct from the program provisions for Close A Custody programming. In a further attempt to clarify our position, the MAC respectfully directs the Administration's attention to the following information. CCR Title 15 and the DOM establish clear and separate criteria and provisions for Close B Custody program access and assignments. The MAC cites the following specific provisions and constructive language included in the CCR and DOM (*bold/italicized print* has been utilized for added emphasis of relative points).

CCR Title 15 §3000 contains four definitions relative to **Designated Level II Housing, Facility Security Perimeter, and Security Parameters:**

1.    "**Designated Level II Housing** means a housing facility encompassed by a **facility security perimeter** and constructed to provide celled housing for inmates with **Level II classification scores.**"
- *The MAC asserts that CTF Central Facility Level II Housing within the Central Facility security perimeter contains celled housing for inmates with Level II classification scores, exactly as defined by §3000.*

2.    "**Facility Security Perimeter** is any combination of living unit, work area and recreation area perimeters that is set aside to routinely restrict inmate movement based on custody level. This **perimeter** will contract and expand depending upon the weather, lighting conditions and hours of operation.
- *The MAC does not see any restrictive parameters contained in this definition, which would deny the requested expansion of Close B Custody program opportunities.*

3.    "**Secure Perimeter** means the **largest Security Perimeter** that physically retains inmates in custody on facility property."
- *The MAC does not see any restrictive parameters contained in this definition, which would deny the requested expansion of Close B Custody program opportunities.*

4.    "**Secure Perimeter** means any unbroken physical barrier or combination of physical barriers that restricts inmate movement to a contained area without being process through a door, gate or sally port."
- *The MAC does not see any restrictive parameters contained in this definition, which would deny the requested expansion of Close B Custody program opportunities.*

Q-29

CCR Title 15 §3000.5 establishes the **Rules of Construction**, which apply to salient points in the MAC's grievance.

CCR Title 15 §3377.1(a)(4)(A-C) establish the following points relative to this grievance:

1.  Subsection (A) states that Close B inmates' "...housing shall be in cells within **designated institutions** in housing units located within an established **facility secure perimeter**."
    *   *The MAC asserts that the programming opportunities, which they have advocated for, are not prohibited by the parameters of this definition.*

2.  Subsection (B) states "Close B inmates shall be permitted to participate in program assignments and activities during the hours of 0600 hours to 2000 hours in areas **located within the facility security perimeter including beyond work change area** in a designated Level II, Level III or Level IV institution. Close B inmates may participate in limited evening activities after 2000 hours until the general evening lockup and count when the limited activity is in a designated housing unit within the **facility security perimeter**.
    *   *The MAC asserts that the programming opportunities, which they have advocated for, are specifically authorized by the parameters of this definition.*

3.  Subsection (C) provided for the direct and constant supervision of work supervisors during the inmates' assigned work hours
    *   *The MAC asserts that staffing for the programming opportunities, which they have advocated for, are adequate to meet the parameters of this definition.*

4.  Subsection (D) provides for the direct and constant supervision of Close B Custody inmates at all times.
    *   *The MAC asserts that staffing for the programming opportunities, which they have advocated for, are adequate to meet the parameters of this definition.*

The crux of this appeal is that CTF has refused for years to comply with the Legislative and Departmental mandates outlined in CCR Title 15 §3377.1(a)(4)(B), which delineate the opportunities for Close B inmates to participate in program assignments and activities within the facility security perimeter, including beyond the work change area, between 0600 and 2000 Hours. CTF Central Facility is clearly and unambiguously a **designated Level II institution** within a **facility security perimeter**, which should provide inmates who are designated as Close B Custody with entitlement to participate in program assignments and activities up until 2000 Hours. At this time, CTF does not permit Close B Custody inmates to participate in this *mandated* access to program activities on the recreation yard beyond 1500 Hours. The First Level Responder never addressed this tenet in his response.

The First Level Responder confined his response to the second element of the section cited above, focusing on limited program activities after 2000 hours until the general evening lockup and count when the activity is in a designated housing unit located within the facility security perimeter. The Responder emphasized the usage of the permissive word "...may..." in the context of that issue. The MAC's main tenet however, focuses on the program opportunities afforded in the first portion of the cited CCR section, which contains the mandatory wording "...shall..." when referring to Close B Custody inmates opportunity to access program activities between 0600 and 2000 Hours. The MAC asserts that this wording imposes an obligation on and duty on CTF to provide Close B Custody inmates with program activities during the designated hours. To this extent, CTF is not in compliance with Legislative and Departmental mandates.

Q-30

CTF Appeal Log # CTF-C-06-02329 – Request for Second Level Response
Page 3


The First Level Responder also attempts to excuse CTF's failure to provide mandated programming under the guise of available resources and constraints imposed by security needs. The courts have not allowed institutions to excuse themselves with program responsibilities and the Responder was provided with the Department's own direction, published in Issue #17 of *The Insighter* (Attachment A). The circumstances discussed in this article were similar to those existing at CTF in that a CDC institution was denying Close B Custody inmates with program activities during the program hours specified by the CCR. The court ruled that an "…institution **could not ha**ve a reasonable interest that contravenes the regulations under which it operates." In the present matter, CTF seeks to advance different theories and reasons to contravene the Legislative and Departmental guidelines.

Based upon the foregoing information and material previous submitted by the MAC, the MAC requests that the Second Level Response address the following specific issues and requests for action expressed in our appeal:

  1.   Invalidate the findings of the First Level Response.
  2.   Address the main tenet of that appeal, which pertains to Close B Custody program activities between 0600 and 2000 Hours.
  3.   Resolve the discrepancy(ies) that exist because of CTF's non-compliance with CCR Title 15 §3377.1(a)(4)(B) pertaining to Close B Custody program activities between 0600 and 2000 Hours.


**A. BOSTON**
**MAC Chairman**
**CTF-Central Facility**　　　　　　　　　　　**October 13, 2006**

193

6-71

DEPARTMENT OF CORRECTIONS
Correctional Training Facility
Soledad, California

## Second Level Reviewer's Response

DATE:   November 28, 2006

TO:   *BOSTON*        *D-03868*        *EW-236U*

CTF APPEAL LOG No. CTF-C-06-02329

APPEAL DECISION:      **DENIED**

APPEAL ISSUE:  (Custody/Class)

APPEAL RESPONSE:

In your appeal you request the following items be answered at the Second Level of appeal:

  (1) That the First Level response be invalidated.

  (2) That CTF address the main tenet of the First Level appeal, which pertains to Close B
      Custody program activities between 0600 and 2000 hours.

  (3) That CTF resolve the discrepancy(ies) that exist because of CTF's non-compliance
      with CCR Title 15 §3377.1(a)(4)(B) pertaining to Close B Custody program activities
      between 0600 and 2000 hours.

On August 27, 2006, you were interviewed by Lieutenant R. Lynch to provide you the
opportunity to explain your appeal and present supporting information or documents.

A thorough review of your appeals' package and all of your attachments has been completed and
reveals the following:

  (1) The Appeals Coordinator at CTF reviewed this appeal and it was processed for a First
      Level response. It is now at the Second Level, which you request.

  (2) Operations Procedure #34 states in part: *Close B Custody, Level II inmates shall be
      permitted to participate in program assignments and activities, ie., Alcoholic
      Anonymous and Narcotics Anonymous, during the hours of 0600 hours to 2000
      hours in areas located within the Central Facility security perimeter (West Gate to
      East Gate. Close B Custody inmates may participate in designated assignments until
      2200 hours when the work program is in an assigned housing unit located within the
      facility security perimeter.*

  (3) Operation Procedure #34 clearly states that Close B Custody inmates are permitted to
      participate in programs within Central Facility between 0600 and 2000 hours with
      exceptions being made until 2200 hours.

  (4) Close Custody inmates at CTF are not permitted to go beyond the West Gate for night
      yard privileges.

  *1 Q4*

  *D-3:*

Second Level Reviewer's Response
CTF Appeal Log # **CTF-C-05-** J45
Page 2 of 2

You have not provided any new or additional information.    Therefore, based on the aforementioned, your appeal is being denied at the Second Level of Review.

Reviewed By: _____    Date    12/5/06
                    C. Noll, Associate Warden, Central Facility

_____    Date    12-7-06
Ben Curry, Warden (A)

cc:    Appeals Office File
       Inmate's Central File

Ɣ-33

# REQUEST FOR DIRECTOR'S LEVEL REVIEW OF INMATE APPEAL
## CTF# 06-02329

(Continued)

and the Administration in the assignment of staff for appellate responses, particularly when the issues involve institutional policy(ies). The MAC respectfully requests that the Director's Level Review *acknowledge* and *address* the points raised in the MAC's request for a Second Level Review and the points, which follow, that address the institutional response.

1.    The Second Level response neatly sidesteps acknowledgement or granting the MAC's request for invalidating the First Level response to an institutional policy issue by a Correctional Lieutenant, signed off by a Correctional Captain. The MAC continues to assert that Operations Procedures, signed by the Warden, constitute institutional policy decisions and directives that are not subject to the review or commentary by his subordinates in the implementation of that policy. This remains a substantial problem at CTF. Correctional Officers, Correctional Supervisors, and bargaining unit officials *routinely* obstruct, contradict, or redirect the application and implementation of institutional policy. Their actions extend to personal interpretation of statutory/regulatory rulings and circumvention of state and federal law. The Administration is unable to effectively counter or discipline the actions of bargaining unit officials who erect a de facto "Green Wall" against the adoption of changes that would normalize programming access and opportunities at this institution.

2.    The institution's response quotes the local Operations Procedure (OP) #34, which partially governs program access and participation by Close B Custody inmates. *Again,* the institution neatly sidesteps the *key issue.* CTF's OP's *are not in compliance with California Regulatory Law and the DOM.* They do not address, acknowledge, comment, or provide an "institutional interpretation" of the *ten, specific citation of the CCR* presented by the MAC in this appeal. Those actions and the "creation" of OP's that *contravene the regulations under which they operate* violate departmental policy as defined in DOM §51020.1. That section states: "Supplements shall:...Not create new policy/regulation. Clarify and not duplicate or conflict with the DOM provisions." The language of OP #34 clearly violates the *mandatory* language contained in the CCR. That language negates the discretion of CTF to apply its own interpretation of Close B Custody program access, activities and assignments.

3.    The institution's reliance on the language contained in their OP to demonstrate that Close B Custody program inmates "...are permitted to participate in programs within Central Facility between 0600 and 200 hours with exceptions being made until 2200 hours..." are contradicted by other language contained in the OP and the actual practices engaged in by CTF staff. The OP's partial adoption of language from the CCR and the DOM, while excluding the *complete provisions of regulatory law and Departmental policy,* side steps the issue of evening yard access and program activities in the housing units between 2000-2100 Hours. The difference between what an OP "clearly states" and the *reality* of program practices is "day and night."

4.    The institution does not justify why Close B Custody inmates are not permitted beyond the West Gate for night yard. Again, the institution chooses to ignore the provisions of the CCR and the DOM.

The MAC charges that CTF is deliberately indifferent and in violation of law by their failure to provide the mandated programming under a variety of guises and ignoring cautionary advice published in *The Insighter,* a Departmental publication; thereby contravening rulings in the state courts, Legislative intent and Departmental guidelines.

Recent changes to the daily program schedule of activities, articulated in OP#40, further restrict and violate Close B Custody inmates' access to assignments and program activities in the course of a normal program day.

(See Reverse)

A-34

The MAC asserts that CTF does not have a reasonable interest or legitimate penological interest in contravening the regulations under which it operates.

The MAC's position is simply that the institution should be in *complete, not "selective"* compliance with California Regulatory Law. The institutional position is in direct conflict with the CCR, in that California Regulatory Law establishes the parameters that institutions *shall* (mandatory language) operate under and the expectation that they will carry out their duties *within those defined parameters*

The MAC is requesting the Director's Level Response direct:

1.    Instruct CTF that all local procedures must be in full compliance with any applicable provisions of California Regulatory Law and Departmental policy, especially where those procedures apply to access to program assignments and activities by Close B Custody inmates housed within the institution.

2.    Instruct CTF to immediately amend any of the several local OP's with provisions that directly contradict or do not reflect complete compliance with California Regulatory Law and applicable provisions of the DOM.

Respectfully submitted,

**A. BOSTON**
**MAC Chairman**
**CTF-Central Facility**        December 22, 2006

A-35

STATE OF CALIFORNIA
DEPARTMENT OF CORRECTIONS AND REHABILITATION
INMATE APPEALS BRANCH
P. O. BOX 942883
SACRAMENTO, CA 94283-0001

## DIRECTOR'S LEVEL APPEAL DECISION

Date: MAR 16 2007

In re:    Boston, D-03868
Correctional Training Facility
P.O. Box 686
Soledad, CA 93960

IAB Case No.: 0607538          Local Log No.: CTF 06-02329

This matter was reviewed on behalf of the Director of the California Department of Corrections and Rehabilitation (CDCR) by Appeals Examiner J. G. Arceo, Facility Captain. All submitted documentation and supporting arguments of the parties have been considered.

I    APPELLANT'S ARGUMENT:    It is the appellant's position that he disputes the California Code of Regulations, Title 15, Section (CCR) and CDC Operations Manual Section's polices and procedures at it relates to inmates designated with Close "B" custody. The appellant reports that Correctional Training Facility (CTF) us essentially removing privileges from the specialized segment of the general inmate population at CTF-Central (C) who would otherwise be entitled to and eligible for same. He requests that CTF's policies and procedures be brought into compliance with regulatory law and departmental policy. Further, he asks that CTF's Close "B" inmates be granted full and equitable opportunities for Inmate Work/Training Incentive Program assignments and activities between 0600 and 2000 hours, pursuant to the CCR 3377.1.

II    SECOND LEVEL'S DECISION:    The reviewer found that the institution is in compliance with Operational Procedure #34 regarding programs within CTF-C, Close "B" inmates are permitted to participate in. The Operational Procedure also addresses the programs and activities Close "B" Level II inmates shall be permitted to attend during the hours of 0600 and 2000. The First and Second Levels of appeal have provided responses within departmental policy for this issue.

III  DIRECTOR'S LEVEL DECISION:  Appeal is denied.

A. FINDINGS: The appellant has failed to present evidence that he is aware of all security concerns within the CTF. The Warden is charged by law with the responsibility to ensure the safety of staff, inmates, and public safety. The Warden has indicated that he will consider Men's Advisory Council recommendations. Pursuant to the California Penal Code Section 2933, inmates are not guaranteed a specific assignment but are afforded the opportunity for a credit qualifying assignment as provided by institutional and departmental resources. Unfortunately, Close custody inmates are limited by numerous factors because of staff allocation, safe custody, and accountability. Given the inmate population at CTF and available resources not all inmates will be assigned to the job of his choice or in a specific area of a facility. The appellant has failed to establish that the Warden has violated the intent of the law. The Warden must ensure that recommendations submitted by any inmate or group of inmates on behalf of the entire inmate population ensure institutional safety and security, are within the intent of established law and reasonable penological interest. The appellant's appeal issues have received the required reviews. The appellant has not supported his requested action. No intervention at the Director's Level of Review is warranted.

B. BASIS FOR THE DECISION:
CCR: 3271, 3270, 3272, 3377, 3377.1, 3377.2, 3380

C. ORDER: No changes or modifications are required by the institution.

D-36

198

BOSTON, D-03868
CASE NO. 0607538
PAGE 2

This decision exhausts the administrative remedy available to the appellant within CDCR.

N. GRANNIS, Chief
Inmate Appeals Branch

cc:    Warden, CTF
       Appeals Coordinator, CTF

$\Omega$-37

# EXHIBIT C

C-38



| CORRECTIONAL TRAINING FACILITY OPERATIONS PROCEDURE #34 | Subject: ICC & UCC REVIEWS/CLOSE CUSTODY/SPECIAL ASSIGNMENTS |
| --- | --- |
| | Reference: DOM 62010, 62040 & 11010 |
| | Revision Due Date:   JULY 2007 |
| | Responsibility:   CDW-CENTRAL & CDW-NORTH/SOUTH |

## INITIAL SCREENING OF NEW ARRIVALS:

Upon arrival at the Correctional Training Facility (CTF), an inmate shall be screened for an appropriate housing assignment. A staff member at the level of Correctional Lieutenant or above is designated as the Screening Authority. In rare cases where a Correctional Lieutenant is unavailable, a Correctional Sergeant trained in Tri-Plex screening may be designated as the alternate Screening Authority. During initial screening of new arrivals, the Screening Authority shall check the CDC 840 for endorsement, CDC 812 and 812C for documented enemies at CTF prior to approving release to the general population. The Screening Authority shall also thoroughly review the central file or available documentation, interview the inmate, and complete a CTF Form 128-B Triplex Housing Review [Attachment #A], making the necessary distribution of the form.

During initial screening, reviewing staff are responsible for evaluating each inmate on a case-by-case basis for either dormitory or celled housing. A CDC 1882 Form [Attachment # B] (Initial Housing Review) shall be completed for each inmate. In the event that double celling in Administrative Segregation (Ad/Seg) is required, staff shall complete a CDC 1882-B Form [Attachment # C] (Ad/Seg Unit/Security Housing Unit Double Cell Review). Based on the available information and the interview with the inmate, the Screening Authority shall determine if the inmate is suitable for cell housing with or without special restrictions. Restrictions are any case factors which may limit the inmate's placement options at the institution. Such as gang affiliation, health or psychiatric concerns, disciplinary behavior, nature of commitment offense, age, social factors, etc.

Upon completion of the review, the Screening Authority will complete the CTF Housing chrono 128-B, identifying the inmate to be eligible for Single or Double-Cell assignment.

## DOUBLE-CELLING:

It is the expectation of the Department that inmates will double-cell and accept housing assignments as directed by staff.

Precluding factors to double-celling an inmate would be, but are not limited to, the following factors:

- History of predatory and/or repeated in-cell attempts to physically or sexually abuse another inmate.
- A significant background of fights/violence toward previous cell partners, a single act of mutual combat does not warrant single cell status.
- The inmate may be extremely vulnerable due to his limited physical stature or degree of mental illness.
- A history of sexual assaultive behavior toward other inmates.
- Inmate has an "S" suffix.
- If the inmate's affiliation with any prison gang/disruptive group would conflict with his potential cell partner.
- If the inmate's religious beliefs conflict with his potential cell partner's beliefs.
- If the inmate has current or prior victimization concerns (Developmentally Disabled Program, etc.).
- If the inmate has expressed fear in being double-celled during interview or committee reviews.

D - 79



| CORRECTIONAL TRAINING FACILITY OPERATIONS PROCEDURE #34 | Subject: ICC & UCC REVIEWS/CLOSE CUSTODY/SPECIAL ASSIGNMENTS |
|---|---|
| | Reference: DOM 62010, 62040 & 11010 |
| | Revision Due Date:  JULY 2007 |
| | Responsibility:  CDW-CENTRAL & CDW-NORTH/SOUTH |

## SINGLE CELLING:

Inmates who have been identified as requiring single-celling will not be double-celled without the removal of the "S" suffix by a classification committee. However, the absence of an "S" suffix does not automatically qualify an inmate for double-cell placement.

The level of staff member authorized to temporarily approve single cell assignment shall be at the level of Correctional Lieutenant, Correctional Counselor II, or above.

If the Screening Authority determines a need for single cell housing, in addition to circling Single Cell on the CTF Housing Review Form, a CDC 1882 Form shall be initiated to reflect the same. The CCII or Lieutenant conducting the Housing Review will sign this form as the Screening Authority and the Watch Commander will sign as the Approving Authority. The inmate shall then be housed in CTF-Central X-Wing or other appropriate housing on Single Cell status pending Initial Unit Classification Committee (UCC) review.

- During the initial screening process by the CTF Housing Review committee, staff shall insure inmates who are identified to have a history of in-cell sexual abuse, assaultive behavior towards a cell partner or dormitory partner will be placed temporarily on single cell status. During the inmate's initial review by UCC per CCR # 3377.1(c), UCC shall decide, if appropriate, to affix an "S" suffix to the inmate's custody designation.

- Verification that an inmate is or has been predatory towards a cell partner, has a history of in-cell sexual abuse, is or has been assaultive towards a cell partner, or demonstrates any significant in-cell violence against a cell partner shall require referral to a classification committee for review and determination of Single Cell Status. **Upon determination that an inmate warrants Single Cell Status, the "S" Suffix shall be affixed to the inmate's custody determination and appropriately documented.**

## HOUSING INMATES UNDER 18:

It is not CDCR policy to house inmate's seventeen (17) years of age or younger at an adult facility. However, if it is determined that newly received inmate is under seventeen years of age, the inmate shall be housed with another inmate under seventeen (17) years old, or placed on single cell status. The C&PR's office shall be notified immediately and arrangement made to transfer the inmate an appropriate youth facility.

## CLASSIFICATION REVIEW:

All staff involved in the review and approval of an inmate's housing placement must be cognizant of all factors that should be considered prior to making the determination to double-cell.

It remains the responsibility of the classification committee to use correctional experience and correctional awareness to make every effort to ensure the safety of inmates and staff prior to approving an inmate for double-cell housing. Any discussion during committee regarding celling status should be

*13-110*

| | CORRECTIONAL TRAINING FACILITY **OPERATIONS PROCEDURE** #34 | **Subject**: ICC & UCC REVIEWS/CLOSE CUSTODY/SPECIAL ASSIGNMENTS |
|---|---|---|
| | | Reference: DOM 62010, 62040 & 11010 |
| | | Revision Due Date:   JULY 2007 |
| | | Responsibility:   CDW-CENTRAL & CDW-NORTH/SOUTH |

included in the CDC Form 128G. Prior to referral for transfer, placement consideration or DRB, the UCC or ICC shall determine the inmate's need for continued Single Cell Status. A classification committee's decision regarding housing status reevaluations shall be documented on a CDC Form 128-G, *Classification Committee Chrono.*     Each classification chrono written (for the purpose of Initial Classification, Annual Review or for CSR action) shall state committee reviewed the inmate's central file for Double Cell Housing eligibility. He (either does or does not) require Single Cell Housing.

This decision is based upon the inmate (either having or not having) a history of predatory assaultive behavior towards a cell partner. This inmate also (either has or does not have) a history of having been assaulted by previous cell partners. The inmate is satisfied with his current cell partner: (either Yes/No or N/A). Committee elects to (either approve or continue), (either Double Cell or Single Cell) status.

### INITIAL CLASSIFICATION:
The Unit Correctional Counselor II (CCII) has overall responsibility for the inmate classification process. Each Correctional Counselor is tasked with reviewing the Daily Movement Sheet (DMS) and scheduling their assigned inmates for initial classification within 14 days of reception. Newly arrived inmates will be placed on Orientation Status (ORI) pending initial classification review.

### ARMSTRONG vs. WILSON:
The court ordered Remedial Plan of **Armstrong vs. Wilson** requires Initial Classification Committees to adjust the Work Group of DPP inmates spending in excess of sixty (60) days at the Reception Center (RC), for no disciplinary reasons (no fault of inmate). The 61st day will be utilized as the effective date of placement on a waiting list. If the inmate's stay at the RC exceeds the waiting period on the waiting list, the inmate will be placed in work group A1 effective the date of Initial Classification and granted "S" time until assigned. The type of disability and the tracking code (DPW, DPM, DPH, SPS, or DPV) will be noted in the CDC-128-G.

### CLOSE B CUSTODY:
Close B Custody will be established by classification committee for inmates that meet the criteria of Section CCR # 3377.2 (Criteria for Assignment of Close Custody):

Central Facility Level II inmates designated as Close B Custody shall be housed in E Wing and/or D Wing. C Wing has been designated for the overflow.

North Facility Level III inmates designated as Close B Custody shall be housed in Rainer Hall on the "A" Side then the "B" Side. Shasta Hall "A" Side has been designated for the overflow.

### CLOSE CUSTODY PROGRAM/WORK ASSIGNMENTS:

### Central Facility:
Close B Custody, **Level II,** inmates shall be permitted to participate in program assignments and activities, i.e., Alcoholic Anonymous and Narcotics Anonymous, during the hours of 0600 hours to 2000 hours in areas located within the Central Facility security perimeter (West Gate to East Gate). Close B

Q-41

| | CORRECTIONAL TRAINING FACILITY OPERATIONS PROCEDURE #34 | Subject: ICC & UCC REVIEWS/CLOSE CUSTODY/SPECIAL ASSIGNMENTS |
|---|---|---|
| | | Reference: DOM 62010, 62040 & 11010 |
| | | Revision Due Date:  JULY 2007 |
| | | Responsibility:  CDW-CENTRAL & CDW-NORTH/SOUTH |

Custody inmates may participate in designated work program assignments until 2200 hours when the work program is in an assigned housing unit located within the facility security perimeter. Close B Custody inmates may participate in limited evening activities after 2000 hours until the general evening lockup and count when the limited activity is in a designated housing unit located within the facility security perimeter.

No Close Custody Inmates will be assigned to the Culinary with access to the Loading Dock, Laundry/Clothing Room, Lower East Corridor, or areas outside the East Gate.

### North Facility:

Close B Custody, Level III, inmates shall be permitted to participate in program assignments, and activities, i.e., Alcoholic Anonymous and Narcotics Anonymous, during the hours of 0600 hours to 2000 hours in areas located within North Facility security perimeter to include North Chapel and Education. The North Patio, Visiting Room and areas behind the halls are not authorized for Close B Custody, Level III inmate assignments (with the exception of Inmate Visiting). Close B Custody inmates may participate in designated work program assignments until 2200 hours when the work program is in an assigned housing unit located within the facility security perimeter. Close B Custody inmates may participate in limited evening activities after 2000 hours until the general evening lockup and count when the limited activity is in a designated housing unit located within the facility security perimeter.

No Close Custody Inmates will be assigned to the North Vocations area, Culinary Back Dock area, North Visiting, North Administration Crew areas, North Patio, or any assignment that does not allow direct and constant supervision.

### MINIMUM CUSTODY:

Unit Classification Committees may assign Minimum A and/or Minimum B custody to inmates that satisfy the Minimum Support Facility Criteria as outlined in the Violent Felonies and Minimum Custody Eligibility memorandum dated January 6, 2006.

MIN A and MIN B custody is not to be considered as automatic criteria for work assignments outside of the fenced security areas. All assignments that require an outside gate clearance must be referred to ICC for review and approval.

### MEDIUM CUSTODY:

Medium B and Medium A custody may be assigned at the discretion of Unit Classification Committees. All assignments that require an outside gate clearance must be referred to ICC for gate clearance review and approval.

### MENTAL HEALTH SERVICES DELIVERY SYSTEM (MHSDS) LEVEL-OF-CARE (LOC)

The Correctional Counselor I (CCI) shall continue to prepare and submit to the Classification Staff Representative (CSR) the initial request to place an inmate into any Mental Health Services Delivery System (MHSDS) Level-of Care (LOC). Subsequent to the initial CSR endorsement, the Classification

62-4.



| CORRECTIONAL TRAINING FACILITY OPERATIONS PROCEDURE #34 | Subject: ICC & UCC REVIEWS/CLOSE CUSTODY/SPECIAL ASSIGNMENTS |
|---|---|
| | Reference: DOM 62010, 62040 & 11010 |
| | Revision Due Date:  JULY 2007 |
| | Responsibility:  CDW-CENTRAL & CDW-NORTH/SOUTH |

and Parole Representative (C&PR) will do MHSDS LOC endorsement changes within an institution if the institution is authorized to provide the required LOC.

## SOUTH FACILITY WORK ASSIGNMENTS:

1) Once an inmate is cleared for an outside assignment he should be reviewed for the lowest custody possible MIN B and ORWD.

   a) If an inmate is cleared for assignment to the firehouse, the case will be recommended and referred to the Warden for Firehouse live-in status.

   b) Inmates who are assigned to the Firehouse are subject to being directed by Firehouse staff via the 9-1-1 dispatcher to respond to local communities or freeway emergencies (per local Mutual Aid Agreement).

2) The next consideration would be for MIN B, ORWD custody.  This custody qualifies an inmate for assignment to the Community Service Crew.

   a) These inmates are under constant supervision by custody staff however they are directly in the public eye.  They work in all local communities doing painting, tree trimming, weeding, etc.  They work in parks, streets, alleyways, schoolyards. (Normally while schools are not in session).  They also are assigned to help at local community activities such as air shows, fairs, music concerts, and raceways. (Pre and post setups)

3) Next consideration should be job skill level, which would normally be maintenance type work such as, Auto Mechanic, Carpenter, Plumber, Electrician, Painter, Groundskeeper, Equipment Operator, Heavy Equipment Operator, Welder, Sheet Metal Worker, and Sewage Plant.  Any of these areas would also qualify for IDL (Inmate Day Labor) assignment.  Snack Bar workers should be considered in this action such as short order cook.  These areas may have less supervision by non-custody staff.

4) Next consideration should be all office areas: In-Service Training (IST), Warehouse, Personnel Assignment Lieutenant, Procurement Office, Entrance Buildings, North Administration Building, Family Visiting, Plant Operation and Garage.  They all need clerical skilled inmates as well as inmate porters.  These areas may have less supervision by custody and non-custody staff.

5) Next consideration would be Recycling Center or a Central Yard Canteen Worker.  These inmates are not under direct supervision; however they are in controlled area with a security fence around them.  Recycling Center supervised by two custody staff and one non-custody staff.

6) Next consideration would be Utility Work Crews.  Custody staff directly supervises these inmates.  The inmate may have MIN B custody; however, committee may require an observation/monitoring period from 30 days up to 6 months before giving consideration.  This action could be for a number of reasons (e.g.: not enough information in his C-file history, too much time to serve, attitude, or simply, that the committee is not comfortable in a less supervised assignment).

Δ-43



| | CORRECTIONAL TRAINING FACILITY OPERATIONS PROCEDURE #34 | Subject: ICC & UCC REVIEWS/CLOSE CUSTODY/SPECIAL ASSIGNMENTS |
|---|---|---|
| | | Reference: DOM 62010, 62040 & 11010 |
| | | Revision Due Date: JULY 2007 |
| | | Responsibility: CDW-CENTRAL & CDW-NORTH/SOUTH |

7) Next consideration would be MED B Crews. These inmates may have a MIN B or MED B custody. These crews are also directly supervised by custody staff. Inmates would be assigned for 6 months to one year before they are returned to ICC for proper placement of assignment if they have a good work report.

The following assignments are prioritized suggestions; however, the Manpower Needs Report should be reviewed.

## AREA                                                    SUPERVISION

**Firehouse:**
  12 inmates assigned to Firehouse (Live-In status)    Fire Chief/Fire Captain
**Community Service Crew:**     (2 Crews)    Custody
**Maintenance:**
       Sewage Plant    Non-Custody
       Carpenters    Non-Custody
       Corporation Yard    Non-Custody
       Electrician    Non-Custody
       Painter    Non-Custody
       Plumber    Non-Custody
       Garage    Non-Custody
       Groundskeeper     (3 Crews)    Non-Custody
       Plant Operation    Non-Custody
**IDL (Inmate Day Labor):**    Custody and Non-Custody
**Snack Bar:**    Non-Custody
**Warehouse:**    Non-Custody
**Canteen Warehouse:**    Non-Custody
**Central Yard Canteen:**    Non-Custody
**Personnel Assignment Lieutenant:**    Custody and Non-Custody
**Procurement Office (Clerk):**    Non-Custody
**Family Visiting Porters:**    Custody
**IST (Porters/Clerks):**    Custody and Non-Custody
**Central Entrance Building (Porters):**    Custody
**South Entrance Building (Porters):**    Custody
**North Administration Building (Porters/Shoeshine):**    Non-Custody
**Recycling Center:**     (2 Crews)    Custody/Non-Custody
**Utility Work Crew:**     (5 Crews)    Custody

## WORK CREW SERGEANT:
To facilitate a job change off a work crew, the Work Crew Sergeant will present a Work Change Application (CDC 132 Form) and Work Supervisor Report (CDC 101 Form) with recommendations to the Unit VII, CC II. If no further committee (ICC) action is required, the CC II will initiate and forward the

Q-1

|  CORRECTIONAL TRAINING FACILITY OPERATIONS PROCEDURE #34 | Subject: ICC & UCC REVIEWS/CLOSE CUSTODY/SPECIAL ASSIGNMENTS |
|---|---|
| | Reference: DOM 62010, 62040 & 11010 |
| | Revision Due Date:   JULY·2007 |
| | Responsibility:  CDW-CENTRAL & CDW-NORTH/SOUTH |

request to the Inmate Assignment Lieutenant.  In cases where additional ICC review and approval is required, the Unit VII CC II will schedule the inmate for committee as soon as practical.

## INTERNAL CLASSIFICATION AUDIT TEAM

The Audit team will consist of:

- C&PR (Chairperson)
- Assistant C&PR (Member)
- Inmate Appeals Coordinator (Member)

The primary function of this team is to review the classification process at CTF to ensure compliance with the mandates and guidelines of the D.O.M. and Director's rules.  The audit team will submit an annual report to the Chief Deputy Warden regarding their respective facilities.

**AREAS TO AUDIT:** (Will include but are not limited to)
Inmate Classification Scoring System
Initial and Annual Classification Committees
CCI Unit Caseload Tracking Procedure Methods  .
Caseload Management
Recordkeeping
Reports
Education / Work Programs
Confidential Information
Parole Procedures to include the CCRC Process

**A. P. KANE**
Warden (A)
Correctional Training Facility

April 3, 2006

NAME & NUMBER   Test, Page   A00000                                    CDC-128B

Subject's case was reviewed on this date for CLOSE CUSTODY. The review indicated subject ☐ May   ☐ May Not require CLOSE CUSTODY. Factors requiring CLOSE CUSTODY include the following:

Life without Possibility of Parole (LWOP)-5 years CLOSE A + 10 years CLOSE B.
☐ DSL or total term of 50 years or more – 5 years CLOSE A + 10 years CLOSE B.
☐ Multiple Life terms – 5 years CLOSE A then CLOSE B until within 7 years of MEPD.
☐ Life Term 1 year CLOSE A + CLOSE B until 7 years of MEPD.
☐ Determinate Sentence or Total Term of 15 years or more – 1 year CLOSE A + 4 years CLOSE B.
☐ Public Interest Case (PIC) or High Notoriety Case – 5 years CLOSE A + 5 years CLOSE B.
☐ Prior Escape or attempt with force from any correctional facility/law enforcement agency/armed escort within five years of return to custody – 8 years CLOSE + 2 years CLOSE B.
☐ Prior Escape or attempt without force from a secure perimeter facility or armed escort within five years [exclude minimum walk away] 5 years CLOSE A + 5 years CLOSE B.
☐ Involvement in documented plot/plan to escape from a secure perimeter facility within two years – 2 years CLOSE A + 2 years close B.
☐ Active Felony Holds which may result in serving a considerable amount of additional time after serving current term – 1 to 5 years CLOSE A depending on possible sentence and remainder of time at CLOSE B or until hold Dropped/Resolved.
☐ Murder of Non-Inmate while in custody-total term at CLOSE A after SHU term, not eligible for CLOSE B.
☐ Murder of inmate in custody within the last 6 years – CLOSE A first 6 years after SHU + 4 years CLOSE B.
☐ Guilty of RVR (A1/A2) or needs further Classification Committee review due to a demonstrated pattern of violence/escape/narcotic trafficking – minimum of 2 years CLOSE B before being eligible for custody reduction.
☐ Former gang member (Drop Out) 1 year CLOSE B before being eligible for custody reduction.
☐ Other documented security concerns: _____
☐ Subject does not require CLOSE CUSTODY Housing.
☐ Single Cell Status.                          CENTRAL ☐     NORTH ☐     SOUTH ☐

CS_____ DSL _____   APPROVED FOR: GYM ☐
Following review of your Central File this date, you are approved for placement as indicated above. Subject was advised he would be moved to his assigned housing as soon as possible, and if placed at CTF-North he would remain on RTQ-Orientation pending Unit Classification.

☐ 1845 Present (Copy forwarded to C&PR).
asonable accommodation required and noted per 1845.   ☐ Yes   ☐ No

_____

                                                        Chairperson

Original:   C-File
            Inmate
                                                        CTF-1444 (Rev. 5-04)
DATE:                      CTF TRIPLEX HOUSING REVIEW              GENERAL CHRONO


# ATTACHMENT A
207

Ϫ-4b

## INITIAL HOUSING REVIEW

| Name of Inmate | | CDC Number | Institution |
|---|---|---|---|
| | | | |

The above inmate has been screened prior to assigned housing. An inmate interview and available documents indicate the following:

| Ethnicity | Date of Birth | Place of Birth | County of Commitment |
|---|---|---|---|
| CSR Endorsement | Sending Jail/Institution | Previous Housing Status (xxxxxx) | Release Date/Type |
| Enemies | | Gang/Disruptive Group Affiliation | |
| Health Concerns | | Other Special Concerns | |
| History of In-Cell Assaults | | History of Aggression Towards Other Inmates | |
| Other Information/Comments | | | |
| Inmate's Remarks | | | |

Based on a review of the above, a determination has been made that:

☐ The inmate is suitable for dorm/cell housing with no special restrictions.

☐ The inmate is suitable for dorm/cell housing with the following restrictions:

| |
|---|
| |
| |

☐ There are placement concerns which may require single cell assignment. These concerns are based upon the following documentation:

| |
|---|
| |

| | |
|---|---|
| **SCREENING AUTHORITY** | Signature: _____<br>Printed Name: _____<br>Title: _____ |

| | |
|---|---|
| **APPROVING AUTHORITY** ☐ Not Applicable<br>Single cell status is:   ☐ approved  ☐ disapproved | Signature: _____<br>Printed Name: _____<br>Title: _____ |

DATE: _____

DISTRIBUTION:
C-File (original)
Housing Assignment Authority
Facility Captain
Inmate

# ATTACHMENT B

208

Q-47

CDC 1882B

ADMINISTRATIVE SEGREGATION UNIT
DOUBLE CELL REVIEW

| Name of Inmate | CDC Number | Housing |
|---|---|---|
| Name of Inmate | CDC Number | Housing |

The above-listed inmates are being processed for occupancy of the same cell.

1. The request is being initiated per:

       ☐ Administrative assignment by staff
       ☐ Request from one of the inmates to be assigned to the same cell
       ☐ Request from both inmates to be assigned to the same cell

2. During the interview with:

| Staff Witnesses' Printed Name | Title | Signature |
|---|---|---|
| | | |

☐ Both inmates stated agreement to the cell assignment and signed below to indicate compatibility.

    Signature of Inmate: _____     Date: _____

    Signature of Inmate: _____     Date: _____

☐ Both inmates stated agreement, but one or both refused to sign the acknowledgement of compatibility.
☐ One or both inmates refused the cell assignment.

3. After a review of the inmate's statements and the case factors in each inmate's Central File it has been determined that:

    ☐ There is NO information available to indicate that the inmates are incompatible.
    ☐ There IS information that leads to the belief that the assignment of these two inmates to the same cell is contrary to the legitimate penalogical interests, or may threaten institution security of the safety of others.

4. Based on this evaluation, the double cell occupancy request is:

    ☐ APPROVED
    ☐ DISAPRROVED

## APPROVING AUTHORITY

| Printed Name | Title | Date | Signature |
|---|---|---|---|
| | | | |

DISTRIBUTION:
C-File
Facility Captain
Correctional Counselor I
Inmate

# ATTACHMENT C

| | DSL | | CENTRAL ☐ | NORTH ☐ | SOUTH ☐ |
| --- | --- | --- | --- | --- | --- |
| | | | Approved for: | Gym ☐ | |

wing review of your Central File this date, you are approved for placement as indicated above.
...ct was advised he would be moved to his assigned housing as soon as possible, and if
)d at CTF-Central/North he would remain on Orientation pending Unit Classification.

Approved: DOUBLE / SINGLE CELL

eviewing Panel

_____          _____
                                                 Chairperson

ATE                          CTF TRIPLEX HOUSING REVIEW                    GENERAL CHRONO

---

ATTACHMENT A

ME and NUMBER _____

CDC-128-B (Rev. 3/83)
CTF-774 (Rev. 3/83)

| | DSL | | CENTRAL ☐ | NORTH ☐ | SOUTH ☐ |
| --- | --- | --- | --- | --- | --- |
| | | | Approved for: | Gym ☐ | |

llowing review of your Central File this date, you are approved for placement as indicated above.
bject was advised he would be moved to his assigned housing as soon as possible, and if
aced at CTF-Central/North he would remain on Orientation pending Unit Classification.

Approved: DOUBLE / SINGLE CELL

ving Panel

_____          _____
                                                 Chairperson

TE                          CTF TRIPLEX HOUSING REVIEW                    GENERAL CHRONO

---

ATTACHMENT A

ME and NUMBER _____

CDC-128-B (Rev. 3/83)
CTF-774 (Rev. 3/83)

| | DSL | | CENTRAL ☐ | NORTH ☐ | SOUTH ☐ |
| --- | --- | --- | --- | --- | --- |
| | | | Approved for: | Gym ☐ | |

llowing review of your Central File this date, you are approved for placement as indicated above.
bject was advised he would be moved to his assigned housing as soon as possible, and if
iced at CTF-Central/North he would remain on Orientation pending Unit Classification.

Approved: DOUBLE / SINGLE CELL

viewing Panel

_____          _____
                                                 Chairperson

                          CTF TRIPLEX HOUSING REVIEW                    GENERAL CHRONO

# Attachment D

ADMINISTRATIVE SEGREGATION UNIT PLACEMENT NOTICE
CDC 114-D (Rev 10/98)

DISTRIBUTION:
WHITE - CENTRAL FILE          CANARY - WARDEN
BLUE - INMATE (2ND COPY)      PINK - HEALTH CARE MGR
GREEN - ASU                   GOLDENROD - INMATE (1ST COPY)

| INMATE'S NAME | | CDC NUMBER | |
|---|---|---|---|

## REASON(S) FOR PLACEMENT (PART A)

☐ PRESENTS AN IMMEDIATE THREAT TO THE SAFETY OF SELF OR OTHERS

☐ JEOPARDIZES INTEGRITY OF AN INVESTIGATION OF ALLEGED SERIOUS MISCONDUCT OR CRIMINAL ACTIVITY

☐ ENDANGERS INSTITUTION SECURITY    ☐ UPON RELEASE FROM SEGREGATION, NO BED AVAILABLE IN GENERAL POPULATION

DESCRIPTION OF CIRCUMSTANCES WHICH SUPPORT THE REASON(S) FOR PLACEMENT:

| ☐ CONTINUED ON ATTACHED PAGE (CHECK IF ADDITIONAL) | | ☐ IF CONFIDENTIAL INFORMATION USED, DATE OF DISCLOSURE: | | / / |
|---|---|---|---|---|
| DATE OF ASU PLACEMENT | SEGREGATION AUTHORITY'S PRINTED NAME | SIGNATURE | | TITLE |
| DATE NOTICE SERVED | TIME SERVED | PRINTED NAME OF STAFF SERVING ASU PLACEMENT NOTICE | SIGNATURE | STAFF'S TITLE |
| ☐ INMATE REFUSED TO SIGN | | INMATE SIGNATURE | | CDC NUMBER |

## ADMINISTRATIVE REVIEW (PART B)
*The following to be completed during the initial administrative review by Captain or higher by the first working day following placement*

| STAFF ASSISTANT (SA) | | INVESTIGATIVE EMPLOYEE (IE) | |
|---|---|---|---|
| STAFF ASSISTANT'S NAME | TITLE | INVESTIGATIVE EMPLOYEE'S NAME | TITLE |

### IS THIS INMATE:

| | | |
|---|---|---|
| LITERATE? | ☐ YES ☐ NO | EVIDENCE COLLECTION BY IE UNNECESSARY ☐ YES ☐ NO |
| FLUENT IN ENGLISH? | ☐ YES ☐ NO | DECLINED ANY INVESTIGATIVE EMPLOYEE ☐ YES ☐ NO |
| ABLE TO COMPREHEND ISSUES? | ☐ YES ☐ NO | ASU PLACEMENT IS FOR DISCIPLINARY REASONS ☐ YES ☐ NO |
| FREE OF MENTAL HEALTH SERVICES DELIVERY SYSTEM NEEDS? | ☐ YES ☐ NO | DECLINED 1ST INVESTIGATIVE EMPLOYEE ASSIGNED ☐ YES |
| DECLINING FIRST STAFF ASSISTANT ASSIGNED? | ☐ YES | |

☐ NOT ASSIGNED    Any "NO" requires SA assignment       ☐ NOT ASSIGNED    Any "NO" may require IE assignment

## INMATE WAIVERS

☐ INMATE WAIVES OR DECLINES INTERVIEW WITH ADMINISTRATIVE REVIEWER    ☐ INMATE WAIVES RIGHT TO 72 HOURS PREPARATION TIME

| ☐ NO WITNESSES REQUESTED BY INMATE | INMATE SIGNATURE | DATE |
|---|---|---|

## WITNESSES REQUESTED FOR HEARING

| WITNESS NAME | TITLE/CDC NUMBER | WITNESS NAME | TITLE/CDC NUMBER |
|---|---|---|---|
| WITNESS NAME | TITLE/CDC NUMBER | WITNESS NAME | TITLE/CDC NUMBER |

**DECISION:** ☐ RELEASE TO UNIT/FACILITY _____    ☐ RETAIN PENDING ICC REVIEW    ☐ DOUBLE CELL    ☐ SINGLE CELL PENDING ICC

REASON FOR DECISION:

| ADMINISTRATIVE REVIEWER'S PRINTED NAME | TITLE | DATE OF REVIEW | TIME | ADMINISTRATIVE REVIEWER'S SIGNATURE |
|---|---|---|---|---|
| CORRECTIONAL ADMINISTRATOR'S PRINTED NAME (if necessary) | | CORRECTIONAL ADMINISTRATOR'S CO-SIGNATURE (if necessary) | | DATE OF REVIEW |

STATE OF CALIFORNIA
**INMATE SEGREGATION PROFILE**

CDC 114-A1 (10/98)

DEPARTMENT OF CORRECTIONS

Update information legibly and prepare a new CDC Form 114-A1 at least every 90 days or as required to maintain current information.

| DATE INITIATED | CDC NUMBER | INMATE'S NAME | | ETHNICITY | CELL |
|---|---|---|---|---|---|

| DATE OF BIRTH | COUNTY OF LAST LEGAL RESIDENCE | CONTROLLING COMMITMENT OFFENSE | PRIOR HOUSING |
|---|---|---|---|

| REASON FOR SEGREGATION | DATE OF ASU PLACEMENT | CS | PRISON RELEASE DATE | MERD |
|---|---|---|---|---|

## SPECIAL INFORMATION
*COMMENT WHEN ADDITIONAL INFORMATION WOULD HELP CLARIFY AN ISSUE*

MED / PSYCH ISSUE:  ☐ EOP  ☐ CCCMS  ☐ DRP:  ☐ HEARING  ☐ SIGHT  ☐ MOBILITY

| YES | NO | | YES | NO | |
|---|---|---|---|---|---|
| | | STAFF THREATS / BATTERY | | | SAFETY CONCERNS (WHEN/WHERE?): |
| | | INMATE THREATS / BATTERY | | | PRIOR SUICIDE ATTEMPTS |
| | | SEX RELATED OFFENSES/ DISCIPLINARIES: | | | CELLING LIMITATION/RESTRICTIONS: |
| | | IN PRISON WEAPON OFFENSES | | | PRIOR CELL FIGHTS: |
| | | GANG STATUS: | | | DOUBLE CELL / AUTHORIZED BY: |
| | | NICKNAME OR MONIKER: | | | PRIOR SINGLE CELL STATUS (WHEN/WHERE/REASON?): |
| | | ESCAPE RISK: | | | |

COMMENTS / OBSERVATIONS:

## ENEMIES / RIVAL GROUPS (LIST ALL ENEMIES HOUSED IN *THIS* INSTITUTION)

| DATE ADDED | NAME AND CDC NUMBER | HOUSING/LOCATION | GANG STATUS/COMMENTS |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

☐ ADDITIONAL ENEMIES NOTED ON ATTACHED INMATE SEGREGATION PROFILE

| YARD ASSIGNMENT: ICC DATE: | ☐ WALK ALONE | ☐ CONTROLLED/COMPATIBLE | ☐ REINTERGRATED/MIXED | |
|---|---|---|---|---|
| YARD ASSIGNMENT: ICC DATE: | ☐ WALK ALONE | ☐ CONTROLLED/COMPATIBLE | ☐ REINTERGRATED/MIXED | Reason for Change |
| YARD ASSIGNMENT: ICC DATE: | ☐ WALK ALONE | ☐ CONTROLLED/COMPATIBLE | ☐ REINTERGRATED/MIXED | Reason for Change |

YARD ASSIGNMENT RESTRICTIONS/COMMENTS:

| PRINTED NAME, TITLE AND SIGNATURE OF PERSON INITIATING FORM | DATE |
|---|---|

HIGHLIGHT "CONFIDENTIAL" ENEMIES AND REDACT PRIOR TO SENDING TO RECORDS OFFICE FOR SLOUGH FILING

**ATTACHMENT F**

INMATE SEGREGATION RECORD
CDC 114-A (Rev 9/98)

| CDC NUMBER | | | | | | | | | | INMATE'S NAME | | CELL |

## RECORD OF DAILY ACTIVITY

### INSTRUCTIONS:

In order to document Segregated Housing Conditions, Unit Staff must record all services and activities offered to segregated inmates and all significant activity (e.g., classification reviews). Maintain a record of the following:

1. CELL INSPECTION - A weekly inspection must be completed and recorded to ensure the cells are being properly maintained by the inmates.
2. EXERCISE - A record must be maintained on exercise offered and received to ensure each inmate is given the opportunity to exercise a minimum of ten (10) hours per week. Exercise may be suspended for disciplinary offenses. Record refusals.
3. SHOWERS - Inmates must be allowed to shower three (3) times each week. Record all showers or refusals.
4. SUPPLIES - Cleaning and personal hygiene supplies shall be offered on a weekly basis to all inmates and provided on an as-needed basis. Record what was provided.
5. CLOTHING, LINEN - Clothing will be issued upon assignment and exchanged and laundered not less than every other week. Towels, sheets, and pillow cases will be laundered not less than once every two (2) weeks. Blankets shall be cleaned at least once every six (6) months. Record all exchanges.
6,7,8. MEALS - Record all meals served. Record any refusals of a meal served.
9. TRASH DISPOSAL - Daily trash disposal shall be offered. Record all disposals.

| DATE | CELL INSPECTION 1 | EXERCISE 2 | SHOWERS 3 | SUPPLIES 4 | CLOTHING / LINEN 5 | BREAKFAST 6 | LUNCH 7 | DINNER 8 | TRASH DISPOSAL 9 | STAFF COMMENTS | STAFF NAME |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

SYMBOLS
X - ITEM COMPLETED
Q - CONFINED TO QUARTERS / PENDING DISCIPLINARY
L - LINEN EXCHANGED
R - REFUSED
N - NO YARD PENDING ICC/ REVIEW
C - CLOTHING EXCHANGED

RELEASE PROGRAM STUDY
CDC 611 (10/84)

ORIGINAL TO C-FILE VIA C&PR AFTER SECTION II IS COMPLETED
ONE COPY TO C&PR
RETAIN ONE COPY AT REGION
ONE COPY TO INMATE (ATTACH ASSIGNED AGENT'S BUSINESS CARD)
ONE COPY TO RE-ENTRY SPECIALIST OR ASSIGNED AGENT

SECTION I

| INMATE'S NAME | | CDC NUMBER | | |
|---|---|---|---|---|

| SCHEDULED RELEASE DATE | RRD | EPRD | CLASSIFICATION SCORE | HOUSING STATUS | INSTITUTION |
|---|---|---|---|---|---|

| RESIDENCE PLANS IN COUNTY OF COMMITMENT | WITH WHOM | | RELATIONSHIP | PHONE NUMBER |
|---|---|---|---|---|
| | STREET ADDRESS | CITY | COUNTY |

| RESIDENCE PLANS OUT OF STATE/COUNTY OF COMMITMENT (SEE REVERSE FOR COMMENTS) | WITH WHOM | RELATIONSHIP | PHONE NUMBER |
|---|---|---|---|
| | STREET ADDRESS | CITY | COUNTY (STATE, IF INTERSTATE) |

| EMPLOYMENT PLANS | NAME OF FIRM | PERSON TO CONTACT | TYPE OF POSITION OFFERED |
|---|---|---|---|
| | STREET ADDRESS | CITY | PHONE NUMBER |

| RE-ENTRY PLANS | IS INMATE INTERESTED IN WORK FURLOUGH? ☐ YES ☐ NO | INMATE'S SIGNATURE | DATE |
|---|---|---|---|

REGISTRATION/NOTIFICATION REQUIRED:  ☐ NONE  ☐ 11590 H&S  ☐ 290 PC  ☐ 457.1 PC  ☐ 3058.6 PC
HOLDS PLACED:  ☐ NO  ☐ YES BY:

US I&NS A NO. _____

| ENEMY-GANG FACTORS: | ☐ NONE  ☐ SEE ATTACHED CDC 812 |
|---|---|
| INSTITUTIONAL PROGRAM BEHAVIOR: | ☐ ABOVE AVERAGE  ☐ ACCEPTABLE  ☐ MARGINAL |
| SERIOUS DISCIPLINARIES: | ☐ NONE  ☐ SEE REVERSE |
| MEDICAL/PSYCHIATRIC PROBLEMS: | ☐ NONE  ☐ SEE REVERSE |
| CASEWORKER'S EVALUATION: | ☐ NONE  ☐ SEE REVERSE |

| COUNSELOR'S NAME (PRINT) | PHONE NUMBER AND EXTENSION | DATE |
|---|---|---|
| C&PR'S SIGNATURE | | DATE |

SECTION II   TO BE COMPLETED BY ASSIGNED AGENT

| REGIONAL RE-ENTRY SCREENING | RE-ENTRY PLACEMENT:  ☐ APPROVED  ☐ DENIED | IF APPROVED, INDICATE PROGRAM |
|---|---|---|
| | IF DENIED, FULLY EXPLAIN REASON | |
| | WAS THIS INMATE COMMITTED FOR AN ACT OF VIOLENCE (INJURY OR DEATH) AGAINST A PEACE OFFICER EITHER AS PART OF, OR INCIDENTAL TO, THE OFFENSE/ARREST FOR WHICH THE INMATE WAS SENT TO PRISON?  ☐ YES  ☐ NO | |

| SIGNATURE OF REGIONAL RE-ENTRY SCREENING AGENT | PHONE NUMBER | DATE |
|---|---|---|

| PAROLE UNIT ASSIGNMENT AND REPORTING INSTRUCTIONS | ASSIGNED UNIT | ASSIGNED AGENT | PHONE NUMBER |
|---|---|---|---|

ASSIGNED AGENT'S COMMENTS AND REPORTING INSTRUCTIONS TO INMATE

RESIDENCE TO BE ARRANGED IN _____ (COUNTY) _____ (STATE) _____

☐ RELEASE WITH FULL FUNDS
☐ RELEASE WITH $ _____ IN FUNDS WITH BALANCE TO PAROLE OFFICE
☐ REPORT TO PAROLE UNIT - STREET
   CITY & STATE
   PHONE

☐ REPORT FIRST WORKING DAY FOLLOWING RELEASE
☐ REPORT AS FOLLOWS:

| ASSIGNED AGENT'S SIGNATURE | UNIT SUPERVISOR'S SIGNATURE | DATE |
|---|---|---|

ATTACHMENT H

13-5

# EXHIBIT D

Q-54

| | | Subject: GENERAL UNLOCKS & YARD CARDS |
|---|---|---|
|  | CORRECTIONAL TRAINING FACILITY<br><br>OPERATIONS PROCEDURE #40 | Reference:<br>    DOM Section 52020.8.11 |
| | | Revision Due Date: SEPTEMBER 2007 |
| | | Responsibility:    Correctional Captain<br>                     and Program Lieutenants |

The Correctional Captain is responsible for ensuring compliance with this procedure. The Program Lieutenants are responsible for ensuring that all personnel comply with the schedules set forth in this procedure in their specific area of responsibility.

## METHODS:

1. **First Watch General Unlock / Lockup Procedures for General Population Housing Wings B, C, D, E, F, G, Y and Z Wings:**

   - When the First Watch Wing Officers assume their post, all inmates residing in the wing must be secured in their respective cells. The securing of a wing is accomplished by the Third Watch Wing Officers prior to the 2130 count and is done in the following manner:
   - All inmates will be secured in their assigned cells. All cell doors will be secured by keying the cell door Folger-Adams locking device in the locked position.
   - The bar-locking device will be placed in the deadlock position.
   - Upon reporting to their assigned wing, the officers will make a visual inspection of the wing. This inspection is to make sure that all cells are secured and locked by the Folger-Adams locking device. Further inspection will assure the locking device is in the deadlock position. A visual check will be made of the wing to ensure that all common areas are secured. Additionally, the security check is to ascertain that no inmates are injured, (i.e., suicide, cell-fights, etc...).

## A. Emergency Unlocks:

   - An emergency unlock is considered to be an unscheduled inmate movement from a cell between the hours of 2200 & 0600 hours, with the exception of the porters & clerks who are regularly assigned night workers. Early worker releases are not considered an emergency unlock.
   - Emergency unlocks require the notifying / approval of the Watch Commander. At least two (2) officers and one (1) supervisor should be present on tier if time permits, (i.e. fire, etc.).
   - Emergency unlocks shall be accomplished by placing the locking bar in the "KEY" position and then unlocking the cell door of the inmate involved. The S&E Officer with the bar key controls the bar-locking device on the tier and maintains control of the bar locking device key during all unlocks on First Watch. A visual inspection from the cell's door window will precede the opening of the cell door. Examples of Emergency Unlocks are as follows:
     a. In case of suicide or attempted suicide.
     b. If an inmate is ill and medical personnel require and/or request that he be moved to the Infirmary.
     c. If an inmate has placed an obstruction over his cell door window bars and refuses to remove the obstruction.
     d. If the inmate cannot be counted in his cell, i.e., he cannot be awakened and is not showing skin.
     e. If the inmate assaults another inmate in the cell.

Q-55



| | | |
|---|---|---|
| **RRECTIONAL AINING FACILITY** | **Subject:** CT AL UNLOCKS & YARD CARDS | |
| **OPERATIONS PROCEDURE #40** | **Reference:** DOM Section 52020.8.11 | |
| | **Revision Due Date:** SEPTEMBER 2007 | |
| | **Responsibility:** Correctional Captain and Program Lieutenants | |

- All emergency unlocks will be accomplished in accordance with the following procedures:
  a. When notified of a need for an emergency unlock, and approval has been granted, the Watch Sergeant will proceed to the wing with the additional staff as outlined in this order and with an S&E Officer who will be in control of the bar key.
  b. Staff with Wing Corridor Entrance Door Key Set must surrender this set to the Staff remaining in the corridor.
  c. On the tier the bar-locking device will be placed in the "KEY" position.
  d. The Wing Officers, supervisor and additional officers will proceed to the cell door. After making a visual inspection of the cell through the cell door window, the cell door will be keyed open, the inmate removed, if necessary, and the cell door locked.
  e. The locking device is to be secured back in the deadlock position, and the bar-locking device key will be returned to Central Control.

**B. Culinary Early Workers Unlocks:**
- The Second Watch Culinary Sergeant will submit to Control and the Watch Office every day, a list of inmate(s) who are to be awakened early on the following morning. This will be accomplished prior to 1330 hours daily in the following manner:
  a. This list will contain the names, numbers, housing and time each inmate is to report to his assignment.
  b. The Third Watch Culinary Sergeant will ensure that copies of the early wake-up list are correct and routed to the concerned areas.
  c. The Wing Officer will awaken all inmates housed in the wing whose name appear on the list one half (1/2) hour maximum prior to the scheduled releasing of the inmates or at the discretion of the Wing Officer.
  d. The overhead tier lights are to be turned on after awakening inmates and prior to releasing inmates in order to maintain visual contact of the inmates and to enhance the safety of the release.

- Culinary unlocks will be conducted in the following manner:
  a. Two (2) S&E Officers will proceed to the wing. The bar-locking device will be placed on the "KEY" position by the S&E Officer. During releases, the S&E Officer will retain the bar key. The Wing Officer, will proceed to the tiers and conduct the unlock while the Second S&E remains in the wing sallyport providing additional visual coverage of the Wing Officer and inmates being released. The sallyport gate will be locked during releases. As each inmate is released from his cell, he will proceed to the first tier. At the completion of releases for the individual wing, the S&E will unlock the gate, and the inmates will proceed to their work assignments.
  b. Upon completion of the unlock, the S&E Officer will ensure that the bar locking devises are returned to the deadlock position. The S&E Officer will return the bar keys to Control at the completion of the releases. At no time will the sallyport gate key be taken past the sallyport gate.
  c. At NO TIME will the bar-locking device be placed in the "OPEN" position to facilitate a Culinary Unlock.

Q-54



| | CORRECTIONAL TRAINING FACILITY | Subject: CF   AL UNLOCKS & YARD CARDS |
|---|---|---|
| | | Reference: |
| | OPERATIONS PROCEDURE #40 | DOM Section 52020.8.11 |
| | | Revision Due Date: SEPTEMBER 2007 |
| | | Responsibility:    Correctional Captain and Program Lieutenants |

d. All unlocks will be handled as quietly as possible so as to minimize disturbing other inmates. Kicking on cell doors, banging on the locking devices and other loud noises will not be tolerated.

2. Second Watch General Unlock / Lockup Procedures for General Population Housing Wings B, C, D, E, F, G, Y and Z Wings:

• The initial unlock of general population inmates prior to breakfast meal release will be conducted in the following manner:

   a. A minimum of two (2) Officers will be present on the tier at all times in a wing when all unlocks or lockups are conducted on a routine basis and during major releases, i.e., meals, work/school.

   b. Immediately upon assuming their post, the 0600 hours Officers assigned to the general population housing wings will conduct a security inspection. This inspection will be conducted with the bar-locking device in the deadlock position. During this inspection the Wing Officers will unlock the Folger-Adams locking devices on the cell doors of all identified a.m. diabetics and early workers at this time period. The remaining cell doors in that wing will have their Folger-Adams locking devices in the locked position. When the a.m. diabetics and early workers are called for they will be released by moving the bar from the deadlock position to the "KEY" position and then back to the deadlock position once the inmates have exited the cell. The bar will be moved to the "KEY" position releasing the a.m. diabetics and early workers. The wing security officer will ensure that only diabetics and early workers (not their cellmates) are released to the morning meal early by utilizing the early workers and diabetics list.

   c. Prior to the breakfast release, the Wing Officers will unlock the remaining Folger-Adams locking devices, with the exception of CTQ/RTQ inmates. Those inmates housed with a CTQ/RTQ inmate will be released individually after their tier has been released. The Wing Tier Officer will then place the bar-locking devices in the "KEY" position to begin that tier's release, starting with the Third Tier down to the First Tier. The Officer assigned to the front door will place the 1st tier bar-locking devices into the "KEY" position for the first tier release.

   d. Upon completion of each half (B,C,D,E,Y,Z) or tier (F,G) being released, both Tier Officers will be on the tiers to release inmates housed with RTQ/CTQ inmates. Both Officers will conduct security checks to ensure that all inmates have been released safely. The inmates will proceed directly to the dining hall or other approved activity. Under no circumstances will inmates be allowed to loiter on the tiers. The bar will then be moved back to the deadlock position before the release of the tier.

   e. All inmates will return to their housing units after the morning meal and will remain on the 1st Tier. After all inmates have returned the Tier Officers will announce 3rd tier Lock-Up. Only 3rd Tier Inmates will go up and stand by their door with their backs against the wall. The Officers will key each door and allow only the assigned inmates in the cell. After completing the 3rd Tier, the Officers will follow the same procedure for the 2nd Tier and then the 1st Tier. The Officers will proceed with the lockup from the Third Tier down to First Tier (1 East Side & 1 West Side) locking those inmates in their respective cells. Upon

3

Q-57



| | | |
|---|---|---|
| CORRECTIONAL TRAINING FACILITY | **Subject:** CENTRAL UNLOCKS & YARD CARDS | |
| | **Reference:** DOM Section 52020.8.11 | |
| **OPERATIONS PROCEDURE #40** | **Revision Due Date:** SEPTEMBER 2007 | |
| | **Responsibility:** Correctional Captain and Program Lieutenants | |

completion of the 0800 hour work and school release, the tier officers will conduct a 0815 hour yard release. The Tier Officers will lock all Folders-Adams locking devices and complete all hourly unlocks without using the bars. The bars will be utilized for the 1230 work and school call. Upon completion of the 1230 hour work and school release the Tier Officers will lock all Folders-Adams locking devices and complete all hourly unlocks without using the bar.

f.   Bar-Locking devices will not be utilized when conducting hourly unlocks. The bar-locking devices will only be utilized for mass unlocks / releases (0600 a.m. diabetics and early workers release, morning meal release and lock-up, 0800 work, school and yard release and the 1230 work, school and yard release) and emergency releases.

g.   During Yard Release, it will be the duty of the Officer assigned to the I.D. Card Box to collect I.D. Cards of ALL inmates going to the yard. The I.D. Cards will be placed in the box according to the last two (2) digits of the inmate's commitment number.

h.   Those inmates assigned Close Custody Status will have their I.D. Cards placed in the Close Custody Section of the I.D. Card Box. Again, these cards will be organized according to the last two (2) digits of the inmate's commitment number. The purpose of this is to accommodate the scheduled count activity and higher security requirements. I.D. picture boxes will remain locked at all times when not in use.

i.   Periodic clothed body searches of inmates are required of Correctional Personnel during mass movement of inmates in the corridor to control contraband.

j.   The completed yard count will be called into the Center Corridor Officer, (Ext. 4314). When releasing from the yard, the Yard Officer will allow ten (10) inmates at a time through the yard gate. Upon entering the West Gate, the inmates will identify themselves by their last name and the last two (2) digits of their commitment number in order to receive their I.D. Cards from the West Gate Officer. The inmates will then remove all items from their pockets, place them on the table prior to proceeding through the metal detector.

k.   The Yard Fence Gate and the West Corridor Grill Gate shall remain locked between unlocks. The outer security door located at the West Gate will be left unlocked whenever inmates or Officers are on the yard in the event that an emergency arises on the yard. The West Corridor Officer will be responsible for the operation of the West Corridor Gate.

l.   Special unlocks or releases from the yard will be made to accommodate visits or other needs at the discretion of the Recreation Yard Officer following approved notification of legitimate activity.

m.   Upon determination that an inmate is on the Recreation Yard, the Wing Officer will notify the West Gate Officer (via telephone Extension. #4439) to accommodate visits, interviews or other legitimate activity. The West Gate Officer will check the I.D. Cards under their supervision to determine if the inmate is or is not involved in Recreation Yard Activity. Under these circumstances, if an inmate is on the yard, the Wing Officer will have the inmate's name announced over the Public Address System. Additionally, Tower #4 (telephone Extension #4004) may be contacted, who in turn will notify the Yard Officers to provide assistance in locating inmates for visits or specified legitimate activity.

n.   Yard releases are subject to change at the direction of the Watch Commander to accommodate the other movement during the normal workday.

4.0

Q-58



| | | Subject: CF 'AL UNLOCKS & YARD CARDS |
|---|---|---|
| | CORRECTIONAL TRAINING FACILITY | |
| | | Reference: |
| | OPERATIONS PROCEDURE #40 | DOM Section 52020.8.11 |
| | | Revision Due Date: SEPTEMBER 2007 |
| | | Responsibility: Correctional Captain and Program Lieutenants |

A. Unlocks to the Education Department:

- All inmates entering the Education Department will surrender their I.D. cards to the Officer at the door. Inmates without I.D. Cards will not be permitted entry. Inmates who have lost, or have not been issued their I.D. Cards, will not be permitted entry until they have received an I.D. Card.
- The Education Officer will sort the I.D. Cards by individual classes and will retain them until school is released. The Education Officer will return I.D. Cards to student inmates at that time.
- The Education Officer will retain education clerks I.D. Cards until the inmates are released from their assignments.
- Non-student or unassigned inmates with legitimate business in the area may enter the Education Department with a pass/ducat after surrendering their I.D. Cards with the Education Officer at the Entrance Door.

3. Third Watch General Unlock / Lockup Procedures for General Population Housing Wings B, C, D, E, F, G, Y and Z Wings:

- Upon reporting to the wings, the 1400-hour Officers will make a security inspection of their unit, ensuring that all RTQ/CTQ inmates are in their assigned cells, not injured, and that all doors are locked. This includes cells, mop rooms, and plumbing chases. The Unit Sergeant will be notified immediately of any discrepancies.
- Yard recall begins promptly at 1500 hours or at the discretion of the Watch Commander. The Officers and Unit Sergeant designated for corridor coverage will report to the Corridor promptly when the yard announcement is made.
- The Wing will be secured prior to yard recall.
- Yard recall is conducted by wing. At the completion of the wing yard recall, the two (2) Tier Officers will announce lockup. Those inmates requesting to go into their cells will stand by their assigned cell door. The two (2) Tier Officers will proceed with the lockup from the Third Tier down to the First Tier (1 East Side – 1 West Side) locking those inmates in their respective cells.
- At 1630 hours, all inmates are secured in their cells for Count unless placed on authorized Out-Count Slips.
- At approximately 1730 hours, or upon the clearing of the Institution Count and completion of emergency alarm checks, the evening meal will commence. When Central Control announces for corridor coverage, those Officers and Unit Sergeants assigned for corridor coverage will promptly report to the corridor.
- To facilitate the pick-up of TB and Psychotropic Medication for inmates requiring such medication, the evening meal release will precede beginning with the First Tier up to the Third Tier. Wings are released to the dining halls one and a half (1½) tiers at a time for B, C, D, E, Y and Z Wings. One (1) tier at a time for F and G Wings, (due to a larger tier size).
- Prior to the evening meal release, the Wing Officers will deadlock the bar and unlock the Folgers-Adams locking devices, with the exception of CTQ/RTQ inmates. Those inmates housed with a RTQ/CTQ inmate will be released individually after their tier has been released. The Wing Tier Officer will then place the bar-locking devices in the "KEY" position to begin



| | |
|---|---|
| **CORRECTIONAL TRAINING FACILITY**<br><br>**OPERATIONS PROCEDURE #40** | **Subject:** CENTRAL UNLOCKS & YARD CARDS<br>**Reference:**<br>            DOM Section 52020.8.11<br>**Revision Due Date:** SEPTEMBER 2007<br>**Responsibility:** Correctional Captain<br>            and Program Lieutenants |

that tier's release, starting with First Tier up to the Third Tier. The Officer assigned to the front door will place the 1st tier bar-locking devices into the "KEY" position for the first tier release. Upon completion of each half (B,C,D,E,Y,Z) or tier (F,G) being released, both Tier Officers will be on the tiers to release inmates housed with RTQ/CTQ inmates and will conduct security checks to ensure that all inmates have been released safely. Inmates will proceed directly to the dining hall, yard, or other approved activity. Under no circumstances will inmates be allowed to loiter on the tiers. The wing will be secured by locking the cell doors with the Folgers-Adams Key making sure that all inmates staying behind are uninjured and appear mentally normal before the release of the next tier.

- When the wing is released from the dining hall, inmates in possession of a valid Red Privilege Card, and a Green I.D. Card may go directly to the yard at this time. All inmates returning to the wing will remain on the 1st Tier. After all inmates have returned the Tier Officers will announce 3rd tier Lock-Up. Only 3rd Tier Inmates will go up and stand by their door with their backs against the wall. The Officers will key each door and allow only the assigned inmates in the cell. After completing the 3rd Tier the Officers will follow the same procedure for the 2nd Tier and then the 1st Tier. The Officers will proceed with the lockup from the Third Tier down to First Tier (1 East Side & 1 West Side) locking those inmates in their respective cells. Within 10 minutes of the last inmates being locked up (in order to allow the wing porters to clean the wing), the Officers will commence with Red Privilege Card program.
- At no time shall an Officer be on the tier alone. Both Tier Officers shall be on the tier at the same time. The Officer with the Door Set shall provide visual coverage during major releases from the sallyport area.

## A. Evening Release for Yard and Shower Program:

- Upon being released from the dining hall, those inmates not on yard restriction, in possession of a valid Red Privilege Card and a Green I.D. Card will be allowed the opportunity to go directly to the yard. The I.D. Cards of all inmates entering the Recreation Yard will be retained at the West Gate. Those inmates returning to the wings will remain on the First Tier until lockup is announced following completion of the evening meal for their respective wing.
- After securing the wing, the Wing Officers will begin the evening wing program in accordance with Third Watch Post Orders. The cell door Folger-Adams locking devices will not be unkeyed / unlocked at any time on Third Watch except to release authorized inmates to the evening meal / Red Card Programs, etc. Upon releasing the approved inmate, the cell door is to be re-locked.

## 4. Central Facility Unlocks: ALL TIMES ARE APPROXIMATE

| | |
|---|---|
| 0300 Hours | Unlock for Culinary Cooks (B, C, F, G, Y and Z Wings). |
| 0500 Hours | Unlock for Culinary Cooks (all mainline wings). |
| 0615 Hours | Breakfast releases from B, C, D, E, Y & Z Wings will be by 1½ tiers. F & G Wings will release one (1) tier only. Work release from Culinary and wings already fed eastbound to Maintenance and Laundry, and west bound to yard. |
| 0800 Hours | Work, and School release from wings, or upon completion of the breakfast meal. |
| 0815 Hours | Yard Release from wings upon completion of Work and School Release. |
| 0830 Hours | Commence with RTQ/CTQ Status shower program. |

B-16



| | CORRECTIONAL TRAINING FACILITY | Subject: CENTRAL UNLOCKS & YARD CARDS |
|---|---|---|
| | OPERATIONS PROCEDURE #40 | Reference: DOM Section 52020.8.11 |
| | | Revision Due Date: SEPTEMBER 2007 |
| | | Responsibility:   Correctional Captain and Program Lieutenants |

| | |
|---|---|
| 0900 Hours | Begin tier activity / hourly unlock schedule. |
| 1100 Hours | Close Custody Yard Recall / Courtesy Yard Recall. |
| 1115 Hours | Education release to all mainline wings. |
| 1130 Hours | Secure all wings. |
| 1215 Hours | Wing secured, bars secured for afternoon release to work, school and yard. |
| 1215 Hours | Close Custody Count. |
| 1230 Hours | Commence program for "C" Status inmates, and end at 1515 Hours.  (NOTE: Program for "C" status inmates will be conducted weekdays only). |
| 1230 Hours | Work, School, and Yard release from all mainline wings. |
| 1330 Hours | Hourly Unlock |
| **1415 Hours** | **Weekends and Holidays all inmates will Lockup.** |
| **1430 Hours** | **Hourly Unlock for A2B and Red Card inmates.  (Red Card Only on Weekends and Holidays).** |
| 1430 Hours | Commence yard recall for P.M. Culinary workers. |
| 1500 Hours | Yard Recall. *(NOTE: Yard recall may begin earlier due to the number of inmates on the yard).* |
| 1500 Hours | Education release back to all mainline wings in conjunction with E & F Wing Yard Recall. |
| 1515 Hours | Secure "C" Status inmates from the yard and wing. |
| 1530 Hours | Hourly Unlock. **(Weekends and Holidays-Red Card Only).** |
| 1630 Hours | Secure Wings and commence alarm checks. |
| 1700 Hours | Count (Mandatory Standing Count). |
| 1730 Hours | Release wings to the evening meal on a rotating basis.  E, D and C Wings will be fed in the first phase as long as Close Custody inmates reside in these wings.  For those wings not in the first phase for the evening meal, unlock for Red Card Yard, Early Workers, Diabetics and Ducats (Library on Sundays and Mondays).  The wings in the second and third phase for the meal release will begin their evening Red Card Program (showers only) and will be limited to East or West side on a daily rotation.  Lockup the wing prior to the evening meal release from the wing.  Upon completion of the evening meal the wing will be secured.  Red Card Unlock begins ten (10) minutes after the wing is secured.  When the wing is released from the Dining Hall, all inmates returning to the wing will be secured prior to commencing with Red Privilege Card Program. |

NOTE:     Red Card Yard Release: Wings scheduled in the second and third phases will conduct a release to the yard only after the completion of the release to the dining halls for the First Phase Wings. This release will be for Red Card Holders who do not want to go to the evening meal (no Close Custody). Those inmates who want to go to the yard and forgo attending the evening meal will remain on the first tier of their wings, behind the grill gate until the West Corridor Officer announces yard



| | |
|---|---|
| ⌐RRECTIONAL TR.NING FACILITY OPERATIONS PROCEDURE #40 | Subject: CEN AL UNLOCKS & YARD CARDS<br>Reference:<br>    DOM Section 52020.8.11<br>Revision Due Date: SEPTEMBER 2007<br>Responsibility:    Correctional Captain<br>    and Program Lieutenants |

release for that wing. Upon completion of the yard release the Red Card Program (showers only) will be conducted.

NOTE:    A2B and "C" Status inmates will lockup upon returning from the Dining Hall. A continued hourly unlock for Red Card holders will commence no more than ten (10) minutes after the lockup is completed.

2000 Hours    Close Custody Count
2030 Hours    Commence yard recall.
2100 Hours    Red Card shower program ends.
2130 Hours    Count.

Special Security Measures:

- Bar-locking devices will never be utilized to accomplish hourly unlocks. The bar-locking devices will only be utilized for mass unlocks / releases, meal lockups and emergency releases.
- Cell visiting and wing visiting is not permitted at any time. Only authorized maintenance workers will be permitted to enter a wing. These workers must be under direct supervision of a staff member at all times.
- Tier loitering is forbidden at all times.
- With the exception of extreme emergencies, the bar-locking device will never be placed in the open position.
- Activities in the wing during Second Watch and Third Watch will be limited to the designated or approved tier activities. Program is restricted to Red Privilege Cards on weekdays after the 1700 hours count. On weekends and holidays the program is restricted to Red Privilege Cards at 1430 hours.
- Library on weekends and holidays is restricted to Red Card Only for Non-Priority Use.
- With the exception of authorized unlocks, inmates will not exit the wings unless they have a verified pass or ducat in their possession. Passes will not be issued to any area unless the supervisor in charge of the area has been contacted and the presence of the inmate is requested and/or verified. Passes will only be made out and issued by Custody Staff.
- Officers/Staff in charge of the Culinary will release Culinary Workers from their assigned areas. Corridor Officers will not release workers from the Culinary. Upon ascertaining whether or not an inmate lives in a wing, the Corridor Officer may allow him access to the wing.
- During meal and major releases, the Unit Sergeant assigned as Corridor Sergeant will supervise the wing releases. Dining Hall supervision during meals will be provided by a Unit Sergeant in each Dining Hall. It will be the responsibility of the Watch Commander to ensure supervisory coverage of the Corridor and Dining Halls.
- Inmate corridor traffic during major releases will be one-way traffic (to the right of the corridor) unless otherwise determined by the Watch Commander. Inmates will not walk within the white boundary lines and may only cross these lines while exiting or entering an area, i.e. culinary, wings, etc.

8

Q-b



Case 3:08-cv-02933-JSW Document 2-3 Filed 06/12/2008 Page 50 of 15

SOLEDAD ... TRAINING FACILITY

OPERATIONS PROCEDURE #40

Subject: OPERATIONAL USE OF YARD CARDS

Reference:
    DOM Section 52020.8.11

Revision Due Date: SEPTEMBER 2007
Responsibility:    Correctional Captain
            and Program Lieutenants

- Inmates returning from meals have the choice of yard (if eligible), or their cells (unless released for a shower or Red Card Programs). If an inmate is going to the yard, he does not enter the wing. No cell visiting or tier loitering is permitted at any time.

- The area from the Wing Entrance Door to the inner gate is to be clear of inmates at all times.

- When conducting major lockups, the two (2) Tier Officers will stand on the 2nd Tier and make sure all inmates returning to the wing remain on the 1st Tier. After all inmates have returned the Tier Officers will announce 3rd tier Lock-Up. Only 3rd Tier Inmates will go up and stand by their door with their backs against the wall. The Officers will key each door and allow only the assigned inmates in the cell. After completing the 3rd Tier the Officers will follow the same procedure for the 2nd Tier and then the 1st Tier. The Officers will proceed with the lockup from the Third Tier down to First Tier (1 East Side & 1 West Side) locking those inmates in their respective cells.

- All inmates in the East Corridor beyond X-Wing will be in state issued clothes. No personal clothes will be allowed beyond X-Wing unless it is for a medical emergency.

5. **Lockdowns or Modified Program:**
   - When the entire facility or any part of the inmate population is on lockdown status, the cell-feeding process will begin immediately after the respective watch has assumed duty and the meal has been delivered. Inmates returning to the wing will be immediately secured in their cells.
   - There will be no yard releases until completion of cell feeding and wing clean up.

6. **Shower Programs:**
   - Close "B" Custody inmates who are a full-time assigned worker will be showered between the hours of 1500 and 1930 hours.
   - All CTQ/RTQ inmates regardless of custody level will be showered on Second Watch.
   - All unassigned inmates and "C" status will be allowed to shower during their program time which starts at the 1230 hours release and prior to the 1515 hours lockup.
   - Third Watch is responsible for showering those inmates assigned to a full-time work/school position. Showers will be conducted between 1500 and 2050 hours.
   - Controlled showers will consist of a maximum of one-half (½) tier of inmates out at any given time. A reasonable amount of time (30 minutes per group of inmates) will be afforded for inmates to shower and return to their cells.

## YARD CARDS:

**Identification/Privilege Cards:**
Receiving and Release will prepare a CDC 131 Green Identification Card, a CDC 130 Red Privilege Card, and a Yard Card for all new arrivals to CTF. All inmates will receive a Green Identification Card prior to departing R&R, or as soon as practical. R&R will deliver the non-issued Red Privilege Cards and Yard Cards to the Records Department for storage and later issuance as appropriate.



| | Subject: CENTRAL UNLOCKS & YARD CARDS |
|---|---|
| CORRECTIONAL TRAINING FACILITY **OPERATIONS PROCEDURE #40** | Reference: DOM Section 52020.8.11 |
| | Revision Due Date: SEPTEMBER 2007 |
| | Responsibility:    Correctional Captain and Program Lieutenants |

**Initial Classification:**

The correctional counselor is responsible for reviewing the DMS for new arrivals to their caseload, determining the inmates Work Group / Privilege Group and obtaining the appropriate Yard Card and/or Red Card as necessary.    The Yard Card and Red Privilege Card can be obtained in the Records Department. The correctional counselor will issue the appropriate card (s) to the inmate upon completion of the initial classification process, or forward the appropriate card (s) to the respective Wing Officer for issuance.

Should Unit Classification Committee change an inmate(s) work group status from A1-A to either A2-B or C-Status, the assigned correctional counselor will be responsible for obtaining the appropriate card.

Lost or altered ID cards shall be replaced.  The cost associated with replacing the Green ID, Red Privilege or Yard Card shall be the sole responsibility of the inmate(s).  Should any card(s) as described above be altered, the inmate(s) shall not be allowed entrance into the Central Yard.

B. Curry

Ben Curry
Warden (A)
Correctional Training Facility                September 13, 2006

RECEIVED

SEP 20 2006

AW-CEN CTF

10

Q-64

# EXHIBIT E

Q-65

# Memorandum

Date    :    December 23, 2002

To    :    **ALL STAFF & INMATES**
**CTF - CENTRAL**

Subject :    **OPERATION PROCEDURE (OP) #40**

The following is a clarification to O.P. #40.
These clarifications will be strictly adhered to effective January 8, 2003.

1. East/West Rotation
    2nd **phase** – Only East side or West side will be released to the yard or for showers. The whole side (Red Card holders desiring either yard or showers) will be released at the same release.

    NOTE:    Staff will continue to explore and consider systems which would identify a set number of inmates from the non-designated side of the wing for courtesy yard release.

    3rd **phase** – Courtesy yard release will be completed for Red Card holders on both sides of the wings desiring yard access. When the courtesy yard release inmates have exited the wing, staff will conduct a shower program for the designated East or West side Red Card holders.

2. Close Custody programming after 2000 hours is no longer permitted.

J. Hamlet
Warden
Correctional Training Facility

D

Q-66

227

# EXHIBIT "R"

July 26, 2007

**THE HONORABLE JONATHAN R. PRICE**
**Monterey County Superior Court**
**240 Church Street**
**Department 3**
**Salinas, CA 93902-1819**

RE:     **INFORMAL REPLY**
**In Re Andre' Boston, et. al,. Case No. HC-5668**

Dear Judge Price:

Petitioners hereby submit their reply to the Respondents' Informal Response. Petitioner incorporates by reference, the entire Petition for Writ of Habeas Corpus filed in the above entitled case.

I.

On June 8, 2007, this court issued its order for an informal response from the respondents. In that order the court directed the respondents to address the following issues: 1) Whether Correctional Lieutenant Lynch had the authority to review the appeal (Log No. CTF-C-06-02329) at the first level under California Code of Regulations (CCR), Title 15, Section 3084.5(e); 2) Why Close B Custody inmates have access to the recreation yard only between the hours of 0900 to 1100 and 1300 hours to 1500 hours; 3) Whether the definition of "Facility Security Perimeter" set forth in CTF's Operations Procedure (OP) Number 34 conflicts with the definition of "Facility Security Perimeter" set forth in CCR, Title 15, § 3000; 4) Whether Close B Custody inmates are allowed to participate in program assignments and activities in areas beyond the work change area during the hours of 0600 to 2000 hours; 5) Whether CTF officials are not permitting Close B Custody inmates to work in the Clothing Room, Laundry or Culinary and 6) Why Close B Custody inmates are not permitted to participate in limited evening activities after 2000 hours? Petitioners assert that the respondents failed to address the issues raised by the court in their informal response.

Specifically, petitioners allege and contend the following: 1) Respondents did not directly answer whether or not Correctional Lieutenant Lynch had the authority to review the appeal at the first level of review under CCR Title 15 regulations; 2) Respondents did not clearly explain why Close B Custody inmates are limited in their access to the recreation yard only between the hours of 0900 to 1100 and 1300 to 1500; 3) Respondents did not qualify whether or not CTF's definition of a "Facility Perimeter" conflicts with the definition set forth under CCR Title 15 regulations; 4) Respondents did not specifically answer why Close B Custody inmates are not allowed in areas beyond the work change area during the hours of 0600 to 2000; 5) Respondents did not describe why CTF officials are not permitting Close B Custody inmates to work in the Clothing Room, Laundry or Culinary; and 6) the respondents avoided any explanation of why Close B Custody inmates are not permitted to participate in limited evening activities after 2000 hours as provided under CCR Title 15 regulations. The court's directions were succinct and unambiguous. Petitioners would contend that the informal response filed by respondents is a crafted and confusing opposite to the intent of the court's order

II.

[     In paragraph 1, page 1: In their preamble, respondents allege and contend that: "...CTF may properly restrict Close B Custody inmates from fully participating in the prison's programs and activities based on the institution's limited resources and safety concerns." Petitioners contend that this is incorrect. Petitioners base their contention on departmental policy and regulations approved by the Office of Administrative Law (OAL). CTF is an institution within CDCR and, as such, CTF is mandated to follow all of the appropriately enacted and established provisions of departmental regulations. CTF has no authority or discretion for

1

R-2

*selective compliance* (emphasis added) with administrative laws. The established regulatory provision in CCR Title 15 § 3377.1(a)(4)(B) sets forth the departmental requirements and restrictions for Close B Custody program activities and assignments. Petitioners contend that since the regulations have been adopted and enacted by the department, including review and approval by the OAL, CTF must comply with *all* the provisions of those regulations and they are not subject to reinterpretation by CTF. Petitioners hereby reference for relevance, Contention II of our Petition for Writ of Habeas Corpus, wherein petitioners addressed the respondents' duty to follow administrative regulations. Petitioners properly asserted that an administrative regulation has the force of law, which is binding on the issuing agency.

> "It is well established that any administrative regulation has the force of law and is binding on the issuing agency. United States v. Nixon (1974) 418 U.S. 683, 6950696 [94 S.Ct. 3090; 42 L.Ed.2d 1039]; Atkins v. Rivera (1986) 477 U.S. 154 [106 S.Ct. 2456; 91 L.Ed.2d 131]; Agricultural Labor Relations Board v. Superior Court (1976) 16 Cal.3d 392, 401 [127 Cal.Rptr. 183].

> In the case of In re Reina (1985) 171 Cal.App.3d 638 [217 Cal.Rptr. 535], the court ordered the CDC to follow its own rules and awarded worktime credits to prisoners unable to work due to a non-adverse transfer.

Additionally, petitioners hereby reference for relevance, Exhibit E-7 to our Petition for Writ of Habeas Corpus, which acknowledged the department's acquiescence to a court order where it was determined, "...an institution could not have a reasonable interest that contravenes the regulations under which it operates." The circumstances raised in that departmental administrative informational bulletin were identical to those raised in our Petition for Writ of Habeas Corpus.

### III.

In paragraph 1, page 1: In the introduction to their informal response, respondents allege and contend that: "...consistent with the California Department of Corrections and Rehabilitation's (CDCR) regulations – CTF properly defined the prison's "facility security perimeter," restricting Close B Custody inmates movement within the prison." Petitioners contend that this is incorrect and that CTF's definition of a "facility security perimeter" is *inconsistent* (emphasis added) with established CDCR's regulations and the departmental definition of a "facility security perimeter" found in CCR Title 15 § 3000.

> CCR Title 15 § 3000 states: "Facility Security Perimeter is any combination of living unit, work areas, and recreation area perimeters that is set aside to routinely restrict inmate movement based on custody level. This perimeter will contract and expand depending upon the weather, lighting conditions and hours of operation."

Petitioners contend that by departmental definition, the "Facility Security Perimeter" is *inclusive* of the recreation area and the areas beyond work change, not *exclusive* of them. CTF OP #34 has made the recreation yard and all areas beyond the East and West Gate *exclusive* in context. This local interpretation and CTF's selective compliance with the departmental definition is *inconsistent* with the applicable regulations. Accordingly, this portion of the respondents' contention is incorrect. Petitioners correctly note that respondents did not argue or support a position that there are any "...weather, lighting conditions or hours of operations," which would "...routinely restrict inmate movement..." within living units, work areas or recreation areas. The instant circumstances represent an arbitrary decision imposed by former Warden J. Hamlet, which removed Close B Custody inmate access and participation in areas beyond work change (PIA, vocations, etc.), the Clothing Room, Laundry, Culinary and Receiving & Release. He did so in the absence of any incident at CTF and without any legitimate penological interest - after Close B Custody inmates had been assigned to work in those areas for *decades*. Warden Hamlet made this decision *against* existing

2

R-9

departmental regulations, which were subsequently endorsed by his successors through CTF's operation procedures.

The actions of Warden Hamlet and his successors were taken without regard to regulatory law, which was established by legislative intent to support inmate program access and rehabilitation. Independent decision making by subsequent wardens, who could have complied with departmental regulations, has been blocked by the necessity of renegotiating with bargaining units or the suggestion of possible liability in the event (however unlikely) of some future incident involving Close B Custody inmates. If the department harbored any of these concerns, CDCR has had ample opportunity to revise existing regulations.

In addition to the aforementioned, petitioners also reference for relevance, Contention VI in our Petition for Writ of Habeas Corpus, which challenges respondents' selective interpretation of applicable regulatory authority and respondents' lack of compliance with the full provisions of CCR Title 15 § 3377.1.

IV.

Pursuant to the court's order for an informal response, petitioners are uncertain what respondents' intentions are in statement 1: "CTF May Restrict Close B Inmates From Fully Participating in Institutional Programs and Activities Based on Available Resources and Safety and Security Concerns." Is this an attempt to "answer" one of the six questions for which the court requested an informal response? The information assembled to support this statement does little more than confuse the issue by a mixture of partial quotations, paraphrases, and recapitulation of the California Penal Code, CCR Title 15 and the institution's response to petitioners' Inmate Appeal.

V.

In paragraph 2, page 1: Respondents allege and contend that: "The warden is entrusted with the supervision, management, and control of the prison and is responsible for the care and custody of all its inmates." Petitioners would concede to this paraphrasing of CCR Title 15, § 3380(a), but only with the stipulation of additional language actually contained in that section of Title 15, incorrectly attributed by respondents to: "...(Cal. Code Regs., titl. 15, § 3270, subd. (c).)".

"Subject to the approval of the Director of Corrections, wardens, superintendents and parole region administrators will establish such operations plans and procedures as are required by the director for implementation of regulations..." - CCR Title 15 § 3380(c)

This subsection requires the warden of CTF to establish operational plans that are required for the implementation of regulations. It does not, however, relieve the warden of the requirement to *fully* comply with existing administrative regulations by the creation of underground policies, which are contrary to those regulations. CTF's underground policies neglect the care and custody of Close B Custody inmates and their access to participation in vocational training, work assignments and recreation that would enhance compliance with the mandate for rehabilitation outlined in the institution and departmental mission statements.

VI.

In paragraph 2, page 1: Respondents allege and contend that: "The primary objective of a prison – protecting public safety – must take precedence over all other prison operations." Petitioners contend that the inflection of respondents' quotation is inaccurate and incomplete. Similar to the circumstances described in Contention V above, respondents paraphrase only a portion of the established regulations. Petitioners base their contention on quotation of the *entire* sentence only partially referenced by the respondents.

3

231

R-4

The initial sentence of Article 2 of CCR Title 15 § 3270, which regulates Security, states: "The primary *objectives* (emphasis added) of the correctional institutions are to protect the public by safely keeping persons committed to the custody of the Director of Corrections, and to afford such persons with every reasonable opportunity and encouragement to participate in rehabilitative activities."

This language clearly defines the dual objectives of the department – not a singular objective as implied by respondents. Respondents repeated efforts to paraphrase regulations and mix the inflections of different sections of CCR Title 15 in the structure of their informal response is suggestive of the very reasons petitioners sought relief through the filing of our Writ for Petition of Habeas Corpus. Petitioners are consistently and vigorously held to the letter of regulations in their day-to-day activities. If petitioners are found guilty of a rules violation based on those regulations, they are subjected to consequences by the respondents. If respondents refuse to follow existing regulations in the absence of similar accountability, without effective administrative remedies available to petitioners, then the court must hold respondents accountable.

## VII.

In paragraph 2, page 1: Respondents allege and contend that: "Although inmates are afforded a reasonable opportunity to participate in rehabilitative activities, institutional programs are limited by the prison's available resources and safety and security concerns." Petitioners contend that this is incorrect and represents a mischaracterization of the circumstances in this case. Contrary to respondent's contentions, Close B Custody inmates are *not* being afforded "...every reasonable opportunity and encouragement to participate in rehabilitation activities." Respondents' attempts to invoke sections of the California Penal Code (PC) are similarly flawed by paraphrasing or only partially rendering the language of the referenced section. PC § 2933 deals with "Worktime credits on sentences...." something that CTF's Close B Custody inmates are being denied.

The sentence excerpted and paraphrased from PC § 2933 (b) actually says: "Except as provided in subdivision (a) of Section 2932, every prisoner shall have a reasonable opportunity to participate in a full-time credit qualifying assignment in a manner consistent with institutional security and available resources."

CCR Title 15 clearly establishes the manner in which inmates should be offered the opportunity to participate in full-time credit qualifying assignments. Contrary to those regulations, through the establishment of operations procedures and underground policies, CTF is actively denying Close B Custody inmates from access and participation in job assignments, vocational opportunities and recreational activities afforded to inmates similarly situated in other CDCR institutions in a manner, which is clearly inconsistent with institutional security and available resources.    Instead of following the letter of the law, the repeated paraphrasing and selective quotations from portions of departmental regulations and the Penal Code to support their arguments should call the merit of respondents' contentions into question.

In paragraph 2, page 1: The respondent implies facts not in evidence by stating: "...institutional programs are limited by the prison's available resources and safety and security concerns." Petitioners contend that they are not being provided reasonable opportunities to program because of CTF's arbitrary and capricious interpretations of regulations and the institution's contrived refusal to comply with departmental regulations - *not* due to a lack of "...available resources and security concerns." Allowing Close B Custody inmates to participate in the program activities afforded to Medium and Minimum Custody inmates in both Central and North Facilities at CTF would not require any additional staffing resources. No incident and no existing safety or security issues at CTF were raised when Close B Custody inmates were removed from their program opportunities by Warden Hamlet. The issues were created by CTF's redefinition of the facility's security perimeter and the adoption of an underground policy, which departs from established departmental

regulations. The Vocational class sizes or the number of job assignments available beyond work change in PIA, the Clothing Room, Laundry, Culinary and Receiving & Release areas of Central Facility would not change with the opportunity for assignment of Close B Custody inmates. By any reasonable interpretation, let alone by the exact definition in contained departmental regulations, all of these areas are located within the confines of the facility's true security perimeter. The same number of Custody Staff are available for supervision of the Recreation Yard throughout the program day. CTF is the only designated Level II institution with four *armed guard towers* providing yard coverage. In addition, CTF has a Correctional Sergeant and three additional Correctional Officers assigned to the Recreation Yard and a minimum of four Correctional Officers assigned to control access and egress from the Recreation Yard. Additionally, CTF is the only facility, which collects inmates' CDCR identification cards and requires a privilege card or locally created "yard card" for release to the yard. It is difficult for petitioners to imagine what additional "...available resources and safety and security..." measures CTF would need to justify Close B Custody inmates departmentally mandated program access.

VIII.

In paragraph 3, pages 2-3: Respondents' contention that: "Thus a Close B Custody inmate's "right" to fully participate in CTF's program and activities is limited by the prison's available resources and safety and security concerns..." is a redundant contention based on recapitulation of the institution's response to petitioners' inmate appeals and quotations. Respondents quote a bewildering series of references, paraphrases and partial quotations excerpted from *petitioner's exhibits* or cited from other sources without ever justifying, explaining or answering the questions raised by this court. Respondents never contended throughout the administrative appeal process that their non-compliance with the department's regulations was the result of "limited resources." Therefore, to raise this issue now as an attempted justification for CTF's non-compliance also lacks merit. The fact that thousands of other CTF inmates are already afforded full program access negates respondents' basic arguments.

CCR Title 15 regulations already clearly address and respond to any "...increased risk to institutional security and public safety." This partial quotation from classification regulations is utilized by respondents in an attempt to confuse the issue. This moves to the point of "fear mongering," which is not supported by the realities or provisions of existing departmental policies that deal with security concerns. In this case, respondents have advanced no definitive evidence or information at any point through these proceedings that demonstrates a reasonable safety and security concern which is not already addressed by the existing regulations. Petitioners reiterate the department's own acknowledgement that "...an institution could not have a reasonable interest that contravenes the regulations under which it operates." (See Exhibit E-7 to the Petition for Writ of Habeas Corpus). Accordingly, respondents' contention that: "...CTF may additionally limit Close B Custody inmates' access to the prison's facilities based on the prison's available resources and safety and security concerns..." represents little more than a convoluted, reiteration of CTF's response to petitioners' Inmate Appeal and lacks merit.

IX.

In paragraph 3, continued on page 2: Respondents contention that: "...CTF's operation procedures reflect a balance between offering Close B Custody inmates the opportunity to participate in rehabilitative activities, using the prison's limited resources, and maintaining safety and security..." is a complete mischaracterization. What "balance?" For respondents to cite petitioners' Exhibit E from our Petition for Writ of Habeas Corpus as a reason for limiting program fails to acknowledge the reason why the "Memorandum re Operations Procedure #40, dated December 23, 2002" was issued by the institution. The same number of paid Correctional Officers and Supervisors are available throughout Third Watch from 1400 to 2200 Hours. Restricting Close B Custody inmates from normal program access between 1400 and 2000 Hours defies departmental regulations. Paying Custody Staff to facilitate program access and supervision after 2000 Hours when Close B Custody inmates are locked in their cells raises additional issues about the

5

R-6

## XII.

In paragraph 4, continued on page 3: The respondents' contention that: "Thus, CTF properly defined "facility security perimeter," restricting Close B Custody inmates' movement within the prison..." lacks merit and is called into question when it is based on the institution's own contrived refusal to comply with departmental regulations. Petitioners housing is located *within* respondents' definition of a security perimeter. Why then are they not allowed to program in their housing units after 2000 Hours, in accordance with departmental regulations? Petitioners have access to the Recreation Yard, Canteen, and telephones between the hours of 0900 to 1100 and 1300 to 1500. Those areas and activities are located *beyond the West Gate.* As noted above, respondents do not address, respond to or explain to the court, why Close B Custody inmates are being denied access to these areas after the 1700 Hours Institutional Count clears until an institutionally imposed 2000 Hours lockup of those inmates. Institutions throughout the state have Close A Custody inmates (a much more restricted classification) working in PIA operations, Clothing Rooms, Laundries, Culinary areas and in vocations and job assignments beyond their work changes. Why does CTF impose greater restrictions against Close B Custody inmates (a lesser restricted classification), contrary to existing regulations and departmental policy?

Petitioners base their contentions on the language established in CCR Title 15 § 3377.1(a), which states:

> "Designation of a degree of an inmate's custody shall be reasonably related to legitimate penological interests. The CDC uses the following inmate custody to establish where an inmate shall be housed and assigned, and the level of staff supervision to ensure institutional security and public safety."

Respondents' contentions lack merit and defy well-established and clearly defined regulations, which were designed and approved by CDCR to insure adequate institutional security and protect public safety. CTF simply chooses to reinterpret or ignore the regulatory guidelines and legislative intent, which was designed to enhance and support the rehabilitation of *ALL* inmates instead of isolating or ignoring the needs of a single group or classification of inmates.

## XIII.

Pursuant to the court's order for an informal response, petitioners are uncertain what respondents' intentions are in making statement 3: "Petitioners' Claim that Correctional Lieutenant Lynch Did Not Have Authority to Review Petitioners' Appeal is Moot." If this is an answer to the court's first issue: "1) whether Correctional Lieutenant Lynch had authority to review the appeal..." respondents avoid answering this central question. Did CTF follow existing regulations by having a Correctional Lieutenant respond to the appeal of an institutional policy issued by the Warden? To allege and contend the point is "moot," avoids answering the question. Petitioners contend that respondents are incorrect and must answer the question. One of the reasons petitioners advanced this issue to the court was because CTF and, subsequently CDCR have refused to comply with administrative regulations enacted under CCR Title 15, § 3084.5, which was actually cited by respondents in their informal response. CCR Title 15, § 3084.5(e) clearly establishes who shall not participate in the review of formal appeals.

> "Appeal Review. Formal appeals *shall not be reviewed* (emphasis added) by a staff person who participated in the event or decision appealed, or who is of lower administrative rank than any participating staff, or who participated in review of a lower level appeal refiled at a higher level." CCR Title 15, § 3084.5(e)

Based on the above regulation, Correctional Lieutenant Lynch did not have the authority to review petitioners' appeal. Because this issue has been exhausted at the highest level of administrative review,

R-8

petitioners contend that this court has the jurisdiction to hear and decide the claims presented in our Petition for Writ of Habeas Corpus. A prisoner may bring a petition for writ of habeas corpus to ask a court to declare and enforce rights regarding prison or parole. A petition may be based in constitutional, statutory, or administrative law. In re Harrell (1970) 2 Cal.3d 675 [87 Cal.Rptr. 504]; In re Davis (1979) 25 Cal.3d 384 [159 Ca.Rptr. 384]

Petitioners also hereby make reference for relevance to Contention I in our Petition for Writ of Habeas Corpus.

### XIV.

Respondents cite the case authority of In re Hutchinson 23 Cal.App.3d 337 (1972) to support their contention that petitioners' case should be dismissed as moot. Petitioners correctly point out that the application of Hutchinson, *supra*, is irrelevant to the instant case. In Hutchinson, *supra*, the court addressed circumstances where two prisoners had petitioned the court for habeas corpus. The petitioners in that case were seeking a release from housing wings that were designated for inmates who were in isolation, segregation or protective custody status. In that case, one of the petitioners had been transferred to another prison following the issue of the order to show cause, but prior to the hearing on the claims. As a result of these circumstances, the court ruled that the *transferred* (emphasis added) petitioners' claim was moot. The court did address the claims of the remaining petitioner. Petitioners allege and contend that the circumstances of the cited case authority and the instant case are not similar and have no apparent relevance. This case involves circumstances of the respondents arbitrarily and capriciously interpreting regulations and refusing to comply with applicable regulations. These circumstances exist for several hundred inmates who are classified as Close B Custody and housed at CTF. Without resolution on these issues, violations of administrative regulations will continue to exist. Therefore, the issues in this case are not moot and have to be addressed by this court to insure resolution and compel future compliance with issues of non-compliance with administrative regulations.

### XV.

Respondents contend that: "Moreover even assuming petitioners' appeal is not moot (and Lieutenant Lynch did not have authority to review it), petitioners would not be entitled to habeas relief." Petitioners contend this is incorrect. This issue is not moot and is dispositive to the claims presented herein. Petitioners base their contention on the following information. Lieutenant Lynch's inappropriate review of the appeal at the first level is germane to the issue at hand because it is still another factor that points to the blatant pattern of the institution's arbitrary and capricious interpretation and/or complete disregard for administrative regulations. As stated in Contention XIII of this reply, the regulations are clear about appeal reviews and who may/may not review appeals.

Despite clear administrative regulations in this matter, CTF elected to deliberately violate the regulation by having the appeal reviewed by an unauthorized party. This issue has a cumulative affect on the claims presented by petitioners. Not only does CTF feel it does not have to comply with established administrative regulations, but respondents appear to be condoning their lack of compliance. This has a chilling affect on any attempt by petitioners to advance resolution or reconciliation of issues on the behalf of their constituents. Again, petitioners reiterate higher courts findings that administrative regulations have the force of law and are binding on the issuing agency. (See United States v Nixon , *supra*) Petitioners further contend that the California court system has previously ordered CDCR to comply with its own rules, even if CDCR preferred not to because of the benefits resulting to prisoners. Because respondents have condoned CTF's non-compliance with regulations, petitioners contend that respondents have demonstrated a clearly arbitrary and capricious basis for their interpretation of the applicable regulations. Accordingly, petitioners assert that this court has the authority to reject respondents' interpretation. Petitioners offer the following case citation to support their contention.

INFORMAL REPLY TO RESPONDENT'S INFORMAL RESPONSE – in re BOSTON et. al., (HC 5668)

"Where an agency's interpretation of regulation is clearly arbitrary and capricious or has no reasonable basis, courts should not hesitate to reject it." In re Scott 5 Cal.Rptr.3d 887 (Cal.App.2 Dist. 2003)

Petitioners further hereby make reference for relevance to Contention II of our Petition for Writ of Habeas Corpus.

## XVI.

Pursuant to the court's order for an informal response, petitioners are uncertain what the intentions of respondents' stated "Conclusion" might be. They do not appear to answer any question raised by the court in its order. Petitioners would allege and contend that respondents failed to provide any definitive response to issues 2) through 6) as requested by the court.

## XVII.

Petitioners contend that CTF is improperly limiting Close B Custody inmates from full participation in the prison's programs and activities. Petitioners contend that the limitations imposed by respondents' representation of "limited resources and safety and security concerns" are unreasonable and violate existing administrative regulations. Petitioners further contend that the representations presented in our Petition for Writ of Habeas Corpus and this reply are accurate and fully supported by departmental regulations. Accordingly, the petition should be issued and relief should be granted in this matter. It would be a travesty of justice to refer any portion of this matter back before the same entity which has elected to arbitrarily and capriciously interpret the cited regulations. This administrative entity has demonstrated that they would not comply the courts' directions in previous cases of non-compliance with administrative law. This is not a case where the petition contains exhausted and unexhausted claims. All claims have been exhausted and despite having several opportunities to follow CDCR's own regulations, respondents have elected to ignore the regulations they have issued. This court has the appropriate jurisdiction of the claims and should decide the issue.

## CONCLUSION

As demonstrated herein and by the information contained in the Petition itself, petitioners' claims have been exhausted, have merit and are ripe for judicial adjudication. Therefore, petitioners are entitled to the relief requested in the original petition. Furthermore, due to the numerous disputes in this matter, petitioners respectfully request that this Honorable Court issue an order to show cause, grant an evidentiary hearing, permit discovery in the instant case and provide counsel or reasonable attorney's fees to the petitioners.

Respectfully Submitted,

Andre' Boston, et. al.,
Petitioner, Pro-Se

Date: _7/26/07_

<table>
<tr><td colspan="2">

ATTORNEY OR PARTY WITHOUT ATTORNEY<br>
*(Name, state bar number, and address):*

**ANDRE BOSTON, D03868<br>
PO BOX 689, EW-236L<br>
SOLEDAD, CA 93960-0689**

    TELEPHONE NO.    N/A        FAX NO.

ATTORNEY FOR *(Name)*):  **PRO SE**
</td><td>

*FOR COURT USE ONLY*
</td></tr>
</table>

| | |
|---|---|
| COURT **MONTEREY COUNTY SUPERIOR COURT**<br>  STREE ADDRESS: **240 CHURCH STREET**<br>  MAILING ADDRESS: **SAME**<br>  CITY AND ZIP CODE: **SALINAS, CA 93902-1819**<br>    BRANCH NAME: **DEPARTMENT 3** | |
| PETITIONER/PLAINTIFF:<br>**ANDRE BOSTON, et. al.,**<br><br>RESPONDENT/DEFENDANT:<br>**CALIFORNIA ATTORNEY GENERAL<br>ATTENTION: AMANDA MURRAY** | |
| **PROOF OF SERVICE BY MAIL** | CASE NUMBER:<br>**HC 5668** |

1.  I am at least 18 years of age, a party to this action, and I am a resident of or employed in the county where the mailing took place.

2.      My residence or business address is:     **ANDRE BOSTON, D03868<br>PO BOX 689, EW-236L<br>SOLEDAD, CA 93960-0689**

3.  I served a copy of the following documents (*(specify):*
    [   ] Petition for Writ of Habeas Corpus      [ X ]Informal Reply to Respondent's Informal Response

    by enclosing them in an envelope AND
    a. [ ✓ ] **depositing** the sealed envelope with the United State Postal Service with the postage fully prepaid.
    b. [   ] **placing** The envelope for collection and mailing on The date and at the place show in item 4 following our ordinary business practices. I am readily familiar with this business's practice for collection and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

4.  The envelope was addressed and mailed as follows:
    a. Name of person served: _____
    b. Address: _____
        _____

    c. Date mailed: **7/26/07**
    d. Place of mailing *(city and state):* **SₐₗₑdₐD, CA**

    [ X ] STATE ATTORNEY
        GENERAL
        P. O. Box 944255
        Sacramento, CA 94244

5.  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date: **July 26, 2007**

    **ANDRE BOSTON**

_____        ► _____
    (TYPE OR PRINT NAME)            (SIGNATURE OF PERSON COMPLETING THIS FORM)

**PROOF OF SERVICE BY MAIL**

# EXHIBIT "S"

**FILED**

1             SUPERIOR COURT OF CALIFORNIA     AUG 3 ? 2007

2                COUNTY OF MONTEREY   LISA M. GALDOS
                                   CLERK OF THE SUPERIOR COURT

3                                                    DEPUTY
                                           S. GARSIDE

4  In re                      )  Case No.: HC 5668

5       Andre Boston, et al.     )  ORDER

6              On Habeas Corpus. )

7

8      Petitioners Andre Boston, David Rucker, Robert Nydegger, Craig Gerstner, Michael

9  Comeaux, David Moreno and Adam Vasquez filed a petition for writ of habeas corpus.

10      Petitioners are incarcerated at Correctional Training Facility (CTF) in Soledad.

11  Petitioners are Men's Advisory Council Executive Body members at CTF-Central Facility.

12      Petitioners claim that CTF prison officials are denying Close B Custody inmates full

13  access to program assignments and activities in violation of California Code of Regulations, title

14  15, section 3377.1(a)(4)(B).

15      Section 3377.1(a)(4)(B) provides:

16      Close B Custody inmates shall be permitted to participate in program assignments and

17        activities during the hours of 0600 hours to 2000 hours in areas located within the facility

18        security perimeter including beyond the work change area in a designated Level II, Level

19        III or Level IV institution. Close B Custody inmates may participate in designated work

20        program assignments until 2200 hours when the work program is in an assigned housing

21        unit located within the facility security perimeter. Close B Custody inmates may

22        participate in limited evening activities after 2000 hours until the general evening lockup

23        and count when the limited activity is in a designated housing unit located within the

24        facility security perimeter.

25

1

1       Petitioners have exhausted their administrative remedies. (See CTF C-06-02329 and

2   CTF C-06-02873.)

3       On June 8, 2007, the court requested an informal response from the Attorney General's

4   Office (Respondent). On July 16, 2007, Respondent filed an informal response. On July 30,

5   2007, Petitioners filed a reply.

6       Petitioners make the following claims: 1) Close B Custody inmates are allowed on the

7   recreation yard only between the hours of 0900 to 1100 hours and 1300 hours to 1500 hours; 2)

8   Close B Custody inmates are not allowed to participate in program assignments and activities in

9   areas beyond the work change area; 3) Close B Custody inmates are not allowed to work in the

10  Clothing Room, Laundry or Culinary Department; and 4) Close B Custody inmates are not

11  permitted to participate in limited evening activities after 2000 hours.

12      Petitioners' claims fail because CTF prison officials may properly restrict Close B

13  Custody inmates from fully participating in program assignments and activities based on limited

14  resources and safety and security concerns.

15      Inmates are to be afforded every reasonable opportunity and encouragement to participate

16  in rehabilitative activities. See California Code of Regs., tit. 15, § 3270. However, correctional

17  institutions' efforts "will be made to insure the security of the institution and the effectiveness of

18  the treatment programs within the framework of security and safety." *Id.* "The requirement of

19  custodial security and of staff, inmate and public safety must take precedence over all other

20  considerations in the operation of all the programs and activities of the institutions of the

21  department." *Id.* The Warden is responsible for the custody, treatment, training and discipline

22  of all inmates under his charge. See Cal. Code Regs., tit. 15, § 3380(a). The Warden has

23  authority to establish operational plans and procedures as are required by the director for

24  implementation of regulations and as may be required for the operations. Cal. Code Regs., tit.

25  15, § 3380(c).

S-3

1    Since Close B Custody inmates represent an increased risk to institutional security and

2    public safety, they receive constant supervision and limited access to programs, activities and

3    facilities. See Cal. Code Regs., tit. 15, §§ 3377.1 & 3377.2. CTF-Central Close B Custody

4    inmates have limited access to the recreation yard, participate in program assignments and

5    activities within the Central Facility Security Perimeter, are not allowed to participate in evening

6    activities after 2000 hours and are not allowed to work in the Clothing Room, Laundry, or

7    Culinary Department. However, Section 3377.1(a)(4)(B) *does not mandate* CTF prison officials

8    to allow Close B Custody inmates to participate in work program assignments until 2200 hours

9    or to participate in limited evening activities after 2000 hours. Based on CTF prison officials'

10    limited resources and the safety and security concerns (See Second Level and Director's Level

11    Responses in Appeals CTF C-06-02329 and CTF C-06-02873), the curtailment of activities and

12    privileges is required to effect these legitimate penological interests. To the extent that

13    Petitioners claim that these are not legitimate penological interests, Petitioners fail to provide

14    evidence supporting their claim. See *People v. Duvall* (1995) 9 Cal.4th 464, 474. Given the

15    number of inmates at CTF and the limited resources, it is not possible for prison officials to

16    assign every inmate to the job of his choice or to a specific area of a facility the inmate feels he is

17    entitled to travel. Prison administrators are accorded wide-ranging deference in the adoption and

18    execution of policies and practices that in their judgment are needed to preserve internal order

19    and discipline and to maintain institutional security. *Jones v. North Carolina Prisoners' Union*

20    (1977) 433 U.S. 119, 128.

21    Petitioners contend that CTF's definition of "Facility Security Perimeter" conflicts with

22    the California Code of Regulations.

23    CTF Operations Procedure No. 34 provides in pertinent part, "Close B Custody, Level II,

24    inmates shall be permitted to participate in program assignments and activities, i.e., Alcoholic

25    Anonymous and Narcotics Anonymous, during the hours of 0600 hours to 2000 hours in areas

3

5-4

1  located *within the Central Facility Security Perimeter (West Gate to East Gate).*" (See

2  Operations Procedure No. 34, p.3.)

3      California Code of Regulations, title 15, section 3000 provides:

4      Facility Security Perimeter is any combination of living unit, work area and recreation

5      area perimeters that is set aside to routinely restrict inmate movement based on custody

6      level. This perimeter will contract and expand depending upon the weather, lighting

7      conditions and hours of operation.

8      CTF's definition does not conflict with the California Code of Regulations. Under

9  section 3000, the Facility Security Perimeter may be any combination of living unit, work area

10  and recreation area perimeters. CTF prison officials considered various factors such as the age

11  of the facility, numerous vehicle and pedestrian sally ports beyond the East Gate, poor lighting

12  and the lack of an electrified fence. Because the definition under section 3000 is expansive and

13  CTF officials have legitimate safety and security concerns, CTF officials properly defined the

14  Facility Security Perimeter as "West Gate to East Gate."

15      Petitioners contend that under California Code of Regulations, title 15, section 3084.5(e),

16  Correctional Lieutenant R. Lynch did not have authority to complete the first level review of

17  their appeal (Log No. CTF-C-06-02329). Assuming arguendo Correctional Lieutenant Lynch

18  lacked such authority, Petitioners fail to show prejudice because Petitioners' appeal was

19  ultimately reviewed *at the highest level of review* (the Director's level of review.) See *Duvall,*

20  *supra,* 9 Cal.4th at p. 474.

21      In light of the foregoing, the petition is denied.

22      IT IS SO ORDERED.

23  Dated:  08-30-07

24

25      Hon. Stephen A. Sillman
        Judge of the Superior Court

4
243

## CERTIFICATE OF MAILING

### C.C.P. SEC. 1013a

I do hereby certify that I am not a party to the within stated cause and that on

___**SEP 0 4 2007**___ I deposited true and correct copies of the following document:

ORDER in sealed envelopes with postage thereon fully prepaid, in the mail at Salinas,

California, directed to each of the following named persons at their respective addresses

as hereinafter set forth:

Andre' Boston (D-03868)
CTF-Central Facility
PO Box 689
Soledad, CA 93960

Amanda Murray, DAG
Office of the Attorney General
455 Golden Gate Ave, Suite 11000
San Francisco, CA 94102

Dated: **SEP 0 4 2007**

LISA M. GALDOS,
Clerk of the Court

By: _____
Deputy    S. GARSIDE

5-6

# EXHIBIT "T"

| | | |
|---|---|---|
|  | **Department of Corrections and Rehabilitation**<br><br>**NOTICE OF CHANGE TO REGULATIONS**<br><br>Sections: 3000, 3005, 3006, 3008, 3009, 3012, 3013, 3015, 3016, 3290, 3310, 3313, 3314, 3315, 3318, 3320, 3323, 3327, 3328 | **Number: 07/09**<br><br>**Publication Date:**<br>July 20, 2007<br><br>**Effective Date:**<br>To Be Announced |

This notice announces amendments to Sections 3000, 3005, 3006, 3008, 3009, 3012, 3013, 3015, 3016, 3290, 3310, 3313, 3314, 3315, 3318, 3320, 3323, 3327, and 3328 of the California Code of Regulations (CCR), Title 15, Crime Prevention and Corrections, to incorporate into the CCR, provisions governing Inmate Discipline.

**IMPLEMENTATION:  To Be Announced.**

**PUBLIC COMMENT PERIOD**
Any person may submit written comments about the proposed regulations to the California Department of Corrections and Rehabilitation, Regulation and Policy Management Branch (RPMB), PO Box 942883, Sacramento, CA 94283-0001, by fax to (916) 341-7366 or by e-mail to *RPMB@cdcr.ca.gov*. All written comments must be received by the close of the public comment period, September 11, 2007 at 5:00 PM.

**PUBLIC HEARING INFORMATION**
A public hearing regarding these proposed regulations will be held September 11, 2007 from **10:00 am – 12:00 am** in the **Large Conference Room, 660 Bercut Dr., Sacramento, CA 95814.** This location is wheelchair accessible. The purpose of the hearing is to receive oral comments about this action. It is not a forum to debate the proposed regulations. No decision regarding the permanent adoption of these regulations will be rendered at this hearing. Written or facsimile comments submitted during the prescribed comment period have the same significance and influence as oral comments presented at the hearing.

**POSTING**
This notice shall be posted immediately upon receipt at locations accessible to inmates, parolees, and employees in each Department facility and field office. Also, facilities shall make this notice available for review by inmates in segregated housing who do not have access to the posted copies and shall distribute it to inmate law libraries and advisory councils.

**CONTACT PERSON**
Inquiries regarding this notice should be directed to Timothy M. Lockwood, Chief, RPMB, or to Stephanie Winn, RPMB, California Department of Corrections and Rehabilitation, PO Box 942883, Sacramento, CA 94283-0001, by telephone (916) 323-6156 or e-mail *RPMB@cdcr.ca.gov*.

SCOTT KERNAN
Chief Deputy Secretary
Adult Operations

Attachments

T-2

## INITIAL STATEMENT OF REASONS:

The California Department of Corrections and Rehabilitation (CDCR) proposes to amend Sections of the California Code of Regulations (CCR), Title 15, Division 3, concerning inmate disciplinary processes.

These proposed regulations will bring CDCR into compliance with Penal Code (PC) Section 2932 which dictates that the Department must not assess more than 30 days forfeiture of credit for any "serious" violation of the Departmental regulations; must not assess more than 90 days forfeiture of credit for any misdemeanor offense; must not assess more than 180 days forfeiture of credit for any felony offense, unless the felony is one identified by the Department regulations as an A1 offense, which allows the assessment of up to 360 days forfeiture of credit. Therefore, the Department must not assess more than 30 days forfeiture of credits, unless the violation is either a misdemeanor or felony offense as indicated by the PC. This action will clarify and amend CCR Sections that were in violation of this section of the PC.

Additionally, these proposed regulations clarify language which has been found to be vague and in danger of being interpreted incorrectly. The proposed regulations also bring the Department into compliance with ongoing court cases which require the Department to perform certain mandated duties, or to refrain from certain activities.

The Department seeks to standardize processes concerning inmate discipline that were formerly subject to local interpretation. These proposed amendments will help to insure the fair and consistent application of the inmate disciplinary process, which will have a positive impact on controlling and rewarding inmate behavior. These changes will also further the safety of all persons and the legitimate penological interests of the institutions.

This action will amend the current CCR with language which has been rewritten for clarity and easier reference by staff, inmates, and the public in general. Some specific regulatory provisions are retained in virtually unchanged form, while at the same time, new regulatory provisions are added

The Department must determine that no alternative considered would be more effective in carrying out the purpose of this action, or would be as effective and less burdensome to affected private persons than the action proposed.

**Subsection 3000 is amended** to alphabetically merge added definitions with those that exist in the regulations. Additionally, two definitions are deleted as indicated by strikethrough in the text.

**Subsection 3005(c) is amended** to make this Subsection a major heading of Force or Violence and deletes the paragraph that follows.

**New Subsections 3005(c)(1) through 3005(c)(3) are adopted to** include the language formally located in Subsection 3005(c). The newly adopted Subsections clarify the language regarding an inmate's prohibition from participating in acts of Force or Violence. The amended language makes specific what is defined as Force or Violence for easier identification for staff and inmates.

**New Subsection 3006(c)(19) is adopted to** include cellular phones in the category of contraband. This language identifies cellular phones as contraband and makes the possession of a cellular phone a violation of this Subsection where there was no specific prohibition regarding the possession of cellular phones in the previous regulations.

**Subsection 3008 is amended to** replace the word may with shall. This change makes it clear to staff and inmates that adherence to this rule is mandatory rather than optional.

**Subsection 3009 is amended to** replace the word may with shall. This change makes it clear to staff and inmates that adherence to this rule is mandatory rather than optional.

**Subsection 3012 is amended to** replace the word may with shall. This change makes it clear to staff and inmates that adherence to this rule is mandatory rather than optional.

**Subsection 3013 is amended to** replace the word may with shall. This change makes it clear to staff and inmates that adherence to this rule is mandatory rather than optional.

**New Subsection 3015(d) is adopted** to include language that makes escape, attempt to escape, or conspiring to escape a violation of this subsection of the CCR. This change is necessary to give staff a consistent rule that will be used to hold inmates accountable for this behavior.

**Subsection 3016(a) is amended to** replace the word may with shall and add the word use. This language is included to make clear that inmates must not use a controlled substance, and is intended to give staff a consistent rule that will be used to hold inmates accountable for this behavior. Additionally the word controlled is deleted. This language is repetitive and unnecessary.

**Subsection 3016(b) is amended** to replace the word may with shall and remove repetitive and unnecessary language.

**Subsection 3016(c) is amended** to remove repetitive and unnecessary language.

**Subsection 3016(d) is amended** to replace the word may with shall and remove repetitive and unnecessary language.

**Existing Section 3290 is renamed** Methods for Testing of Controlled Substances or for Use of Alcohol. This name change was necessary to include the methods for testing for the use of alcohol by an inmate to this Subsection. Additionally, this change gives staff a consistent direction that will be used to hold inmates accountable for this behavior.

**Subsection 3290(a) is amended to** memorialize the fact that the department shall prescribe the methods and materials used to test for controlled substances and for the use of alcohol. This change further makes it clear that testing will be conducted by trained staff.

**Subsection 3290(c) is amended to** include the suspected use of alcohol as a reason for securing a urine sample from an inmate for the purposes of testing.

**Subsection 3290(c)(1) is amended to** include the use of alcohol and will give staff a consistent rule that will be used to hold inmates accountable for this behavior.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Sections 2600, 2601, 2772, 2790, 4574, 5054 and 5057, Penal Code.

**Section 3008. Obscenity is amended to read:**

Inmates may shall not openly or publicly display photographs, pictures, drawings, or other pictorial representations of persons engaged in sexual acts, actual or simulated, masturbation, excretory functions or lewd exhibitions of the genitals which are obscene as defined in Section 311 of the Penal Code.

NOTE: Authority cited: Section 5058, Penal Code. Reference: Section 5054, Penal Code.

**Section 3009 Gambling is amended to read:**

Inmates may shall not participate in any form of gambling or bookmaking.
Comment: Former DR-1107, gambling and bookmaking.

**Section 3012 Theft is amended to read:**

Inmates may shall not obtain anything by theft, fraud or dishonesty.
Comment: Former DR-1110, stealing and dealing.

**Section 3013 Unlawful Influence is amended to read:**

Inmates may shall not attempt to gain special consideration or favor from other inmates, employees, institution visitors or any other person by the use of bribery, threat or other unlawful means.
Comment: Former DR-1111, improper influence.

**Section 3015. Unauthorized Areas and Facility Boundaries is amended to read:**

**Subsection 3015(a) through 3015(c)remains unchanged.**

**New Subsection 3015(d) is adopted to read:**

(d) Inmates shall not escape, attempt to escape or conspire with others to escape from the custody of the department. Inmates shall not solicit or coerce others to aid or assist in an escape.

NOTE: Authority cited: section 5058, Penal Code. Reference: section 5054, Penal Code.

**3016. Controlled Substances, Drug Paraphernalia, and Distribution is amended to read:**

FILED

JUL 0 2 2007

LISA M. GALDOS
CLERK OF THE SUPERIOR COURT
_____DEPUTY
S. GARSIDE

SUPERIOR COURT OF CALIFORNIA

COUNTY OF MONTEREY

SALINAS DIVISION

| | |
|---|---|
| In re<br><br>**BOSTON et al.,**<br><br>Petitioner,<br><br>**On Habeas Corpus.** | NO. HC 5668<br><br>**[PROPOSED] ORDER**<br><br>Judge:     The Honorable ~~Jonathan R.~~<br>~~Price~~ James W. Luther |

Good cause appearing, respondent is granted an extension of time, and shall provide the

informal response by July 17, 2007. Petitioner may reply to respondent's informal response

within 15 days from the date of its service. (Cal. Rules of Court, rule 4.55.1(b)(2), (h).)

DATED:  _July 2, 2007._

JUDGE ~~JONATHAN R. PRICE~~
James W. Luther

3

Request for Extension of Time; [Proposed] Order

## CERTIFICATE OF MAILING

### C.C.P. SEC. 1013a

I do hereby certify that I am not a party to the within stated cause and that on

**JUL 0 2 2007** _____ I deposited true and correct copies of the following document:

ORDER in sealed envelopes with postage thereon fully prepaid, in the mail at Salinas,

California, directed to each of the following named persons at their respective addresses

as hereinafter set forth:

Andre' Boston
D-03868
Correctional Training Facility
PO Box 689
Soledad, CA 93960-0689

Amanda J. Murray, DAG
Office of the Attorney General
455 Golden Gate Ave, Suite 11000
San Francisco, CA 94102-7004

Dated: **JUL 0 2 2007** _____

LISA M. GALDOS,
Clerk of the Court

By: _____
Deputy    S. GARSIDE

1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  JULIE L. GARLAND
   Senior Assistant Attorney General
4  ANYA M. BINSACCA
   Supervising Deputy Attorney General
5  AMANDA MURRAY, State Bar No. 223829
   Deputy Attorney General
6  455 Golden Gate Avenue, Suite 11000
   San Francisco, CA 94102-7004
7  Telephone: (415) 703-5741
   Fax: (415) 703-5843
8
   Attorneys for Respondent
9  SF2007200448

10

11                    SUPERIOR COURT OF CALIFORNIA

12                      COUNTY OF MONTEREY

13                        SALINAS DIVISION

14

15  In re                                    | NO. HC 5668

16      **BOSTON, et al.,**                   | **RESPONDENT'S REQUEST
                                                FOR EXTENSION OF TIME;**
17                              Petitioner,   | **[PROPOSED] ORDER**

18  **On Habeas Corpus.**                     | Judge:    The Honorable
                                                          Jonathan R. Price
19

20      I, AMANDA J. MURRAY, declare as follows:

21      1.    I am an attorney admitted to practice before the courts of the State of California and

22  before this Court. I am employed by the California Attorney General's Office as a Deputy

23  Attorney General in the Correctional Writs and Appeals Section, and am assigned to represent

24  respondent in this case.

25      2.    On June 8, 2007, this Court ordered respondent to file an informal response to Boston,

26  et al.'s petition for writ of habeas corpus by July 2, 2007.

27      3.    On June 14, 2007, my paralegal faxed a request for documents to the Correctional

28  Training Facility.

                                        1

1    4.    As of June 27, 2007, we have not received any documents from the Correctional

2    Training Facility. These documents are necessary to determine the legitimacy of petitioner's

3    claims and prepare a proper response for the Court.

4    5.    For these reasons, respondent respectfully requests an extension of time to file the

5    informal response through July 17, 2007.

6    6.    This request for an extension of time is not made for the purpose of harassment, undue

7    delay, or for any improper reason. No other request for an extension of time has been made in

8    this case.

9    7.    Petitioner is confined in state prison and cannot easily be contacted about an extension

10    of time.

11    I declare under penalty of perjury that the foregoing is true and correct and that this

12    declaration was executed on June 27, 2007, in San Francisco, California.

13

14                                AMANDA J. MURRAY
                                Deputy Attorney General
15

16

17    20093816.wpd

18

19

20

21

22

23

24

25

26

27

28

                                    2

1
2
3
4
5
6

SUPERIOR COURT OF CALIFORNIA

COUNTY OF MONTEREY

SALINAS DIVISION

7
8
9
10

| In re | NO. HC 5668 |
|---|---|
| **BOSTON et al.,** | **[PROPOSED] ORDER** |
| Petitioner, | Judge: The Honorable Jonathan R. Price |
| **On Habeas Corpus.** | |

11

Good cause appearing, respondent is granted an extension of time, and shall provide the

12

informal response by July 17, 2007. Petitioner may reply to respondent's informal response

13

within 15 days from the date of its service. (Cal. Rules of Court, rule 4.55.1(b)(2), (h).)

14
15

DATED: _____

16
17

_____
JUDGE JONATHAN R. PRICE

18
19
20
21
22
23
24
25
26
27
28

3

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:  **In re Boston, et al.**

No.:  **HC 5668**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On **June 27, 2007,** I served the attached

### RESPONDENT'S REQUEST FOR EXTENSION OF TIME; [PROPOSED] ORDER

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

**Andre' Boston**
**D-03868**
**Correctional Training Facility**
**P.O. Box 689**
**Soledad, CA 93960-0689**
in pro per

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on **June 27, 2007,** at San Francisco, California.

| M.M. Argarin | _A.M. Argarin_ |
|:---:|:---:|
| Declarant | Signature |

20094036.wpd

## CERTIFICATE OF MAILING

### C.C.P. SEC. 1013a

I do hereby certify that I am not a party to the within stated cause and that on

_____ **JUN 1 1 2007** _____ I deposited true and correct copies of the following document:

ORDER in sealed envelopes with postage thereon fully prepaid, in the mail at Salinas,

California, directed to each of the following named persons at their respective addresses

as hereinafter set forth:

Andre' Boston (D-03868)
CTF- Central Facility
PO Box 689
Soledad, CA93960-0689

Office of the Attorney General
455 Golden Gate Ave, Suite 11000
San Francisco, CA 94102
Attn: Correctional Law Section

Dated:_____ **JUN 1 1 2007** _____

LISA M. GALDOS,
Clerk of the Court

By: _____
Deputy    **S.** GARSIDE

**Superior Court of California, County of Monterey**

☐ 240 Church Street, Suite 318, Salinas, CA 93901
☐ 1200 Aguajito Road, Monterey, CA 93940
☐ 3180 Del Monte Blvd, Marina, CA 93933
☐ 250 Franciscan Way, King City, CA 93930

RECEIVED
JUN 1 3 2007

93360+0689

Andre' Boston CD-038(B)
CTF-Central Facility
PO Box 689
Soledad, CA 93960-0689

02 1M
00042272324
MAILED FROM ZIP CODE 93901

UNITED STATES POSTAGE
$ 00.41⁰
JUN 11 2007
PITNEY BOWES

# CHRONOLOGY OF ATTACHMENTS FILED WITH WRIT AGAINST CLOSE CUSTODY PROGRAM (HC 5668) – IN RE BOSTON

### as of August 30, 2007

Document #'s followed by an asterisk(s) [* or **] indicate complete records held separately in MAC files. For purposes of review, the files indicated by double asterisks [**] are confidential documents, which must be requested by court or grand jury order for investigative review).

| Date | Addressee or Event | Description of Document, Method or Event |
|------|--------------------|------------------------------------------|
| 12-23-02 | CORRESPONDENCE J. HAMLET | **Document** #1 received from CTF Administration: OPERATION PROCEDURE (OP) #40. |
| 07-21-06 | CORRESPONDENCE Inmate Appeals Coordinator | **Document #2*** filed with Inmate Appeals Coordinator: Inmate Appeal #06-02329. |
| 08-31-06 | CORRESPONDENCE Inmate Appeals Coordinator | **Document #3*** filed with Inmate Appeals Coordinator: Inmate Appeal #06-02873. |
| 09-25-06 | CORRESPONDENCE Inmate Appeals Coordinator | **Document #2*** received from Inmate Appeals Coordinator, First Level Response (DENIED): Inmate Appeal #06-02329. |
| 10-13-06 | CORRESPONDENCE Inmate Appeals Coordinator | **Document #2*** filed with Inmate Appeals Coordinator, for Second Level Response: Inmate Appeal #06-02329. |
| 10-24-06 | CORRESPONDENCE Inmate Appeals Coordinator | **Document #3*** received from Inmate Appeals Coordinator, Second Level Response (DENIED): Inmate Appeal #06-02873. |
| 11-07-06 | CORRESPONDENCE N. GRANNIS Chief, Inmate Appeals | **Document #3*** request for Director's Level Review filed with Chief, Inmate Appeals: #06-02873. |
| 11-28-06 | CORRESPONDENCE Inmate Appeals Coordinator | **Document #2*** received from Inmate Appeals Coordinator, Second Level Response (DENIED): Inmate Appeal #06-02329. |
| 12-22-06 | CORRESPONDENCE N. GRANNIS Chief, Inmate Appeals | **Document #2*** request for Director's Level Review filed with Chief, Inmate Appeals: #06-02329. |
| 01-23-07 | CORRESPONDENCE N. GRANNIS Chief, Inmate Appeals | **Document #3*** received from Chief, Inmate Appeals, (DENIED): Inmate Appeal #06-02873/IAB #0605652. |
| 03-16-07 | CORRESPONDENCE N. GRANNIS Chief, Inmate Appeals | **Document #2*** received from Chief, Inmate Appeals, (DENIED): Inmate Appeal #06-02329/IAB #0607538. |
| 04-11-07 | In re Boston (HC5668) Monterey Superior Court | **Document #146**** In re Boston (HC5668): Filed with Monterey County Superior Court re: Close Custody Program Complaint. |
| 06-08-07 | CORRESPONDENCE Monterey Superior Court | **Document #146**** In re Boston (HC5668): Order on Habeas Corpus issued by Hon. Jonathan R. Price, Judge of the Superior Court. |

| Date | Addressee or Event | Description of Document, Method or Event |
|------|--------------------|------------------------------------------|
| 06-18-07 | CORRESPONDENCE GENERAL POPULATION | **Document #146**** In re Boston (HC5668): Notification filed with the General Population, ADVANCEMENT OF POPULATION ISSUES TO THE SUPERIOR COURT |
| 07-02-07 | CORRESPONDENCE California Attorney General's Office | **Document #146**** In re Boston (HC5668): Notice received from Attorney General's Office: RESPONDENT'S REQUEST FOR EXTENSION OF TIME; [PROPOSED] ORDER. |
| 07-02-07 | CORRESPONDENCE Monterey Superior Court | **Document #146**** Order received from Clerk of Monterey Superior Court, granting: RESPONDENT'S REQUEST FOR EXTENSION OF TIME. |
| 07-13-07 | CORRESPONDENCE California Attorney General's Office | **Document #146**** In re Boston (HC5668): INFORMAL RESPONSE received from Attorney General's Office: RESPONDENT'S REQUEST FOR EXTENSION OF TIME. |
| 07-26-07 | In re Boston (HC5668) Monterey Superior Court | **Document #146**** INFORMAL REPLY filed to INFORMAL RESPONSE received from Attorney General's Office. |
| 08-30-07 | In re Boston (HC5668) Monterey Superior Court | **Document #146**** ORDER dismissing Petition received from Hon. Stephen a. Sillman, Monterey County Superior Court Judge. |

| 08-30-07 | DOCUMENTS | **End of Material Contained in Writ Master Document File** |

| | | |
|---|---|---|
| Name | Andre' Roston | David Rucker | **MC-275** |
| Address | CTF-Central Facility | CTF-Central Facility | |
| | P.O. Box 689 | P.O. Box 689 | |
| | Soledad, CA   93960-0689 | Soledad, CA  939690-0689 | **FILED** |
| CDC or ID Number | D-03868 | P-29892 | APR 1 1 2007 |

SUPERIOR COURT OF CALIFORNIA

LISA M. GALDOS
CLERK OF THE SUPERIOR COURT

COUNTY OF MONTEREY

_____DEPUTY

(Court)                                    S. GARSIDE

---

A. Roston, D. Rucker, et. al.,

Petitioner

vs.

Ben Curry; Anthony Kane, et.al.,

Respondent

**PETITION FOR WRIT OF HABEAS CORPUS**

No.  HC 5668

(To be supplied by the Clerk of the Court)

## INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

---

Approved by the Judicial Council of California for use under rule 8.380 of the California Rules of Court [as amended effective January 1, 2007]. Subsequent amendments to rule 8.380 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Page 1 of 8

Form Approved for Optional Use
Judicial Council of California
MC-275 [Rev. January 1, 2007]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 at seq.;
Cal. Rules of Court, rule 8.380
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

MC–275

**This petition concerns:**

☐ A conviction                    ☐ Parole

☐ A sentence                     ☐ Credits

☒ Jail or prison conditions       ☐ Prison discipline

☐ Other *(specify):* _____

1. Your name:  Andre' Boston, David Rucker, Robert Nydegger et. al.,

2. Where are you incarcerated?  Correctional Training Facility, Central Facility

3. Why are you in custody?  ☒ Criminal Conviction  ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").
      N/A

      _____

   b. Penal or other code sections:  N/A

   c. Name and location of sentencing or committing court:  N/A

      _____

   d. Case number:  N/A

   e. Date convicted or committed:  N/A

   f. Date sentenced:  N/A

   g. Length of sentence:  N/A

   h. When do you expect to be released?  N/A

   i. Were you represented by counsel in the trial court?  ☐ Yes.  ☐ No. If yes, state the attorney's name and address:

      N/A

      _____

4. What was the LAST plea you entered? *(check one)*

   ☐ Not guilty  ☐ Guilty  ☐ Nolo Contendere  ☐ Other:  N/A

5. If you pleaded not guilty, what kind of trial did you have?

   ☐ Jury  ☐ Judge without a jury  ☐ Submitted on transcript  ☐ Awaiting trial

6. GROUNDS FOR RELIEF                                                              **MC–275**

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(if you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

SEE ATTACHED PETITION FOR WRIT OF HABEAS CORPUS

a. Supporting facts:
Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

SEE ATTACHED PETITION FOR WRIT OF HABEAS CORPUS AND MEMORANDUM OF

POINTS AND AUTHORITIES

b. Supporting cases, rules, or other authority (optional):
*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

SEE ATTACHED PETITION FOR WRIT OF HABEAS CORPUS AND MEMORANDUM OF

POINTS AND AUTHORITIES

7. **Ground 2 or Ground** _____ *(if applicable):*                                    **MC–275**

SEE ATTACHED PETITION FOR WRIT OF HABEAS CORPUS AND MEMORANDUM OF

POINTS AND AUTHORITIES

a. Supporting facts:

SEE ATTACHED PETITION FOR WRIT OF HABEAS CORPUS AND MEMORANDUM OF

POINTS AND AUTHORITIES

b. Supporting cases, rules, or other authority:

SEE ATTACHED PETITION FOR WRIT OF HABEAS CORPUS AND MEMORANDUM OF

POINTS AND AUTHORITIES

MC–275

8. Did you appeal from the conviction, sentence, or commitment?    ☐ Yes.    ☐ No.  If yes, give the following information:

   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):

     N/A

   b. Result ___N/A___    c. Date of decision: ___N/A___

   d. Case number or citation of opinion, if known: ___N/A___

   e. Issues raised:  (1) ___N/A___

     (2) ___N/A___

     (3) ___N/A___

  f. Were you represented by counsel on appeal?  ☐ Yes.  ☐ No. If yes, state the attorney's name and address, if known:

     N/A

9. Did you seek review in the California Supreme Court?  ☐ Yes  ☒ No.  If yes, give the following information:

   a. Result ___N/A___    b. Date of decision: ___N/A___

   c. Case number or citation of opinion, if known: ___N/A___

   d. Issues raised:  (1) ___N/A___

     (2) ___N/A___

     (3) ___N/A___

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

   N/A

11. Administrative Review:

   a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

     PETITIONERS HAVE EXHAUSTED ADMINISTRATIVE REMEDIES THROUGH THE

     DEPARTMENT OF CORREXTIONS (SEE ATTACHED PETITON FOR WRIT OF HABEAS

     CORPUS AND MEMORANDUM OF POINTS AND AUTHORITIES)

   b. Did you seek the highest level of administrative review available?  ☒ Yes.    ☐ No.

   *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, **MC–275**
commitment, or **issue** in any court? ☐ Yes. If yes, continue with number 13. ☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____

(2) Nature of proceeding (for example, "habeas corpus petition"): _____

(3) Issues raised: (a) _____

(b) _____

(4) Result *(Attach order or explain why unavailable):* _____

(5) Date of decision: _____

b. (1) Name of court: _____

(2) Nature of proceeding: _____

(3) Issues raised: (a) _____

(b) _____

(4) Result *(Attach order or explain why unavailable):* _____

(5) Date of decision: _____

c. *For additional prior petitions, applications, or motions, provide the same information on a separate page.*

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)

THERE IS NO DELAY IN THE PRESENTATION OF THE CLAIMS. (SEE ATTACHED

PETITION FOR WRIT OF HABEAS CORPUS & MEMORANDUM OF POINTS & AHTHORITIES

16. Are you presently represented by counsel? ☐ Yes. ☒ No. If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes. ☒ No. If yes, explain:

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

THIS COURT HAS JURISDICTION. (SEE ATTACHED PETITION)

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: *H-5-07*

▶ _____
(SIGNATURE OF PETITIONER)

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, state bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| André' Boston                David Rucker<br>D-03868  EW-236L          P-29892  DW-113U<br>P.O. Box 689               P.O. Box 689<br>Soledad, CA 93960-0689    Soledad, CA 93960-0689 | |

TELEPHONE NO.:  N/A      FAX NO.:  N/A

ATTORNEY FOR *(Name):*  IN PRO-SE

| COURT | MONTEREY COUTY SUPERIOR COURT |
|---|---|
| STREET ADDRESS: | 1200 AQUAJITO ROAD |
| MAILING ADDRESS: | SAME |
| CITY AND ZIP CODE: | MONTEREY, CA 93940 |
| BRANCH NAME: | MONTEREY COUNTY SUPERIOR COURT |

PETITIONER/PLAINTIFF:   ANDRE' BOSTON, DAVID RUCKER,
et. al.,

RESPONDENT/DEFENDANT:   BEN CURRY, et. al.,

| PROOF OF SERVICE BY MAIL | CASE NUMBER: |
|---|---|

1. I am at least 18 years of age, not a party to this action, and I am a resident of or employed in the county where the mailing took place.

2. My residence or business address is:       DAVID RUCKER
P-29892  DW-113U
P.O. Box 689
SOLEDAD, CA 93960-0689

3. I served a copy of the following documents *(specify):*

[x] Petition for Writ of Habeas Corpus      [ ] _____

by enclosing them in an envelope AND
a. [ x ] **depositing** the sealed envelope with the United States Postal Service with the postage fully prepaid.
b. [ X ] **placing** the envelope for collection and mailing on the date and at the place shown in item 4 following our ordinary business practices. I am readily familiar with this business's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service in a sealed envelope with postage fully prepaid.

4. The envelope was addressed and mailed as follows:
   a. Name of person served: District Attorney Dean Flippo
   b. Address:        1200 Aguajito Road Rm. 301
                      Monterey CA 93940
   c. Date mailed:    4-5-07
   d. Place of mailing *(city and state):*  Soledad, CA

[ ] STATE ATTORNEY GENERAL
P. O. Box 944255
Sacramento, CA 94244

5. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Date:  4-05-07

DAVID RUCKER
_____           _____
(TYPE OR PRINT NAME)                (SIGNATURE OF PERSON COMPLETING THIS FORM)

1    **Andre' Boston**                          **David Rucker**

2    **D-03868, EW-235L**                      **P-29892, DW-113U**

3    **P.O. Box 689**                           **P.O. Box 689**

4    **Soledad, CA  93960-0689**             **Soledad, CA  93960-0689**

5    **Petitioner, Pro-Se**                   **Petitioner, Pro-Se**

6

7

8                    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                                **COUNTY OF MONTEREY**

10   **In re Men's Advisory Council**   )        **Case No.**_____

11   **et. al.,**                              )        **Petition for Writ of Habeas Corpus**

12   **On Habeas Corpus**             )

13                                              **I.**

14                                      **INTRODUCTION**

15        1.  Petitioners, Andre' Boston, David Rucker, Robert Nydegger, Craig Gerstner,

16   Michael Comeaux , David Moreno, and Adam Vasquez are members of the Men's Advisory

17   Council (hereinafter referred to as the MAC or IAC) Executive Body at the Correctional

18   Training Facility (hereinafter referred to as CTF), Central Facility, located in Soledad,

19   California.  While performing their duties as duly elected MAC Executive Body members for

20   the general population at their facility, petitioners observed that CTF was not in compliance

21   with the regulatory authority provisions outlined in **California Code of Regulations, Title 15**

22   **(hereinafter referred to as the CCR, Title 15)** § 3377.1 regarding program assignments and

23   activities for Close B Custody inmates housed at CTF.  Petitioners requested review and

24   compliance with the applicable regulatory authority by the prison administration. The prison

25   administration has repeatedly refused to comply with the applicable regulations.

26        2.  Petitioners maintain the respondents have acted contrary to several regulations of the

27   California Department of Corrections and Rehabilitation (hereinafter referred to as CDCR/

28   Department) and that some of these acts have violated petitioners' rights.

1                                    **II.**

2                                **PARTIES**

3      3. Petitioner Andre' Boston is a prisoner presently incarcerated at the Correctional Training

4      Facility.

5      4. Petitioner David Rucker is a prisoner presently incarcerated at the Correctional Training

6      Facility.

7      5. Petitioner Robert Nydegger is a prisoner presently incarcerated at the Correctional

8      Training Facility.

9      6. Petitioner Adam Vasquez is a prisoner presently incarcerated at the Correctional Training

10     Facility.

11     7. Petitioner Michael Comeaux in a prisoner presently incarcerated at the Correctional

12     Training Facility.

13     8. Petitioner David Moreno is a prisoner presently incarcerated at the Correctional Training

14     Facility.

15     9. Petitioner Craig Gerstner is a prisoner presently incarcerated at the Correctional Training

16     Facility.

17     10. Respondent Ben Curry is the Warden at the Correctional Training Facility and is the

18     custodian of petitioners. This respondent is also responsible for program assignments and

19     activities for inmates at CTF.

20     11. Respondent Anthony Kane, is currently the California Department of Corrections and

21     Rehabilitation's Associate Director for general population Level II and Level III inmates. At

22     the times herein mentioned this respondent was the Acting Warden of the Correctional

23     Training Facility and legal custodian of petitioners.

24     12. Respondent Pat Barker is the former Chief Deputy Warden of the Correctional

25     Training Facility. This respondent in her official capacity at all times mentioned herein was

26     in charge of program assignments and activities for inmates at CTF.

27     13. Respondent Colleen Noll, is the current acting Chief Deputy Warden of CTF-

28     Central Facility and this respondent in her official capacity at all times mentioned herein has

2

1    been in charge of program assignments and activities for inmates at CTF.

2    14. Respondent J. Sisk, is currently the Associate Warden for Central Facility at CTF. At

3    all times herein mentioned herein this respondent has been the Associate Warden for Central

4    Facility at CTF and the designated Coordinator for the MAC. This respondent assists the with

5    Petitioners coordinating their daily MAC activities and acts as the administrative liaison

6    Between the MAC and the prison administration.

7    //

8    ## III.

9    ## STATEMENT OF THE FACTS

10    15. CTF is a prison in the CDCR located in Soledad, California. This prison is a multi-

11    facility institution that currently houses inmates of several security levels according to

12    their classification scores and custody requirements.

13    16. CTF-Central Facility houses approximately 2828 general population inmates who

14    have a classification score appropriate for housing of Level II inmates.

15    17. Among the general population there are approximately 550 (or more) inmates with

16    classification scores appropriate for Level II housing who are designated as Close B Custody

17    inmates.

18    18. Petitioners are all members of the MAC Executive Body for CTF-Central Facility.

19    The MAC is a group of inmates who are duly elected by the general population to represent

20    the interest of their constituents. The MAC operates under its locally approved Constitution

21    and By-Laws. The MAC is comprised of a General Council and executive officer positions

22    which are Executive Body positions. The General Council elects from their membership, the

23    Council members who will occupy Executive Body positions. The Executive Body members

24    represent both the interest of the General Council and the general population.

25    19. The applicable California Regulatory Authority outlined in **CCR, Title 15 § 3377.1**

26    contains the Departmental Policy for program assignments and activities of all Close B

27    Custody inmates housed in the CDCR. This regulation governs the program assignments

28    and activities of all Close B Custody inmates within CDCR institutions. (see exhibit A)

3

1    20. CTF's local Operations Procedure (hereinafter referred to as OP) for Close B

2    Custody program assignments and activities is OP #34. The language of this local OP permits

3    Close B Custody inmates access to assignments and activities between the facility's East and

4    West Gates, based upon a clause which establishes a superficial and unauthorized definition of

5    a "Facility Security Perimeter". This definition conflicts with the definition contained in the

6    applicable regulations. (see exhibit A and B)

7    21. CTF's OP #40 for Central Facility Unlocks and Yard Cards contains supplemental

8    information and contains language for Close B Custody inmate access to the recreation

9    yard (which is within the Departmental definition of a Facility Security Perimeter)

10   up until 2200 hours (see exhibit A and C )

11   22. CTF is not in compliance with the relevant regulations as they pertain to Close B

12   Custody inmate program assignments and activities.

13   23. **CCR, Title 15 § 3377.1 (a)(4)(B)** states in pertinent part: "Close B Custody inmates

14   shall be permitted to participate in program assignments and activities during the hours of

15   0600 hours to 2000 hours in areas located within the facility security perimeter including

16   beyond the work change area in a designated Level II, Level III, or Level IV institution."

17   The use of the mandatory language "shall" in this provision imposes a duty of all CDCR

18   institutions to comply with this regulation. CTF does not comply with the full provisions of

19   this regulation.

20   24. CTF only permits Close B Custody inmates program activities on the recreation

21   yard between the hours of 0900 to 1100 hours, 1300 hours to 1500 hours. Close B Custody

22   inmates are not given access to the recreation yard beyond 1500 hours despite the applicable

23   regulation authorizing activities up to 2000 hours.

24   25. CTF only permits Close B Custody inmates program assignments within the

25   superficial defined facility security perimeter imposed by the indicated clause in OP #34;

26   but some assignments located within that same security perimeter, such as the Clothing

27   Room, Laundry, and Culinary are excluded for Close B Custody assignments. This clause

28   and the application of a superficial facility security perimeter excludes Close B Custody

4

1  | assignments in locations beyond the work change area, otherwise authorized by CDCR.

2  | 26. For decades, as authorized by Departmental regulations, Close B Custody inmates

3  | were allowed access to limited activities within the designated housing unit after 2000 hours.

4  | 27. On December 23, 2002, the CTF Administration issued a memorandum revoking

5  | Close B Custody programming after 2000 hours. That memorandum did not express any

6  | reason(s) or legitimate penological interests to justify the removal of the authorized

7  | limited program activities. As a result, Close B Custody inmates were denied participation in

8  | program activities within their designated housing units (located within the facility security

9  | perimeter) from 2000 hours until the general evening lock up and count. (see exhibit D)

10 | 28. Since December 23, 2002, CTF has not permitted Close B Custody inmates any

11 | of the Departmentally authorized program activities after 2000 hours, even if those activities

12 | take place within a designated housing unit, located within the facility security perimeter.

13 | 29. Despite CDCR's own regulations, CTF has refused to comply with the applicable

14 | provisions of **CCR, Title 15 § 3377.1 (a)(4)(B)** , which authorize more program assignments

15 | and activities for Close B Custody than currently exist at CTF.

16 | 30. On August 31, 2006, petitioners submitted an administrative grievance on the

17 | behalf of the Close B Custody inmates, based upon the failure of the prison administration

18 | to comply with the regulatory provisions of **CCR, Title 15 § 3377.1** relating to Close B

19 | Custody program assignments and activities.

20 | //

21 | **CONTENTIONS**

22 | 1. PETITIONERS HAVE EXHAUSTED THEIR ADMINISTRATIVE REMEDIES.

23 | 2. PETITIONERS CONTEND THAT RESPONDENTS HAVE A DUTY TO

24 | FOLLOW ADMINISTRATIVE RULES AND REGULATIONS.

25 | 3. PETITIONERS CONTEND THAT THEY HAVE A RIGHT CONVEYED BY

26 | THE REGULATORY AUTHORITY CODIFIED IN THE CCR, TITLE 15 TO

27 | REPRESENT THE INTEREST OF THE GENERAL POPULATION AT CTF.

28 |

5

1    4. PETITIONERS CONTEND THAT THE CALIFORNIA REGULATORY

2    AUTHORITY PROVISIONS OF **CCR, TITLE 15 § 3377.1** ENTITLE CLOSE

3    B CUSTODY INMATES TO THE FULL PROGRAM ASSIGNMENTS AND

4    ACTIVITIES BETWEEN THE HOURS OF 0600 AND 2000 HOURS.

5    5. PETITIONERS CONTEND THAT THE CALIFORNIA REGULATORY

6    AUTHORITY PROVISIONS OF **CCR, TITLE 15 § 3377.1** ENTITLE CLOSE

7    B CUSTODY INMATES TO LIMITED ACTIVITIES AFTER 2000 HOURS

8    WHEN THE LIMITED ACTIVITY IS IN A DESIGNATED HOUSING UNIT

9    WITHIN THE FACILITY SECURITY PERIMETER.

10    6. PETITIONERS CONTEND THAT RESPONDENTS HAVE APPLIED A

11    SELECTIVE INTERPRETATION OF THE APPLICABLE REGULATORY

12    AUTHORITY AND HAVE REFUSED TO COMPLY WITH THE FULL

13    PROVISIONS OF **CCR, TITLE 15 § 3377.1,** AS OUTLINED THEREIN.

14    7. RESPONDENTS HAVE VIOLATED DEPARTMENTAL POLICY BY HAVING

15    A SUBORDINATE RESPOND TO THE ACTIONS OF A SUPERIOR OFFICIAL.

16    //

17    **REQUEST FOR RELIEF**

18    Petitioners are without remedy, save for habeas corpus in this matter.  Accordingly,

19    petitioners request that this court:

20    1. Issue a writ of habeas corpus;

21    2. Issue an order to show cause;

22    3. Declare the rights of the parties;

23    4. Order the respondents to fully comply with all applicable Departmental regulations

24    pertaining to Close B Custody program activities and assignments in a designated

25    Level II Facility;

26    5. Order the respondents to implement forthwith the immediate necessary procedures

27    to initiate full access for Close B Custody inmates to program assignments and

28    activities between the hours of 0600 and 2000 hours in all areas located within the

6

1    facility security perimeter including beyond the work change area as authorized by

2    Departmental regulation;

3    6.  Order the respondents to forthwith and immediately implement the necessary

4    procedures to initiate access for Close B Custody to limited activities after 2000 hours

5    in a designated housing unit located within the facility security perimeter as defined by

6    CDCR.

7    7.  Appoint counsel or award reasonable attorney fees for representation of this case; and

8    8.  Grant any and all other relief found necessary or appropriate.

9

10

11    Date:   4-5-07

12    Andre' Boston, Petitioner, Pro-Se

13    Date:   4-3-07

14    David Rucker, Petitioner, Pro-Se

15    Date:   4-5-07

16    Robert Nydegger, Petitioner, Pro-Se

17    Date:   4.5.07

18    Adam Vasquez, Petitioner, Pro-Se

19    Date:   4-5-07

20    Michael Comeaux, Petitioner, Pro-Se

21    Date:   4/5/07

22    David Moreno, Petitioner, Pro-Se

23    Date:   4-5-07

24    Craig Gerstner, Petitioner, Pro-Se

25    //

26

27

28

1

## CONCLUSION

2    For the reasons stated above, petitioners are entitled to a declaration of their rights and

3    are entitled to all program assignments and activities designated by the provisions outlined in

4    **CCR, Title 15 § 3377.1 (a)(4)(B).**

5

6    Date: _____4-5-07_____

7                                                    Andre' Boston, Petitioner, Pro-Se

8    Date: _____4-5-07_____

9                                                    David Rucker, Petitioner, Pro-Se

10   Date: _____4-5-07_____

11                                                   Robert Nydegger, Petitioner, Pro-Se

12   Date: _____4-5.07_____

13                                                   Adam Vasquez, Petitioner, Pro-Se

14   Date: _____4-5-07_____

15                                                   Michael Comeaux, Petitioner, Pro-Se

16   Date: _____4/5/07_____

17                                                   David Moreno, Petitioner, Pro-Se

18   Date: _____4-5-07_____

19                                                   Craig Gerstner, Petitioner, Pro-Se

20   //

21

22

23

24

25

26

27

28

8

1              **VERIFICATION**

2        I do hereby declare by my signature below that I am one of the petitioners in this action.

3   I have read the foregoing Petition For Writ of Habeas Corpus and the facts stated therein are

4   true of my own knowledge, except as to matters that are stated on my own information and

5   belief, and as to those matters I believe them to be true.

6        I declare under the penalty of perjury that the foregoing is true and correct and that this

7   verification was executed on the indicated date at the Correctional Training Facility, Soledad,

8   California.

9

10  Date: _____4-5-07_____          _____

11                                  Andre' Boston, Petitioner, Pro-Se

12  Date: _____4-5-07_____          _____

13                                  David Rucker, Petitioner, Pro-Se

14  Date: _____4-5-07_____          _____

15                                  Robert Nydegger, Petitioner, Pro-Se

16  Date: _____4-5.07_____          _____

17                                  Adam Vasquez, Petitioner, Pro-Se

18  Date: _____4-5-07_____          _____

19                                  Michael Comeaux, Petitioner, Pro-Se

20  Date: _____4/5/07_____          _____

21                                  David Moreno, Petitioner, Pro-Se

22  Date: _____4-5-07_____          _____

23                                  Craig Gerstner, Petitioner, Pro-Se

24  //

25

26

27

28

9

1     **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**

2     **THE PETITION FOR WRIT OF HABEAS CORPUS**

3

4     **CONTENTION I.**

5     **PETITIONERS HAVE EXHAUSTED THEIR ADMINISTRATIVE REMEDIES**

6     A state court petition for writ of habeas corpus, commonly filed by prisoners to obtain

7 judicial review of conditions of confinement, generally will not be considered unless the

8 prisoner has completed the administrative appeal. **In re Strick (1983) 148 Cal. App.3d 906,**

9 **911 [196 Cal Rptr. 293]; In re Dexter (1979) 25 Cal.3d 921, 925 [160 Cal Rptr. 118];**

10 **In re Muszalski (1975) 52 Cal.App.3d 500, 503 [125 Cal Rptr. 286]**

11     Petitioners contend that they have exhausted their available administrative remedies

12 through CDCR as required by procedure and law.

13                      APPEAL ONE

14     Petitioners initially submitted their inmate appeal/grievance form (CTF Appeal Log #

15 CTF-C-06-02329) to the CTF Administration for resolution on July 21, 2006. Due to the

16 nature of the issue(s) raised in the appeal and regulatory provisions, the appeal was bypassed

17 to the first level review on that same day. (see exhibit E )

18     On September 25, 2006 the appeal was responded to at First Level by Correctional

19 Lieutenant R. Lynch. The appeal decision at this level was "denied." (see exhibit F)

20     On October 13, 2006, in view of several reasons, which included violation of Department

21 policy and fundamental conflict of interest created by a subordinate responding to an appeal

22 for the actions of a superior, petitioners requested a second level review of their appeal. (see

23 exhibit G)

24     On November 28, 2006, the appeal was responded to at the second formal level by

25 C. Noll, acting Associate Warden for Central Facility and approved by P. Barker, the acting

26 Warden. The appeal decision was "denied". (see exhibit H )

27     On December 22, 2006, in view of several reasons, including the violation of Departmental

28 policy, petitioners requested a Director's level (Departmental) review of their appeal.

1    The purpose of this request was based upon numerous issues that arose regarding the appeal

2    decision issued at the second level, which lacked clarification or explanation. (see exhibit I)

3          On March 16, 2007, a Director's Level Appeal Decision (IAB Case No. 0607538) was

4    issued by N. Grannis, Chief, Inmate Appeals Branch. The appeal decision was "denied." The

5    appeal response indicated that the decision exhausts the administrative remedy available to

6    appellants within CDCR. (see exhibit J)

7                    APPEAL TWO

8          Petitioners submitted their inmate appeal/grievance form (CTF Appeal Log #

9    CTF-C-06-02873) to the CTF Administration for resolution on August 31, 2006. Due to the

10    nature of the issue(s) raised in the appeal and regulatory provisions, the appeal was bypassed

11    to the second level review on September 30, 2005. (see exhibit K )

12          On October 19, 2006, the appeal was responded to at the second level by J. Sisk,

13    acting Associate Warden and approved by P. Barker, acting Warden. The appeal was

14    "denied". (see exhibit L)

15          On November 9, 2006, in view of several reasons, including the violation of Department

16    policy, petitioners requested a Director's Level (Departmental) review of their appeal.

17    The purpose of this request was based upon numerous issues that arose regarding the appeal

18    decision issued at the second level, which lacked clarification or explanation. (see exhibit M)

19          On January 23, 2007, a Director's Level Appeal Decision (IAB Case No. 0605652) was

20    issued by N. Grannis, Chief, Inmate Appeals Branch. The appeal decision was "denied". The

21    appeal response indicated that the decision exhausts the administrative remedy available to

22    appellants within the CDCR. (see exhibit N)

23    There are no other speedy, plain or adequate remedies at law available to petitioners in

24    this matter.

25          Based upon the foregoing, petitioners have fully exhausted the available administrative

26    remedies and the claims presented are ripe for this court's jurisdiction.

27         A prisoner may bring a petition for writ of habeas corpus to ask a court to declare and

28    enforce rights regarding prison or parole. A petition may be based in constitutional, statutory,

1    or administrative laws. **In re Harrell** (1970) 2 Cal. 3d 675 [87 Cal Rptr. 504]; **In re Davis**

2    **(1979) 25 Cal. 3d 384 [159 Cal Rptr. 384].**

3    //

4                                    **CONTENTION II.**

5                **PETITIONERS ASSERT THAT RESPONDENTS HAVE A DUTY**

6                **TO FOLLOW ADMINSTRATIVE RULES AND REGULATIONS**

7        Petitioners contend that respondents have a duty to follow administrative rules and

8    regulations. Petitioners base their contention on the following points and authorities.

9        Petitioners contend that all CDCR "regulations", as that word is defined by statue in the

10    indicated Government Code must be created and approved in accord with the requirements of

11    the State Administrative Procedures Act (APA).

12        "Regulation" is defined as every rule, regulation, order or standard of general application

13        adopted by any agency to implement, interpret or make specific the law enforced or

14        administered by the agency, or to govern its procedure." **Government Code § 11342 (g).**

15    A regulation cannot be enforced unless the agency that created it has complied with the APA.

16    (see **Government Code § 11342.1**; see also **Union of American Physician and Dentists v.**

17    **Kizer (1990) 223 Cal.App.3d. 490 [272 Cal Rptr. 886]; Tooma v. Rowland (Tuolumne**

18    **County Superior Court Feb. 6, 1991), Case no. 32735,** Order Granting Writ of Mandate

19    (ordering CDC to cease enforcing **D.O.M. § 54020** until enacted in compliance with the APA).

20    It is well established that an administrative regulation has the force of law and is binding

21    on the issuing agency. **United States v. Nixon (1974) 418 U.S. 683, 695-696 [94 S. Ct. 3090;**

22    **41 L.Ed.2d 1039]; Atkins v. Rivera (1986) 477 U.S. 154 [106 S. Ct. 2456; 91 L.Ed.2d 131];**

23    **Agricultural Labor Relations Board v. Superior Court (1976) 16 Cal.3d 392, 401 [128**

24    **Cal Rptr. 183].**

25        Petitioners further contend that California courts have ordered the CDCR to comply with

26    its own rules, even if the CDCR preferred not to because of the benefit resulting to prisoners.

27        In the case of **In re Reina (1985) 171 Cal. App.3d. 638 [217 Cal Rptr. 535],** the court

28        ordered the CDC to follow its own rules and award worktime credits to prisoners unable

12

1    to work due to a non-adverse transfer.

2    See also **In re French** (1980) 106 Cal.App.3d 74, 85, n. 24 [164 Cal Rptr. 800]  in

3    which it was stated that the Director's Rules are binding on individual institutions.

4    //

5    **CONTENTION III.**

6    **PETITIONERS CONTEND THAT THEY HAVE A RIGHT CONVEYED**

7    **BY THE CALIFORNIA REGULATORY AUTHORITY CODIFIED IN**

8.   **CCR, TITLE 15 § 3230 TO REPRESENT THE**

9    **INTEREST OF THE GENERAL POPULATION AT CTF.**

10   Petitioners contend that pursuant to the provisions of the **CCR, Title 15 § 3230** they have

11   and maintain the departmental right as outlined by regulation to represent the interests of

12   the general population at this facility.

13   **CCR, Title 15 § 3230 (a)** provides: "Each warden shall establish an inmate advisory

14   council, which is representative of the facility's inmate ethnic group.  At the discretion

15   of the Warden, subcommittees of the council may also be established to represent

16   subfacilities or specialized segments of the inmate population."

17   **CCR, Title 15 § 3230 (a)(1)** provides: "Council members shall serve to advise and

18   communicate with the Warden and other staff those matters of common interests and

19   concern to the inmate general population."

20   Both sections contain the mandatory language of "shall" when referring to the inmate

21   advisory council.  According to Departmental standards enumerated in **CCR, Title 15 §**

22   **3005** use of the word "shall" is mandatory.

23   **CCR, Title 15 § 3000.5 (c)** provides:  "Shall" is mandatory, "should" is advisory, and

24   "may" is permissive."

25   Petitioners contend that this regulatory provision imposes a mandate upon the

26   Department and all of its facilities to establish an inmate advisory council to represent the

27   interests of the general population.  Petitioners contend that this regulatory right creates a

28.  departmental mandate because the Department and its facilities are duty bound to establish an

1   inmate advisory council and do not have the discretion to deny the establishment of an inmate

2   advisory council.

3       Petitioners are all members of the MAC, housed in CTF-Central Facility, at Soledad,

4   California.  All petitioners have been duly elected as members of the Central Facility MAC

5   Executive Body and function under the authorized MAC Constitution and By-Laws as required

6   by the Department.  (see exhibit O)

7       **CCR, Title 15 § 3230 (a)(2)** provides: " The council shall operate only under the

8       constitution and by-laws prepared by the council's inmate representatives, with the advice

9       and guidance of designated staff and approved by the Warden."

10  //

11                          **CONTENTION  IV.**

12          **PETITIONERS CONTENDS THAT THE CCR, TITLE 15 § 3377.1**

13          **ENTITLE CLOSE B CUSTODY INMATES TO THE FULL PROGRAM**

14          **ASSIGNMENTS AND ACTIVITIES BETWEEN THE HOURS OF 0600**

15          **AND 2000 HOURS AS MANDATED IN THE REGULATORY PROVISIONS**

16      Petitioners contend that the provisions of **CCR, Title 15 § 3377.1 (a)(4)(B)** contains

17  the language for program assignments and activities which Close B Custody designated

18  inmates are entitled to between the hours of 0600 and 2000 hours.  This regulatory provision

19  provides in pertinent part: "Close B Custody inmates shall be permitted to participate in

20  program assignments and activities during the hours of 0600 to 2000 hours in areas located

21  within the facility security perimeter including beyond the work change area in a designated

22  Level II, Level III or Level IV institution."

23      Petitioners contend that **CCR, Title 15 § 3000** provides the Departmental definition

24  for the regulations found in the CCR.  Under the definitions the Department has clearly

25  outlined their definition of a designated Level II housing facility. This definition is as follows:

26      "Designated Level II Housing means a housing facility encompassed by a facility security

27      perimeter and constructed to provide celled housing for inmates with Level II

28      classification scores."  **CCR, Title 15 § 3000.**

                                    14

1    Petitioners contend that **CCR, Title 15§ 3377.1 (a)(4)(A)** provides the Departmental

2    guidelines for housing of Close B Custody inmates and states: " (A) Housing shall be in cells

3    within designated institutions in housing units located within an established facility security

4    perimeter."

5        The Departmental definition of a "facility security perimeter" pursuant to **CCR, Title**

6    **15 § 3000** is as follows: " Facility Security Perimeter is any combination of living unit, work

7    area and recreation area perimeters that is set aside to routinely restrict inmate movement

8    based on custody level. This perimeter will contract and expand depending upon the weather,

9    lighting conditions and hours of operation."

10       Petitioners contend that CTF-Central Facility is a Designated Level II Housing Facility

11   with a facility security perimeter, which houses inmates who have Level II classification

12   scores. This populace also includes Close B Custody inmates who have classification scores

13   consistent with Designated Level II Housing.

14       Petitioners contend that Departmental guidelines outline the program assignments and

15   activities that the Close B Custody segment of the populace are entitled to. Within the

16   applicable provision of the regulation, the Department has inserted terminology utilizing the

17   word "shall" regarding program assignments and activities between 0600 and 2000 hours. The

18   terminology of "shall" is mandatory pursuant to Departmental regulations.

19       Petitioners contend that the Rules of Construction in the **CCR, Title 15 § 3000.5**

20   provides in pertinent part: "(c) "Shall" is mandatory, "should" is advisory, and "may" is

21   permissive.

22        Use of the terminology "shall" in **CCR, Title 15 § 3377.1 (a)(4)(B)** when referring to

23   program assignments and activities during the hours of 0600 and 2000 hours in areas located

24   within the facility security perimeter **including beyond the work change area in a**

25   **designated Level II institution** imposes upon the Department and all institutions  the

26   mandatory requirement of providing **full** access to assignments and activities between the

27   hours of 0600 and 2000 hours.

28

15

1    Petitioners contend that they clearly have an entitlement to "program assignments and

2    activities" between the hours of 0600 and 2000 hours including beyond the work change area.

3    //

4    ## CONTENTION V.

5    ## PETITIONERS CONTEND THAT THE CCR, TITLE 15 § 3377.1

6    ## ENTITLES CLOSE B CUSTODY INMATES TO LIMITED ACTIVITIES

7    ## IN A DESIGNATED HOUSING UNIT LOCATED WITHIN THE

8    ## FACILITY SECURITY PERIMETER

9    Petitioners contend that they have an entitlement to limited dayroom/tier activities after

10    2000 hours **"WHEN"** this activity is in a designated housing unit located within the

11    facility security perimeter.

12    Petitioners base their contention on the fact that the regulatory authority already provides

13    the language which allows Close B Custody participation in work program assignments until

14    2200 hours when the work program is in an assigned housing unit. Clearly, the legislative

15    spirit and intent in implementing this regulation was not intended to prohibit Close B Custody

16    designated inmates from participating in "ALL" program and activities after 2000 hours, but

17    merely to curtail the "FULL" access afforded between the hours of 0600 hours to 2000 hours.

18    It is equally clear that legislative spirit and intent of the regulation was meant to restrict Close

19    B Custody inmate program assignments and activities after 2000 hours to "within a

20    designated housing unit within the facility security perimeter."

21    **CCR, Title 15 § 3377.1 (a)(4)(B)** provides in pertinent part: "Close B Custody inmates

22    shall be permitted to participate in program assignments until 2200 hours when the work

23    program is in an assigned housing unit located within the facility security perimeter.

24    Close B Custody inmates may participate in limited evening activities after 2000 hours

25    until the general evening lock and count when the limited activity is in a designated

26    housing unit located within the facility security perimeter."

27    Petitioners contend that the language of the above CCR section is clear in that,

28    limited activity after 2000 hours, until the general evening lockup and count is permitted

16

1    for  Close B Custody inmates when that activity is in a designated housing unit within the

2    facility security perimeter.

3    //

4                                **CONTENTION VI.**

5              **PETITIONERS CONTEND THAT RESPONDENTS HAVE APPLIED A**

6              **SELECTIVE INTERPRETATION OF APPLICABLE REGULATORY**

7    **AUTHORITY AND HAVE REFUSED TO COMPLY WITH THE FULL PROVISIONS**

8                   **OF CCR, TITLE 15§ 3377.1, AS OUTLINED THEREIN**

9

10        Petitioners contend that in this case the respondents have elected to apply a selective

11    interpretation of applicable regulatory authority and refused to comply with the applicable

12    provisions of CCR, **Title 15 § 3377.1.**

13        Petitioners contend that the respondents have utilized the language placed in a local

14    procedure as a basis to apply selective interpretation of the applicable regulatory authority.

15    CTF Operations Procedure #34 deals with Close B Custody program assignments and

16    activities.  (see exhibit B)

17        Petitioners contend that while most of the language in this local procedure under the topic

18    of "Close Custody Program/Work Assignments" bears a resemblance to the language in the

19    applicable regulatory authority, respondents have inserted a clause that implements a

20    arbitrary "local facility security perimeter" for Close B Custody assignments and activities to

21    allow for selective application of Departmental regulations.  The clause of the local

22    Operation Procedures that contradict the regulatory authority and definition, state in pertinent

23    part: "Close B Custody, Level II inmates shall be permitted to participate in program

24    assignments and activities, i.e.- Alcoholic Anonymous and Narcotics Anonymous, during the

25    hours of 0600 and 2000 hours in areas located within the **Central Facility Security Perimeter**

26    **(West Gate to East Gate)."** Petitioners contend that the language of the preceding sentence

27    (highlighted in bold), creates and imposes an arbitrary "facility security perimeter" that

28    contradicts the applicable regulatory authority. The Departmental definition of a "facility

17

1    security perimeter" has already been defined by regulation and any selective interpretation

2    of this definition violates the very essence of the regulation. If the Department wanted to make

3    specific accommodations beyond those already stated in the CCR, multiple changes to the

4    Director's Rules over the past two years which specifically address Close Custody programs

5    provided more than ample opportunity for the Department to implement changes. However,

6    the latest revisions of CCR sections impacting Close Custody programming and activities

7    issued in July 2006, did not reflect any changes.   The Department's position remains

8    unchanged and is clear in this matter. (see exhibit A)

9         **CCR, Title 15 § 3000** provides the following relevant definitions: "**Facility Security**

10        **Perimeter** is any combination of living unit, work area and recreation area perimeters

11        that is set aside to routinely restrict inmate movement base on custody level. This

12        perimeter will contract and expand depending upon the weather, lighting conditions and

13        hours of operation."

14    Petitioners contend that by Departmental definition, the "Facility Security Perimeter" is

15    **"INCLUSIVE"** of the recreation area not **"EXCLUSIVE"** of it. Quite to the contrary, the

16    local provisions have made the recreation yard and all areas beyond the East and West Gate

17    **"EXCLUSIVE"** in context. The local interpretation and selective compliance with the

18    Departmental definition is contrary to the applicable regulatory authority. If taken and applied

19    literally, the local provision would prohibit Close B Custody inmates from ever having

20    access to the recreation yard because this area is not within the **"WEST GATE TO EAST**

21    **GATE"** (the locally defined facility security perimeter).

22    Petitioners contend that Departmental Policy as defined in the **DOM** precludes and

23    specifically prohibits supplements (OP's) from creating new policy or regulations.

24    Furthermore, petitioners contend that **DOM § 51020.1** states in pertinent part: "Supplements

25    shall: ...not duplicate or contradict DOM provisions."

26    Petitioners contend that based upon respondents' selective interpretation and compliance

27    with the applicable regulatory authority, CTF Close B Custody inmates are only being

28    allowed partial access to the recreation yard between the hours of 0900 to 1100 and 1300 to

18

1  1500 hours. Petitioners further contend that Close B Custody inmates are not being allowed

2  program assignments in areas beyond the work change area (and in some cases to areas **within**

3  CTF's defined security perimeter, i.e., Culinary, Clothing Room, etc..) Petitioners additionally

4  contend that CTF Close B Custody inmates are being provided only limited evening activities

5  within the housing unit (which is clearly located within CTF's defined facility security

6  perimeter) between the hours of 1830 and 1945 hours. This despite regulatory language,

7  which authorizes limited activity until general evening lock up and count at 2100 hours.

8  Petitioners would contend that prior to December 22, 2002, respondents were in correct,

9  but partial compliance with the applicable regulations by allowing limited activities in the

10  designated housing unit located within the facility security perimeter after 2000 hours until

11  general evening lockup and count. However, on December 23, 2002 for no apparent reason

12  and without any cited legitimate penological interest the respondents revoked the opportunity

13  for even this limited form of evening program activity. (see exhibit D)

14  Petitioners contend that in the administrative appeal process the respondents failed to

15  address why Close B Custody inmates are not permitted the full program activities such as

16  access to the recreation yard area and assignments between the hours of 0600 and 2000 hours

17  or in areas beyond the work change area and are not provided access to limited activities after

18  2000 hours in designated housing units located within the facility security perimeter. The

19  respondents advanced a myriad of reasons in an attempt to excuse and /or exempt their

20  compliance with the applicable regulatory authority for Close B Custody program

21  assignments and activities. Petitioners contend that the refusal to comply with the applicable

22  regulatory authority is in fact a violation of the regulation, and there is no excuse that can

23  exempt or excuse respondents from compliance with regulatory law or Departmental policy.

24  To draw attention to the issue of compliance with regulations, petitioners attached a copy

25  of an informational bulletin to their initial appeal submission, which had been issued from

26  the Inmate Appeal Branch in CDCR headquarters to all institutions. That bulletin addressed

27  CDCR's internal view of the inappropriateness of denying Close B Custody Program Access.

28  (see exhibit E) This bulletin reflected that a court had made the determination an institution

19

1  **could not** have a reasonable interest that contravenes the regulations under which they

2  operate. The reported circumstances in this bulletin mirror this instant case situation. Yet,

3  the respondents attempted to downplay the significance of this document in their second level

4  appeal response as "informational" because it was not a regulatory publication.

5      Assuming arguendo, the respondents position about the bulletin being informational in

6  nature, petitioners contend that the regulations, which govern Close B Custody program

7  assignments and activities are not "informational" and since an institution **could not** have a

8  reasonable interest that contravenes the regulations under which it operates, respondents **must**

9  fully comply with all applicable regulations.

10      Petitioners contend that the respondents lack of compliance with the applicable regulations

11  violates the provisions contained therein.

12  //

13  <center>**CONTENTION VII.**</center>

14  <center>**RESPONDENTS HAVE VIOLATED DEPARTMENTAL**</center>

15  <center>**POLICY BY HAVINGA SUBORDINATE**</center>

16  <center>**RESPOND TO THE ACTIONS OF A SUPERIOR OFFICIAL**</center>

17      Petitioners contend that at the first level review in the administrative appeal process,

18  the respondents violated Departmental policy by having a subordinate staff member respond on

19  behalf of the actions of a superior official.

20      **CCR, Title 15 § 3084.5 (e)** states in pertinent part:

21      "(e) Appeal Review. Formal appeals shall not be reviewed by a staff person who

22      participated in the event or decision being appealed or who is lower administrative

23      rank than any participating staff…"

24      Petitioners initially submitted their inmate appeal/grievance form (CTF Appeal Log #

25  CTF-C-06-02329) to the CTF Administration for resolution on July 21, 2006. Due to the

26  nature of the issue(s) raised in the appeal and regulatory provisions, the appeal was bypassed

27  to the first level review on that same day. (see exhibit E)

28      On September 25, 2006 the appeal was responded to at this level by Correctional

<center>20</center>

1    Lieutenant R. Lynch. The appeal decision at this level was "denied". (see exhibit F)

2        Petitioners contend that this was inappropriate for the following reasons. Operation

3    Procedures are signed by the Warden when implemented and constitute institutional policy

4    decisions and directives that are not subject to review or commentary by his subordinate

5    staff. The responder at the first level of administrative appeal review was Lieutenant R. Lynch

6    and because this staff member is a subordinate of the Warden who authorized the provisions

7    of OP # 34, this staff member could not appropriately review the Warden's decision or

8    respond in a matter that is the responsibility of the Warden who implemented the OP as the

9    institutional head. At no administrative level have the respondents ever sought to address this

10    violation of Departmental policy despite it being raised in the claims presented for review.

11        Petitioners contend that respondents have violated Departmental policy by the above

12    actions.

13    //

14                          **CONCLUSION**

15        For the reasons stated above, petitioners are entitled to a declaration of their rights and

16    are entitled to **"ALL"** program assignments and activities designated by the provisions

17    outlined in **CCR, Title 15 § 3377.1 (a)(4)(B).**

18    //

19

20

21

22

23

24

25

26

27

28

1    **VERIFICATION**

2    I do hereby declare by my signature below that I am one of the petitioners in this action.

3    I have read the foregoing Petition For Writ of Habeas Corpus and the facts stated therein are

4    true of my own knowledge, except as to matters that are stated on my own information and

5    belief, and as to those matters I believe them to be true.

6    I declare under the penalty of perjury that the foregoing is true and correct and that this

7    verification was executed on the indicated date at the Correctional Training Facility, Soledad,

8    California.

9

10   Date:    4-5-07

11                                        Andre' Boston, Petitioner, Pro-Se

12   Date:    4-5-07

13                                        David Rucker, Petitioner, Pro-Se

14   Date:    4-5-07

15                                        Robert Nydegger, Petitioner, Pro-Se

16   Date:    4.5.07

17                                        Adam Vasquez, Petitioner, Pro-Se

18   Date:    4-5-07

19                                        Michael Comeaux, Petitioner, Pro-Se

20   Date:    4/5/07

21                                        David Moreno, Petitioner, Pro-Se

22   Date:    4-5-07

23                                        Craig Gerstner, Petitioner, Pro-Se

24   //

25

26

27

28

22

# Men's Advisory Council Memorandum
## Executive Body
## CTF-Central Facility

Date:        June 18, 2007

To:          **MEMBERS OF THE GENERAL POPULATION**
             **Correctional Training Facility**

Subject:     **ADVANCEMENT OF POPULATION ISSUES TO THE SUPERIOR COURT**

This is to advise members of the general population that the Men's Advisory Council has successfully advanced a number of issues affecting the program environment at the Correctional Training Facility to the Monterey County Superior Court.

Within the past two weeks, the Honorable Jonathan R. Price, Monterey County Superior Court Judge, has issued orders in three writs of habeas corpus affecting the program environment. The most comprehensive court response thus far has been an order for the Attorney General to respond to the issue of Close B Custody inmates' lack of access to program assignments and activities at CTF. A copy of his order is being provided for the population's review.

Warden Curry has continued to engage the MAC in an ongoing dialogue about issues of concern to the population. The MAC welcomes input through the General Council and Executive Body members about matters of ongoing concern to the entire population.

**A. BOSTON**
**MAC Chairman**
**CTF-Central Facility**

Attachment

cc:      J. Soares, Associate Warden (A)
         Council Membership
         General Population Housing Units